No. 2022-1719

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee,

v.

UNITED STATES,
Defendant-Appellant.

Appeal from the United States Court of Federal Claims,
Case No. 14-166C, Hon. Edward J. Damich, Senior Judge

## BRIEF OF DEFENDANT-APPELLANT UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

STEVEN J. GILLINGHAM
Assistant Director

VINCENT D. PHILLIPS, JR.
OF COUNSEL:                  Senior Trial Counsel
EVAN WISSER                  Commercial Litigation Branch
DANIEL A. HOFFMAN            Civil Division, Department of Justice
Trial Attorneys              P.O. Box 480
Commercial Litigation Branch Ben Franklin Station
                             Washington, D.C. 20044
                             Telephone: (202) 305-4591
                             E-mail: Vincent.Phillips2@usdoj.gov
                             *Attorneys for Defendant-Appellee*
Dated: December 22, 2022     *United States*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INDEX TO THE ADDENDUM .......................................................... viii

STATEMENT OF COUNSEL ................................................................ ix

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUES ............................................................3

STATEMENT OF THE CASE ................................................................3

I.    Nature Of The Case ....................................................................3

II.   Statutory Background ................................................................5

III.  Relevant Factual Background ...................................................6

    A.   2003 Project Contracts And Agreements ...................................6

    B.   Course of the Project ...................................................................11

    C.   Prior Litigation ...........................................................................16

IV.  Trial Court Proceedings ...........................................................17

SUMMARY OF THE ARGUMENT ...................................................20

ARGUMENT .........................................................................................21

I.    Standard Of Review ...................................................................21

II.   The 2003 MOU Contained No Duty For MARAD To Deliver A
      Defect-Free Port Structure To Anchorage, Which Was The Only Basis
      For The Trial Court's Award Of Contract Damages To Anchorage ..............22

A.  The Plain Language of the 2003 MOU Contained None Of The Terms That Binding Precedent Requires To Establish A Duty For MARAD To Deliver Any Structure To Anchorage ................................23

B.  The Trial Court's Interpretation Of The 2003 MOU Conflicts With Other Express Language In The Agreement ...........................................33

C.  This Court Should Reverse The Trial Court's Decision Rather Than Remanding Because There Are No Other Viable Grounds For The Damages Claimed By Anchorage ..........................................................35

    1.  Anchorage Did Not Assert Any Damages Beyond Its Expectation Interest In Receiving A Defect-Free Port Structure ....36

    2.  The 2003 MOU Does Not Impose Any Other Duties On MARAD That Could Support Other Breach Holdings ...................40

III.  The 2011 MOA Contained No Duty For MARAD To Pursue Legal Claims On Anchorage's Behalf .......................................................49

IV.  The Trial Court Erred As A Matter Of Law By Awarding Anchorage Both Expectation And Reliance Damages .......................................................52

CONCLUSION .................................................................57

# TABLE OF AUTHORITIES

## Cases

*Amber Res. Co. v. United States,*
 73 Fed. Cl. 738 (2006), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008)............................56

*Anchorage v. Integrated Concepts and Rsch. Corp.,*
 1 F. Supp. 3d 1001 (D. Alaska 2014) ......................................... 17, 50

*Anchorage v. United States,*
 119 Fed. Cl. 709 (2015).................................................................18

*Anchorage v. United States,*
 148 Fed. Cl. 338 (2020).................................................................18

*Anchorage v. United States,*
 No. 14-166C, 2021 WL 5859022 (Fed. Cl. Dec. 9, 2021) ....................3

*Anchorage v. United States,*
 No. 14-166C, 2022 WL 577669 (Fed. Cl. Feb. 24, 2022) ....................3

*Astoria Fed. Sav. & Loan Ass'n v. United States,*
 72 Fed. Cl. 712 (2006)..................................................................56

*Bell/Heery v. United States,*
 739 F.3d 1324 (Fed. Cir. 2014) ......................................................24

*Blackstone Consulting Inc. v. United States,*
 65 Fed. Cl. 463 (2005), *aff'd*, 170 F. App'x 128 (Fed. Cir. 2006)......................31

*Boyle v. United Technologies Corp.,*
 487 U.S. 500 (1988) .....................................................................35

*Chattler v. United States,*
 632 F.3d 1324 (Fed. Cir. 2011) ............................................. 25, 32, 47

*Clark v. United States,*
 461 F.2d 781 (Ct. Cl. 1972)...........................................................49

*Coast Fed. Bank FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) (en banc) ..................................................... 24, 43

*Cutler-Hammer, Inc. v. United States*,
441 F.2d 1179 (Ct. Cl. 1971) ........................................................................ 25, 32

*CVI/Beta Ventures, Inc. v. Tura LP*,
112 F.3d 1146 (Fed. Cir. 1997) ...........................................................................36

*Dolmatch Grp., Ltd. v. United States*,
40 Fed. Cl. 431 (1998).........................................................................................55

*Estate of Bogley v. United States*,
514 F.2d 1027 (Ct. Cl. 1975)...............................................................................48

*Fifth Third Bank v. United States*,
518 F.3d 1368 (Fed. Cir. 2008) ...........................................................................53

*First Hartford Corp. Pension Plan & Tr. v. United States*,
194 F.3d 1279 (Fed. Cir. 1999) ...........................................................................23

*Floyd v. United States*,
26 Cl. Ct. 889 (1992), *aff'd*, 996 F.2d 1237 (Fed. Cir. 1993) ............................48

*Forshey v. Principi*,
284 F.3d 1335 (Fed. Cir. 2002) (en banc) ...........................................................22

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) ...........................................................................38

*Google LLC v. Ji-Soo Lee*,
759 F. App'x 992 (Fed. Cir. 2019).......................................................................36

*Grumman Data Sys. Corp. v. United States*,
28 Fed. Cl. 803 (1993).........................................................................................56

*Grynberg v. FERC*,
71 F.3d 413 (D.C. Cir. 1995)...............................................................................31

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003) ..................................................................... 35, 36

*Hi-Shear Tech. Corp. v. United States*,
  356 F.3d 1372 (Fed. Cir. 2004) .......................................................53

*Hoffman v. United States*,
  894 F.2d 380 (Fed. Cir. 1990) .........................................................46

*Home Sav. of Am., FSB v. United States*,
  399 F.3d 1341 (Fed. Cir. 2005) .......................................................52

*KMS Fusion, Inc. v. United States*,
  36 Fed. Cl. 68 (1996), *aff'd*, 108 F.3d 1393 (Fed. Cir. 1997) .............31

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991) .................................................. 35, 36

*Litton Fin. Printing Div. v. NLRB*,
  501 U.S. 190 (1991) ........................................................................49

*Nat'l By-Prods., Inc. v. United States*,
  405 F.2d 1256 (Ct. Cl. 1969) ...................................................... 23, 25

*Nat'l Control Corp. v. Nat'l Semiconductor Corp.*,
  833 F.2d 491 (3d Cir. 1987) ............................................................56

*Pac. Gas & Elec. Co. v. United States*,
  536 F.3d 1282 (Fed. Cir. 2008) .................................................. 21, 44

*Pacificorp Cap., Inc. v. United States*,
  25 Cl. Ct. 707 (1992) .................................................................. 25, 43

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987) .......................................................35

*Pete Vicari Gen. Contractor, Inc. v. United States*,
  51 Fed. Cl. 161 (2001) ................................................................ 24, 26

*Petrofsky v. United States*,
  488 F.2d 1394 (Ct. Cl. 1973) ...........................................................57

*Pine Hill Coal Co. v. United States*,
  259 U.S. 191 (1922) ........................................................................32

*Rd. & Highway Builders, LLC v. United States*,
  702 F.3d 1365 (Fed. Cir. 2012) ..........................................................46

*S. Corp. v. United States*,
  690 F.2d 1368 (Fed. Cir. 1982) (en banc) .........................................23

*Seven Resorts, Inc. v. United States*,
  112 Fed. Cl. 745 (2013)......................................................................49

*Shell Oil Co. v. United States*,
  896 F.3d 1299 (Fed. Cir. 2018) .............................................. 21, 52, 53

*Stovall v. United States*,
  94 Fed. Cl. 336 (2010)........................................................................55

*TEG-Paradigm*,
  465 F.3d 1329 (Fed. Cir. 2006) .............................................. 22, 24, 43

*United States v. Johnson Controls, Inc.*,
  713 F.2d 1541 (Fed. Cir. 1983) .............................................. 24, 33, 34

*Westfed Holdings, Inc. v. United States*,
  407 F.3d 1352 (Fed. Cir. 2005) ................................................. passim

*Westlands Water Dist. v. United States*,
  109 Fed. Cl. 177 (2013)................................................. 25, 26, 27, 48

*Winstar Corp. v. United States*,
  64 F.3d 1531 (Fed. Cir. 1995) (en banc), *aff'd*, 518 U.S. 839 (1996) ................21

## Statutes

28 U.S.C. § 1295(a)(3)............................................................................3

28 U.S.C. § 1491(a)(1)............................................................................3

41 U.S.C. § 7103(a) ..............................................................................51

Consolidated Appropriations Resolution, 2003,
  Pub. L. No. 108-7, § 626, 117 Stat. 11, 106................................. 5, 7, 47

National Defense Authorization Act for Fiscal Year 2014,
  Pub. L. No. 113-66, § 3504, 127 Stat. 672, 1086 (2013) .......................................6

Safe, Accountable, Flexible, Efficient, Transportation Equity Act:
  A Legacy for Users,
  Pub. L. No. 109-59, § 10205, 119 Stat. 1144, 1934 (2005) ..................................6

## Other Authorities

Anchorage Municipal Code, § 7.15.040(A) ............................................................24

Black's Law Dictionary 879, 1101 (West abridged 6th ed.1991) ...........................31

Dan B. Dobbs, *Law of Remedies*, § 12.3(1) at 51-52 (2d ed. 1993)......................39

L. L. Fuller & William R. Perdue, Jr., *The Reliance Interest in Contract
  Damages: pt. 1*, 46 Yale L.J. 52 (1936) ...............................................................56

Restatement (Second) Contracts § 344(b) .............................................................38

Restatement (Second) Contracts, § 344....................................................................57

Restatement (Second) Contracts, § 347....................................................................56

Restatement (Second) Contracts, § 349....................................................................56

Restatement (Second) Contracts, § 378....................................................................57

# INDEX TO THE ADDENDUM

<u>Document</u><u>Page</u>

Judgment, dated February 24, 2022.................................................................Appx1

Opinion and order granting-in-part and denying-in-part United States'
Motion to Dismiss, dated January 22, 2015......................................................Appx2

Opinion and order denying United States' Motion for Summary Judgment,
dated May 21, 2020...........................................................................................Appx12

Order regarding scope of trial, dated July 1, 2020 ..........................................Appx28

Opinion and Order regarding liability, dated December 9, 2021 ....................Appx35

Opinion and Order regarding damages, dated February 24, 2022...................Appx63

## STATEMENT OF COUNSEL

Pursuant to Rule 47.5, defendant-appellant United States' counsel states that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Defendant-appellant's counsel is unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

No. 2022-1719

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee,

v.

UNITED STATES,
Defendant-Appellant.

Appeal from the United States Court of Federal Claims,
Case No. 14-166C, Hon. Edward J. Damich, Senior Judge

## BRIEF OF DEFENDANT-APPELLANT UNITED STATES

## INTRODUCTION

This case concerns a Federal infrastructure project in Anchorage, Alaska,
and whether the United States not only provided to Anchorage a contractual
guarantee of the project's success but also accepted an open-ended financial
obligation to Anchorage (later quantified at $367 million) if the project were
unsuccessful.  Beginning in 2002, Congress appropriated Federal funds to be used,
together with matching local funds contributed by the Municipality of Anchorage,
to improve and expand the Port of Anchorage (Port).[1]  Then in 2003, Congress
authorized the Maritime Administration (MARAD), an agency within the United

---

[1]  The port was later renamed the Port of Alaska.  We use the Port of
Anchorage, which was its name during the relevant time period.

States Department of Transportation, to receive and administer all of the funds appropriated for the project, including the local matching funds. Using this statutory authority, MARAD executed a procurement contract with a subsidiary of an Alaska Native Corporation to serve as the prime contractor for the project. MARAD then executed a 2003 Memorandum of Understanding that divided responsibilities between MARAD and Anchorage in funding and administering the project.

The trial court, purportedly relying on the 2003 MOU's plain text, held that MARAD had contractually promised to deliver the project as a whole to Anchorage, with no further specifics. But the 2003 MOU itself plainly contains no such promise, and in holding otherwise, the trial court contravened binding precedent requiring that any contractual promise for the United States to deliver an item of construction be stated with clear, express terms. Relying on its legally erroneous contract interpretation, the court then awarded Anchorage $367 million in damages as compensation for a supposed breach of a promise that never existed, *i.e.*, MARAD's alleged promise to successfully deliver the project. This Court, of course, interprets the 2003 MOU *de novo* and should hold that it contained no duty for MARAD to deliver anything to Anchorage. We respectfully request that the Court reverse the trial court's judgment without remand because nothing else in the trial record could support any of the damages claimed by Anchorage.

## JURISDICTIONAL STATEMENT

The United States Court of Federal Claims possessed jurisdiction under 28 U.S.C. § 1491(a)(1).  This Court possesses jurisdiction under 28 U.S.C. § 1295(a)(3) to review the final decision and judgment.

## STATEMENT OF THE ISSUES

1.    Whether the trial court erred by holding that MARAD had breached a contractual duty to deliver a defect-free port structure to Anchorage, when the 2003 MOU contained no such duty;

2.    Whether the trial court erred by holding that MARAD had breached a contractual duty to pursue legal claims on Anchorage's behalf when a later 2011 Memorandum of Agreement executed by the parties contained no such duty; and

3.    Whether the trial court erred by awarding Anchorage both expectation and reliance damages.

## STATEMENT OF THE CASE

I.    Nature Of The Case

At issue is a Court of Federal Claims judgment awarding $367,446,809 in contract damages to plaintiff-appellee, Anchorage.  *Anchorage v. United States*, No. 14-166C, 2022 WL 577669 (Fed. Cl. Feb. 24, 2022), Appx63-81; *Anchorage v. United States*, No. 14-166C, 2021 WL 5859022 (Fed. Cl. Dec. 9, 2021),

3

Appx35-62.[2]  The trial court held that the 2003 MOU executed between the parties contained an express duty in its plain text requiring MARAD to deliver a defect-free port structure to Anchorage.  The court also held that the 2011 MOA executed between the parties contained an express duty requiring MARAD to defend and pursue litigation on Anchorage's behalf.

The trial court held that MARAD had breached these duties and awarded Anchorage its claimed expectation damages, which included three parts: (1) the value of the port structure Anchorage supposedly anticipated but did not receive, (2) the value to remediate the defects in the structure that was built during the project, and (3) the amount that MARAD paid to the project contractor to settle claims under the project's prime contract.  The first two sets of damages, totaling $356,167,750, were awarded for MARAD's supposed breach of its purported duty under the 2003 MOU to deliver a defect-free port structure to Anchorage.  The third set of damages, totaling $11,279,059, was awarded for MARAD's supposed breach of its purported duty 2011 MOA to pursue litigation on Anchorage's behalf.

---

[2] "Appx__" refers to pages in the Joint Appendix.  The trial court's liability and damages opinions are unpublished, so when citing those opinions in this brief we cite to the version in the Joint Appendix.

II.    <u>Statutory Background</u>

Beginning in 2002, Congress appropriated Federal funds to be used, together with matching local funds contributed by Anchorage, for construction of an intermodal marine facility at the Port.  In February 2003, Congress authorized MARAD to receive and administer all of the funds previously appropriated for the project, including the local matching funds.  Congress granted MARAD the following authority:

> Any amounts previously appropriated for the Port of Anchorage for an intermodal marine facility and access thereto shall be transferred to and administered by the Administrator for the Maritime Administration including non-Federal contributions.  Such amounts shall be subject only to conditions and requirements required by the Maritime Administration.

Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 626, 117 Stat. 11, 106.

In 2005, Congress extended MARAD's authority to "any funds" appropriated for the project (again including the local matching funds contributed by Anchorage), rather than only the "previously appropriated" funds:

> Any funds provided for the Federal share, and any funds provided for the non-Federal share, for an intermodal transportation maritime facility at the Port of Anchorage, Alaska, or for access to that facility shall be transferred to and administered by the Administrator of the Maritime Administration.

Safe, Accountable, Flexible, Efficient, Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No. 109-59, § 10205, 119 Stat. 1144, 1934 (2005).

In 2013, Congress amended MARAD's authority by providing that the referenced funds "may" be transferred to and administered by MARAD, instead of "shall" be transferred. National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, § 3504, 127 Stat. 672, 1086 (2013). This amendment made MARAD's role in administering the project permissive rather than mandatory after 2013, allowing Anchorage to advance the project on its own without MARAD's further involvement.

III.   Relevant Factual Background

A.   2003 Project Contracts And Agreements

Using its statutory authority, MARAD executed a procurement contract on May 30, 2003, with Koniag Services, Inc., a subsidiary of Koniag, Inc., an Alaska Native Corporation. Appx40; Appx16972-17023. Less than a year later, MARAD novated the contract to another Koniag subsidiary, Integrated Concepts and Research Corporation (ICRC).[3] Appx40-41. This was an indefinite delivery/indefinite quantity (ID/IQ) contract, with task orders to be issued as needed. Appx17016.

---

[3] For simplicity, we refer to ICRC as the relevant contractor.

6

The purpose of the contract, as described in the statement of work, was for ICRC to provide program management and technical assistance directly to the Port for the duration of the project. Appx17016-17023. Similarly, ICRC's statement of qualifications stated that ICRC would "serv[e] as the Port's program management support and technical support staff during the duration of the [project]." Appx15787-15789. In the statement of work, MARAD directed ICRC to establish a program management office that would interface directly with the Port on technical and program management issues related to the project, among other areas. Appx17016-17017. MARAD directed ICRC to provide seamless communication and direct integration with the Port staff, and the Port would determine what personnel would be necessary for ICRC's program management office. Appx17017. MARAD's procuring contracting officer, Ms. Iris Cooper, explained at trial that this was an unusual contract structure, with MARAD acquiring services to be provided to a third-party, rather than to the Government directly. Appx14774 (Trial Tr. 109:1-15 (Cooper)).

Also using its statutory authority, MARAD negotiated the 2003 MOU with Anchorage. Appx21676-21681 (citing Consolidated Appropriations Resolution, 2003, § 626, 117 Stat. 106 as part of the relevant authority for the 2003 MOU). MARAD's representatives, Ms. Cooper and Ms. Margaret Blum, worked with Ms. Cheryl Coppe, the Port's Executive Administrator, to draft the 2003 MOU.

Appx37; Appx39; Appx48.  The stated "purpose" of the 2003 MOU was to

describe "the responsibilities of [Anchorage], Port of Anchorage, and MARAD in

funding and administering [the project]."  Appx21676.  The stated "objective" of

the 2003 MOU was similar—to "establish working relations and assign

responsibilities" for "successful administration of federal and non-federal amounts

made available for [the project] to MARAD."  *Id.*  The 2003 MOU did not

"obligate either party to spend funds not specifically appropriated or allocated for"

the project, Appx21678, and either party could terminate the 2003 MOU upon 90

days' written notice.  Appx21678-21679.

    Anchorage and MARAD both had seven listed responsibilities under the

2003 MOU, most of which established procedures to transfer Federal and non-

Federal funds to MARAD for administration on the project.  Appx21676-21678.

Consistent with the scope of work in the ICRC contract, which stated that ICRC's

program management office would work directly with the Port to manage the

project, Anchorage's second enumerated responsibility was to "[r]eview all plans,

specifications, and status reports submitted by the primary contractor and its

subcontractors before submission to MARAD . . . ."  Appx21677.  The seventh

enumerated responsibility for each party established reciprocal responsibilities for

expending funds on the project—Anchorage was required to authorize all

expenditures for substantive project activities, after which MARAD would obligate

and disburse funding for those activities through the ICRC contract.  Appx21677-21678.

The 2003 MOU stated that it did not go into effect until it was ratified by the Anchorage Municipal Assembly, Appx21679, which occurred on June 24, 2003, Appx17107, a month after MARAD executed the ICRC contract.  Appx16972. Prior to ratification, the Assembly held a series of public work sessions to discuss the project and MARAD's roles, and to allow for public input.  These work sessions were recorded, and transcriptions of the meetings were accepted into evidence at trial.  Appx15844-15863; Appx16946-16961; Appx17034-17050; Appx17062-17075.

During the Assembly work sessions, Anchorage Port officials described MARAD's roles on the project as follows: "[T]hey act as the funding agency, they act as the project oversight agency, and they act as a contract administration agency." Appx16958 (Assembly Tr. 46:16-20); Appx15065 (Trial Tr. 794:14-795:25 (Coppe)).  As the funding agency, MARAD served as a "conduit for the funds," consolidating the Federal and local funding.  Appx16958-16959 (Assembly Tr. 46:21-47:7, 49:10-11).  As the project oversight agency, MARAD did not provide general management of the project, but only provided specialized technical expertise as appropriate in a consulting capacity.  *Id.* (Assembly Tr. 47:8-48:6, 49:11-13) ("MARAD is acting as the . . . federal project oversight.  That's . . . in a

9

consulting vein but in a very positive one."); Appx15065 (Trial Tr. 796:4-24, 797:12-24 (Coppe)).  And as the contract administration agency, MARAD developed, negotiated, and executed the necessary contractual documents. Appx16958 (Assembly Tr. 48:11-16).

In these meetings, Port officials directly rejected concerns that Anchorage was turning the project over to MARAD to execute.  When an Assembly member asked if the Port was "going to turn it over to MARAD [to] build it for us" the Port Director answered, "No, the MARAD will be the . . . administrator of the funds and the administrator of the program . . . ."  Appx16957-16958 (Assembly Tr. 44:23-45:3).  Ms. Coppe explained that "[t]he Port of Anchorage is responsible for project execution, strategic planning, establishment of project requirement, and day-to-day direction of all Port expansion activities."  Appx16958 (Assembly Tr. 46:7-11).  At the Port's request, MARAD provided a confirmation letter from its Administrator stating that "the programmatic and technical controls [for the project] reside with the Port."  Appx17089.  This letter was included in the ratification package presented to the Assembly and specifically referenced during the ratification discussion.  Appx17086-17089; Appx17104 (lines 69-70) ("A letter from William Shubert (ph) to Governor Sheffield explained that the Port of Anchorage would be in charge of the project.").

B.    Course of the Project

From 2003 through 2010, the project proceeded in accordance with the division of responsibilities under the 2003 MOU.  The Port made all substantive decisions on the project and oversaw and managed ICRC's work on the ground, while MARAD executed the contract actions necessary to implement the Port's management decisions.  At the time, the parties referred to this three-sided project management structure as an "innovative partnership."  Appx16289.  *See also* Appx15835 (early project organization chart showing three-sided relationship); Appx15425 (Trial Tr. 1674:1-1676:9 (Black)).

As noted above, the 2003 MOU required the Port to authorize all project funding for substantive project tasks.  Appx21677.  Whenever ICRC determined the need for a specific contract action, ICRC would present its proposal directly to the Port Director, whose written approval was required before the request could be submitted to MARAD for execution.  Appx14806-14807 (Trial Tr. 240:5-19, 242:8-14 (Leong)); Appx15331 (Trial Tr. 1494:6-14 (Davies)); Appx15429-15430 (Trial Tr. 1691:24-1697:2 (Black)); Appx15472 (Trial Tr. 1863:6-1864:7 (Carlson)).

Port staff provided direct, on-the-ground management and oversight of ICRC's work.  Appx14883 (Trial Tr. 392:5-24 (Carlson)).  MARAD relied on the Port to review and accept ICRC's work and "to ensure that the project was

11

completed to its satisfaction." Appx14783 (Trial Tr. 145:23-148:19 (Leong)).

Indeed, in the 2003 ICRC Contract MARAD modified the standard clause in FAR

52.246-12(i), which states that the Government will inspect and accept completed

work, by inserting language mirroring addendum 2 to the 2003 MOU, which states

that MARAD was relying on the inspection and acceptance of ICRC and the Port.

Appx14809-14810 (Trial Tr. 249:21-253:1 (Leong)); Appx16154-16158.

The Port's project management centered on standing weekly meetings with

ICRC. Appx16234-16235. The primary project management meeting occurred on

Tuesday mornings, in which the Port and ICRC discussed all aspects of the project,

including the status of construction in the field and any problems that were

occurring. Appx15437-15438 (Trial Tr. 1724:7-1727:11 (Black)). Beyond these

standing meetings, the Port and ICRC interacted on a daily basis regarding the day-

to-day work on the ground. Appx14773 (Trial Tr. 106:21-25 (Cooper));

Appx15334 (Trial Tr. 1504:21-1505:6 (Davies)); Appx15465 (Trial Tr. 1836:15-

1837:5 (Carlson)).

As envisioned by the 2003 MOU, MARAD's roles on the project were

entirely administrative, to implement the Port's decisions through the ICRC

contract, "serving as essentially the administrative arm of the Port for the contract

purposes." Appx15329 (Trial Tr. 1484:19-24 (Davies)). After the Port reviewed a

proposed project action for "applicability, soundness, and cost," MARAD would

review to ensure "compliance with the applicable grant requirements or laws and regulations." Appx15435-15436 (Trial Tr. 1717:17-1718:8 (Black)). In light of these procedures, ICRC's program manager, Ms. Carlson, understood, unsurprisingly, that MARAD was simply taking the Port's decisions on the project and passing them through as contractual directions to ICRC. Appx15576 (Trial Tr. 2097:21-2098:5 (Carlson)).

The overall project proceeded in phases. Between 2003 and 2008, ICRC successfully delivered a series of construction projects, including a new floating dock, additional rail lines, additional backlands at the north and south of the port, drainage improvements, road improvements, pipeline improvements, and a dry barge berth. Appx14512 (stipulation ¶ 42); Appx14514 (stipulation ¶ 57). All of these items were accepted and capitalized by the Port, delivering a total value of $117,780,814 in new assets to Anchorage. *Id.*; Appx15238 (Trial Tr. 1304:19-1305:14 (Mahoney)) (Anchorage's CFO agreed that Anchorage recorded first $16 million and later $101 million in assets as a result of the project); Appx21010-21011.

While this construction work was ongoing, ICRC and its subcontractors performed design work for the next phase of the project, construction of a large retaining wall 400 feet into the water, up to 90 feet tall, and nearly two miles long, which would be backfilled with dirt to create new land for the Port. The wall face

13

would also support new docking facilities. *See generally* Appx43; Appx14513

(stipulation ¶¶ 46-56); Appx15467 (Trial Tr. 1842:4-14 (Carlson)).  Although

multiple design options were available for this kind of structure, the Port mandated

a specific type of patented design, referred to as an open-cell sheet pile structure.

Appx14886 (Trial Tr. 404:24-405:14 (Carlson)).  Exercising its programmatic and

technical control over the project, the Port rejected ICRC's recommendation to

allow bidders to propose alternative designs that would meet the design

requirements.  Appx15468 (Trial Tr. 1847:8-1848:8 (Carlson)); Appx15470 (Trial

Tr. 1855:23-1856:21 (Carlson)).  The Port also refused to fund additional design

reviews recommended by MARAD and ICRC.  Appx15524 (Trial Tr. 1887:5-

1189:6 (Carlson)); Appx15525 (Trial Tr. 1892:11-1894:18 (Carlson)).

Construction of the open-cell sheet pile wall began in 2008 and almost

immediately ran into difficulties.  Appx15536 (Trial Tr. 1936:1-13 (Carlson)).  The

Port repeatedly refused ICRC's request to pause and inspect the work to determine

what was going wrong.  Appx15440-15441 (Trial Tr.1737:18-1741:10 (Black));

Appx15536 (Trial Tr. 1936:15-1937:7 (Carlson)); Appx15538-15539 (Trial Tr.

1944:16-1949:1(Carlson)) ("[The Port] would not allow construction to cease in

2009. . . .  [The Port's] position remained . . . that construction must continue

throughout the 2009 season.").  The Port's direction not to suspend construction

resulted from two overriding concerns:  (1) the Port needed to provide a completed

structure to receive new container cranes by 2010, Appx15534-15535 (Trial Tr. 1930:11-1933:12 (Carlson)), and (2) the Port wanted to show that its project was "shovel-ready" to obtain Federal stimulus funds enacted in early 2009. Appx15446 (Trial Tr. 1759:8-1760:16 (Black)); Appx15536 (Trial Tr. 1936:14-1937:7 (Carlson)). The Port Director's view was that if they "g[o]t the project pregnant, they'll have to deliver the baby," meaning that if the project went far enough along, the Federal government would feel compelled to provide the additional funding needed to finish the job. Appx15535 (Trial Tr. 1933:24-1934:22 (Carlson)); Appx15542-15543 (Trial Tr. 1962:2-25, 1963:24-1964:6 (Carlson)).

The Port finally authorized funding for inspections to investigate the cause of the construction difficulties in fall 2009, which revealed widespread damage in the partially-built open-cell sheet pile structure. Appx43; Appx14515-14516 (stipulation ¶¶ 77-81); Appx15537-15538 (Trial Tr. 1941:23-1943:11 (Carlson)). MARAD then engaged the U.S. Army Corps of Engineers to evaluate the design and construction work on the project. Appx44. The Corps' Suitability Study concluded that the design was inadequate and most of the work installed in 2008 and 2009 needed to be removed and rebuilt. Appx46; Appx14516-14517 (stipulation ¶ 91).

In light of project's challenges, the parties agreed to revise the management structure, removing the Port Director's authority and replacing him with a joint body representing both Anchorage and MARAD, called the Project Oversight Management Organization (POMO).  Appx14905 (Trial Tr. 480:19-481:13 (Vakalis)); Appx15653-15654 (Trial Tr. 2221:7-24, 2222:16-2223:16 (Bohnert)).  The parties ratified this new management structure in a new Memorandum of Agreement, executed in November 2011 to replace the 2003 MOU.  Appx15659 (Trial Tr. 2242:4-2243:23 (Bohnert)); Appx18329-18337.  The 2011 MOA was in effect for only six months before it expired by its terms on May 31, 2012.  Appx18335.  By that point the project funds were nearly exhausted, and no substantial work could continue.  Appx15542 (Trial Tr. 1960:4-1961:2 (Carlson)).

C.     Prior Litigation

In 2011, ICRC submitted two claims to MARAD's contracting officer, a pass-through equitable adjustment claim from the construction subcontractors and a direct claim from ICRC for unpaid fees.  Appx14517 (stipulation ¶¶ 92-95).  Neither claim was expressly acted upon, meaning they were "deemed denied," and ICRC filed a complaint before the Civilian Board of Contract Appeals.  *Id.* (stipulation ¶¶ 96-97).  On September 28, 2012, more than three months after the 2011 MOA expired, MARAD executed a settlement with ICRC, which included an immediate payment of approximately $11.3 million in additional direct costs.  *Id.*

(stipulation ¶ 99).  MARAD did not consult with or request consent from

Anchorage before executing the settlement.  *Id*.

In 2013, Anchorage filed suit against ICRC and the design subcontractors,

alleging breach of contract and professional negligence, and seeking the same

damages that Anchorage sought in this case against the United States.  *Anchorage*

*v. Integrated Concepts and Rsch. Corp.*, 1 F. Supp. 3d 1001, 1004-05 (D. Alaska

2014).  Anchorage was able to sue ICRC directly because Anchorage was a named

third-party beneficiary in the MARAD-ICRC procurement contract.  *Id.* at 1017-

20.  Before the district court, Anchorage took the position that "[n]one of [the

defective construction and design] issues relate to decisions made by [MARAD],"

the opposite of the position Anchorage has taken in this case.  Plaintiff's

Opposition to Defendant ICRC's Motion to Dismiss, *Anchorage v. ICRC*, No. 13-

cv-63 (D. Alaska July 1, 2013), ECF No. 37, at 33.  The district court litigation

was resolved through settlements, with a total payment of $19.35 million to

Anchorage from all defendants.  Appx14518 (stipulation ¶ 108).

IV.    Trial Court Proceedings

In 2014, Anchorage filed suit against the United States in the Court of

Federal Claims, alleging that MARAD had breached duties contained in the 2003

MOU and the 2011 MOA.  Appx35.  On December 9, 2021, after trial, the court

17

issued an unpublished decision,[4] holding that MARAD had breached express duties under the plain text of the 2003 MOU and the 2011 MOA, stating that it would issue a separate damages opinion. Appx35-62.

The trial court held that the 2003 MOU contained an unambiguous duty for MARAD to deliver a defect-free port structure to Anchorage. Appx47-53. It further held that MARAD had breached this duty by failing to deliver to Anchorage a completed, defect-free project. Appx54-58. The trial court also held that MARAD had breached unspecified duties under the 2003 MOU by failing to exercise its contractual rights and remedies against ICRC under the MARAD-ICRC contract. Appx58-60. Finally, the trial court held that, in the 2011 MOA, MARAD had contractually promised to pursue and defend claims on Anchorage's behalf, which MARAD supposedly breached by settling ICRC's claims without Anchorage's consent. Appx61.

The trial court largely accepted the evidence offered by the United States showing that the Port made all of the decisions that resulted in the design and construction failures of which Anchorage had complained. *See* Appx51-52. In particular, the trial court expressly found that the testimony provided by ICRC's

---

[4] The trial court's prior merits decisions, granting-in-part and denying-in-part the Government's motion to dismiss and denying the Government's motion for summary judgment, were both published. *Anchorage v. United States*, 119 Fed. Cl. 709 (2015); *Anchorage v. United States*, 148 Fed. Cl. 338 (2020).

personnel was credible.  Appx52 n.15.  But the court deemed the Port's decision-making on the project irrelevant because, in its view, "MARAD held the legal right [under the 2003 MOU] to refuse" the Port's directions, and MARAD's choice to accommodate the Port's instructions was "not the requirement under the 2003 MOU."  Appx52.  The trial court refused to acknowledge the 2003 MOU's express requirement that Anchorage had to authorize the use of funds before MARAD could obligate or disburse those funds for any substantive project task. Appx21676-21678.

The trial court issued its unpublished damages opinion on February 24, 2022.  Appx63-81.  The court found that Anchorage had adequately proven its entitlement to $367,446,809 in expectation damages.  Appx64.  The court's damages calculation contained two parts.  First, the court determined that Anchorage had proven its entitlement to $180,839,809, representing the value of the structure Anchorage supposedly expected but did not receive.  Appx77-79. Included in this amount is $11,279,059, the amount MARAD paid to ICRC as part of the CBCA litigation settlement, though the court did not explain how this sum was related to the value of the port structure Anchorage claimed.  Appx79.  This first set of damages also included a deduction for the $19,350,000 in funds Anchorage recovered through its settlements with ICRC and other contracts.  *Id.* Second, the court determined that Anchorage had proven its entitlement to

$186,607,000 in costs Anchorage anticipates it will have to pay to remediate the defects in the existing open-cell sheet pile structure.  Appx79-80.

The trial court entered judgment on February 24, 2022.  Appx1.  The United States filed a timely notice of appeal on April 22, 2022.   Appx23260-23261.

## SUMMARY OF THE ARGUMENT

Binding precedent from this Court's predecessor, the Court of Claims, establishes that no document can create a contractual promise by the United States to deliver an item of construction without express terms defining that promise. The 2003 MOU contains no such terms, and the trial court erred by ignoring this binding precedent and concluding that MARAD had promised to deliver a defect-free port structure to Anchorage.  The language on which the trial court did rely said nothing about delivering anything to Anchorage.  The trial court also ignored other express language in the 2003 MOU contradicting the idea that MARAD had promised to deliver anything to Anchorage.  The court similarly erred by interpreting the 2011 MOA to contain a promise for MARAD to pursue litigation on Anchorage's behalf, when the relevant language expressly reserved to MARAD the responsibility to manage claims, consistent with the Contract Disputes Act. When reviewed *de novo*, it is plain that the agreements contain none of the duties identified by the trial court.

Further, reversal of the trial court's judgment would require no remand. Anchorage did not present any evidence of damages beyond the value of the port it claimed that it had expected to receive, and Anchorage has no right to a remand to introduce new evidence supporting damages arguments that it chose not to present at trial. Alternatively, the plain text of the 2003 MOU contains no other duties that MARAD could have breached.

Finally, even assuming for argument's sake that the trial court did not err as a matter of law in its misinterpretation of the 2003 MOU and the 2011 MOA, the damages award would still need to be reduced by $11,279,059 because the trial court unlawfully awarded Anchorage reliance damages as part of its expectation damages analysis.

## ARGUMENT

### I.  Standard Of Review

This Court reviews "Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Shell Oil Co. v. United States*, 896 F.3d 1299, 1306 (Fed. Cir. 2018). Contract interpretation is a question of law that this Court reviews *de novo*, without deference. *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1284-85 (Fed. Cir. 2008) (citing *Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), *aff'd*, 518 U.S. 839 (1996)).

II.     The 2003 MOU Contained No Duty For MARAD To Deliver A Defect-Free
Port Structure To Anchorage, Which Was The Only Basis For The Trial
Court's Award Of Contract Damages To Anchorage

The trial court held that the United States owed Anchorage $356,167,750

million in contract damages because the 2003 MOU supposedly included a

contractual promise by MARAD to deliver a completed, defect-free port structure

to Anchorage.[5] Reviewed *de novo,* the 2003 MOU plainly contains no such duty.[6]

The trial court contravened binding precedent that identifies the terms any

---

[5] The trial court acknowledged its requirement to interpret the terms of the
2003 MOU to determine whether MARAD breached any contractual obligations,
Appx37, and addressed the parties' arguments regarding the duties established
under the 2003 MOU, Appx47-53, but the trial court stated that it would not
consider MARAD's specific argument that the 2003 MOU "did not define any
deliverable nor did MARAD agree to deliver any specific item of construction
. . . ." Appx36 (quotation and citation omitted).  Despite this statement, the trial
court's damages opinion, at footnote 8, did address at least a portion of the
Government's arguments on this point.  Appx71.  Regardless, because the trial
court addressed the issue of what duties were created under the 2003 MOU in its
decision, that issue ripe for this Court's review, and this Court should "apply the
correct law even if . . . the court below did not decide it . . . ." *Forshey v. Principi*,
284 F.3d 1335, 1356-57 (Fed. Cir. 2002) (en banc).

[6] Before the trial court, Anchorage contended that the terms of the 2003
MOU were "clear and unambiguous."  Appx22873.  The trial court agreed and did
not consider any arguments related to extrinsic evidence.  Appx47-48.  For this
reason, we focus our arguments on the interpretation of the plain text in light of the
contemporaneous circumstances when the agreement was executed.  *See TEG-
Paradigm*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  If Anchorage reverses its
position in its response brief and contends that the 2003 MOU was ambiguous, we
reserve the right to respond to those arguments in our reply brief and demonstrate
how the relevant extrinsic evidence confirms our interpretation of the 2003 MOU.

document must contain to impose on the United States a contractual duty to complete any specific item of construction.  No such language is present in the 2003 MOU.  Accordingly, because the 2003 MOU contains no duty for MARAD to deliver a completed port structure to Anchorage, full reversal, rather than remand, is appropriate because there are no other viable grounds in the trial record to support the damages claimed by Anchorage.

A.     The Plain Language of the 2003 MOU Contained None Of The Terms That Binding Precedent Requires To Establish A Duty For MARAD To Deliver Any Structure To Anchorage

This Court's predecessor, the Court of Claims, identified some of the essential "terms normally needed for a construction contract— . . . time period, . . . specifications as to form and height, . . . indication of the methods or procedures to be followed." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1266 (Ct. Cl. 1969).  *See also First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999) (citing *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc)) (explaining that the Court of Federal Claims and this Court are both "bound by the decisions of the Court of Claims."). While the absence of some standard terms could be remedied by implying reasonable terms, "the lack of any terms which would ordinarily be present in such a contract is persuasive that this was not a contract to construct a [structure] or to assure that one would be built." *Nat'l By-Prods.*, 405 F.2d at 1266 n.9.  On top of

this binding precedent, Anchorage's own municipal law mandates similar "essential terms" for a construction contract of the type it claims was created through the 2003 MOU, including "[t]he contract price," "[t]he nature and quantity of the performance that [Anchorage] shall receive under the contract," and "[t]he time for performance under the contract." Anchorage Municipal Code, § 7.15.040(A).[7]

When interpreting a contract, the Court "begins with the language of the written agreement." *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quotation omitted). The Court also may look to contemporaneous evidence of the parties' understanding to confirm the plain meaning of the contract. *TEG-Paradigm*, 465 F.3d at 1338 (citing *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). The Court interprets the contract in a way that gives a reasonable meaning to all parts of the contract and avoids a conflict among the provisions, if at all possible. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1359 (Fed. Cir. 2005) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)). Equally important, the Court "may not insert a term into the contract that simply is not there." *Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed. Cl. 161, 169 (2001). *See also*

---

[7] The Anchorage Municipal Code is published online at https://library.municode.com/ak/anchorage/codes/code_of_ordinances.

*Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 n.8, 717 n.9 (1992) (holding there was no duty related to a contract term that was purposefully removed from the contract at issue).

Also, "a [G]overnment representation does not constitute a binding contractual obligation unless it is 'stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention.'" *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 191 (2013) (quoting *Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011)) (other internal quotations and citations omitted). *See also Cutler-Hammer, Inc. v. United States*, 441 F.2d 1179, 1182 (Ct. Cl. 1971); *Nat'l By-Prods.*, 405 F.2d at 1264.

The 2003 MOU contains no language that could be read to create duty for MARAD to deliver any completed item of construction.[8] Nothing states what specifically is to be built, where, or with what dimensions. Nothing identifies a deadline for delivery, or any binding timeline for any part of the project. Nothing identifies the cost for what MARAD is ostensibly delivering to Anchorage. Consistent with the 2003 MOU's plain language, Ms. Coppe, a former Anchorage official and one of the primary creators of the 2003 MOU, Appx39, agreed at trial

---

[8] The trial court's decision was based solely on the language of the 2003 MOU, and Anchorage never contended that any statute created an obligation for MARAD to deliver a completed project.

that the 2003 MOU did not define any particular project structure to be built or any

price, and that the decision of what was going to be built had not yet been made

when the 2003 MOU was executed.  Appx15063 (Trial Tr. 788:2-19 (Coppe)).

The total absence of any of these terms demonstrates that MARAD did not

contractually promise to construct a port structure or to assure that one would be

built through the 2003 MOU.  The trial court read a term into the agreement that

was not there, which the court had previously acknowledged it could not do.

Appx48 (citing *Pete Vicari*, 51 Fed. Cl. at 169).

This is not a novel argument or application of this Court's precedent.  In

*Westlands Water District v. United States*, for example, applying this same

principle under similar circumstances, the court correctly concluded that the United

States was not contractually obligated to construct an irrigation drainage system.

109 Fed. Cl. at 195-202.  There, Congress passed legislation directing the United

States Department of the Interior (DOI) to carry out a specific irrigation and

drainage project, the San Luis Unit, as part of the broader California central valley

irrigation project.  *Id.* at 185-86.  Under its statutory authority, DOI executed a

series of contracts with Westlands, the local water district, to provide water service

from the San Luis Unit and to obtain payment from Westlands "for the

construction of a water distribution and drainage collector system . . . ."  *Id.* at 186-

89 (quotation omitted).  When the drainage portion of the project was substantially

26

delayed, Westlands sued in the Court of Federal Claims, asserting that its contracts with DOI contained express promises for DOI to build the drainage system referenced in the contracts. *Id.* at 183-84.

The court disagreed and dismissed the complaint, concluding that while the DOI-Westlands contracts obviously contemplated the construction of a drainage system, the contracts contained no language creating an express obligation to build the drainage system. *Id.* at 195-202. The court's analysis relied in part on the *National By-Products* precedent that we rely on here. The court concluded:

> [T]he [c]ontracts . . . set no definite time for the Government to provide drainage services, to construct a drainage system or even to construct discrete increments of a drainage system. Nor did they even set forth a construction schedule. Accordingly, the court holds that no provision of the [contracts] creates an express contractual obligation of defendant to provide drainage to Westlands.

*Id.* at 202 (internal quotation and citation omitted).

Here, nowhere in the 2003 MOU did MARAD promise to deliver any structure to Anchorage in the clear terms required by the relevant and binding precedent, or indeed in any other terms. Nor did the trial court identify any such language. In saddling MARAD with the duty to deliver a port structure to Anchorage, the trial court made no reference to the express list of MARAD's responsibilities under the 2003 MOU, Appx21677-21678, relying instead on an

addendum that established a procedure for accepting construction work, Appx49,

and the 2003 MOU's objectives clause.  Appx71.

The addendum, Addendum 2 to the 2003 MOU, in its entirety states:

> **ACCEPTANCE OF CONSTRUCTION**
> Acceptance by MARAD of work shall be effective upon execution by a MARAD Contracting Officer's Technical Representative (COTR) of a properly executed Certificate of Completion tendered by MARAD's prime contractor.  Upon acceptance by MARAD of work tendered, all right, title and interest to such work, and all warranties and guarantees applicable thereto, shall be conveyed to the Municipality of Anchorage and its Department, the Port of Anchorage (MOA), unless otherwise provided.  The term "Work" includes, but is not limited to: Materials, workmanship, warranties, guarantees, and manufacture and fabrication of components.
>
> The Certificate of Completion shall be a document executed by MARAD's prime contractor attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements; including but not limited to customary industry standards, and is free from material defects.  Prior to submission to a MARAD COTR, the Certificate of Completion shall also be signed by an authorized representative of the Municipality of Anchorage.  Such signature indicates acceptance by MOA of the work provided by MARAD's prime contractor as specifically described in the Certificate of Completion.

Appx21681.

Nowhere does Addendum 2 state that MARAD will deliver anything to
Anchorage.  All of the same essential terms discussed above (*e.g.*, specifications,
delivery date, price) are missing, and without them Addendum 2 creates no
contractual duty for MARAD to build a specific structure or to assure that one is
built.  Also, Addendum 2 is purely procedural, specifying the sequence of review
and approval for any work that is completed.  Addendum 2 does not specify what
that completed work must be, and neither does any other part of the 2003 MOU.

Even on its own terms, Addendum 2 places the substantive responsibility for
reviewing and accepting work onto parties other than MARAD.  The project
contractor was required to certify that any work was complete and free from
material defects, and then Anchorage was required to review and accept the work
before the contractor submitted the Certificate of Completion to MARAD for
execution.  MARAD inserted a complementary provision in ICRC's contract,
modifying the standard clause in FAR 52.246-12(i), to state that MARAD was
relying on the inspection and acceptance of ICRC and the Port.  Appx14809-14810
(Trial Tr. 249:21-253:1 (Leong)); Appx16154-16158.  ICRC's program manager
testified that the parties followed this process in practice—Anchorage Port officials
would review and inspect all completed work and sign the certificate of
completion, after which MARAD would execute the certificate of completion.
Appx15527-15528 (Trial Tr. 1902:14-1903:9 (Carlson)).

In its damages opinion, the trial court also cited the 2003 MOU's objectives clause as also relevant in establishing MARAD's duty to deliver a completed item of construction.  Appx71.  The court relied on the statement that "'MOA, Port of Anchorage and MARAD anticipate substantial completion of Port Expansion will occur during calendar year 2008.'"  *Id.* (quoting Appx21676).  The full language excerpted by the trial court states:

> **OBJECTIVES:**  It is the objective of this Agreement that the parties shall establish working relations and assign responsibilities that leverage the expertise of all parties.  The parties intend that this Agreement will benefit the efforts of MOA, Port of Anchorage in execution of its Port Expansion.  The relationship and responsibilities established herein shall facilitate efficient and timely completion of Port Expansion.  Within the parameters of this Agreement, each party shall work cooperatively with the other and ensure coordination of efforts for successful transfer to MARAD and successful administration of federal and non-federal amounts made available for Port Expansion to MARAD.  MOA, Port of Anchorage and MARAD anticipate substantial completion of Port Expansion will occur during calendar year 2008.

For several reasons, this language cannot establish any duty for MARAD to deliver any specific item of construction either.

*First*, nothing in this language provides the essential terms discussed above, such as a definition of what specific structure is to be built, or a price or delivery date.  Indeed, nothing in this language states that MARAD will deliver anything to

30

Anchorage.  The primary objective of the 2003 MOU is to ensure successful

transfer to MARAD and administration by MARAD of the project funds.  The

"substantial completion of Port Expansion" is framed as a shared objective among

Anchorage, the Port, and MARAD, not something MARAD is delivering to

Anchorage.

   *Second*, this "objectives" clause is part of the recitals to the 2003 MOU, the

"'formal statement . . . in order to explain the reasons upon which the transaction is

founded . . . .'"  *Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470

(2005), *aff'd*, 170 F. App'x 128 (Fed. Cir. 2006) (quoting Black's Law Dictionary

879, 1101 (West abridged 6th ed.1991)).  Such recitals "generally are not

considered 'contractual' and cannot be permitted to control the express provisions

of the contract, [although] recitals may be read in conjunction with the operative

portions of a contract in order to ascertain the intention of the parties."  *KMS*

*Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996), *aff'd*, 108 F.3d 1393 (Fed.

Cir. 1997) (citing cases).  *Accord Grynberg v. FERC*, 71 F.3d 413, 416 (D.C. Cir.

1995) (A recital, "while sometimes useful as an aid to interpretation, cannot create

any right beyond those arising from the operative terms of the document.")

(internal quotation and citation omitted).

   And *third*, the objectives clause is "a mere prediction or statement of opinion

or intention" that does not establish any contractual liability for the United States

to deliver an undefined "Port Expansion" by 2008. *Chattler*, 632 F.3d at 1330 (citing *Cutler-Hammer*, 441 F.2d at 1182).

Sound policy supports the requirement for detailed and explicit terms in order to find a duty for the United States to deliver or guarantee a piece of construction. "A liability in any case is not to be imposed upon a Government without clear words." *Pine Hill Coal Co. v. United States*, 259 U.S. 191, 196 (1922). Congress authorizes countless Federally-funded and Federally-administered infrastructure projects each year. Many of those projects involve participation by and agreements with local governments to facilitate the project's execution. Inevitably, some number of those projects will not be fully successful. If the Federal Government is to be held responsible for guaranteeing the success of any individual project, it must say so expressly. Courts cannot simply assume that the Federal Government has guaranteed the successful delivery of every project with Federal involvement absent express language in a contract or a statute. The trial court erred as a matter of law by imposing a responsibility to deliver a defect-free port structure on MARAD without identifying any clear language establishing such a responsibility in the 2003 MOU.

B.     The Trial Court's Interpretation Of The 2003 MOU Conflicts With
       Other Express Language In The Agreement

The trial court's holding that MARAD was obligated to deliver a defect-free

port structure to Anchorage has no basis in the text, as explained above.  Such a

duty would also conflict with another express provision in the 2003 MOU.  Any

interpretation of a contract must give a reasonable meaning to all terms and avoid a

conflict among the provisions if at all possible.  *Westfed Holdings*, 407 F.3d at

1359 (citing *Johnson Controls*, 713 F.2d at 1555).  On *de novo* review, the Court

follows the same rule in its interpretation of the 2003 MOU.  But the trial court,

rather than reading the 2003 MOU as a whole to understand its meaning, inserted a

duty to deliver a port that was not present in the agreement, then ignored other

express language that contradicted the court's invented duty.

Here, the termination clause of the 2003 MOU granted both parties an

unlimited and unilateral right to terminate the agreement at any time with 90 days'

written notice.  Appx21678-21679.  The trial court acknowledged this clause in its

damages opinion but disagreed "that because MARAD could terminate the

Agreement at any time, this disproves that MARAD owed Anchorage any specific

item of construction. . . .  The termination clause is just standard government

contracting language."  Appx71.  It is not.  The clause here allowed MARAD to

simply walk away from the project, unlike a "standard" termination clause that

permits the Government as procurer to relieve the contractor of its obligation, at the expense of paying close out costs. *See*, *e.g.*, FAR 52.249-2. The United States is unaware of any standard clause that allows a performing contractor to simply spurn its obligations without incurring reprocurement damages. In any event, the court did not explain how the parties' actual termination provision could be harmonized with an obligation to deliver a defect-free port. In short, MARAD could not have made a contractual promise to deliver any completed item of construction if it also had the undisputed freedom to end the agreement at any time for any reason.

Thus, the trial court's holding that the 2003 MOU obligated MARAD to deliver to Anchorage a completed port structure free of defects violates the requirement to interpret the 2003 MOU in a way that gives a reasonable meaning to all terms and avoids a conflict among the provisions. *Westfed Holdings*, 407 F.3d at 1359 (citing *Johnson Controls*, 713 F.2d at 1555). The trial court's misreading of the 2003 MOU is untenable. According to the trial court, MARAD somehow promised to successfully deliver a port structure to Anchorage while simultaneously reserving its right to terminate the agreement at any time. The trial court could not reconcile its self-contradictory reading.

C.    This Court Should Reverse The Trial Court's Decision Rather Than Remanding Because There Are No Other Viable Grounds For The Damages Claimed By Anchorage

After correctly interpreting the 2003 MOU and concluding that MARAD had no duty to deliver any port structure to Anchorage, this Court should reverse the trial court's judgment regarding the breach of the 2003 MOU and the associated $356,167,750 in damages.  There is no need to remand for further proceedings because "a proper application of the law to unassailable findings compels reversal." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1565 (Fed. Cir. 1987).  Once the United States has challenged "the sufficiency of the evidence under a proper legal analysis, [the Court] may consider whether the appellee [Anchorage] has properly identified the presence of a disputed factual issue by citation to evidence of record." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1539 (Fed. Cir. 1991) (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 513-514 (1988)).  Anchorage has the "burden of identifying a genuine issue of fact . . . that should be submitted to the trial court for determination" based on the existing trial record. *Laitram*, 939 F.2d at 1539.  Critically, Anchorage must make this showing based on the existing trial record; Anchorage has no right to introduce new evidence on remand if this Court reverses the trial court's contract interpretation. *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1323 (Fed. Cir. 2003).

There is no evidence in the trial record that could support Anchorage's claimed damages once the Court corrects the trial court's misinterpretation of the 2003 MOU. The Court has reversed without remanding in comparable patent cases, where the Court corrected a legally erroneous patent interpretation and then determined that there was no evidence in the trial record that could have supported an infringement claim under the correct interpretation of the patent. *E.g.*, *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160-62 (Fed. Cir. 1997); *Laitram*, 939 F.2d at 1534-39. *See also Google LLC v. Ji-Soo Lee*, 759 F. App'x 992, 995-96 (Fed. Cir. 2019) (reversing without remanding to the Patent Trial and Appeal Board after a similar analysis in the context of an obviousness challenge to patentability). The Court should similarly reverse here without remanding for further proceedings.

1. Anchorage Did Not Assert Any Damages Beyond Its Expectation Interest In Receiving A Defect-Free Port Structure

Reversal is appropriate because there is no evidence in the record supporting any damages claim under the 2003 MOU beyond Anchorage's expectation interest in receiving a defect-free port structure. Anchorage has no right to introduce new evidence to support an alternative damages argument that it chose not to make at trial. *Hewlett-Packard*, 340 F.3d at 1323. At trial, Anchorage's damages evidence

was limited to the value of the port structure that it expected to receive, including the cost to remediate the defects in the existing structure.

The trial court's damages opinion summarized the full scope of damages evidence presented by Anchorage, divided into two categories.  First, Anchorage quantified the value of the open-cell sheet pile structure it claims it expected to receive under the 2003 MOU.  Appx65-68.  Second, Anchorage quantified the cost it may choose to pay in the future to remediate the defective work.  Appx68-70. The trial court held it necessary to compensate Anchorage for both sets of costs to put Anchorage in the financial position it would have been in had it received a defect-free port structure.  Appx77-81.

If the Court agrees with our arguments above that MARAD had no contractual obligation to deliver any structure to Anchorage, then none of Anchorage's evidence or the trial court's analysis is relevant to the damages Anchorage could lawfully claim under the 2003 MOU.  Nor did Anchorage present evidence that could support any other kind of expectation damages analysis, such as the value of the services MARAD was allegedly providing or the cost for Anchorage to obtain the same port structure from some other party.  Anchorage's expectation damages evidence was limited to the value of the structure it claimed it expected to receive, including remediation costs.  If the Court agrees through its *de novo* review of the 2003 MOU that Anchorage had no expectation to receive any

37

structure, then there is no other basis in the record to award Anchorage any expectation damages under the 2003 MOU.

Anchorage's post-trial briefing also stated a very brief claim for reliance damages, Appx22959, Appx23194, but no remand is necessary to consider Anchorage's halfhearted reliance theories because the existing trial record makes clear that Anchorage suffered no reliance damages. Reliance damages compensate the nonbreaching party for "any losses actually sustained as a result of the breach" by "'being put in as good a position as he would have been in had the contract not been made.'" *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1382-83 (Fed. Cir. 2001) (quoting Restatement (Second) Contracts § 344(b)). The parties stipulated that Anchorage transferred a total of $163.4 million to MARAD, which defines its potential reliance loss. Appx14518 (stipulation ¶ 107). Anchorage's chief financial officer admitted at trial that Anchorage did not receive the Federal funds that were contributed to the project, which were appropriated by Congress directly to MARAD. Appx14518 (stipulation ¶¶ 104-106); Appx15230 (Trial Tr. 1274:11-23 (Mahoney)).

Nor can Anchorage claim any unspent costs for potential future work under a reliance theory because it "is not an actual loss [if Anchorage] has not paid anything out of its pocket." *Westfed Holdings*, 407 F.3d at 1371 (citing *Glendale*, 378 F.3d at 1312). "[P]otential future obligations . . . do not count yet as an

actually sustained loss, and therefore [it would be] error to award" Anchorage its claim for future costs under a reliance theory. *Westfed Holdings*, 407 F.3d at 1368-69. Thus, the starting point for any reliance damages would be the funds that Anchorage contributed to the project, $163.4 million, which it arguably would have retained if the agreements with MARAD had never been executed.

However, "[t]he reliance damages recovery is a recovery for net reliance loss, so the defendant is credited with any benefit the plaintiff receives from the expenditure in reliance." *Id.* at 1369 (quoting Dan B. Dobbs, *Law of Remedies*, § 12.3(1) at 51-52 (2d ed. 1993)). There are three benefits Anchorage received as a result of its expenditures that more than offset its $163.4 million in total contributions. *First*, it is undisputed that Anchorage received $117,780,814 in new assets as a result of the project. Appx14512 (stipulation ¶ 42), Appx14514 (stipulation ¶ 57) (identifying the work Anchorage accepted and capitalized as a result of the project); Appx15238 (Trial Tr. 1304:19-1305:14 (Mahoney)) (Anchorage's CFO agreed that Anchorage recorded approximately $117 million of assets as a result of the project); Appx21010-21011. *Second*, Anchorage acknowledged receiving $19.35 million in settlement funds from the project contractors. Appx14518 (stipulation ¶ 108). And *third*, Anchorage was reimbursed by the State of Alaska through grant funds for $91,290,263 of the $163.4 million that Anchorage contributed to the project. Appx15236 (Trial Tr.

1295:12-1297:18 (Mahoney)); Appx21009.  The funds and value Anchorage

received as a direct result of its $163.4 million expenditure in reliance totaled

$228,421,077, eliminating any possible reliance damages Anchorage could claim.

In sum, the existing trial record cannot support any claim of damages for

breach of the 2003 MOU beyond the damages evidence Anchorage submitted to

quantify its expectation interest in receiving a defect-free port structure.  Thus, if

the Court agrees with the United States that the 2003 MOU contains no such duty,

then reversal without remand is the appropriate result.

> ### 2.  The 2003 MOU Does Not Impose Any Other Duties On MARAD That Could Support Other Breach Holdings

Even if Anchorage could point to some evidence in the existing record

supporting a damages claim independent of its claim that MARAD was obligated

to deliver a defect-free port structure, reversal without remand would still be

appropriate because a *de novo* review of the 2003 MOU's plain text demonstrates

that MARAD did not have any other contractual duties that it could have breached.

In addition to Anchorage's argument that MARAD was obligated to deliver

a port structure, Anchorage also argued that MARAD was contractually

responsible for designing and constructing the project, as well as managing and

overseeing the activities of the project contractor, which performed the substantive

work.  Appx22873-22878.  However, none of those duties exist in the plain text of

the 2003 MOU section that lists MARAD's seven responsibilities under the 2003

MOU:

1. Coordinate with other Federal agencies that receive annual Congressional appropriations for Port Expansion.

2. Provide specialized technical expertise and input as appropriate to Port Expansion tasks and activities. Administrative costs to be used for MARAD participation under this project will be 3% of funding received.

3. Designate primary MARAD points of contact for day-to-day management of Port Expansion activities.

4. Develop and execute all financial documents as required for the transfer and administration by MARAD of federal and non-federal amounts received for Port Expansion activities.

5. Accept transfers, approximately quarterly, of the non-federal share for Port Expansion from MOA, Port of Anchorage.  MARAD and MOA, Port of Anchorage shall base transfer amounts on current MOA, Port of Anchorage fiscal year Capital Improvement Budget allocations for Port Expansion as certified by the Administration of the MOA and approved by the Assembly of the MOA.

6. Expend transfers of the non-federal amounts identified by MOA, Port of Anchorage as bond receipts in first-priority order for Port Expansion activities. Subsequent to the full expenditure of bond receipts, MARAD shall resume expenditure of other federal and non-federal amounts for Port Expansion activities.

7. Obligate and disburse funding for Port Expansion project oversight, program management, study,

> environmental analysis, engineering, design,
> construction, or rehabilitation pursuant to Port
> Expansion requirements consistent with contract
> requirements.

Appx21677-21678.  None of these responsibilities state that MARAD is providing

substantive services of any kind to Anchorage.  MARAD's responsibilities were

entirely financial and administrative in nature.  MARAD was responsible for

facilitating the flow of project funds, including obligating and disbursing the funds

necessary for substantive project activities in paragraph 7.  MARAD was also

responsible for providing specialized technical expertise and input as appropriate,

but not to take on substantive responsibility for any portion of the project.

The contemporaneous evidence of the parties' intent when the 2003 MOU

was executed confirms that MARAD was not contractually responsible for the

substantive management or execution of the project.

*First*, regarding MARAD's purported duty to manage the project on

Anchorage's behalf, the initial language for the 2003 MOU that MARAD provided

to Anchorage stated that MARAD would be responsible to "[p]rovide project

management services . . . as set forth in individual task orders issued under this

[agreement]" and "[p]rovide and update program management plans and tools

needed to execute projects . . . as appropriate."  Appx15767 (alterations in

original); Appx15010 (Trial Tr. 745:7-746:17 (Coppe)).  Anchorage's

representative, Ms. Coppe, removed all of that language in the draft 2003 MOU

she sent back to MARAD for review.  Appx15826-15830; Appx15012-15013

(Trial Tr. 754:12-755:2 (Coppe)).  A comparison among the original language

MARAD proposed, the draft Ms. Coppe prepared, and the final executed version

of the 2003 MOU shows that that the parties retained virtually all of the

preliminary language in the final agreement, with the notable exceptions of the

language referencing MARAD's duties to provide project management services

and a reimbursable compensation structure.  Appx22709-22714.  The Court cannot

interpret the 2003 MOU to contractually obligate MARAD to manage the project

on Anchorage's behalf when the parties expressly removed that duty from the

agreement during negotiations.  *See Pacificorp*, 25 Cl. Ct. at 717 n.9.

The trial court did not reference this evidence when determining that the

parties intended for MARAD to manage the project on Anchorage's behalf.

Instead, the trial court relied on witness testimony to determine the parties' intent.

Appx48-50.  However, trial testimony is not "contemporaneous evidence of the

parties' understanding," the only evidence that a court can potentially consider

without first concluding that the contract language is ambiguous, which the court

did not hold here.  *TEG-Paradigm*, 465 F.3d at 1338 (citing *Coast Fed. Bank*, 323

F.3d at 1040).  Also, this Court has previously explained that, to the extent

relevant, pre-breach evidence is the most reliable evidence to reference when interpreting a contract. *See Pac. Gas & Elec.*, 536 F.3d at 1290-92.

*Second*, the parties provided detailed presentations to the Anchorage Assembly prior to the execution of the 2003 MOU, describing how the project would be run.  As the trial court recognized, the plain text of the 2003 required Assembly ratification before it went into effect.  Appx50 ("The Alaska Assembly was required to ratify the 2003 MOU.  The Assembly met four times before ratifying the 2003 MOU." (citing Appx14509 (stipulation ¶ 10))); Appx21679 ("This Agreement [the 2003 MOU] shall become effective after signature by both parties and ratification by the [Anchorage] Municipal Assembly.").

During the presentations to the Assembly, the parties were in agreement that Anchorage, not MARAD, was responsible for executing and managing the project on a day-to-day basis on the ground.  For example, when an Assembly member asked if the Port was "going to turn it over to MARAD to build it for us" the Port Director answered, "No, the MARAD will be the . . . administrator of the funds and the administrator of the program . . . ."  Appx16957-16958 (Assembly Tr. 44:23-45:3).  "The Port of Anchorage is responsible for project execution, strategic planning, establishment of project requirement, and day-to-day direction of all Port expansion activities."  Appx16958 (Assembly Tr. 46:7-11).

Port officials repeatedly emphasized MARAD's three roles on the project: "[T]hey act as the funding agency, they act as the project oversight agency, and they act as a contract administration agency." Appx16958 (Assembly Tr. 46:16-20); Appx16289; Appx15065 (Trial Tr. 794:14-795:25 (Coppe)).  As the funding agency, MARAD served as a "conduit for the funds," consolidating the Federal and local funding.  Appx16958-16959 (Assembly Tr. 46:21-47:7, 49:10-11).  As the project oversight agency, MARAD did not provide general management of the project, but only provided specialized technical expertise as appropriate in a consulting capacity.  *Id.* (Assembly Tr. 47:8-48:6, 49:11-13) ("MARAD is acting as the . . . federal project oversight.  That's . . . in a consulting vein but in a very positive one."); Appx15065 (Trial Tr. 796:4-24, 797:12-24 (Coppe)).  And as the contract administration agency, MARAD developed, negotiated, and executed the necessary contractual documents.  Appx16958 (Assembly Tr. 48:11-16).  Nowhere did Port officials suggest that MARAD was providing the design, construction, or project management services needed for substantive execution of the project.

The trial court acknowledged these statements, but characterized them as a "sales pitch," presumably not reflective of the parties' actual intent and understanding in executing the 2003 MOU.  Appx51.  The court's reasoning suffers from two flaws.  First, all public officials, including Anchorage's officials, are presumed to discharge their duties correctly, lawfully, and in good faith.  *See*

45

*Hoffman v. United States*, 894 F.2d 380, 385 (Fed. Cir. 1990). Anchorage did not offer, and the trial court did not find, the kind of clear and convincing evidence necessary to overcome the presumption that Anchorage's officials honestly described the parties' responsibilities to the Anchorage Assembly. *See Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012). Second, even if the Port officials were not honest or delivering a "sales pitch" to the Assembly, which is what the trial court implied, the Assembly, as the ultimate approving authority for Anchorage, bought the pitch. What the Assembly was told informed Anchorage's understanding of the agreement it was entering into with MARAD. And those statements make clear that the Anchorage Assembly did not understand that it was executing an agreement for MARAD to design, construct, or manage the project on Anchorage's behalf because the Assembly was expressly told that the agreement did not assign MARAD those responsibilities.

*Third*, Anchorage had a number of local and state legal requirements it would have had to meet if it believed it had contracted with MARAD to provide design, construction, or project management work for the project. As explained above in Part II.A., the Anchorage Municipal Code specifies requirements for any contracts executed by Anchorage to acquire supplies, services, professional services, or construction, none of which were met here. Also, when the Anchorage Assembly voted on ratifying the 2003 MOU, it was not included in the section of

46

the agenda addressing awards for construction and engineering contracts.
Appx17094; Appx17102-17107.

All of these contemporaneous actions and statements confirm what the plain
text of the 2003 MOU says—MARAD did not contractually promise to design,
construct, or manage the project on Anchorage's behalf.

Rather than accepting the necessary conclusions from this undisputed
contemporaneous evidence confirming the Government's interpretation of the
2003 MOU, the trial court instead emphasized the fact that MARAD executed and
oversaw the prime contract for the project.  Appx49-50.  The court reasoned that
because MARAD executed the prime contract, MARAD must have done so to
discharge its contractual duties to Anchorage.  Appx52.  But the trial court ignored
that MARAD had a preexisting legal duty from Congress to administer the project,
subject only to the conditions and requirements MARAD saw fit to impose.
Consolidated Appropriations Resolution, 2003, § 626, 117 Stat. 106.  And once a
procurement contract was issued, MARAD as the procuring agency was
responsible for managing and overseeing that contract.  Even if the court could
have identified a clear textual basis for these responsibilities in the 2003 MOU,
which it did not, "simply restat[ing] obligations created by [law] evinces that the
government 'never intended the language . . . to be more than a mere expression of
intention, as opposed to words of commitment.'"  *Chattler*, 632 F.3d at 1331

(alterations in original and quotation omitted). *Accord Estate of Bogley v. United States*, 514 F.2d 1027, 1033 (Ct. Cl. 1975) ("[A] promise to do what one is required by law . . . to do is not a valuable consideration."); *Westlands*, 109 Fed. Cl. at 196-97 (a provision "entirely consistent with [the agency's] statutory duty . . . does not constitute a separate contractual undertaking . . . .").

The Claims Court reached a similar result in a case in which the plaintiff claimed that a contract clause stating that the Farmers Home Administration would make or insure future loans to the plaintiff, provided certain conditions were met, was a binding promise to make such loans. *Floyd v. United States*, 26 Cl. Ct. 889, 890 (1992), *aff'd*, 996 F.2d 1237 (Fed. Cir. 1993). The court explained that this clause was simply a restatement of the agencies responsibility "to administer various farm assistance loan programs authorized by Congress on behalf of applicants meeting prescribed lending criteria" and was "legally insufficient to form the basis for a breach of contract." *Id.* at 890-91. Similarly, any responsibility MARAD had related to the ICRC contract would have been part of its ordinary legal responsibilities as the procuring agency tasked by Congress with administering the project. MARAD did not, and could not have, contractually promised to Anchorage to discharge its ordinary legal responsibilities.

In sum, even if Anchorage could point to some evidence in the existing record supporting a damages claim independent of its claim that MARAD was

obligated to deliver a defect-free port structure, reversal without remand would still be appropriate because a *de novo* review of the 2003 MOU's plain text demonstrates that MARAD did not have any other contractual duties that it could have breached.

III.  The 2011 MOA Contained No Duty For MARAD To Pursue Legal Claims On Anchorage's Behalf

The trial court held that that MARAD's September 28, 2012 settlement with ICRC breached MARAD's purported duty under the 2011 MOA to "defend against claims as well as pursue affirmative claims on MOA's behalf." Appx61. The trial court agreed that the 2011 MOA had expired by the time the settlement occurred, *id.*, and events that occur after an agreement expires cannot breach that agreement. *Clark v. United States*, 461 F.2d 781, 783 (Ct. Cl. 1972). However, the trial court held that that MARAD had a fixed obligation to "defend against claims as well as pursue affirmative claims on Anchorage's behalf" that was not yet satisfied when the 2011 MOA expired, which apparently required MARAD to take instruction from Anchorage into the indefinite future about how to handle the claims filed by MARAD's contractor. Appx61 (citing *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 785 (2013) (in turn citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991))). This was the sole alleged breach that the trial court identified under the 2011 MOA.

49

The 2011 MOA, however, contains no duty for MARAD to "defend against claims as well as pursue affirmative claims on Anchorage's behalf," as the court described it, nor did the actual language of the 2011 MOA preclude MARAD from settling claims.  MARAD's actual responsibility was to, "[p]ursuant to the Contract Disputes Act, 41 U.S.C. §§ 7001-7013, *administer* claims submitted by MarAd contractors and *coordinate and cooperate* with the MOA/POA in affirmative and defense of claims consistent with federal contract law."  Appx18333 (emphasis added).  Anchorage introduced no evidence at trial suggesting that MARAD failed to administer, coordinate, or cooperate while the 2011 MOA was in effect.  The trial court made no such finding either, because the court misinterpreted MARAD's duty as obligating MARAD to pursue and defend claims on Anchorage's behalf, without any apparent limitation.  Appx61.  Nor did the trial court reconcile its interpretation of the 2011 MOA, that Anchorage required MARAD to pursue claims on its behalf, with the fact that Anchorage ultimately pursued its own claims directly against ICRC as a named third-party beneficiary to the MARAD-ICRC procurement contract.  *Integrated Concepts and Rsch. Corp.*, 1 F. Supp. 3d at 1017-20.

Regarding settlement, the 2011 MOA conditioned MARAD's responsibility to administer claims "[p]ursuant to the Contract Disputes Act, 41 U.S.C. §§ 7001-7013."  Appx18333.  Similarly, MARAD's obligation to coordinate and cooperate

with Anchorage was limited to the extent it is "consistent with federal contract law." These sources of authority expressly provide that the Federal contracting officers will "decide or resolve all claims arising under or relating to a contract subject to the [Contract Disputes Act]." FAR 33.210; 41 U.S.C. § 7103(a). The FAR establishes the Government's general policy to "try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level." FAR 33.204. The trial court's interpretation of the 2011 MOA failed to discuss or account for these conditions, which clearly reserve to MARAD full discretion regarding the management of claims.

Moreover, the trial never applied the standard it announced, that the United States was obligated to "defend against claims" or "pursue affirmative claims." Indeed, the court never examined whether any such affirmative or defensive claims were available or at what point the Government's attorneys would have been ethically obligated to advance them or prohibited from doing so. Instead, the court necessarily assumed that the United States could have contractually abdicated those responsibilities by binding itself to the litigation direction of a third-party. The court also assumed, without fact-finding, that the United States somehow failed to pursue any available affirmative or defensive claims to the best of its ability prior to achieving a settlement.

In sum, as with its interpretation of the 2003 MOU, the duty posited by the trial court is simply not present in the agreement's text and, in fact, is contradicted by it. On a *de novo* review, this Court should determine that MARAD did not breach any express duty in the 2011 MOA by executing a settlement to resolve contractor claims without Anchorage's consent.

## IV. The Trial Court Erred As A Matter Of Law By Awarding Anchorage Both Expectation And Reliance Damages

As explained above, the trial court erred in holding that MARAD had breached any contractual obligation under the 2003 MOU and 2011 MOA, and the court's judgment should be reversed in its entirety. But even assuming, for argument's sake, that the trial court did not commit reversible error in holding that MARAD had breached the agreements, then the trial court's damages award would still need to be reduced by $11,279,059.

"When reviewing damages awarded by the Court of Federal Claims, '[d]ifferent standards of review are applicable to different aspects of a damages award.'" *Shell Oil*, 896 F.3d at 1306 (quoting *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1346 (Fed. Cir. 2005)). "The abuse of discretion standard applies to decisions about methodology for calculating rates and amounts." *Shell Oil*, 896 F.3d at 1307 (quotation omitted). "A court abuses its discretion when '(1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is

based upon an erroneous construction of the law; (3) the trial court's factual findings are clearly erroneous; or (4) the record contains no evidence upon which the [trial] court could have rationally based its decision." *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1377-78 (Fed. Cir. 2004) (citation omitted). *Accord Shell Oil*, 896 F.3d at 1307. Here, the trial court's decision was based on an erroneous construction of law because the court's expectation damages impermissibly included $11,279,059 in damages that could only have been awarded as reliance damages.

The trial court awarded Anchorage $11,279,059 in damages for Anchorage's claim that MARAD breached the 2011 MOA by settling claims with ICRC without Anchorage's consent. Appx74. The trial court expressly stated that it was awarding these damages under an expectation theory and did not address a theory of reliance damages. Appx71, Appx74. "Expectancy damages are intended to make a non-breaching party whole by providing the benefits expected to be received had the breach not occurred." *Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008) (citation omitted). Yet the trial court made no findings about how the $11.3 million amount represented a benefit Anchorage expected to receive under the 2011 MOA. The only stated basis for the court's expectation award was that some of the funds used to pay the settlement were

funds that Anchorage had transferred to MARAD previously.  Appx74.[9]  But the

court never explained how or why Anchorage expected to receive that amount of

value if MARAD had performed its purported duty to pursue and defend claims on

Anchorage's behalf.  The trial court in no way considered how different decisions

MARAD might have made in the administration of ICRC's claims could have led

to a net savings of $11.3 million compared to the settlement executed.

Nor could the trial court have engaged in that analysis because Anchorage

did not present any evidence or argument explaining how the $11.3 million related

to a benefit it expected to receive under the 2011 MOA.  Anchorage's post-trial

brief included the $11.3 million as part of its "summary of the lost costs/value

experienced by MOA due to the defective design and construction . . . ."

Appx22923-22924.  Anchorage then reprinted tables from the report of its

damages expert, Mr. McGeehin, who listed the $11.3 million as part of his

conclusion that Anchorage lost $180 million in value it expected to receive as a

---

[9]  The trial court referred back to its summary judgment decision where it "found that [the settlement] money was spent out of Anchorage's coffers." Appx74.  In its summary judgment decision, however, the trial court relied on MARAD's accounting records, which showed that the 2012 ICRC settlement payment was funded with $2,353,195 in Federal funds and only $8,925,864 in funds previously transferred to MARAD by Anchorage for the project.  Appx19 (citing Appx8526, Appx10070 (Tr. 105:8-25)).  *Accord* Appx22939 (Anchorage's expert relied on the same breakdown in funding sources for the 2012 ICRC settlement payment).

result of the defective work. Appx22935; Appx22939. But at trial Mr. McGeehin explained that he included the ICRC settlement amount in his calculation of damages at the "direction of counsel" and that he was not offering any opinion about whether Anchorage is "entitled to it." Appx15212 (Trial Tr. 1201:17-1202:8 (McGeehin)). He was merely providing quantification of the amount paid to ICRC as part of the settlement. *Id.*

Anchorage provided no other evidence or argument that could have supported any expectation damages award related to the ICRC settlement. MARAD's purported duty was to pursue and defend claims on Anchorage's behalf. Appx61. Anchorage made no effort to quantify the value of that duty, either in terms of the value of the services Anchorage expected to receive from MARAD or the value of the ultimate outcomes Anchorage expected to obtain from MARAD's pursuit and defense of claims.

Even if Anchorage had argued that the funds it contributed to the ICRC settlement could have been refunded under a reliance theory, the trial court would have been foreclosed from awarding reliance damages together with its other expectation damages award. The Court of Federal Claims has consistently held that a "[p]laintiff cannot recover both expectancy and reliance damages on the same transaction." *Dolmatch Grp., Ltd. v. United States*, 40 Fed. Cl. 431, 440 (1998). *Accord, e.g.*, *Stovall v. United States*, 94 Fed. Cl. 336, 353-54 (2010);

*Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 744-45 (2006), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008); *Grumman Data Sys. Corp. v. United States*, 28 Fed. Cl. 803, 810 n.11 (1993) (citing *Nat'l Control Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 499 (3d Cir. 1987); Restatement (Second) Contracts, §§ 347, 349).

This is because the goal of expectation damages is to "'put the plaintiff in as good a position as he would have occupied had the defendant performed his promise'" while the goal of reliance damages is to "'put [the plaintiff] in as good a position as he was in before the promise was made.'" *Amber Res.*, 73 Fed. Cl. at 744 (quoting L. L. Fuller & William R. Perdue, Jr., *The Reliance Interest in Contract Damages: pt. 1*, 46 Yale L.J. 52, 53-55 (1936)). Combining reliance and expectation interests "becomes problematic" because the plaintiff receives the benefits of the contract while also being refunded the costs that would have been necessary to secure those benefits. *Amber Res.*, 73 Fed. Cl. at 744-45 (citing Fuller & Purdue, *supra*, at 81).

Thus, even assuming, for argument's sake, that the trial court did not commit reversible error in holding that MARAD had breached both the 2003 MOU and the 2011 MOA, Anchorage would still have to choose between an expectation and reliance theory of damages. Because Anchorage "is entitled to recover the highest amount it can prove under any measure of damages," *Astoria Fed. Sav. & Loan Ass'n v. United States*, 72 Fed. Cl. 712, 718 (2006) (citing *Petrofsky v. United*

*States*, 488 F.2d 1394, 1405 (Ct. Cl. 1973); Restatement (Second) Contracts, §§ 344, 378), the most appropriate solution would be to award Anchorage its true expectation damages of $356,167,750 rather than its potential reliance damages of $11,279,059.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court reverse the judgment of the Court of Federal Claims.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

<u>s/Steven J. Gillingham</u>
STEVEN J. GILLINGHAM
Assistant Director

<u>s/Vincent D. Phillips, Jr.</u>
VINCENT D. PHILLIPS, JR.

OF COUNSEL:            Senior Trial Counsel
EVAN WISSER            Commercial Litigation Branch
DANIEL A. HOFFMAN      Civil Division, Department of Justice
Trial Attorneys        P.O. Box 480
Commercial Litigation Branch   Ben Franklin Station
                       Washington, D.C. 20044
                       Telephone: (202) 305-4591
                       E-mail: Vincent.Phillips2@usdoj.gov
                       *Attorneys for Defendant-Appellant*
Dated: December 22, 2022   *United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this response:  (1) complies with the type volume limitation of Federal Circuit Rule 32(b)(1); (2) contains 12,639 words, excluding the portions of this response exempted from the type volume limitation by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2); (3) complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5); (4) complies with the type style requirements of Federal Rules of Appellate 32(a)(6); and (5) has been prepared on a computer in a proportionally spaced typeface using Microsoft Word in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the response.


s/Vincent D. Phillips, Jr.

<u>ADDENDUM</u>

# In the United States Court of Federal Claims
### No. 14-166 C
### Filed: February 24, 2022

**ANCHORAGE, A MUNICIPAL**
**CORPORATION**

                                                          **JUDGMENT**

        **v.**


**THE UNITED STATES**


      Pursuant to the court's Opinion and Order, filed December 9, 2021, and Opinion and Order, filed February 24, 2022,

      IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff recover of and from the United States damages in the amount of $367,446,809.00.


                              Lisa L. Reyes
                              Clerk of Court

                    By:     s/ Debra L. Samler

                              Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.   Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 14-166C
(Filed:  January 22, 2015)

```
************************************
                                   *
ANCHORAGE, A MUNICIPAL             *        Motion to Dismiss, Cooperative
CORPORATION                        *        Agreement
                                   *
              Plaintiff,           *
                                   *
      v.                           *
                                   *
THE UNITED STATES,                 *
                                   *
              Defendant.           *
                                   *
************************************
```

## OPINION AND ORDER

**DAMICH, Senior Judge**

        This case arises from a contract dispute between the Plaintiff, Anchorage, A Municipal Corporation ("Anchorage" or "MOA") and the United States (the "Government"), acting through the Department of Transportation, Maritime Administration, ("MarAd"). The lawsuit concerns losses from a project jointly administered by Anchorage and MarAd to expand the Port of Anchorage in Anchorage, Alaska ("the Project").  During the course of construction, widespread damage was discovered in the Project, rendering parts of the Port unsuitable for use.

        Defendant filed a Motion to Dismiss the Complaint pursuant to RCFC 12(b)(1) and 12(b)(6).  The Government alleges the Complaint should be dismissed because (1) the Court does not possess jurisdiction under the Tucker Act because the agreements relating to the project between MarAd and Anchorage are not money mandating, (2) the Complaint fails to state a claim for breach of contract or a breach of the implied covenant of good faith and fair dealing because the agreements place responsibility on Anchorage but not on the United States for the alleged breaches, and (3) the Complaint fails to state a claim as a third-party beneficiary of the contract between the Government and the construction contractor because Anchorage does not allege that the Government breached that contract.

        For the reasons set forth below, the Court hereby denies-in-part with respect to counts one and two, and grants-in-part with respect to count three, the Defendant's Motion to Dismiss.

## I.      BACKGROUND

The Municipality of Anchorage determined that the facilities at the Port of Anchorage were deteriorating and outdated. Complaint ("Compl.") at ¶ 10. Anchorage envisioned the Project as a multi-year endeavor that would help increase the Port's ability to serve Anchorage, the State of Alaska, commercial tenants, and the United States military. *Id.* Not having the expertise to undertake the Project on its own, MOA sought a party to provide the requisite technical expertise. *Id.* at ¶ 12. After considering the private sector, MOA decided to contract with the Department of Transportation, Maritime Administration ("MarAd") as part of an agency-wide initiative to embark on a port infrastructure development program. *Id.* at ¶ 13.

MOA and MarAd executed two contracts regarding the Project. Appendix to the Defendant's Motion to Dismiss ("DA") at 1, 7. The first contract was executed in 2003 ("the 2003 Agreement") and described project administration, funding, and the obligations of the parties. DA 1-6. Following the discovery of defects in the sheet pile system in 2010, MarAd revised its agreement with MOA to increase MarAd's oversight over the Project. Compl. at ¶¶ 66-69, 92; DA at 23. The second contract was entered into in 2011 ("the 2011 Agreement") and superseded the 2003 Agreement. DA at 7, 13-14. The 2011 Agreement expired on May 31, 2012. *Id.*

The express terms of the 2003 Agreement required MOA to "[p]rovide overall program requirements and direction of Port Expansion to MarAd." DA at 1. The Agreement also specified, in regard to the level of program control to be exerted by MOA, that MOA had the responsibility to "[r]eview all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MarAd . . . ." DA at 2. MOA was also responsible for certifying completion and acceptance of the work. DA at 6. MOA had to accept work from the contractor and certify that the work was acceptable before a certificate of completion could be submitted to MarAd for MarAd to accept the work from the contractor. DA at 6.

The 2003 Agreement outlined MarAd's responsibilities as primarily financial in nature, because MarAd had the responsibility to "[c]oordinate with other Federal Agencies that receive annual Congressional appropriations for Port Expansion." DA at 2. MarAd was also responsible for executing all financial documents, accepting transfers of non-Federal funds, and was to "[o]bligate and disburse funding for Port Expansion oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." DA at 3. The parties agreed not to shift liability to the other, and they agreed that the 2003 Agreement "does not obligate either party to spend funds not specifically appropriated or allocated for actions described herein." *Id.*

Problems with the Project were discovered upon inspection in 2010, when large-scale damage was found in the installed sheet piles. Compl. at ¶ 66-68. The damage resulted in large sections of the Project being unsuitable for use. *Id.* at ¶ 80. This was the impetus for the parties entering into a second agreement in 2011.

The 2011 Agreement redefined the roles and responsibilities of Anchorage and MarAd, outlined authorities, and assured accountability for the Project. DA at 7. It created a Port

Oversight and Management Organization ("POMO") to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project." DA at 8. The 2011 Agreement deleted Anchorage's responsibility to provide program requirements and direction for the Project and instead gave POMO the responsibility to "[m]anage the scope, schedule, and budget of the Project on a day-to-day basis." DA at 8. The Agreement outlined the objectives, project oversight and management organization, the responsibilities of the parties, the shared responsibilities of both parties, general provisions, the term of the agreement, and provisions regarding the termination and amendment of the agreement. DA at 7-13. The Agreement also recognized that MarAd would designate the United States Army Corps of Engineers ("USACE") to serve as a design and construction agent for the Project and perform an independent technical evaluation of the sheet pile system. DA at 7; Compl. at ¶ 78. The Agreement further expanded MarAd's responsibilities by providing that MarAd or its designee would "provide acquisition, construction, design, and quality assurance service for the Project . . . ." DA at 12. The 2011 Agreement remained in effect until its expiration on May 31, 2012. DA at 13. It was the last written agreement in effect between MarAd and Anchorage relating to the Project.

In the meantime, to aid in the construction of the Project, MarAd entered into a contract with Integrated Concepts and Research Corporation ("ICRC") in 2003 to "among other things, provide program management, design-build and related procurement services with respect to the Project's management, design and construction." Compl. at ¶ 33. ICRC in turn entered into subcontracting agreements with PND Engineers, Inc. ("PND") and Quality Asphalt Paving ("QAP"). *Id.* at ¶¶ 42-47. QAP then entered into a contract with MKB Constructors ("MKB"). In 2008, MarAd and ICRC again executed a contract "to continue performance of design-build and Project management related services for the Project." *Id.* at ¶ 37. As a result of MarAd denying ICRC's certified pass-through claim, ICRC bought three claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals. Compl. at ¶ 72. On September 28, 2012, MarAd and ICRC settled the claims, with MarAd paying ICRC $11,300.000.00 and both parties agreeing to "forever release and discharge one another from any and all liability, obligations, and claims . . . arising out of the contract to perform work at the Project." *Id.* at ¶ 73.

On August 2, 2013, the Department of Transportation Office of the Inspector General ("DOT IG") issued a report critical of MarAd for contracting to Anchorage the authority over project construction and management. Compl. at ¶ 92. DOT IG found that MarAd had "limit[ed] its role to obligating and distributing funds for project tasks." DA at 21. In its investigation of MarAd officials, DOT IG also reported that "the Agency's leadership made a policy decision that abdicated programmatic and technical control to [Anchorage] which contributed to problems with the project." DA at 19. It also noted that MarAd entered into a new agreement for the Project in November 2011 after major problems with the Project were revealed to Agency officials and the public. DA at 23; Compl. at ¶ 92.

## II.    STANDARD OF REVIEW

### A.  Standard of Review Under RCFC 12(b)(1)

Subject matter jurisdiction may be challenged at any time by the parties. *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993). Indeed, this Court's jurisdiction to entertain claims and grant relief, like all Federal courts, depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976). The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff, who must establish jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936). Even so, when faced with a motion to dismiss for lack of subject matter jurisdiction, a court must assume that all undisputed facts alleged in the complaint are true, and it must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part, Martinez v. United States,* 281 F.3d 1376 (Fed. Cir. 2002).

### B.  Standard of Review Under RCFC 12(b)(6)

Pursuant to RCFC 12(b)(6), the Court is required to grant Defendant's motion to dismiss if it finds the Plaintiff has failed to state a claim upon which relief can be granted. In considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). In order for a claim to properly be stated, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

### III.    DISCUSSION

### A.  Count I of the Complaint survives a 12(b)(1) Motion to Dismiss.

The Government's first argument in favor of dismissal is that this Court lacks jurisdiction because neither the 2003 or 2011 Agreements are money mandating under the Tucker Act. Specifically, the Government contends that neither the 2003 or 2011 Agreements contain any right for a money remedy because they are cooperative agreements. For the reasons set forth below, the Court concludes that the Agreements are not cooperative agreements, and thus money damages can be presumed.

A plaintiff must prove that a substantive source of law creates the right to recovery of money damages, and that source of law "need not explicitly provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can be fairly

4

interpreted as contemplating money damages." *Hamlet v. United States*, 63 F.3d 1097, 1101 (Fed. Cir. 1995). This separate source of law can come from either a money-mandating constitutional provision, statute, or regulation, or an express or implied contract with the United States. *Lovelades Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cr. 1994). Put another way, "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). There is no that both the 2003 and 2011 Agreements between MOA and MarAd are express contracts between the Plaintiff and the Government and that Plaintiff is arguing breach of contract. Because an express contract carries with it a presumption of money damages (and thus Tucker Act jurisdiction), the Defendant must show that the Agreements somehow rebut this presumption.

The Government contends that both the 2003 and 2011 Agreements between MarAd and MOA should be considered cooperative agreements under the Federal Grant and Cooperative Agreement Act ("FGCAA"). Mot. Dismiss at 16-17. The Government argues that, based on the precedent set forth in *Rick's Mushroom Serv. v. United States*, 76 Fed. Cl. 250 (2007), *aff'd*, 521 F.3d 1338 (Fed. Cir. 2008), and *Holmes v. United States*, cooperative agreements, unlike procurement contracts, are not presumed to provide monetary relief. Mot. Dismiss at 17. Additionally, the Government argues that "neither of the agreements contains any provision for any monetary remedy upon breach." *Id.* Thus, because money damages are not contemplated specifically by the contract, and money damages are not presumed in a cooperative agreement, this court lacks jurisdiction. *Id.* at 19. However, the Court disagrees that the 2003 and 2011 Agreements are cooperative agreements.

According to 31 U.S.C. § 6305, cooperative agreements are to be used when "the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support of stimulation authorized by a law . . . instead of acquiring . . . property or services for the direct benefit or use of the United States Government." The Government argues that this description fits the current situation perfectly: that the "purpose of the 2003 agreement was not for MarAd to purchase or lease anything from Anchorage" and that rather the Agreement stated "that the parties would 'work cooperatively' to 'benefit the efforts of [Anchorage] in execution of its Port Expansion.'" Mot. Dismiss at 17. While this is certainly true, it ignores the true reciprocal nature of the Agreement that leads this Court to hold that the 2003 Agreement is an express contract and not a cooperative agreement.

MOA gave MarAd approximately $302,000,000.00 towards the construction of a port. Compl. at ¶ 5. MarAd was to receive 3% of that amount in exchange for providing "specialized technical expertise and input as appropriate." Def. App. at 2. One part of the project called for the construction of a new road to directly connect the Port of Anchorage with Elmendorf Air Force Base "to facilitate quick deployments of military forces through the port without the need to use the public highway system." Compl. at ¶ 11. Additionally, the project contemplated adding "new staging areas for military deployments and dual-use facilities which can be used for military hangars for helicopters." *Id.* Thus, it is clear that the relationship contemplated between the parties goes well beyond merely transferring a "thing of value" to a local government; although the transfer of the port is a major component of the Agreements, the value

5

that the Government was to receive, namely money and increased military infrastructure, goes well beyond mere incidental benefit.

Furthermore, the Government itself concedes that there is a specific process that must be followed when entering into a cooperative agreement that was not followed in this case.  The regulations found in 46 C.F.R. § 385.1 *et seq.* set forth "information about the Maritime Administration (MarAd) assistance regulations: Their purpose, authority, applicability, issuance, arrangement, implementation, and exception procedure."  46 C.F.R. § 385.1.  At the Oral Argument held on November 5, 2014, the Government admitted that "we don't dispute that MarAd did not follow its own regulations in entering into this agreement, to the extent that it wanted to make this an official cooperative agreement under its regulations."  Transcript at p. 13, lines 19-22.  Thus, although the Government failed to follow its own procedures in creating a cooperative agreement, it now asks the Court to construe the Agreement as such.

For all the reasons stated above, the Court concludes that the 2003 and 2011 Agreements between MOA and MarAd are not cooperative agreements.  Accordingly, the Court holds that the Agreements can fairly be interpreted as contemplating money damages, thus giving the Court jurisdiction under the Tucker Act.

### B. Plaintiff's Complaint has met the pleading standard under RCFC 12(b)(6) such that it can survive a Motion to Dismiss.

#### i. Count I of the Complaint survives because there is a genuine issue of fact as to the duties of the parties under the 2003 Agreement.

The Government's second argument for dismissal is that even if this Court has jurisdiction, Plaintiff has failed to state a claim for which relief can be granted, thus necessitating dismissal under RCFC 12(b)(6).  Mot. Dismiss at 19.  Defendant points out seven alleged breaches of the 2003 and 2011 Agreements, comprising Count I of the Complaint.  *Id.* at 22-23.[1]  Defendant responds by asserting that the allegations fail, variously, because the 2003 Agreement failed to create the alleged duty for Defendant to design, construct, and/or manage the Project, that Defendant had "full legal authority to settle claims with ICRC," and that several claims must fail because they took place after the expiration of the 2011 Agreement, when there was no contractual agreement binding the parties.  *Id.* at 28-30.

---

[1] Those breaches are: [(A)] failing to provide its promised expertise to design, construct, and oversee the design and construction of the Project, resulting in a Project that (except for the Dry Barge Berth) has been rendered useless and not suitable for its intended purposes; [(B)] failing to manage and oversee the 2003 MarAd-ICRC Contract and the 2008 MarAd-ICRC Contract, the effect of which was that ICRC, PND and other design and construction professionals committed breaches and independent tortious acts which MarAd simply ignored; [(C)] failing to exercise its contractual rights against ICRC to repair and replace the defective work at ICRC's own cost; [(D)] settling ICRC's claim with [Anchorage's] funds and without [Anchorage's] knowledge or consent even though ICRC first blamed its own contractors, QAP and MKB, for construction defects, and later blamed its own designer, PND, for Project defects; [(F)] by otherwise completely abdicating its responsibility to design, construct, and oversee the Project; and [(G)] by failing to perform its obligations to [Anchorage] "in good faith and for the benefit of the citizens of the Municipality of Anchorage."  *Id.*

6

According to the 2003 Agreement, MOA's responsibilities include, *inter alia*, "provid[ing] overall program requirements and direction of Port Expansion to MARAD," "review[ing] all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD," and to "Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary." DA at 1-2. MarAd's responsibilities were, *inter alia*, to "Provide specialized technical expertise and input as appropriate to Port expansion tasks and activities," and "Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." *Id.* at 2-3.

Defendant argues that the 2003 Agreement "created no duty in MarAd to design, construct, or manage the project." Mot. Dismiss at 24. Rather, it interprets MOA's responsibilities quoted above placing the responsibility on MOA to provide requirements for Port expansion. *Id.* Defendant further argues that MarAd's responsibilities were "almost entirely financial," *id.* at 25, and that the technical expertise it was required to provide does not include management, design, and construction of a port because "Congress did not mandate MarAd to develop the expertise to manage the port improvement development program (PIDP) until 2009, six years after the 2003 agreement." *Id.* Plaintiff, on the other hand, argues its responsibilities related to the design and construction were limited to providing specifications and reviewing plans, implicitly arguing that if its only duty was to review the plans for port design and construction, it must be MarAd's duty to create those plans. Pl.'s Response at 40-41.[2]

It is clear to the Court that at this stage in the litigation, the parties are at a disagreement as to the duties of each party under the 2003 Agreement, specifically relating to the design and construction of the port. Because this case is at the Motion to Dismiss stage, the parties have yet to conduct discovery as to this issue. Accordingly, when reviewing the Defendant's Motion to Dismiss, the Court must "assum[e] the truth of all the allegations." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Furthermore, "the [f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Assuming as true Plaintiff's allegations that it was MarAd's duty to design and construct the Project, Plaintiff has made out a cognizable case for breach of contract. There is no dispute that completion of the Project has failed to materialize as envisioned by the Agreements between the parties. If it was MarAd's duty to design and construct the port, then, given the fact that the design and construction done on the Project has been faulty, Plaintiff's cause of action for breach of contract can survive. Because there is a genuine issue of material fact as to the duties of the parties under the 2003 Agreement, the Court must deny the Motion to Dismiss at this stage.

---

[2] MOA notes that it, "like any project owner, merely retained insight into the actions of MarAd and its contractors." Pl.'s Response at 32. At the oral argument, Plaintiff analogized its duty of reviewing port design plans to the duty of a new homeowner reviewing plans for the construction of a house, noting "you review the plans and specs to make sure you're getting the four or five bedroom house that you asked for" but stating that MOA was "not taking a management role" and that the review was to "keep [MOA] informed on how [MarAd was] spending their money." Oral Argument at 74.

      ii.  Count II of the Complaint survives because there is a genuine issue of
material fact as to the conduct of MarAd in the settlement of claims with
ICRC.

The Government argues that Count II of the Complaint must be dismissed because it
"fails to state a claim of breach of the implied covenant of good faith and fair dealing because the
alleged breaches occurred after the term of the 2011 Agreement." Mot. Dismiss at 30.
Defendant points out six different allegations made by Plaintiff in this Count, namely that
Defendant breached the duty of good faith and fair dealing by: 1. Recklessly disbursing
Anchorage's funds to ICRC for defective work; 2. Failing to enforce its contractual remedies
against ICRC; 3. Using $11,300,000.00 in Project funds to settle the CBCA Action with ICRC
without notifying or involving Anchorage in the settlement process; 4. Attempting to hide the
settlement from Anchorage; 5. Refusing to participate in the disputes process mandated by the
2011 Agreement; and 6. Failing to pursue a counterclaim against ICRC at any time during either
the 2003 or 2011 Agreements thereby denying Anchorage the benefit of the 2011 Agreement,
which promised that MarAd would pursue affirmative claims against ICRC. *Id.* at 31.

Regarding the first allegation above, Defendant argues that it must fail because it
contradicts an express term of the contract. Mot. Dismiss at 31. Anchorage, Defendant argues,
had the responsibility to review and accept work before submitting it to MarAd for completion,
and thus "any duty concerning reckless management of payment would fall on Anchorage, not
MarAd." *Id.* at 33. With regard to the other allegations, Defendant argues that because those
actions took place after the expiration of the 2011 Agreement, they could not form the basis of a
breach of the duty of good faith and fair dealing because such a duty would terminate along with
the expiration of the contract. *Id.* at 33. The 2011 Agreement terminated on May 31, 2012. DA
at 12.

Plaintiff raises several arguments as to how MarAd breached the 2011 Agreement.
Plaintiff first argues that MarAd recklessly distributed funds to ICRC because although the
defective work was known to the parties in 2010, MarAd continued to pay ICRC for work done
rather than pursue its right to have the defective work corrected. Pl.'s Response at 34. Plaintiff
also avers that MarAd continued to act as though a contractual relationship existed between the
parties even after the May 31, 2012 termination date, creating an implied-in-fact contract. *Id.* at
36. Specifically, Plaintiff mentions that POMO meetings, which were obligated by the 2011
Agreement, continued to occur for a year after 2012. Transcript at 49. During the oral
argument, Plaintiff also stated that it believed that "what happened at the time was the
Government made a conscious decision not to extend the contract, but to pretend to extend the
contract, so that they could get to the point where they could deny [MOA] some of [MOA's]
protections under the agreement." *Id.* at 48.

Again, this case is at the Motion to Dismiss stage. Assuming that the parties continued
their relationship, including formalities such as POMO meetings that the parties would not
usually engage in in the absence of a contractual agreement, it is at least plausible that this
conduct could lead to the creation of an implied-in-fact contract between the parties. This Court
has previously held that "[i]f, after the expiration of a contract, the parties to the contract
continue to perform under the contract's terms, the parties' relationship is generally governed by

a new, implied-in-fact contract that incorporates the terms of the expired contract." *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 780 (2013). Because these issues concern the conduct of various parties and officials at specific times, the parties should be allowed to conduct discovery on the issues in order to better establish what actually happened. At this stage, however, Plaintiff has adequately pleaded a cause of action to survive the Motion to Dismiss. Defendant's Motion to Dismiss is therefore denied with regard to Count II of the Complaint.

### C. Count III

Finally, the Court turns to the issue of whether Plaintiff's third count for breach of contract as a third party beneficiary can survive the Motion to Dismiss. Plaintiff argues that "MarAd breached its contractual duties to MOA by, among other things, failing to enforce its contractual rights against ICRC, and continuing to disburse funds to ICRC for defective work." Compl. at 28. It is uncontested by the Defendant that MOA was a third party beneficiary of the 2003 and 2008 Mar-Ad-ICRC Contracts. Mot. Dismiss at 35 ("The Government assumes that Anchorage was a third-party beneficiary for purposes of this motion.")[3]

A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim. *Sullivan v. United States,* 625 F.3d 1378, 1379-80 (Fed. Cir. 2010) (citing *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003)). Not only is privity a fundamental requirement of contract law, but it is particularly important in cases involving government contracts because the "government consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). The United States Court of Appeals for the Federal Circuit has recognized limited exceptions to that general rule when a party standing outside of privity "stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Thus, under *Sullivan*, when suing as a third party beneficiary, the third party "stands in the shoes" of the injured party to the contract and sues the breaching party.

In the instant case, in order to sue the Government as a third party, MOA must allege that MarAd breached its contract with ICRC, such that MOA may stand in ICRC's shoes and sue MarAd. Plaintiff, however, has failed to sufficiently plead any facts which suggest that MarAd committed a breach of either the 2003 or 2008 MarAd-ICRC contracts. Plaintiff has failed to show any course of conduct that would lead to ICRC taking action against MarAd in court. At best, MarAd can be accused of failing to enforce contractual terms against ICRC. However, as Defendant correctly notes, "the Government's failure to enforce its contractual rights, however, cannot be the basis for a third party beneficiary claim." Def.'s Reply at 19 (*see Sullivan,* 625 F.3d at 1379 ("the Government's failure to enforce a contractual provision . . . does not amount to breach of contract by the Government.")). Because it is not apparent how MarAd breached the MarAd-ICRC contracts, MOA cannot step into ICRC's shoes and pursue a third party claim against MarAd. Accordingly, this Count must be dismissed.

---

[3] Although non-binding, the Court takes notice of the fact that in the District Court for the District of Alaska, the Court found that MOA was a third-party beneficiary of the MarAd-ICRC contracts. *See Anchorage v. ICRC et al.*, No. 3-13-cv-00063-SLG at 30-31.

## IV.    CONCLUSION

For all the reasons set forth above, the Court reaches the following conclusions.  First, this Court has jurisdiction to hear Plaintiffs breach of contract claims because the 2003 and 2011 Agreements can be fairly interpreted as contemplating money damages.  Second, Plaintiff has adequately pleaded sufficient facts to maintain an action for breach of contract.  Finally, the Court determines that Plaintiff has failed to plead sufficient facts to give rise to a claim of breach of contract as a third party beneficiary.  Therefore, Defendant's Motion to Dismiss is hereby denied-in-part with respect to Count I and Count II of Plaintiff's Complaint, and granted-in-part with respect to Count III.

The parties are directed to file a joint status report within 30 days from the date of this opinion outlining the next steps to be taken in this litigation.

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge

# In the United States Court of Federal Claims

No. 14-166C
(Filed: May 21, 2020)
FOR PUBLICATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | \* |
| **ANCHORAGE, A MUNICIPAL** | \* Motion for Summary Judgment; |
| **CORPORATION,** | \* Trial; Contract Formation; Consideration; |
| | \* Genuine Issues of Material Fact Remain |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES,** | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH,** Senior Judge

    Anchorage, A Municipal Corporation ("Anchorage") determined that the facilities at the Port of Anchorage were deteriorating and outdated. Not having the expertise to undertake any project on its own, Anchorage entered into an "innovative partnership" with the Department of Transportation, Maritime Administration, ("MARAD") through two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") (cumulatively "the Agreements"). Anchorage is now before this Court alleging a breach of contract by the United States ("the Government") for losses it sustained under the Agreements. ECF No. 1.

    In lieu of an Answer, the Government filed a motion to dismiss the complaint. ECF No. 10. In its motion, the Government argued that the Agreements were not money mandating, but instead cooperative agreements, thus, outside this Court's jurisdiction. ECF No. 10 at 15-19. It further argued that the 2003 MOU was not backed by the presumption of money damages, therefore, also outside this Court's jurisdiction. *Id.* With regard to the 2011 MOA, the Government argued that the duties allegedly breached—settlement with its prime contractor— were not created by the Agreement because the 2011 MOA expired on May 31, 2012. *Id.* at 19-34. After full briefing and oral argument, the Court denied-in-part and granted-in-part the Government's motion. In denying the motion the Court held: (1) the Court has jurisdiction to hear Anchorage's breach of contract claims because the 2003 MOU and 2011 MOA could be fairly interpreted as contemplating money damages; and (2) Anchorage adequately pleaded

sufficient facts to maintain an action for breach of contract. ECF No. 22. However, the Court dismissed Anchorage's third-party beneficiary claim. *Id*.

Thereafter, the Government filed its Answer. ECF No. 23. Discovery ensued and was completed on July 15, 2019. ECF No. 89. Pursuant to the scheduling order, the Government filed its motion for summary judgment on July 6, 2019, revisiting its argument raised at the motion to dismiss stage. The Government again argued that Anchorage could not prove its breach of contract claims because Anchorage could not establish that a commercial contractual obligation existed. ECF No. 90 at 2. The Government further argued that the 2003 MOU was not supported by consideration. *Id*. at 21. With regard to the 2011 MOA, the Government argued that no implied-in-fact agreement existed to extend the parties' obligations under the 2011 MOA. *Id*. at 29. Anchorage filed its response in opposition on July 26, 2019, ECF No. 98, and the Government filed its reply on August 20, 2019. ECF No. 100. In its reply, the Government raised a new issue–that not only did the Government receive authority from Congress to administer funds, but it also received authority from Congress to administer contracts and provide Federal project oversight. *Id*. at 1. This, according to the Government, rendered the 2003 MOU void. *Id*. Anchorage then filed a motion to strike new arguments raised for the first time in defendant's reply memorandum, or in the alternative, leave to file a sur-reply. ECF No. 101. The Court denied Anchorage's motion to strike and granted Anchorage's motion to file a sur-reply. ECF No. 103. Anchorage timely filed its sur-reply on September 18, 2019. ECF No. 104.

On October 10, 2019, the Court held a status conference informing the parties that the issues raised in the Government's motion for summary judgment required a "mini-trial" to determine the factual disputed issue of consideration. ECF No. 106. The Court was "exclusively interested in the financial arrangement for consideration purposes between Anchorage and the Government, money or otherwise." ECF No. 133 at 2.

Trial was held on February 18-19, 2020, in San Francisco, California. However, prior to trial, the parties filed a stipulation. The stipulation stated that: "MARAD received a total of $163,400,000 from Anchorage for administration on the Project." ECF No. 118 ¶ 9. This alone, would lead the Court to find consideration—that Anchorage paid money for services—which it does. Additionally, at trial, the evidence showed that Anchorage's money was spent by MARAD to provide services, contrary to the Government's assertion that it was not. The evidence also showed that the Government received non-monetary consideration as well. Thus, the Court finds that there was consideration for the Agreements and, therefore, the Agreements are valid, binding contracts. The Court further holds that there remain disputed material issues of fact. For these reasons and the for the reasons set forth below, the Court **DENIES** Defendant's Motion for Summary Judgment.

## I.      Background

In 1999, the Port of Anchorage[1] received a Master Plan, commissioned by the Municipality of Anchorage, outlining the steps the Port needed to take to replace deteriorated facilities and meet increasing demands. PX1.[2] The Master Plan was commissioned to guide the Port's growth for the next 20 years. Trial Tr. at 268:16-17. As part of the Master Plan, the Plan recommended a "north access route to Anchorage military bases" in order to accommodate munitions shipments. PX1 at ES-3. The Port serves as the entry point for military operation at the Joint Base Elmendorf Richardson. *Id*.

In May 2001, William Sheffield, former Governor of Alaska, was appointed as Port Director. ECF No. 60 at 6. Gov. Sheffield was responsible for executing the Master Plan. *Id*. Gov. Sheffield hired lobbyists to help obtain Federal appropriations. ECF No. 90 at 7.

The Port of Anchorage Intermodal Project ("Project") was to be a multi-year infrastructure project that would replace deteriorated and outdated facilities at the Port. ECF No. 97 at 2. In 2001, Anchorage began pursuing federal agencies to help with the Project. *Id*. at 4. After discussions with various agencies, Anchorage and MARAD ultimately entered into an agreement. *Id*. In furtherance of this partnership, the U.S. Government enacted legislation authorizing federal funds for the Project and non-federal[3] share funds to MARAD. *Id*.

Cheryl Coppe was hired as executive administrator for the Project, ECF No. 90 at 7; Trial Tr. at 266, and "was pivotal in the formation of the 'innovative partnership.'" ECF N0. 90 at 7. Ms. Coppe drafted the 2003 MOU, which was ratified by the Anchorage Municipal Assembly, on June 24, 2003, after signatures by both Anchorage and MARAD, in March 2003.[4] ECF No. 98 at 7; Trial Tr. at 291:12-17.

In relevant part, Section IV of the 2003 MOU set forth Anchorage's responsibilities which included:

> Provide overall program requirements and direction of Port Expansion to MARAD.
>
> . . .

---

[1] The Port of Anchorage is a department within the Municipality of Anchorage. ECF No. 97 at 2 fn.2

[2] "PX__" refers to Plaintiff's exhibits admitted at trial.

[3] Federal funds included funds from the Department of Defense, Federal Transportation Administration and Federal Highway Administration. Trial Tr. at 166-169.

[4] The ratification of the 2003 MOU came after MARAD had already hired Integrated Concepts and Research Corporation ("ICRC") for the design and construction of the Project. The ratification, according to Ms. Coppe, was just "pro forma." Trial Tr. at 304:15-18. The Court agrees. The evidence showed that MARAD and Anchorage were moving forward as if the MOU had been ratified.

Review all plans, specifications, and status reports submitted by the primary contractor before submission to MARAD for inclusion in its permanent federal project file.

. . .

Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design construction or rehabilitation as necessary.

Section V of the 2003 MOU set forth MARAD's responsibilities, which included:

Provide specialized technical expertise and input as appropriate to Port Expansion tasks and activities.  Administrative costs to be used for MARAD participation under this project will be 3% of funding received.

. . .

Obligate and disburse funding for Port Expansion oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

PX9.

To aid in the construction of the Project, in 2003, MARAD entered into an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract with Integrated Concepts and Research Corporation ("ICRC") for the design and construction of the Project.[5]  Pl. App. at 612.[6]  ICRC qualified as an 8(a) small business under the Small Business Administration's ("SBA") 8(a) program.  ECF No. 90 at 10-11.  In 2008, MARAD and ICRC again executed a contract "to continue performance of design-build and Project management related services for the Project."  *Id.*

MARAD selected the open cell sheet pile structure to construct the Project.  Pl. App. at 1168.  Construction began, but then in 2010, all construction stopped due to damaged sheet piles.[7]  ECF No. 97 at 16.

_____

[5] Originally, MARAD entered into a contract with Koniag Services, Inc., an Alaskan Native Corporation, but shortly after execution of the contract, MARAD determined KSI was not equipped to perform so MARAD agreed to novate the contract to ICRC.  For continuity, the Court will use ICRC in place of KSI at all times.

[6] "Pl. App. ___" refers to Plaintiff's appendix to its motion in opposition, ECF No. 97.

[7] The Court viewed the site on August 1, 2019.  The Court saw the significant damage to the sheet piles that had been removed as well as the buckling of the sheet piles that remained creating an unfinished pier wall.  The Court also observed sink holes that were a result of the buckling sheet piles.

In November 2011, the parties renegotiated the agreement with MARAD, resulting in the 2011 Memorandum of Agreement.  Trial Tr. at 211-212; PX24.  The 2011 MOA redefined the roles and responsibilities of Anchorage and MARAD, outlined authorities, and assured accountability for the Project.  PX24.  It created a Port Oversight and Management Organization ("POMO") to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project."  *Id*.  The POMO was made up of a committee of decision makers from both Anchorage and MARAD, who would hold frequent meetings to address issues related to the Port construction.  ECF No. 97 at 17.  The 2011 MOA continued the language from the 2003 MOU: "the parties will transfer to MARAD on a quarterly basis 3% of all funding received under this project to cover MARAD's costs and added: "related to the project until May 3, 2012."  Trial Tr. at 216; PX 24.

After the MOA was executed, funds were transferred to MARAD.  Trial Tr. 219:5-7.  In practice, MARAD would request money and Anchorage, in turn, would pay.  Trial Tr. at 219-20; 352-53.  The 2011 MOA also stated that MARAD was "[p]ursuant to Contract Disputes Act, 41 U.S.C. §§ 7001-7013 [sic], to administer claims submitted by MARAD contractors and coordinate and cooperate with MOA/POA in affirmative and defense claims consistent with federal contract law."  PX 24.  The 2011 Agreement remained in effect until its expiration on May 31, 2012.

On December 28, 2011, ICRC brought two claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals.   Pl. App. at 1426-1459.  MARAD settled with ICRC in the amount of approximately $11,300,000.00.  *Id*. at 1460-63.

## II.    Statutory Framework

MARAD received authority from Congress to implement the Project through the Transportation Equity Act for the 21st Century ("TEA-21"), enacted June 9, 1998, as Public Law 105-178.  The legislation authorized funds for the project:

> (3)  Intermodal center authorizations. – Notwithstanding any other provision of law, each of the following projects are eligible for funding under section 5309(m)(1)(C) of title 49, United States Code:
>
> . . .
>
> (F) Port of Anchorage Intermodal passenger and freight facility.

*See* Section 3030(d)(3) of the Transportation Equity Act for the 21st Century (Public Law 105-178) as amended by Section 345(2)(F), Title III, Division I, of the Consolidated Appropriations Resolution, 2003 (Feb. 20, 2003) ("TEA-21").

On that same date, MARAD received appropriated funds through the passage of the Consolidated Appropriations Resolution which stated:

> SEC. 626.  Any amounts previously appropriated for the Port of Anchorage for an intermodal marine facility and access thereto shall be transferred to and administered by the Administrator for the Maritime Administration including non-Federal contributions.  Such amounts shall be subject only to conditions and requirements required by the Maritime Administration.

Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7 §§ 345, 626, 117 Stat. 11, 106, 418 (Feb. 20, 2003).

A subsequent appropriation was further made in 2005, under the Safe, Accountable, Flexible, Efficient, Transportation Equity Act: A legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59 § 10205, 119 Stat. 1144, 1934 (Aug. 10, 2005).

The funds transferred to MARAD to date total approximately $306,000,000.  ECF No. 118 at 2; Trial Tr. at 8:8. Of this amount $139,000,000 were federal funds and $163,400,000 were funds from Anchorage.  ECF No. 118 at 2; Trial Tr. at 8:17. There is no dispute that $163,400,000 was transferred by Anchorage to MARAD through the U.S. Treasury.  *Id.*

## III.    Trial Testimony and Discussion

The Government raises three theories as to why judgment should be granted in its favor. First, the Government argues that the 2003 MOU was not a contract to hire MARAD because Anchorage could not prove that it paid a 3% fee to hire MARAD to provide services.  Trial Tr. at 8.  Instead, the Government argues that the entire amount of $163,400,000 was used under the federal procurement contract by MARAD to pay ICRC for construction costs and that all administrative costs came from federal appropriated money, only.  Trial Tr. at 19-20.   Second, the Government advances that the military road was merely an ancillary benefit, not consideration.  Trial Tr.  23-24.  And third, the Government advances the argument that Congress only authorized MARAD to administer the funds for the project, and, in addition, raises its new argument—that the origination of the partnership was Congress, not Anchorage, therefore the MOUs are void.  Trial Tr. at 375.

At trial, the Court heard testimony regarding the financial arrangements between MARAD and Anchorage.  It also heard argument on the Government's contention that MARAD was only on the Project to administer the money—nothing else.  The Government presented its case with two witnesses, David Bohnet and Alexander Caine.  Anchorage called three witnesses – Colonel George Vakalis, Cheryl Coppe, and Lucinda Mahoney.  After hearing the testimony and reviewing the evidence, the Court finds that the evidence is clear—there was consideration and the 2003 MOU and 2011 MOA are valid and binding contracts.

### A.  Formation of a Contract

In order to prove that Anchorage "hired" MARAD to "provide its expertise to design, construct, oversee and manage the [Project]" compl. ¶ 5, Anchorage must prove the elements of contract formation for that alleged duty.  Specifically, Anchorage must prove: (1) offer, (2) acceptance, (3) actual authority, and (4) consideration. *Massie v. United States*, 166 F.3d 1184,

1188 (Fed. Cir. 1999).  The Government does not take issue with the first three elements.
Instead, and as stated earlier, the Government contends that consideration is lacking.
Consideration is a bargained for exchange between parties to an agreement and may consist of
promise or performance.  Restatement (Second) of Contracts Sections 71,72 (1981).  At its most
basic, consideration is a promise for a promise.  Consideration also means mutuality of
obligation. *Total Medical Mgmt. v. United States,*104 F.3d 1314 (Fed. Cir. 1997).

## 1.    Anchorage Paid At Least 3% To MARAD

The Government argues that the 2003 MOU was not a contract to "hire" MARAD
because Anchorage could not prove that it paid a 3% fee to hire MARAD to provide
administrative costs.  ECF No. 90 at 23.  Instead, the Government argues that MARAD spent all
of Anchorage's funds to pay ICRC for construction costs, only.  The Federal money, according
to the Government, was used to cover MARAD's administrative costs, not Anchorage's money.
Trial Tr. at 19-20.  To prove this contention, the Government called David Bohnet, a MARAD
employee.  Mr. Bohnet began working as a federal employee in September of 2012, and at that
time, he had 30 grants that he was responsible for managing, including this Project.  Trial Tr. at
37, 92, 109.   As part of his responsibilities, and in preparation of trial, Mr. Bohnet was tasked
with preparing spreadsheets tallying all the funds appropriated, transferred, and expended in
connection with the project.[8]  Trial Tr. 40; *see* DX39, DX40, and DX41.[9]  The first round of
spreadsheets was compiled in April 2016.  Trial Tr. at 44:5. However, prior to this trial, Mr.
Bohnet updated the spreadsheets in December 2019, well after the close of discovery.  Trial Tr.
at 56:20. The updates, according to Mr. Bohnet, were necessary for accuracy purposes to show
that all monies had been spent.  Trial Tr. at 44.

On direct examination, Mr. Bohnet gave an in-depth review of his reports.  DX39, titled
"Anchorage Fund Summary," detailed all the expenditures for administrative purposes and
construction purposes as well as the individual task orders on the job.  Trial Tr. at 42-43.  Tab 2
of DX 39 contained a second summary of expenditures, updated in December 2019, to show the
payment of a settlement.  Trial Tr. at 44-45.  DX40, was a summary of Anchorage's
administrative expenses.  In his updated version, Mr. Bohnet removed certain calculations
regarding salaries.  Trial Tr. at 47:4-10.  DX41 was titled the "Delphi Report Compilation."
Trial Tr. at 47.  Delphi was the invoicing system MARAD used for all its expenditures.  Trial Tr.
at 48:24-25.  This report tallied purchase order summary and accounts payable reports.  Trial Tr.
at 49-51.  The Delphi Report identified the funding source—that is—where the funds came from
to pay for the administrative and construction costs.  Trial Tr. at 51-52.  Funds were provided by
the Department of Defense, Federal Highway Administration, Federal Transit Administration,
Port of Anchorage and the state municipality of Alaska.  Trial Tr. at 52.  This report, DX 41, was
used to compile DX39.  Trial Tr. at 58:12-14.

The purpose of the spreadsheets was to show where every dollar, federal and nonfederal,
was expended, and in particular to show that all of Anchorage's money was spent on

---

[8] In making his spreadsheets, Mr. Bohnet considered the state and municipal dollars the
same.  Trial Tr. at 114:8-20.

[9] "DX__" refers to Defendant's exhibits admitted at trial

construction costs, not administrative costs. At his deposition, Mr. Bohnet defined administrative costs as anything not construction related. Trial Tr. at 99:7-11. At trial, Mr. Bohnet expanded his definition to "other elements . . . that are not nails and hammers." Trial Tr. at 99:12-15. He did not elaborate other than that statement. Significant to this issue was Mr. Bohnet's testimony regarding DX41. This report, the Delphi Report which tallied all the expenditures, was the evidence Mr. Bohnet relied upon when asked by counsel on direct examination: "Do you know how much of the nonfederal money was spent on construction?" allowing him to state: "All of it." Tr. Transcript at 60:5-7. Relying on DX40, Mr. Bohnet testified when asked: "Were any of MARAD's administrative costs in DX40 paid out of the nonfederal contribution?" he replied: "No." Tr. Transcript at 61:4-6. Mr. Caine, Budget Director of MARAD, echoed this sentiment. Trial Tr. at 147:12-14. ("On the nonfederal side, there was no – no administrative charges to the nonfederal source funds."). Mr. Caine also reviewed Mr. Bohnet's spreadsheets and found them to be accurate. Trial Tr. at 132-33. In concluding his testimony, Mr. Bohnet reaffirmed that his reports showed that Anchorage did not pay MARAD any money for administrative costs. Trial Tr. 87:14-16. Instead, according to Mr. Bohnet, his reports showed that Anchorage's money was predominately spent on the ICRC contract. Trial Tr. at 86:17-19.

It became clear, however, on cross-examination, that the spreadsheets told a different story. For instance, in DX39 certain task orders that were not construction costs were paid for by Anchorage. A suitability study was paid for by Anchorage in the amount of approximately $3.4 million. Trial Tr. at 97:6-18, DX39.97-39.107. Although the cost was placed under construction costs in the Delphi Report, Mr. Bohnet could not say whether or not it was a construction cost or administrative cost. Trial Tr. at 99:14-20. In fact, he didn't know what the costs were at all. Trial Tr. 99:14-16. In the same spreadsheet, DX39, there was a line item for a DCAA audit, conducted by the defense auditing agency, in the amount of $118,280 and paid for by Anchorage. Trial Tr. at 100:6-28. Mr. Bohnet could not explain what the expenditure was for, yet he put it in the construction cost ledger portion of his spreadsheet. Trial Tr. at 101:3-5. Another line item was for $199,769.46 labeled 2DFAS Elmendorf. Trial Tr. at 101:8-21. That too was paid by Anchorage and Mr. Bohnet could not again ascertain as to whether it was for administrative or construction costs. Id. The spreadsheet also showed that money was paid to the Department of Justice in 2013 and 2014 in the amount of $267,224. Trial Tr. at 102:5-18. When pressed, Mr. Bohnet admitted that the costs associated with this line item were "presumably for legal expenses." Trial Tr. at 103:8-10. Yet, he still labeled the costs as construction costs. DX39 further showed that Anchorage paid for two settlements in the amounts of $1.6 million and $11.2 million. Trial Tr. at 105:8-25. What DX39 did not show, and Mr. Bohnet admitted, were any task orders showing that Anchorage paid ICRC. Trial Tr. at 107-08. In fact, Mr. Bohnet testified that MARAD paid all the invoices that came in from ICRC. Id.

With regard to DX40, Mr. Bohnet's new 2019 version related to changes regarding salaries. Trial Tr. at 108. In the updated 2019 report, that line item—salaries—was removed at the direction of counsel. Trial Tr. at 109:3-6. In the 2016 report, MARAD carried a line item for full-time employee salaries—$3.2 million—from 2007 through 2019. DX40.2 (Administrative Contractors). And interestingly, Mr. Caine testified that it was very important for the Government to accurately reconcile its spending on a monthly basis. Trial Tr. at 159. Yet, when questioned with regard to missing salaries from the spreadsheets he was not able to

say why the salaries were removed. *See* Trial Tr. 154-166. In fact, Mr. Caine's testimony revealed that he only looked at the spreadsheets to make sure that there were no undelivered orders and to reconcile the amounts. Trial Tr. at 166:6-16.

The evidence clearly showed mutuality of obligation. There is no dispute that Anchorage transferred $163 million to MARAD. That transfer was made in exchange for services that MARAD offered to provide to the project. Mr. Bohnet's testimony proves that MARAD spent its money on administrative costs. The reports showed that MARAD took over $14 million out of Anchorage's funds and used it to pay for things like legal fees, the settlement of claims that were filed against the MARAD, for DCAA audits and salaries—which clearly fall within the guise of administrative expenses. The administrative expense incurred by MARAD and paid for out of Anchorage's money was well in excess of 3% of $163 million. Therefore, the Court finds that there was consideration for both Agreements. Even so, the Court will address the nonmonetary benefits as well.

## 2.  There Was Also Nonmonetary Consideration

The Government did not put any evidence on to rebut the military benefit piece of this Project but instead argued that maybe there were military benefits, but if there were, they were only paid for out of federal dollars. Trial Tr. at 23-24. However, there was no proof at trial supporting this claim. Instead, Anchorage's witness, Col. Vakalis, testified as to the military benefits received by the Government. Ms. Coppe also testified as to the military's involvement.

Col. Vakalis was employed by Anchorage from 1994-2000. Trial Tr. 191:17-23. He was the operations manager from 1994-1998 and municipal manager from 1998-2000. Trial Tr. 192:5-10. He was responsible for overseeing Port operations. Trial Tr. at 193:1-24. He left in 2000 and returned to the Port as municipal manager from 2009-2015 with basically the same responsibilities. Trial Tr. at 194:3-25. Prior to his military retirement, Col. Vakalis was garrison commander for three army posts in Alaska, including Elmendorf Air Force Base. Trial Tr. at 196:21-24.

Col. Vakalis testified that the Project was built to satisfy infrastructure needs the military had expressed all the way back to 1994. Trial Tr. at 192:5-7. It was part of the 1999 Master Plan. Trial Tr. at 195:22-23. He further testified about the need to have these infrastructure improvements to facilitate deployments back when he was the garrison commander. Trial Tr. at 198-201. In his capacity as municipal manager coupled with his history as garrison commander, Col. Vakalis testified that the $163 million along with the federal money was intended to build a dual-use facility for the people of the state of Alaska and for the military. Trial Tr. 207-208. This was a huge project, and Col Vakalis testified that when Anchorage paid $163 million they were paying for an entire project, not just pieces of a project. *Id*.

Ms. Coppe also testified that she drafted a "Purpose and Need Statement" in April 2002, which discussed the proposed Port expansion as being critical to the military's rapid deployment capabilities. Trial Tr. 274:9-24; PX4. This was sent to MARAD before the 2003 MOU was signed. Trial Tr. 274-75.

Additionally, MARAD, all the way up until July of 2019, posted these military benefits on its website. Trial Tr. at 203-08; PX48.   Specifically, it boasted:

- The project has added a new direct road access between the Port and Elmendorf Air Force Base to facilitate quick deployments of military forces through the port and negating the need to use the public highway system, thereby transiting between secure facilities.

- The direct road access to Elmendorf AFB has also allowed for the mining of fill material on Elmendorf property which is being used in creating the new Port facility.  The mining of this fill material is also reduction a flight path hazard at the end of the North-South Runway on Elmendorf providing a win-win solution for both the Port and Elmendorf.

- The project adds new staging areas for military deployment and provides dual-use facilities which can be used by the Port for maintenance activities or by the military as hangars for helicopters new staging areas for military deployments and dual-use facilities which can be used for military hangars for helicopters.

PX48 at 2.  Col. Vakalis testified that the road was actually constructed and is currently being used.  Trial Tr. at 205:24. He further testified that the staging area was constructed and also being used.  Trial Tr. at 207:8-13.

Mr. Bohnet acknowledged that he has construction experience through his work as grants management specialist and admitted that construction projects require project management. Trial Tr. at 94.  The evidence showed that the program management costs which were required to supervise and manage the construction work at this project were paid for out of Anchorage's money.  *See* DX39, Tab TO 0112 ("Task Order").  This Task Order related to Project Management Office.  Trial Tr. 254:13-15.  Col. Vakalis testified that one would need project management to build staging areas, direct access road and to reduce the flight path hazard.  Trial Tr. at 255:11. And the Task Order clearly showed that Anchorage's funds were used to pay for this.  Trial Tr. 256:8-13. Thus, the evidence showed that the military gained direct benefits as a result of the Agreements; therefore, the Court finds that there was nonmonetary consideration as well.

Because the Court finds that there was consideration—both monetary and nonmonetary—the Court finds that the Agreements are binding and valid contracts.

### B. The Agreements Are Not Void[10]

The Government argues that the three obligations found in the Agreements that are alleged to have been breached were created by law rather than through the execution of the Agreements. This, according to the Government, relieves MARAD of the obligations, promises, and duties it made to Anchorage through the Agreements, thus making the Agreements void. The Government argues that the legislation—TEA-21 and the Consolidated Appropriations Resolution in 2003—did three things: (1) it gave MARAD the directive from Congress to administer the Port Project; (2) it gave MARAD the ability, which it didn't have, to spend Anchorage's money which was what Anchorage used to induce Congress to put the Federal agency in charge of the Project; and (3) the statute gave MARAD the ability to put conditions and requirements on it. *See generally* ECF No. 100; *see also* Trial Tr. at 14-15. The Court disagrees with all of these arguments.

Neither party disagrees that Anchorage, through Gov. Sheffield, hired lobbyists to pursue Federal funding to assist with the Project.[11] Neither party disagrees that Congress enabled MARAD to receive authority to carry out the Project. The disagreement becomes what authority was given to MARAD. In other words, did MARAD receive general authority to administer the project or did Congress specify how MARAD was to administer the project, leaving no room for contractual obligations to arise between MARAD and MOU?

In looking at the history of the relevant legislation regarding the Project, the Court discerns nothing other than the normal process of authorizing an agency to do something and then appropriating the money to do it.

Specifically, MARAD received authority from Congress to carry out the Project through TEA-21. Originally, TEA-21 authorized federal surface transportation programs for highways, highway safety, and transit for the 6-year period 1998-2003. But then, in 2003, TEA-21 was amended to authorize funds specifically for the Project:

> (3) Intermodal center authorizations.--Notwithstanding any other provision of law, each of the following projects are eligible for funding under section 5309(m)(1)(C) of title 49, United States Code:
> . . .
> (F) Port of Anchorage Intermodal passenger and freight facility.

---

[10] In its reply brief, the Government changes its theory. It is well settled that reply briefs are only for the purpose of *replying* to a plaintiff's brief, not, as here, to put forth new theories of the case. The Court allowed the brief and allowed Anchorage to file a sur-reply. However, the Government is warned not to do this in the future.

[11] The Government seems to argue that the lobbying efforts "induced" the Congress to enact the appropriations statute and that that inducement voids the Agreements. ECF No. 90 at 6-11; Trial Tr. 12-14, 375-376. This argument is without merit. Anchorage hired lobbyists in order to secure the legislation. The Congress then passed the appropriations statute. This is a common every day activity within the Congress. And the appropriations statute is just that—an appropriations statute giving money to a Federal agency to carry out the Project.

Thus, the 2003 amendment to TEA-21 specifically provided MARAD authority to carry out the Project.

Then, once MARAD had authority to carry out the Project, MARAD received appropriated funds to carry out the authority granted to it by TEA-21 through the following:

> SEC. 626. Any amounts previously appropriated for the Port of Anchorage for an intermodal marine facility and access thereto shall be transferred to and administered by the Administrator for the Maritime Administration including non-Federal contributions. Such amounts shall be subject only to conditions and requirements required by the Maritime Administration.

Consolidated Appropriations Resolution 2003, Pub. L. No. 108-7 §§ 345, 626, 117 Stat. 11, 106, 418 (Feb. 20, 2003).[12]

Somehow, the Government converts the general statutory language to administer the Project into a directive to enter into a contract with ICRC:

> The appropriate interpretation of the statute is that Congress authorized MARAD to administer the ICRC contract to complete the Project and to disburse all Project funds to that contract. *The "administer" language is the operative grant of authority;* the "conditions and requirement" language merely supported the grant of authority. If Congress had not intended for MARAD to administer a Federal contract to complete the Project, there would have been no reason to afford the agency the ability to have non-Federal contributions transferred to it so that those funds could be disbursed to the ICRC contract along with the appropriations.

ECF No. 100 at 4 (emphasis added).

The Government confuses "authorization" and "appropriation" by interpreting the appropriations language as its "grant of authority." However, the grant of authority came from TEA-21—the authorization statute, not the appropriations statute. And it is clear that the appropriations statute is silent with regard to how MARAD should administer the Project. Indeed, with regard to administration of the Project, the appropriations statute states that "any amounts previously appropriated . . . shall be transferred to and administered by [MARAD]." The statute is clear: it is speaking to any amounts of funds that had previously appropriated for the Project be transferred to and administered by MARAD. The only limitation on how MARAD should administer the Project is that: "Such amount shall be subject only to conditions and requirements required by the Maritime Administration." Thus, the Court is perplexed as to how the Government can read the statute to require MARAD to administer the ICRC contract.[13]

---

[12]  SAFETEA-LU was a subsequent appropriation in 2005.

[13]  Intertwined in this argument is that the statute also mandated that MARAD chose ICRC because it was an 8(a) small business. This argument must fail for the same reasons.

The Government further tries to use the appropriations bill language to suggest that this was a congressional grant of authority. Specifically, the Government equates "administer funds" with "administer contracts." The Court is not persuaded. Authority, as a prerequisite to an appropriation, means "legal authority to carry out a program." *See The Government Contracts Reference Book* (Nash, Schooner et al., 4th ed. 2013) (citations omitted). In contrast, an appropriation is "[a]n act of Congress permitting federal agencies to incur "*obligations*." *See The Government Contracts Reference Book* (Nash, Schooner et al., 4th ed. 2013). "An obligation is a definite commitment by the government to spend appropriated funds. A binding contract is an obligation." *Id.* And "appropriated funds" is defined as "funds made available by Congress for specified purposes, including formation of contracts." *Id.* If the Court were to accept the Government's argument, government contracting would not exist because all obligations would be owed to Congress, not the agency. The directive to administer funds means those funds that are available for obligation, thereby carrying out what the appropriations statute is meant to do. By interpreting the directive "to administer funds to mean "administer contracts," MARAD would render obsolete all duties contained in government contracts. Instead, "administer funds" in an appropriations statute grants the authority to an agency to incur obligations by the formation of contracts. It does not tell the agency how or where to enter into those contracts. And in this case, MARAD entered in the Agreements with Anchorage and contracted with ICRC.

Here, it is clear, the appropriations statute by its very definition, permits an agency to incur obligations through binding agreements. And MARAD carried out this authority to obligate appropriated funds through the execution of the Agreements.

And finally, the Government argues that the "clearest proof that MARAD's obligations were created by law, not contract, is the fact that MARAD executed the Federal procurement contract with ICRC and administered the appropriations with Federal oversight before the 2003 MOU was executed." ECF No. 100 at 6. However, at trial, Ms. Coppe testified that the ratification of the 2003 MOU was just "pro forma." Trial Tr. at 304:15-18. The Court agrees. The evidence showed that MARAD and Anchorage were moving forward as if the MOU had been ratified. For instance, the Government admits that "[o]nce Congress authorized MARAD to 'administer' the funds for the Project, Anchorage and MARAD worked out the details of their 'innovative partnership' . . . ." ECF No. 90 at 12. Ms. Coppe worked with Gene Simmons, the Contracting Officer for MARAD on the particulars. *Id.* She then sent a draft MOU to MARAD on March 1, 2003, to which MARAD provided no significant edits. *Id.* Thereafter, on March 14, 2003, MARAD signed the 2003 MOU. JX2; PX9. Then two months after MARAD's signature on the 2003 MOU, MARAD entered into the procurement contract, on May 30, 2003. PX12. The 2003 MOU was ratified less than one month later, on June 24, 2003. JX2. The Government also admits "Anchorage, MARAD, and ICRC worked collectively to advance the Project from 2003 to 2012." ECF No. 90 at 15. Thus, it is clear that the parties were moving forward as if the ratification had occurred and that the ratification was indeed just "pro forma."

## IV.   Summary Judgment

In evaluating a summary judgment motion, the Court draws justifiable inferences in favor of the non-moving party.  *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one which will affect the outcome of the case.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986).   In deciding a motion for summary judgment, the Court does not resolve factual disputes, but ascertains whether material disputes of fact are present.  *Id*. at 250.

### A.  The Government Was Authorized to Receive the 3% Fee

The Government advances the argument, in its motion for summary judgment, that "MARAD had no authority to either charge fees or retain any amounts collected consistent with the rule against augmentation of appropriations."  ECF No. 90 at 24.  The Government cites to Federal fiscal law principles, including the U.S. Constitution, the Miscellaneous Receipts statute (31 U.S.C. § 3302), the GAO Redbook, and two Comptroller General opinions.  However, the cited material is only instructive on what the Government is required to do internally when handling appropriated funds.

First, the Government asserts that under U.S. Constitution Article I, § 9, Cl. 7, provides that Treasury money may not be drawn unless the legislature passes an appropriation.  However, Congress did pass an appropriation.  *See* 2003 Pub. L. No. 108 7, 117 Stat. 11, 106, §626 (February 20, 2003).  Indeed, the appropriated funds were to be used on the Project and to be administered by MARAD.  *Id*.  Nowhere in the statute does Congress prohibit MARAD from charging a 3% fee.  Instead, the appropriation specifically grants MARAD the authority to put conditions and requirements on any amount of money previously appropriated for the Project including non-Federal contribution.  *Id*.  Those conditions and requirements resulted in the 2003 MOU.  And that agreement provided for the 3% fee to be paid as consideration for MARAD's services.  Congress did not prohibit this action.

Second, the Government asserts the Miscellaneous Receipts statute (31 U.S.C. §3302) precludes MARAD from retaining funds from Anchorage.  Yet, the statute merely provides that officials and agents of the Government must promptly deposit money they receive into the Treasury, and does not prohibit the 3% fee.

Third, the Government argues that MARAD lacked the authority to retain any of the Federally-appropriated project funds for agency use.  ECF No. 90 at 24.  Relying on the GAO Redbook's rule against augmentation, the Government argues that agencies may not "transfer funds between appropriations without specific authority."  ECF No. 90 at 24 *citing* Principles of Federal Appropriations Law (GAO Redbook) (4th Edition, 2016 Revision) at 6-162-6-170.  However, augmentation is not at issue.  And, nowhere in the legislation did Congress prohibit MARAD from accepting a fee.

Fourth, and lastly, the cited GAO opinions are not dispositive as well as Anchorage correctly points out:

> because (1) GAO opinions and decisions on appropriations law are internal
> to the Government and provide direction to agency and government
> officials involving the use of, and accountability for, public funds, and do
> not affect agreements between the Government and a private party; (2) the
> cited opinions do not state that a contract lacks consideration because it
> violates the Miscellaneous receipts statute; and (3) the cited opinions
> involve Government agencies attempting to augment, obligate, and increase
> funding and appropriations and/or allocate funding to other needs without
> prior legislative approval, which is not the case here. The money was
> approved by Congress for the Project and was used for the Project,
> including the expenses incurred by MARAD in administering the work.

ECF No. 97 at 28.

Therefore, for the reasons set forth above, the Court holds that MARAD was authorized to receive the 3% administrative fee.

### B. Remaining Genuine Issues of Material Fact

The remaining disputed issues of material fact are as follows.

- It is clear from the 2003 MOU that MARAD had a duty to oversee, design and construct the Project. However, it is the Government's contention that Anchorage was in total control of the project. *See* ECF No. 90 at 14-16. Anchorage, disagrees, and as such, the question as to whether Anchorage had control of the Project and was the ultimate decision-maker remains a disputed issue of material fact.

- Whether MARAD's 2012 settlement with ICRC was a breach of the implied covenant of good faith and fair dealing because the 2011 MOU had expired, and no implied-in-fact contract was created remains a disputed issue of material fact.

### V.    CONCLUSION

For the reasons set forth above, the Court finds the 2003 MOU and 2011 MOA binding and valid contracts. The Court further holds that the Agreements are not void and that MARAD was authorized to receive the 3% fee. However, there remain genuine issues of material fact as enumerated above. For these reasons, the Court **DENIES** Defendant's motion for summary judgment.

The Court sets a telephonic status conference for **Tuesday, June 2, 2020 at 2:00 p.m. EDT** to discuss the trial schedule.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge

# In the United States Court of Federal Claims

No. 14-166C
(Filed:  July 1, 2020)

```
*************************************
                                    *
ANCHORAGE, A MUNICIPAL              *
CORPORATION,                        *
                                    *
              Plaintiff,            *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
              Defendant.            *
                                    *
*************************************
```

## ORDER

After this Court's decision of January 22, 2015, ECF No. 22, denying the Government's Motion to Dismiss, ECF No. 10,  on the grounds that the 2003 Memorandum of Understanding and the 2011 Memorandum of Agreement  (referred to collectively as "MOUs") in this case were cooperative agreements rather than contracts; after this Court's May 21, 2020, ECF No. 141, decision denying the Government's Motion for Summary Judgment, ECF No. 90; after a mini-trial that focused on consideration; the Government asserted at a June 3, 2020 status conference that the contract formation elements of intent, offer and acceptance, and authority regarding the 2003 and 2011 MOUs were still in dispute; therefore, it intended to make this argument at trial. Anchorage disputed this assertion, and the Court on June 4, 2020, ECF No. 143, ordered briefing on this issue. The last brief was submitted on June 16, 2020, ECF No. 150.

The Government argues that its Motion for Summary Judgment dealt only with the lack of the contract formation element of consideration, leaving the lack of the other elements in play. Furthermore, at the status conference of October 10, 2019, which was held to organize the mini-trial, the Government reserved (and the Court allowed) the right to raise these issues at trial.

Anchorage argues (1) that this Court concluded that the MOUs were contracts in its decision denying the Government's Motion to Dismiss, (2) that the Government admitted in its Answer that the MOUs were contracts, (3) that this Court concluded again that the MOUs were contracts in its decision denying the Government's Motion for Summary Judgment, and (4) that the Government did not reserve its arguments on the lack of the other contract formation elements in the October 10, 2019 status conference.

For the reasons expressed below, the Government is prohibited from making arguments based on lack of contract formation at the principal trial.

## I.    The Government's Motion to Dismiss, June 27, 2014

The thrust of the Government's Motion was that the MOUs were cooperative agreements rather than contracts; therefore, the Court did not have jurisdiction because cooperative agreements are not money-mandating.  The Court decided on January 22, 2015 that the MOUs were not cooperative agreements and that they were express contracts between the Government and Anchorage.  ECF No. 22 at 6.

Anchorage points out that in the Government's briefing, it referred to the MOUs as "contracts."  Anchorage further argues that the Government implicitly admitted that the agreements were binding, the issue being whether they were contracts over which the Court had jurisdiction or cooperative agreements over which the Court would not have jurisdiction.  ECF No. 150 at 2-3.  Although the Government often used the word "contract," at other times it was careful to refer to the MOUs as "agreements."  Although it is true, as Anchorage argues, that cooperative agreements are still binding on the parties, the Court does not see how this fact would preclude the Government from arguing that the contracts found by the Court were not properly formed.  The Government's Motion to Dismiss gave the Court a binary choice: the MOUs were either cooperative agreements or contracts.  The Court held that they were not cooperative agreements and that they were therefore contracts, but they were contracts because the MOUs were money-mandating. This holding does not preclude the Government from arguing that they were not *valid* contracts.

## II.    The Government's Answer, February 5, 2015

After this Court decided that it had jurisdiction under the Tucker Act because the MOUs were money-mandating, the Government filed its Answer. Anchorage argues that the Government admitted in its Answer that the MOUs were contracts in Paragraphs 17 and 23 and in its response to Paragraph 102 of the Complaint:

> 17. Admits that in 2003, the parties entered into a contract identified as a Memorandum of Understanding (2003 agreement). Admits that the 2003 agreement delineated the contractual responsibilities between the parties. Denies the remainder of the allegations contained in paragraph 17.

> 23. Admits that in 2011, the parties entered into a contract identified as a Memorandum of Agreement (2011 agreement). Admits that the 2011 agreement set forth the contractual responsibilities between the parties. Denies the remainder of the allegations contained in paragraph 23.

ECF No. 23 at 3-4.

Furthermore, in Paragraph 102 of Plaintiff's Complaint, MOA alleged that "MarAd

executed two contractual agreements with MOA, the 2003 MOA-MarAd Agreement and the 2011 MOA-MarAd Agreement." ECF No. 1 at 27. In response, MARAD stated as follows: "102. Admits." ECF No. 23 at 14.

Looking at the cited language, it is hard for the Court not to conclude that the Government admitted that the 2003 and the 2011 MOUs were contracts. This is a different case from the Motion to Dismiss where, essentially, the Court decided that the MOUs were not cooperative agreements and that they were contracts because they were money-mandating, without deciding whether the contracts were properly formed. The Answer's immediate context is different, that is, it is an Answer pure and simple. It was not made in the context of a binary choice. The Government could have submitted its Answer with any truthful response, except that it could not claim that the MOUs were cooperative agreements. The Government could have claimed that, although the MOUs were *contracts*, they were not *valid* contracts. This, the Government did not do. It should have.

As Anchorage points out, the Federal Circuit and the Court of Federal Claims has held the answering party to its statements in an answer:

> MARAD's admissions as to the existence of two contracts puts to rest any issue regarding contract formation. The Court of Appeals for the Federal Circuit has long held that "an answer to a complaint constitutes an admission." *E.C. McAfee A/C Bristol Metal Indus. of Canada Ltd. v. United States*, 832 F.2d 152, 154 n.* (Fed. Cir. 1987) (observing that government could not dispute a fact it admitted in its answer). Similarly, the Court of Federal Claims has, on multiple occasions, held the same. *See, Ameriserv Tr. v. United States*, 125 Fed. Cl. 733, 745 (2016) (admissions in the answer are "judicial admissions" and thus "render the facts contained therein indisputable."); *Alli v. United States,* 86 Fed. Cl. 33, 34 (2009) ("pleadings are judicial admissions" which "render the facts contained therein indisputable."). *See also,* Wright and Miller, Federal Practice and Procedure ("As has been noted in many judicial opinions, the theory of Rule 8(b) is that a defendant's pleading should apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable the plaintiff to prevail") 5 Fed. Prac. & Procedure § 1261(3d. ed.) p.1.

The Court has examined these authorities and is persuaded by them.

### III.    Motion for Summary Judgment, June 6, 2019

What is puzzling to the Court is why Anchorage did not use the Government's admissions in its Opposition to the Government's Motion for Summary Judgment, in which the Government raised issues of contract formation, focusing on consideration. In its main brief, the Government mentioned the elements of contract formation, but did not present arguments on them except for consideration. However, in its Reply brief, the Government surprised the Court and Anchorage by discussing the contract formation elements of offer and authority and by

making additional arguments.  The most astonishing of these was that the alleged duties in the MOUs were created by the U.S. Congress, not by contracts between the Maritime Administration (MARAD) and Anchorage, but the Government also argued that "Anchorage had failed to establish any of four elements" necessary to prove that the 2003 MOU was a valid contract between Anchorage and MARAD.  ECF No. 100 at 8.  Naturally, the Court ordered a Surreply.  In its Surreply, Anchorage countered the argument that the duties were created by Congress and addressed the authority issue in this context.

Deliberating on the parties' submissions, the Court concluded that it could decide all of the issues raised by the motion except for one—consideration—because of a genuine dispute of material fact.  It determined that the most efficient way to move the case along would be to take evidence on the issue of consideration at a mini-trial.

## IV.    October 10, 2019 Status Conference

The purpose of the October 10, 2019 Status Conference was to plan the mini-trial. At the telephonic status conference, the Government raised the issue of contract formation elements other than consideration. The transcript confirms this:

> MR. PHILLIPS:  There was some question about whether it went further.  With this schedule, we would also -- we had also proposed to opposing counsel, and this was included in our schedule, that in the interest of giving the Court everything it needs and following with Appendix A, that the parties then brief -- under the Appendix A rules, fully brief the contract formation issues because one of the concerns that the Government has is that we took a limited view in the summary judgment motion.

ECF No. 108 at 11:2-11.

The Government also asked the Court to recognize that it had not waived these issues. The relevant excerpt from the transcript is:

> MR. PHILLIPS: Because we haven't had a chance to develop all of our affirmative defenses in this -- or in response to this, we would want to know that all of those were reserved just so that we aren't deemed to have waived these -- any arguments that have not been raised merely because we didn't present them in a summary judgment motion, which did not necessarily afford us the opportunity to present all of the arguments that we would have presented in an App A brief.
>
> THE COURT: Yes. No, I recognize you have not waived them.

ECF No. 108 at 12:7-17.[1]

It is clear that the Court recognized that the Government did not waive arguments regarding lack of contract formation that were not raised in its Motion for Summary Judgment. Anchorage did not oppose the Government's request for reservation. Anchorage confirmed that the purpose of the mini-trial was for the Court to render a decision on the Government's Motion for Summary Judgment and that the next stage in the case would be "to proceed with the regular pretrial process and trial." ECF No. 108 at 13:4-14. This statement does not evince opposition to the Government raising problems with contract formation at trial other than those raised in its motion. More significantly, Anchorage did not bring up the Government's admissions in the Answer.

## V.    The Court's May 21, 2020 Decision on the Government's Motion for Summary Judgment

The mini-trial was held in San Francisco, California from February 18-19, 2020. The Government maintains that it relied on the Court's representation that contract formation elements other than consideration were not matter for the mini-trial by withdrawing witnesses or not calling witnesses and by restricting the scope of its questioning. More significantly, Anchorage moved for summary judgment in its favor during the trial. ECF No. 139 at 32:24-33:3; ECF No. 140 at 388:15-18;

The Court's opinion focused on consideration and MARAD's authority to enter into contracts with Anchorage. It found that there was consideration and that MARAD had authority to contract with Anchorage; therefore, the Court denied the Government's Motion for Summary Judgment. Enlightened by argument and testimony at the mini-trial, the Court indicated further factual issues for the principal trial:

- Whether MARAD only assumed the role of lead federal agency for purposes of administering funds, and therefore had no duty to oversee, design and construct the Project?
- Whether MARAD executed a contract with ICRC at the insistence of Governor Sheffield and only for the purpose of using the SBA 8(a) program?
- Whether Anchorage had control of the Project and was the ultimate decision-maker?
- Whether MARAD's 2012 settlement with ICRC was a breach of the implied covenant of good faith and fair dealing because the 2011 MOU had expired, and no implied-in-fact contract was created?

ECF No. 141 at 15.

[1] As Anchorage points out, the Government only specifically mentioned "affirmative defenses," while arguments attacking contract formation are *negative* defenses. The Court believes, however, that, since the Government had earlier raised the issue of the elements of contract formation aside from consideration, that if did not intend for its request to cover only affirmative defenses.

The effect of the Court's decision to deny the Motion for Summary Judgment is a resolution of all the arguments raised in it even if the Court did not discuss them in its opinion. Looking at the elements of contract formation, the Court explicitly found that there was consideration for the 2003 and 2011 MOUs and that MARAD was authorized to enter into contracts with Anchorage. As the Government raised the "offer" element of contract formation in its motion,[2] that issue is included in the Court's decision to deny. Indeed, the Court stated in its decision: "There is no dispute that Anchorage transferred $163 million to MARAD. That transfer was made in exchange for services that MARAD *offered* to provide to the project." ECF No. 141 at 9 (emphasis added). Although the Court did not explicitly discuss intent and acceptance, in light of what the Court has already decided, it would be ridiculous and a waste of time to maintain that Anchorage did not accept MARAD's offer or that the parties had no intention to form a contract.[3] Finally, the Government put in issue all four elements of contract formation in its Motion for Summary Judgment: "The United States Also Demonstrated That Summary Judgment Is Appropriate Because Anchorage Has Failed To Establish Any Of Four Elements Necessary To Prove The 2003 MOU Was An Alleged Contract. . . ."[4] ECF No 100 at 8. It does not matter that the Government chose to develop arguments for only some of them. Therefore, the Court's denial of the Motion for Summary Judgment disposes of the argument that the necessary elements for contract formation were lacking.

## VI. Summary

The Government may not argue lack of the elements of contract formation at the upcoming principal trial. First, the Government admitted in its Answer that the 2003 and 2011 MOUs were contracts. Second, the Court's denial of summary judgment encompasses all issues raised in the Government's motion. The Motion for Summary Judgment raised the lack of all four elements of contract formation, although the Government chose only to elaborate on authority, offer and consideration. Therefore, in reserving its arguments at the October 10, 2019 Status Conference, the Government did not reserve these arguments to be raised anew at the principal trial. It could not, as it had raised these arguments in its Motion for Summary Judgment. In effect, the reservation was not to waive these issues by participating in the mini-trial, which was focused on consideration. Furthermore, Anchorage moved for summary

---

[2] "Nor can Anchorage prove that MARAD offered to sell its services through the 2003 MOU. . . ." ECF No. 100 at 2. "Thus the 2003 MOU was not an offer by MARAD to sell services." *Id.* at 8. "MARAD Did Not Offer To Be Anchorage's Project Manager. . . ." *Id.* at 10.

[3] Similarly, it is a waste of the Court's time to argue that Anchorage did not have authority to enter into the contracts.

[4] The Government's argument must necessarily include the 2011 MOU, which was merely a revision of the 2003 MOU. Indeed, in its Reply, the Government stated: "Anchorage has also failed to establish that the 2011 Memorandum of Agreement (2011 MOA), *which was also not a contract* to hire MARAD, was extended beyond its expiration through an implied agreement." ECF No. 100 at 2 (emphasis added).

judgment in its favor at the mini-trial.  Thus, the Court's decision rejected the argument regarding the lack of the four elements of contract formation, effectively deciding that these elements were present in the 2003 and 2011 MOUs.  Thus, this Court concluded its Opinion by stating: "the Court finds the 2003 MOU and 2011 MOA binding and valid contracts."   ECF No. 141 at 15.

This case has been going on for 6 years.   During this time, there was a change of lead counsel for the Government from Mr. Jeffrey A. Regner to Mr. Vincent D. Phillips.  Mr. Regner filed the Motion to Dismiss and the Answer on behalf of the Government.   It looks like Mr. Regner's strategy was to persuade the Court that the MOUs were cooperative agreements not contracts.  When he did not succeed in this, the Answer indicates that he chose not to argue lack of contract formation.  But it looks like Mr. Phillip's strategy is to chisel away piecemeal at Anchorage's case, despite the Answer and without elaborating on all of the contract formation issues in the Government's Motion for Summary Judgment (although the motion raises them all).  It is time to focus on the most important issues in the case, namely, what the duties were under the contacts and whether the Government breached them.   The U.S. Court of Federal Claims has been called "the People's Court."   To merit this title, it has a duty to make sure that the virtually unlimited resources of the Government in time and money not be used to undue advantage.

## VII.    Conclusion

For the reasons set forth above, the Government is precluded from arguing lack of contract formation at trial.   Trial will, therefore, be confined to evidence regarding breach of contract and damages and any argument relevant to these issues as well as the issues the Court has identified in its Opinion and Order, ECF No. 141.  The Court will provide the parties with a pre-trial scheduling chart--to be completed jointly.  It will track the chart that was provided for the mini-trial.  Again, pre-trial briefs will not be necessary or accepted.  With the schedule, the parties shall include the date and place for trial.  And finally, the parties will be limited to 30 hours each to be used at trial.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge

# In the United States Court of Federal Claims

No. 14-166C
(Filed:   December 9, 2021)

```
*************************************
                                    *
ANCHORAGE, A MUNICIPAL              *
CORPORATION,                        *
                                    *
                  Plaintiff,        *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                  Defendant.        *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH,** Senior Judge

The dispute between Anchorage, A Municipal Corporation ("Anchorage") and the United States ("the Government") came before this Court more than seven years ago on Anchorage's complaint alleging breach of contract on a Port of Anchorage Intermodal Expansion Project ("the Project" or "PIEP") for which it had entered an "innovated partnership" with the Department of Transportation, Maritime Administration ("MARAD").  ECF No. 1.

The "innovative partnership" was entered into between Anchorage and MARAD through two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") (cumulatively "the Agreements").  It is these Agreements which Anchorage alleges were breached by MARAD. [1]

---

[1] This case's relevant background factual information, detailed procedural history—including the Government's unsuccessful motion to dismiss, ECF No. 22, and subsequent motion for summary judgment, ECF No. 90, which was denied after a February 2020 "mini-trial" addressing the contentious factual issue of consideration, ECF No. 141—are laid out in this Court's previous opinion, *id.*, and are incorporated by reference as if fully set forth herein.  In addition, in a telephonic status conference following the mini-trial, the Government made clear its intent to argue the other elements of contract formation—intent, offer, acceptance, and authority—at the principal trial, ECF No. 153 at 1.  After requesting briefing on the issues, the

The Court heard a total of 24 witnesses over a nine-day trial held from February 16, 2021 to March 4, 2021, by Zoom, regarding liability and damages. Anchorage presented its case with fifteen witnesses, the Government with nine. Notably, the Government did not call any expert witnesses as compared to Anchorage, who called five expert witnesses.

Anchorage's case is premised on evidence and argument that the express terms of the 2003 MOU and Addendum No. 2, as well as the 2011 MOA, required MARAD, to provide technical expertise to oversee, design and construct the Project free of defects. Because MARAD failed to do so, Anchorage argues MARAD breached its Agreements. In addition, Anchorage presented evidence and argued that the Government settled claims against it using Anchorage's funds without Anchorage's knowledge or consent, in violation of the Agreements. Anchorage requests $367,669,257 in damages.

In contrast, the Government countered with its evidence and arguments alleging that Anchorage was the party responsible for managing and executing the Project, thus, MARAD did not breach any duties under the Agreements. In particular, the Government points to evidence which it concludes proved that the Contracts and contemporaneous circumstances showed that Anchorage, not MARAD, was responsible for the management and control of the Project. In light of this, argues the Government, it did not breach any duties under the Agreements. In addition, MARAD argues that a better reading of the Agreements would be that MARAD's duties were only administrative and financial.

Post-trial briefs were timely filed. In the Government's 163-page post trial brief,[2] the Government raised, for the first time, several new issues. *See generally* ECF No. 242. In particular, the Government now argues, in addition to its evidence and arguments presented at trial, that: (1) the 2003 MOU was illegal, *id*. at 53-56; (2) the Contracts "did not define any deliverable" nor did MARAD agree to deliver any "specific item of construction," *id*. at 66; (3) the 2003 MOU's termination provision established that the Government did not have any duties under the 2003 MOU, *id*. at 5, 46, 67, 69, 71, 79, 136; and (4) that judicial estoppel and judicial notice and admission in the U.S. District Court of Alaska[3] ("Alaska case") precluded Anchorage from its current stance on the duties and relationships between Anchorage and the Government. *Id*. at 64-66, 117-19. However, on July 20, 2020, this Court specifically held: "counsel is cautioned—any new arguments will be stricken." ECF No. 158. Although this Order was in reference to the filing of the parties' memorandum of contentions of fact or law prior to trial, as well as the fact that the Government did not raise these issues at any time during the 7 years of

Court prohibited the Government from making contract-formation arguments upon considering that (1) the Government had already admitted that the MOUs in question were contracts; and (2) that the Court's denial of summary judgment encompassed *all issues* raised in the Government's motion. *See id*. at 6. All three opinions and orders found that the 2003 MOU and 2011 MOA were contracts. *See* ECF Nos. 22, 141, 153.

[2] Anchorage also filed a lengthy post-trial brief at 153 pages.

[3] In the Alaska case, Anchorage sued ICRC for negligence as a third-party beneficiary to the MARAD-ICRC contract. Ultimately, the case settled between Anchorage and ICRC.

litigation but instead raises the issues in its post-trial brief and in contradiction of the Court's Order, the Court will not allow these new arguments at this late date. The Court, therefore, **STRIKES** the Government's new arguments. In addition, in that same order, the Court further warned the Government that the Court would not consider any further argument on contract formation. *Id*. Yet, contrary to this Court's ruling, the Government raises yet again, on 8 pages of its post-trial brief, argument regarding contract formation. The Court will not address these arguments and admonishes the Government for raising the issues in contravention of this Court's order.

Turning now to the case at hand, it is not contested that the bulk of the Project was never completed.[4] The case, therefore, rests on the terms of the Agreements. Specifically, the case rests on the roles and responsibilities of the parties as enumerated in the Agreements and whether those duties were breached.

After hearing all the evidence and after careful consideration, the Court finds the Government breached its Agreements with Anchorage.

## I.    Trial Witnesses

Anchorage presented fourteen witnesses in support of its case. Of the fourteen witnesses, four witnesses were MARAD's employees: Iris Cooper, Deputy Director of Acquisitions, Wayne Leong, Director, Office of Acquisition & Contracting Officer, and contracting officer at the time of the Project, Michael Carter, Office of the Environment, and Captain Robert Loken, Director of Infrastructure Development and Northwest Gateway and the Contracting Officer Representative at the time of the Project. Anchorage employees included: Cheryl Coppe, former Executive Administrator for the Port, Col. George Vakalis, former Anchorage Municipal Manager, Jim Hinkle, former Director of Finance and Administration and Lucinda Mahoney, Commissioner of the Alaska Department of Revenue and former Chief Financial Officer of Anchorage. Anchorage also called Diana Carlson, Project Manager for ICRC and later Principal-In-Charge. Expert witnesses included: James Schoonmaker, Doug Playter, Gayle Johnson, P.E., Dr. Timothy D. Stark, P.E., D.GE, F.ASCE, Patrick McGeehin, and Ginger Evans, MS, P.E..

In support of its case, the Government called nine witnesses— Captain Scott Davies, transportation specialist in the MARAD Office of Ports and Waterways Planning, Don Norden, a lobbyist who represented Anchorage in connection with the Project, James Lexo, former CEO of ICRC, Diana Carlson, Connie Black, former ICRC Program Manager and deputy to Diana Carlson, Carl Williams, former ICRC Chief Operating Officer, David Cole, engineer who served on the Anchorage Geotechnical Advisory Commission ("GAC") and Roger Bohnert, MARAD Deputy Associate Administrator for the Port from 2007-2015. The Government also briefly called Ms. Coppe of Anchorage.

---

[4] One area—the dry barge berth area—was the only section of the Project that was successfully completed. Trial Tr. 3.

II.    **Findings of Fact**

MARAD is a Federal agency and an operating administration of the United States
Department of Transportation ("DOT").  The Port of Anchorage, now the Port of Alaska, is an
enterprise department of the Municipality of Anchorage.  Stip. ¶ 1.[5]  As a municipal enterprise,
the Port pays for its operations costs through its own revenues, rather than the general Anchorage
tax base.  Stip. ¶¶ 1-3.  An estimated 90% of the merchandise goods for 85% of Alaska's
populated areas pass through the Port on an annual basis.  Stip. ¶ 5.  The Port Director is
appointed by the Mayor and reports to the Anchorage Municipal Manager.  Trial Tr. 480:24-481-
2

In 1999, Anchorage prepared a Master Plan that proposed a phased development to
replace deteriorated facilities and meet increasing demands.  Stip. ¶ 6.  The Plan was to guide the
Port's growth over a 20-year span. Stip. ¶ 6.  Cheryl Coppe, Port Executive Administrator at the
time, stated that "the goal of the Project was to reinvigorate and upgrade the existing
infrastructure" and "to accommodate the needs of the military."  Trial Tr. 620:1-9.

Former Governor William Sheffield took over responsibility for executing the Master
Plan as Port Director in May 2001. [6]  DX 863; Stip. ¶ 7.  Previously, Governor Sheffield served
as CEO of the Alaska Railroad between 1997 and 2001.  Stip. ¶ 7.  Ms. Coppe also worked at the
Alaska Railroad during this time. Trial Tr. 702:22-704-19.  Ms. Coppe followed Governor
Sheffield to the Port.  Anchorage also engaged the services of Washington, DC lobbyists,
including Don Norden.  Mr. Norden lobbied Congress for funds to pay for the Project.  DX 863.

Ms. Coppe testified that Anchorage was interested in finding a federal lead agency to
help with the Project because federal funds had been allocated to the Project. Trial Tr. 624:6-10.
The Project was Federally funded by Congress through MARAD by interagency transfers,
pursuant to the following statutory authority: Departments of Commerce, Justice, and State, the
Judiciary, and Related Agencies Appropriations Act, 2003 (2003 Consolidated Appropriations
Act), Pub. L. No. 108-7, 117 Stat. 11, 106, § 626 (Feb. 20, 2003) and Safe, Accountable,
Flexible, Efficient Transportation Equity Act: A Legacy For Users (SAFETEA-LU), Pub. L. No.
109-59, 119 Stat. 1144, 1934, § 10205 (August 10, 2005).  Stip. ¶ 106.  From FY2002-FY2010,
Congress appropriated a total of $143,066,919.76 for the Project through earmark appropriations
to the Department of Defense, the Federal Highway Administration, and the Federal Transit
Administration.  Stip. ¶ 105.  In addition, Anchorage paid MARAD a total of $163,400,000 for
the Project. Stip. ¶ 107.  In total, MARAD received a total of $306,466,919.76 in Federal and
non-Federal funds for administration of the Project.  Stip. ¶ 104.

Anchorage chose MARAD to be the lead federal agency after rejecting other
possibilities. Trial Tr. 625:8-23.  Prior to selecting MARAD as lead federal agency, Ms. Coppe
sent a purpose and need statement to MARAD.  Trial Tr. 628:14-16; JX 12.  The purpose and

---

[5] "Stip."  Refers to the Stipulation filed at ECF No. 191.
[6] Although Governor Sheffield was no longer governor but Port Director during the
Project, the parties and witnesses all referred to him as Governor Sheffield and the Court will do
so as well.

need statement contained two project design alternatives for the proposed project. Trial Tr. 628:17-23; JX 12. One design concept mirrored the existing wharf; the other design concept was known as an open cell sheet pile ("OCSP"). Trial Tr. 629:6-20; JX 12.

Sometime thereafter, Ms. Coppe worked with MARAD's Maggie Blum, Associate Administrator, Iris Cooper, Deputy Director of Acquisitions[7] and Tim Roark, Contracting Officer to create the 2003 MOU. Trial Tr. 630:7-10. The final 2003 MOU was created by Ms. Coppe of Anchorage and MARAD's employees Ms. Blum and Ms. Cooper. Trial Tr. 632:8-9; PX 43. According to Ms. Coppe, the "innovative partnership" was because there were three funding sources that were going to be used to construct an intermodal facility that would also serve the military. Trial Tr. 660:16-661:14.

The 2003 MOU objective was for the parties to "establish working relations and assign responsibilities that leverage the expertise of all parties." PX 43 at 1. To accomplish this, the 2003 MOU detailed the responsibilities of both MARAD and Anchorage. In particular, Section IV, of the 2003 MOU, set forth Anchorage's responsibilities:

**Section IV. MOA [Municipality of Anchorage], PORT OF ANCHORAGE RESPONSIBILITIES:**

1. Provide overall program requirements and direction of Port Expansion to MARAD.
2. Designate primary MOA, Port of Anchorage points of contact for day-to-day direction and management of Port Expansion activities.
3. Review all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD for inclusion in its permanent federal project file.
4. Execute all documentation that will enable MARAD to request interagency funding transfers of all amounts received by other federal agencies through past, present and further annual Congressional Appropriations for Port Expansion.
5. Execute periodic transfers of non-federal amounts for Port Expansion to MARAD. The MOA, Port of Anchorage shall base transfer amounts on current Port of Anchorage fiscal year Capital Improvement Budget allocation for Port Expansion as approved by the Administration of the MOA and the MOA Assembly.
6. Facilitate periodic transfers, approximately quarterly, of non-federal amounts for Port Expansion to MARAD when MOA, Port of Anchorage does not retain direct financial control of such non-federal amounts allocated under the Port of Anchorage Fiscal Improvement Budget for Port Expansion.

[7] In 2004, Ms. Cooper was elevated to Director of Acquisitions. Trial Tr. 45:15-45:18.

> 7. Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary.

PX 43.

MARAD's responsibilities were enumerated as:

### Section V. MARAD Responsibilities:

1. Coordinate with other Federal agencies that receive annual Congressional appropriations for Port Expansion.
2. Provide specialized technical expertise and input as appropriate to Port Expansion tasks and activities. Administrative costs to be used for MARAD participation under this project will be 3% of funding received.
3. Designate primary MARAD points of contact for day-to-day management of Port Expansion activities.
4. Develop and execute all financial documents as required for the transfer and administration by MARAD of federal and non-federal amounts received for Port Expansion activities.
5. Accept transfers, approximately quarterly, of the non-federal share for Port Expansion from MOA, Port of Anchorage. MARAD and MOA, Port of Anchorage shall base transfer amounts on current MOA, Port of Anchorage fiscal year Capital Improvement Budget allocations for Port Expansion as certified by the Administration of the MOA and approved by the Assembly of the MOA.
6. Expend transfers of the non-federal amounts identified by MOA, Port of Anchorage as bond receipts in first-priority order for Port Expansion activities. Subsequent to the full expenditure of bond receipts, MARAD shall resume expenditure of other federal and non-federal amounts for Port Expansion activities.
7. Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

*Id*. The 2003 MOU was ratified by the Alaska Assembly, Anchorage (Governor Sheffield), and MARAD. Although he did not testify at trial, Governor Sheffield, was instrumental in this agreement.

In May 2003, MARAD vetted and then contracted with Koniag Services, Inc. ("KSI"), an Alaskan Native corporation, under the Small Business Administration's 8(a) program as prime contractor on the Project. JX 4. The contract was a Fixed-Price Indefinite Deliver, Indefinite Quantity ("IDIQ") contract for $210 million. Stip. ¶ 14. Thereafter, in February 2004, MARAD, after vetting, agreed to novate the contract to Integrated Concepts and Research

Corporation ("ICRC") as prime contractor.[8]  Iris Copper and Ms. Coppe both agreed that MARAD did its own investigation before hiring ICRC.   JX 6; Trial Tr. 5-:16-51:1; 838:21-839:14; PX 94; Trial Tr. 74:25-75:18. The contract contained a Statement of Work setting forth the contractor's scope of work.  The Statement of Work included the various services to be provided by ICRC under the contract with MARAD such as quality control, Port Planning and Conceptual Engineering Services, Environmental Documental and Permitting Services, Design Management Services, Construction Management Services, and Contractor Oversight Services. JX 4 at 46-52.  No performance bonds were ever obtained between MARAD and ICRC.  Trial Tr. 183:24-184:4; Stip. ¶ 21.

Ms. Cooper confirmed that the contract contained a provision by which the contractor was required to meet the specifications set forth in the Statement of Work, and to the extent the contractor failed to do so the Government had the right to reject non-confirming work.  Trial Tr. 60:24-61:2. Mr. Leong, MARAD's contracting officer, also acknowledged that the 2003 MARAD-ICRC  contract required the Contracting Officer or a duly authorized representative to perform inspection and acceptance of supplies and/or services to be provided under the contract. JX 4 at 9; Trial Tr. 145:4-16.

In order to proceed with the Project, MARAD issued Task Orders.  Stip. ¶ 18.  In particular to this case, MARAD issued Task Order 312 to ICRC for design and related services. PX 198.  Ms. Cooper testified as to how the Task Order system worked.  First, Anchorage would identify the requirements that were within the prime contract.  Trial Tr. 77:1-7.  Then, MARAD and the prime contractor would develop a statement of work together with the technical specifications that Anchorage wanted to see constructed.  Trial Tr. 77:13-22.

Diana Carlson had also previously worked with Governor Sheffield at the Alaska Railroad.  Trial Tr. 1806:3-1807-2. At Governor Sheffield's request, Ms. Carlson interviewed at ICRC, and, ICRC hired her as Project Manager. (Later she became Principal-In-Charge.) Trial Tr. 1810-1-17.

After the 2003 MOU was signed, ICRC entered into several subcontracts.  One such subcontract was with Terracon Consultants, Inc. ("Terracon") to conduct a site-specific geotechnical investigation.  Stip. ¶ 25.  Even though ICRC would enter into the subcontracts, Ms. Cooper testified that MARAD would review the qualifications and expertise of all the subcontractors.  Trial Tr. 68:7-10.  Specifically, MARAD's Purchasing Policies required:

> In addition to the following review thresholds, MARAD requires all specifications to be submitted to the COTR for review and approval.  **In no instance shall a CONTRACTOR allow work to begin without MARAD's approval of the specification,** unless it is an emergency, or the requirement is specifically waived by the PCO for a mission essential task.

PX 53 at 10 (emphasis in original).

---

[8] For ease the Court will refer to KSI as ICRC throughout.

On March 16, 2004, Terracon issued its Marine Geotechnical Exploration report concluding: "we have determined that the open cell sheet pile wall (OCSP) concept is a feasible alternative," and that "[w]ith soil improvement, it is our opinion that the pile supported deck (PSD) option is feasible." PX 98 at 13. Terracon also stated that "the OCSP option will prove most economical to construction and potentially have lower life cycle costs than the pile-supported deck." *Id.*

On August 3, 2004, ICRC and Terracon entered into a second subcontract for Geotechnical Engineering and Investigation Support Services for the Project. Stip. ¶ 26. On September 24, 2004 Terracon issued its Global Stability Analysis Report which evaluated conceptual designs for an OCSP and a pile-supported structure in all areas of the Port. PX 115; Stip. ¶ 27. Terracon concluded that "[b]ased upon the stability analysis, we have determined that the OCSP and PSD options are feasible for the construction of the port," and that "[w]e recommend that the OCSP structures be constructed from the landside and that the dredging planned beneath the structures and partial placement of engineered fill be conducted prior to the driving of sheet piles." PX 115

In 2005, MARAD and ICRC conducted an Environmental Assessment ("EA") studying design alternatives. Stip. ¶ 24; JX 12. The EA ultimately concluded that the OCSP was the preferred design and MARAD selected the OCSP structure for the Project. JX 12; PX 193; Trial Tr. 341:10-18. MARAD's Director of the Office of the Environment, Michael Carter, assisted in preparing the Environmental Assessment. Trial Tr. 307:18-307:25. Mr. Carter acknowledged that MARAD relied on Terracon's geotechnical analysis in selecting the design. Trial Tr. 309:20-310:5.

Then, in February 2006, MARAD and Anchorage amended the 2003 MOU,[9] to include that MARAD was to accept the work via execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects." PX 188.

In March 2006, MARAD issued Task Order 312 to ICRC for design and related services for the North Waterfront Expansion. Stip. ¶ 28.

In June 2006 ICRC contracted with PND Engineers for design services under Task Order 312. The subcontracts were approved by MARAD. Stip. ¶ 31; PX 206. During the months of June/July 2006, PND subcontracted with GeoEngineers, Inc. and VECO, also for design services. Stip. ¶ 32.

Construction work at the Project was broken into four distinct areas: North Backlands, Dry Barge Berth, Wet Barge Berth and North Extension. Under Task Order 404 and 405, ICRC contracted with Alaska Interstate Construction Company, LLC ("AIC") to perform the work.

---

[9] This was the second time that the 2003 MOU was amended. In June 2003, the MOU was amended for the first time. PX 64.

In March 2008, MARAD issued Task Order 414 for construction of the OCSP bulkhead at the Dry Barge Berth, Wet Barge Berth, and North Extension. Stip. ¶ 45. The sheet piles are vertically arranged steel structures that act as a horizontally-tied membrane to retain soil. Stip. ¶50. The Bulkhead features a vertical flat sheet pile anchor wall (tail wall) to restrain a curved flat sheet pile arch face. *Id*. Fill is then placed in the open cells creating additional Port property. *Id*. A key feature of the OCSP design for the Project was a construction dike that acts as a working platform for installation of the bulkhead wall from the landside. Stip. ¶ 51. The construction of the OCSP-related parts of the Project, as designed, were to take place in phases including the construction of the Dry and Wet Barge Berths and the North Extension. Stip. ¶ 52.

PND and GeoEngineers produced a Geotechnical Analysis Report. ICRC, PND, Terracon, and GeoEngineers also met with U.S. Army Corps of Engineers ("USACE") to review the Geotechnical report, and USACE affirmed finding of compliance with Phase II[10] permit design coordination with respect to the initial planned phase of construction, North Waterfront Project. Stip. ¶ 41.

On March 19, 2008, ICRC contracted with Quality Asphalt Paving ("QAP") for sheet pile driving under Task Order 414. Stip. ¶ 45. Thereafter, QAP contracted with MKB Constructors ("MKB") to conduct sheet pile installation. PX 321. MKB commenced in-water pile driving in the Dry Barge Berth on July 15, 2008. In 2008, QAP and MKB began sheet pile installation in the Wet Barge Berth, and experienced difficulties as soon as work on the Wet Barge Berth commenced. Stip. ¶ 58.

In July 2008, MARAD and ICRC entered into a second contract to continue performance re: designing and building. PX 357. This MARAD-ICRC contract was similar to the 2003 MARAD-ICRC agreement.

QAP/MKB achieved substantial completion of the Dry Barge Berth in July 2009, and it was accepted as complete by Anchorage. Stip. ¶ 57. However, after the 2009 construction season, QAP's contract "descoped" and terminated because of deficient performance.

In 2010, ICRC contracted with West Construction Inc. ("West") to remedy problems found in the Wet Barge Berth and North Extension. West found numerous defects. In December 2010, ICRC demanded that QAP and MKB correct their deficient work. Stip. ¶ 82. Mr. Leong testified that QAP responded asserting that it was design flaws that caused the problems in the north waterfront extension. Trial Tr. 218:13-16. ICRC later revoked its demand to QAP/MKB to repair and/or remove damaged and non-conforming work on the Project. Stip. ¶ 83.

In November 2010, MARAD refused to pay ICRC citing poor performance. After this, Governor Sheffield wrote to MARAD for it to pursue claims against ICRC for the failed Project. PX 622. Specifically, MARAD's Roger Bohnert wrote that "[o]n several occasions the

_____

[10] The Project was to be completed in two phases.

Governor talked about being "made whole," and MARAD should "go after ICRC" for restitution.  PX 622.

On August 30, 2011, MARAD executed an inter-agency agreement with USACE to conduct a detailed investigation.  USACE awarded a contract to CH2M Hill to perform a Suitability Study.  Stip. ¶ 88.  The Suitability Study was a detailed engineering analysis to evaluate whether the bulkhead design was suitable for use at the Project as well as investigated and documented defective construction work at the Project.  Stip. ¶ 88; Trial Tr. 860:8-22.

Then, on September 29, 2011, MARAD hired AECOM Services Inc. to perform a Root Cause Analysis to find out who was responsible for the defects.  Stip. ¶ 87; PX 712.  The Suitability Study was to run parallel with the AECOM root cause analysis.  However, AECOM was terminated without completing the contract and after being paid approximately $500,000.  Trial Tr. 587:4-588:5.

Because of the continual problems with construction, the parties informally created a Project Oversight and Management Organization ("POMO").  Trial Tr. 430:20-432:3).  Thereafter, in November 2011, Anchorage and MARAD entered into the 2011 MOA.  Stip. ¶ 86; JX 34.  The 2011 Agreement reaffirmed the Parties' existing obligations and formally established the POMO.  JX 34.  The objective of the 2011 MOA was for the parties to "establish a working relationship and assign responsibilities to the respective parties."  *Id*. at 1.  Section III. C, of the 2011 MOA, articulated that: "[t]he PIEP is a major transportation infrastructure project for the Federal Government and the MOA/POA that must be delivered in a manner that captures the public's trust and confidence in the government's ability to effectively and efficiently deliver a quality product."  *Id*.

Section IV of the 2011 MOA formally established the POMO.  The POMO was to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the Project."  *Id*. at 2.  The POMO consisted of Project executives, members, and advisors.  *Id*. at 3.  The executive members consisted of the Mayor of Anchorage and MARAD Administrator.  *Id*.  The executive duties were to address "major scope, schedule, and budget changes. . . ."  *Id*.  Members of the POMO consisted of the Municipal Manager, Port Director and MARAD associate.  *Id*.

Anchorage's responsibilities, found in Section V of the 2011 MOA, were as follows:

**A.  MOA/POA Responsibilities:**

1.  Develop an up-to-date Port Master Plan.
2.  Execute all documentation that will enable MarAd to request interagency funding transfers of all amounts received by other federal agencies through past, present, and future annual Congressional Appropriations for Port Expansion.
3.  Execute transfers of non-federal amounts for the Project to MarAd in a timely manner.

4.  Authorize all Project funding maintained by MarAd for federal project oversight, program management, study, environmental analysis, engineering, design, construction or rehabilitation as required.
5.  Transfer to MarAd, on a quarterly basis 3% of all funding received under this project to cover MarAd's cost related to the project until May 12, 2012.
6.  Assume no later than May 31, 2021, through itself or its designee, acquisition and contract administration for the design and construction of the project.
7.  Since the authorities of the parties involved acknowledge the requisite complexities inherent in the interaction of federal and local municipal law, the Port Director shall not invoke Anchorage Municipal Code Title 11.050.50 as it relates to this agreement between the parties.
8.  Coordinate with the Port Users and keep them apprised of the progress of the Project and seek their input as necessary.

*Id*. at 4.

Pursuant to Section V. B. MARAD's responsibilities included:

1.  To the extent required by law, administer any funds provided for the federal share, and any funds provided for the non-federal share, for the Project.
2.  Facilitate through its Memorandum of Agreement with the U.S. Army Corps of Engineers Alaska District and the Economy Act 31 U.S C. §1535, the transfer of project funds as necessary for a Technical evaluation of the preferred alternative's Open Cell Sheet Pile foundation system and other project related expenses including, but not limited to, dredging, project design and constructability analysis, and such other expenses as are reasonably incurred.
3.  As Federal Partner to the MOA, provide subject matter expertise in support of the Project, including, but not limited to, areas such as project oversight and management, compliance with federal environmental laws and regulations, including the approval of proper permitting, coordination with other federal agencies, and the management and transfer of funding for the Project.
4.  Provide an on-site MarAd representative for day-to-day direction and management of activities on the Project and coordination with MarAd headquarters.
5.  Develop and execute any financial documents as required forth transfer and administration by MarAd of federal and non-federal amounts received for Project activities.
6.  Provide to the MOA Project records developed by MarAd or its designees.
7.  Pursuant to the Contract Disputes Act, 41 U.S.C. §§7001- 7013, administer claims submitted by MarAd contractors and coordinate and

cooperate with the MOA/POA in affirmative and defense of claims consistent with federal contract law.

8. Through itself or its designee, provide acquisition, contract administration, construction, design and quality assurance service for the Project until May 31, 2012.

*Id.* at 5-6.

On Sept 19, 2011, ICRC submitted a claim to MARAD seeking payment of fees for its role as program manager. Stip. ¶ 95. In July 2012, MARAD and Anchorage entered into a Joint Defense Agreement. Stip. ¶ 98. On Sept 28, 2012, MARAD executed a settlement with ICRC in the amount of $11.3 million paid to ICRC. Stip. ¶99. MARAD also released all its claims against ICRC. Anchorage was not involved in the settlement nor did it consent. Stip. ¶ 99.

On March 31, 2012, CH2M Hill issued a draft Suitability Study. Stip. ¶ 89. On Feb 14, 2013, CH2M Hill issued a final suitability study finding that the design and construction were defective. JX 41; Stip. ¶ 90. CH2M Hill also concluded that the Wet Barge Berth and North Extension must be reconstructed using a suitable design. *Id.* Douglas Playter, the Senior Project Manager at CH2M Hill who oversaw the Suitability Study, testified that CH2M Hill found that the factors of safety for the OCSP bulkhead constructed in the Wet Barge Berth and North Extension are far below industry standard. Trial Tr. 878:10-879:6. He further testified that the OCSP bulkhead could collapse. Trial Tr. 900:2-12. Specifically, Mr. Playter testified that the OCSP bulkhead must be removed and stabilized because it is a safety hazard and will fail. Trial Tr. 906:7-24; 1016:24-1017:7.

In the end, neither the Wet Barge Berth nor the North Extension were completed. Stip. ¶ 91.

Now, Anchorage is undergoing a Port Modernization Project ("Modernization Project") designed to rebuild the entire Port infrastructure. Mr. Playter, of CH2M Hill, testified with regard to the Modernization Project. The Modernization Project will be built in phases because Anchorage does not have enough money to build it all at once and the Port needs to remain open during construction. Trial Tr. 900:17-901:25. Furthermore, the North Extension of the Port needs to be stabilized for seismic and static reasons. Trial Tr. 902:1-7.

CH2M Hill is the program manager. CH2M Hill hired Kiewit-Manson as the design-build contractor. Kiewit-Manson then hired AECOM who preprepared a preliminary design for the North Extension areas. CH2Mill oversees the work of Kiewit-Manson and indirectly ACECOM. Trial Tr. 902:8-16.

After CH2M Hill hired Kiewit-Manson as the design builder, AECOM, as Kiewit's subcontractor, prepared a 35% design estimate ("AECOM 35% Design Estimate"). PX 973. AECOM first reviewed the North Extension area and evaluated a variety of designs for slopes and soil mixing processes. AECOM came up with what is referred to as the AECOM 35% Design for North Extension stabilization Step 1. Step 1 was to be done as soon as possible and a second effort, known as Step 2 would be done after the construction of key facilities necessary to

provide services to Anchorage after a major earthquake.  Trial Tr. 920:2-921:2, 1016:4-1019:1.
Step 1 removes the highest part of the OCSP structure to allow ships to dock at Terminal 3
more safely.  It also is a result of the need to replace essential facilities in the Port prior to a
major earthquake.  *Id.*  In Step 2, Anchorage plans to come back and remove the balance of the
structure.  The OCSP structure will have to be removed all the way to the Dry Barge Berth.  Trial
Tr. 920:2-921:13.  Therefore, the entire OCSP structure must be removed and then stabilized
because it is a safety hazard and will fail. Trial Tr. 906:7-24; 1016:24-1017:7. This plan will not
use any open cell sheet piles nor does it use a closed cell structure.  Trial Tr. 922:1-923:5. The
35% design includes a detailed design narrative, a constructability review, and a detailed
schedule.  Trial Tr. 923:6-929:13; PX 972, 974.  Although the AECOM 35% North Extension
stabilization design was only for Step 1, the damages sought by Anchorage are an estimate for
both Steps 1 and 2.  Trial Tr. 1377:20-1381:6.  Mr. Schoonmaker, retired former member of
Moffat & Nichols, testified as an expert in estimating the demolition of the existing North
Extension.  He concluded that the design chosen by Anchorage for removing the defective
structure and stabilizing the area was $186,607,000.00.  Trial Tr. 1322:9-13.  His probability of
accuracy goal for his estimate was a range of minus 20 to plus 30.  *Id*.

III.    **Plain Meaning of the Agreements**

A.  **MARAD was Obligated to Provide Federal Project Oversight, Design, and
    Construction and to Deliver a Defect Free Project pursuant to the 2003 MOU
    and Addendum No. 2 to the 2003 MOU**

Although this Court has already ruled that "[i]t is clear from the 2003 MOU that
MARAD had a duty to oversee, design and construct the Project, ECF No. 141 at 13, MARAD
now argues a different position, that the "innovative partnership" required Anchorage to direct
and manage the Project on a day-to -day basis, while MARAD's duties were only administrative
and "almost entirely financial." ECF No. 242 at 58, 71, 95.  In support, the Government argues
that the contemporaneous circumstances surrounding the Project show that Anchorage, led by
former Alaska Governor William Sheffield, was in charge of the Project and that MARAD was
only there "to implement the Port's decisions through any necessary contract actions." ECF No.
242 at 2-3.  Therefore, the Government argues that the Court cannot give the plain meaning to
the Agreements.  ECF No. 242 at 1.  Instead, "the language of a contract must be given that
meaning that would be derived from the contract by a reasonably intelligent person acquainted
with the contemporaneous circumstances." *W. States Const. Co. v. United States*, 26 Cl. Ct. 818,
825 (1992) (quoting *Hol–Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388 (1965)) "Thus, to
interpret disputed contract terms, 'the context and intention [of the contracting parties] are more
meaningful than the dictionary definition.'"  *Metric Constructors, Inc. v. Nat'l Aeronautics and
Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999).  *See also P.J. Maffei Bldg., Wrecking Corp. v.
United States*, 732 F.2d 913, 917 (Fed. Cir. 1984) (instructing that a proper technique of contract
interpretation is for the Court to place itself "into the shoes" of the parties).

In contrast, Anchorage argues that the 2003 MOU expressly delineates the parties' roles
and responsibilities.  ECF No. 241 at 6-7; ECF No. 248 at 9-10.  Those duties and
responsibilities, argues Anchorage, established a duty for MARAD to provide a completed item

of construction and to provide design construction and project management services, free of defects.

The Court agrees that the 2003 MOU expressly delineates the parties' roles and responsibilities.[11]  Even so, the Court also finds that the contemporaneous evidence shows that the MARAD was obligated to provide Federal project oversight, design, and construction, and for MARAD to deliver a completed defect free project.

Both parties acknowledge that "[c]ontract interpretation begins with the language of the written agreement."  *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quoting *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)) (quotation omitted).  ECF No. 242 at 56; ECF No. 248 at 9-10.  In addition, the parties agree that the Court "may not insert a term into the contract that simply is not there."  *Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed. Cl. 161, 169 (2001); s*ee also Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 n.8, 717 n.9 (1992) (finding no duty related to a contract term that was purposefully removed from the contract at issue).  *Id*.  Courts, therefore, are bound by terms of agreement and may not render the terms of an agreement meaningless.

Relying on Section IV of the 2003, Anchorage argues and presented evidence that its responsibilities were to provide to MARAD: (1) overall program requirements and direction of Port Expansion; (2) designate primary MOA, Port of Anchorage points of contact for day-to-day direction and management of Port Expansion activities;  (3) review all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD for inclusion in its permanent federal project file; and (4) to "authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary."  PX 43.  In support of its position, Anchorage called Ms. Coppe and Col. Vakalis of Anchorage as well as Ms. Copper, Mr. Leong and Captain Loken of MARAD.

Ms. Coppe, as a drafter of the 2003 MOU, testified as to Anchorage's responsibilities.  For instance, she testified that Anchorage's main responsibility and obligation was to "tell MARAD what [Anchorage] wanted because [Anchorage was] the owner of the Project."  Trial Tr. 636:13-15.  She further testified that the day-to-day direction Anchorage was giving to MARAD referred to the Port's day-to-day operations.  Trial Tr. 637:1-4.  This meant that Anchorage was required to provide constant communication to the prime contractor about the Port activities in order for the port to continue to operate.  Trial Tr. 637:4-13.  Day-to-day direction did not relate to design and construction.  Trial Tr. 637:14-17.  Nor did Anchorage have staffing to oversee design and construction; that was "why [Anchorage] had the contract for port expansion."  Trial Tr. 637:18-21.

With regard to the review of "all plans, specifications and status reports" Ms. Coppe testified that the provision was added to ensure that Anchorage was getting what it wanted.  Trial Tr. 638:9-15.  The review was not intended for the Port to provide engineering oversight.  Trial

---

[11] In light of the reasoning set forth, the Court need not address Anchorage's arguments regarding extrinsic evidence as well as trade customs and usage.

Tr. 638:16-18. However, as part of the review oversight, Anchorage reviewed Task Orders before they were sent to MARAD for payment. Trial Tr. 638:23. Review was required, according to Ms. Coppe, to make sure that "what [Anchorage] was asking for was being provided before the actual activity proceeded . . . before money was being spent." Trial Tr. 638:23-639:4.

MARAD employees, Wayne Leong and Iris Cooper further solidified Anchorage's responsibilities. Mr. Leong, the Contracting Officer and Director of Acquisition for MARAD during 2002-2012, Trial Tr. 123:5-15, 124:4-6, testified that Anchorage was responsible for securing project funding and communicating project needs. Trial Tr. 133:17-21. Ms. Cooper, testified regarding the relationship between the parties, specifically indicating that Anchorage would have "defin[ed] what it wanted out of the project" as project owner. Trial Tr. 46:20-22, 47:1-3.

George Vakalis, the former Anchorage Municipal Manager and Anchorage's corporate designee, testified in both his personal capacity and as a corporate designee. He testified that in his position he was tasked with understanding the parties' roles and responsibilities. Trial Tr. 415:4-7. As such, he testified that Anchorage's role was to ensure that the Port was operational through the Project, and to review Task Orders to ensure there was no conflict between tasks that were being performed and the normal operations at the Port. Trial Tr. 417:5-12.

Section V of the 2003 MOU set forth MARAD's responsibilities with regard to the Project. In particular, Section V.2 required MARAD to "[p]rovide specialized technical expertise and input as appropriate to Port Expansion activities." PX 43. Section IV.7 of the MOU provided that Anchorage was to "'[a]uthorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction or rehabilitation as necessary." PX 43. As consideration, MARAD was to be paid 3% off all funding received for the Project to cover administrative costs. PX 43, Section V.2. Addendum No. 2 of the 2003 MOU, required that MARAD deliver a completed project, free of defects. PX 188.

With respect to Section V.2, Ms. Coppe testified that MARAD was to provide overall oversight and oversee contract administration, and with regard to other areas of technical expertise, MARAD would execute contracts as provided in the phrase "provide specialized technical expertise and input as appropriate to Port expansion tasks and activities." Trial Tr. 643:21-644:11. With regard to V.7 of the MOU regarding obligating and disbursing funding for project oversight and other tasks, she testified that "obligate" is another way to describe "contracting," and that MARAD would be disbursing funds to a prime contractor for specific activities. Trial Tr. 645:5-25. She defined "federal project oversight" as it related to MARAD's responsibilities, as meaning "a lead federal agency." Trial Tr. 641:13-20. In addition, she testified that Federal project oversight, meant that the lead federal agency was responsible for managing the overall project, managing the contractors MARAD had hired, and delivering a Port to Anchorage. Trial Tr. 831:3-:22.

Col. Vakalis concurred with Ms. Coppe's testimony. Simply put, he testified that MARAD was to provide expertise as it pertained to the Project, provide oversight and

management of the design and construction and manage all funds.   Trial Tr. 415:9-18.   In addition, Col. Vakalis testified that he understood that the Project was to be accepted by MARAD and Anchorage, and per Addendum No. 2 to the 2003 MOU, the Project was to be free of defects.  Trial Tr. 415:19-416:16.

Ms. Cooper, of MARAD, further testified that MARAD as the lead federal agency on the Project "was responsible for managing the contract with the contractor who did the actual port construction."  Trial Tr. 47:4-15.  She further testified that MARAD would carry out its obligations on the Project through the award of contracts.  In her words, MARAD was "responsible for contract management," Trial Tr. 47:16-23, and as such the deliverable that MARAD was to manage and ultimately deliver to the Port was a newly expanded Port.  Trial Tr. 47:24-48:3.

Mr. Leong testified that not only was MARAD's role on the Project to manage and administer funds, but it was also responsible for contracting and procuring goods and services, including procuring the technical aspects of the Project, project oversight, and quality assurance. Trial Tr. 133:23-25, 147:19-148:1.  In spite of the difficulties installing the sheet pile cells, Mr. Leong wrote emails suggesting that pile driving continue nonetheless due to the short construction season in Alaska. Trial Tr. 214:24-215:2.  Mr. Leong agreed that the direction for the contractor to either continue or stop performance could only come from MARAD.  Trial Tr. 214:24-215:5. Captain Robert Loken, of MARAD, echoed Mr. Leong's testimony with regard to MARAD's responsibilities. Trial Tr. 561:5-9.  He further articulated that Anchorage's role was to secure funding and to communicate the Project phasing needs.  Trial Tr. 561:1-4.

Nevertheless, the Government points to contemporaneous evidence to support its position that Anchorage was in charge of the Project and MARAD's only duty was administrative and financial.  The Government relies heavily on the Port's representations to the Anchorage Assembly[12] regarding the Project.  ECF No. 242 at 18-21.  For example, in one of the first Assembly presentations, Ms. Coppe provided a detailed explanation of MARAD's roles on the project: "MARAD has three roles as the lead agency for this project. . . . [T]hey act as the funding agency, they act as the project oversight agency, and they act as a contract administration agency."  JX 3 at 45:16-20; Trial Tr. 795:15-25.[13]

The Government further points to evidence that showed that in order for the Assembly to understand and approve the partnership between MARAD and Anchorage, Ms. Cooper testified that she understood that Ms. Coppe wanted a letter stating that the Port "was in charge of the program and project."  Trial Tr. 111:6-112:14.  MARAD provided the letter from its Administrator, William Shubert, which stated: "[The project] represents a new way for the Government to work with private industry in a teaming arrangement.  As such, the programmatic and technical controls reside with the Port."  JX 7 at 704; DX 726.  Indeed, Ms. Coppe confirmed that this letter was clarifying for the Assembly the agreement that had been reached

---

[12] The Alaska Assembly was required to ratify the 2003 MOU.  The Assembly met four times before ratifying the 2003 MOU.  Stip. ¶ 10.

[13] Ms. Coppe used the same language to describe MARAD's roles when discussing the 2003 MOU with the Port's lobbyists as well.  DX 727.

between Anchorage and MARAD regarding the project structure. DX 185 at 4:4-16; Tr. 810:22-811:7, 812:15-813:2. And as part of the ratification packet, the letter was referenced. JX 7 at 704; JX 8 at 15:69-70.

However, this evidence does not persuade the Court that the roles and responsibilities of the 2003 MOU were not clear nor that the contemporaneous evidence changed the plain meaning of the 2003 MOU. In fact, Ms. Coppe also testified as to the reasoning for the Assembly's concerns and the need for the letter from MARAD. Her testimony was clear, the Assembly was concerned that "the Federal Government would essentially come in and control – take over control of the port . . . and [Anchorage] would have no say with how things were done, [and] how they were built. Trial Tr. 657:18-25. She further testified that her statement to the Assembly as to "all control of who owns it, who builds it. . . is here," here meaning Anchorage, was intended to express to the Assembly that Anchorage remained the owner of the Project, that Anchorage determined what it wanted, and that Anchorage wanted to make clear that the Federal Government could not dictate what gets built. JX 3 at 49; Trial Tr. 664:11-665:7. Of course, Anchorage would present its case for the Project in its best light as the approval of the Assembly was needed for the Project to go forward. It was essentially a sales pitch. Thus, the representations to the Assembly were merely to assure the Assembly that Anchorage would retain control of the Port, not change the meaning of the roles and responsibilities of the MOU.

The Government further directs the Court to its evidence presented at trial which it suggests proved that "the parties' contemporaneous understanding [was that] Anchorage would be managing and executing the project on the ground." ECF No. 242 at 59. The Government relies on the fact that Governor Sheffield was interested in moving the Project forward by using the SBA 8(a) program to issue a sole-source contract to ICRC. *Id.* (citing Trial Tr. 1626:5-1627:5, 1627:19-23, 1628:20-1629:22; 728:19-24. It is the Government's position that because Governor Sheffield was excited to use the sole-source program, it was at his insistence that MARAD contract with ICRC. First, the Court notes that MARAD's use of the SBA8(a) program to award the sole-source contract is irrelevant to the issue of duties. Moreover, the enabling legislature was silent as to the competition procedure MARAD was to implement in fulfilling its contract obligations, and so MARAD was free to do as it chose. Second, Ms. Copper, who personally oversaw the contract for MARAD, stated that the decision to award the contract to ICRC was MARAD's decision. Trial Tr. 50:14-51:1. Indeed, there was plenty of testimony that Governor Sheffield was extremely involved in the Project; however, Governor Sheffield did not have the ultimate authority to determine whether to award a contract to a particular party. Trial Tr. 118:12-119-1.

The Court does not ignore the fact that Governor Sheffield had some authority under the 2003 MOU. The 2003 MOU spelled out those authorities and responsibilities. The testimony was clear that he was briefed continually as to the progress of the Project as well as attended daily meetings. The evidence from ICRC employees, Diana Carlson and Connie Black, clearly showed that Governor Sheffield pushed the team hard.[14]  In addition, the testimony was clear

---

[14] The evidence showed that both Ms. Carlson and Ms. Black worked tirelessly on the Project.

that all the Task Orders had to be approved by Governor Sheffield before payment by MARAD. Even if it is true, as the Government contends, that Governor Sheffield in essence bullied MARAD and ICRC into making their decisions,[15] this fact is irrelevant. Rather, the question is: whether MARAD was compelled to follow the dictates of Governor Sheffield by the 2003 MOU. From the description of responsibilities in the MOU, MARAD held the legal right to refuse Governor Sheffield.  And even though Governor Sheffield was briefed daily with regard to all aspects of the Project, and reviewed all the Task Orders, that does not mean he had control of the Project.  Just because MARAD and ICRC accommodated Governor Sheffield, that was their choice, not the requirement under the 2003 MOU or the contracts between MARAD and ICRC.

Yet, the Government continues to argue that the terms of the MARAD-ICRC contracts support its interpretation of the 2003 MOU.  The Court does not agree.  The terms of the ICRC contract simply reflect a typical federal procurement contract and the services to be provided by the prime contractor to the Government – and nothing more.  In fact, Ms. Cooper and Captain Davies, both MARAD employees, agreed that Anchorage did not have any rights under the contract.  Trial Tr. 79:24-80:4, 1523:18-24.

And finally, the Government alleges that the 2003 MOU and Addendum No. 2 were not fully integrated.  ECF No. 242 at 82.  To be clear, the Court finds that the 2003 MOU was a fully integrated agreement.  An agreement is not completely integrated if the writing "omits a consistent additional agreed term which is (a) agreed to for separate consideration, or (b) such a term as in the circumstances might naturally be omitted from the writing." *Grand Acadian, Inc. v. United States*, 87 Fed. Cl. 193, 209 (2009) (citing Restatement (Second) of Contracts § 216(2) (1981)).  As Anchorage correctly points out, there was no evidence introduced at trial that the 2003 MOU omitted additional terms that were agreed to for separate consideration.  Although the Government cites to documents from Ms. Coppe suggesting that the Project would be further defined through "subsequent procurement documents," ECF No. 242 at 82, and such documents were executed by MARAD following the 2003 MOU, such documents do not negate or render obsolete the duties MARAD owed Anchorage.  Every witness confirmed that MARAD's role under the 2003 MOU was to build the Port – which is exactly what MARAD attempted to do. This is clear evidence of MARAD's duty to deliver the Project to Anchorage.  Conversely, had the Project responsibilities belonged to Anchorage, it would have been Anchorage's duty to solicit and separately contract for those services.  But it did not.  It was MARAD who held those contracts, including the rights, remedies, and obligations under those contracts to procure those services.  Furthermore, Addendum No. 2 was clear, MARAD was to accept the work upon the execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to

---

[15] In fact, the Government argues that the ICRC witnesses were the more credible witnesses with regard to knowing how they were being managed, who they were reporting to on a day-to-day basis, and who was making the relevant decisions on the project.  ECF No. 242 at 87.  The Government also argues that these employees are more credible because they are neutral third parties.  *Id.*  The Court agrees that the ICRC employees were credible witnesses who all worked hard to make the Project a success.  However, it does not change the legal contractual relationship between MARAD and ICRC.

specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects."  PX 188.

Contemporaneous evidence can help interpret a contract, in contrast to supplying terms in an unintegrated contract.  Consequently, for the reasons set forth above, the Court finds that the plain text of the 2003 MOU and Addendum No. 2, interpreted in light of contemporaneous evidence of the parties' understanding, established a duty for MARAD to provide a complete item of construction or to provide design construction and project management services, free of defects.

### B. The Plain Meaning of the 2011 MOA further Confirms MARAD's Obligation to Oversee, Design, and Construct the Project

The Government now advances a perplexing argument that "the 2011 MOA disproves Anchorage's argument that MARAD was responsible for executing the Project under the 2003 MOU."  ECF No. 242 at 83.  In making this argument, MARAD compares the language found in the 2003 MOU related to "funding and administering" the Project, with the 2011 MOA phrase "deliver[ing] a quality product."  *Id.*  In comparing the two, the Government argues that it was never responsible for the Project under the 2003 MOU.  Instead, according to the Government, it received these "new duties" under the 2011 Agreement, including duties to provide project management, construction, design, and quality assurance services.  *Id.*  The Court disagrees.  This interpretation does not comport with the plain language of the Agreements and the witness testimony confirming that plain language.

In making its argument, the Government ignores MARAD's responsibilities that were enumerated in the 2003 MOU.  These responsibilities never changed with the 2011 MOA.  In fact, similar to 2003 MOU, the objective of the 2011 MOA was for the parties to "establish a working relationship and assign responsibilities to the respective parties."  JX 34 at 1.  In conformance with Addendum No. 2 of the 2003 MOU requiring that the Project be free from defects, Section III. C, of the 2011 MOA, articulated that: "[t]he PIEP is a major transportation infrastructure project for the Federal Government and the MOA/POA that must be delivered in a manner that captures the public's trust and confidence in the government's ability to effectively and efficiently deliver a quality product."  *Id.*  Moreover, whereas the 2003 MOU specifically provided that MARAD was to "obligate and disburse" funds for design and construction services, and to provide "federal project oversight," PX 4, the 2011 MOA provided that MARAD "provide subject matter expertise," and "administer funds."  JX 24 at 5.  Clearly, the responsibilities cannot be classified as "new duties" as suggested by the Government.

Furthermore, contrary to the Government's assertion that Col. Vakalis agreed that the 2011 MOA "substantially changed the parties' roles on the project," ECF No. 242 at 84 (citing Trial Tr. 480:18-481:9), Col. Vakalis's testimony at this citation made no such claim.  Instead, the testimony elicited by the Government referred to the POMO's creation and who would have a seat at the decision-making table.  What the Court finds more persuasive is Col. Vakalis's testimony that the 2011 MOA did not alter or amend the goals and responsibilities related to oversight of the Project and that it only reaffirmed the parties' existing obligations as well as formally establishing the POMO.  Trial Tr. 434:13-25.

And finally, the Government argues that "Anchorage misinterprets the nature of the responsibilities transferred to the Port at the expiration of the 2011 MOA on May 31, 2012." ECF No. 242 at 84. Specifically, the Government argues that Anchorage's interpretation that the 2011 MOA transferred design and construction responsibility to Anchorage is incorrect. Instead, according to the Government, the transfer of duties to Anchorage was only for the "acquisition and contract administration" for the Project. The Court disagrees. The 2011 MOA clearly states that Anchorage will "[a]ssume, not later than May 31, 2012, through itself or its designee, acquisition and contract administration *for the design and construction of the Project*." JX 34 at 4 (emphasis added). Clearly, the plain reading of the clause shows that MARAD was in control of contracting for, and administration of, design and construction of the Project from its inception through May 31, 2012, after which Anchorage would take over. Stated another way, if Anchorage was always responsible for the administration of the design and construction work for the Project, why would Anchorage have to assume these responsibilities upon expiration of the 2011 MOA? It is clear that the design and construction of the Project rested with MARAD up until May 31, 2012.

For these reasons, the Court finds that the plain reading of the 2011 MOA confirms MARAD's obligation to oversee, design, and construct the Project.

### IV.    The MARAD-ICRC Contract and Subsequent Breach by MARAD

It is a basic premise of contract law that, absent excusable grounds, a party to a contract is obligated to fulfill the duties it undertook. *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 776 (2005). Furthermore, a contractor is responsible for the performance failures of its subcontractors absent a showing of impossibility or other excusable grounds." *Id*.

Both Anchorage and the Government agree that MARAD's role on the Project included administrative duties. ECF No. 242 at 95; ECF No. 248 at 26. To that end, the Government contends that its "roles on the project were entirely administrative, intended to simply implement the Port's decisions through the ICRC contract." ECF No. 242 at 95. Even if true, Anchorage argues, the Government "fails to define what is meant by 'administrative.'" ECF No. 248 at 26. As provided by Anchorage, the Court agrees that the only reasonable interpretation can and must be "administrative" as defined in the government procurement context since MARAD was the contracting agency. *See* NASH & CIBINIC, ADMINISTRATION OF GOVERNMENT CONTRACTS at 1 ("The broad goals of contract administration are to ensure that the government obtains the needed work on time and at the level of quality called for by the contract and that the contractor receives proper compensation. This will often involve ensuring that both parties fulfill their contractual obligations.").

Accordingly, as the Court has already found, MARAD's obligation was to procure a completed, defect-free Project pursuant to the 2003 MOU and, notably, Addendum No. 2. The 2003 MOU further provided, and the Court found that MARAD was required to execute contracts for the design and construction of the Project. The Court further found that the 2011 MOA further confirmed MARAD's obligation to oversee, design and construct the Project.

A.  **Contractual Arrangement**

MARAD's contractual arrangement is clearly shown by the contractual chart prepared by MARAD:



PX 193.

Now, however, instead of relying on this chart, the Government asserts that the MARAD-ICRC- contract was like a "three-sided partnership." ECF No. 242 at 22.   This means, according to the Government, that the Contract between MARAD-ICRC was actually a contract between MARAD-ICRC-Anchorage.  *Id*.  The Government contends that this three-sided partnership resulted in Anchorage being "responsible for substantively directing and managing ICRC's work, while MARAD administered the contract and ensured compliance with all legal requirements."  *Id*.  In support, the Government points to Ms. Black's testimony that ICRC used the organization chart that was sent to Ms. Coppe in early 2003 which depicted a triangle of communications among the Port, MARAD, and ICRC.   DX173; Trial Tr. 1674:1-9, 1674:25-1675:5, 1675:17-1676:9.  With this backdrop, MARAD "deferred" the day-to-day operations to Governor Sheffield.  ECF No. 242 at 116.  In doing do, the Government claims that Governor Sheffield was in charge of the project and as such he was responsible for the Project failure.  Failure occurred because Governor Sheffield: (1) picked the design, (2) refused to pay for an independent review, and (3) failed to prevent construction deficiencies.  Thus, Governor Sheffield's action prove that Anchorage was the party responsible for directing and managing ICRC, not MARAD which resulted in the Project's failure.  ECF No. 242 at 97-113.  The Court finds that the evidence says otherwise.

The evidence was clear that even though Governor Sheffield preferred the OCPS design,[16] MARAD selected the design after its contractors, ICRC and Terracon, performed feasibility analysis of two different design alternative. Trial Tr. 1979:10-1985:11. In particular, the Government's witness, Diana Carlson, of ICRC, testified on cross-examination that the design selection process and feasibility analysis began in 2003 and continued through 2005. Trial Tr. 1979:10-1985:11. Ms. Carlson also admitted that Terracon, hired by ICRC and MARAD as the geotechnical engineer for the Project, recommended the use of the OCSP design, touted it as more economical to construct and stated that it would have lower life cycle costs over a more traditional pile-supported deck. Trial Tr. 1981:10-23. Ms. Carlson also acknowledged that it would make sense for an owner to want a design that was more economical and easier to construct. Trial Tr. 1981:24-1982:2. Ms. Carlson's testimony was clear that ". . . a threshold decision [was] reached by MARAD, after consultation with the Port, [ ] to use the OCSP technology in the design work for the Project."[17] JX 42 at ¶ 21; Trial Tr. 1989:10.

The Government further claims "that both ICRC and MARAD recommended that an independent review be performed, but that Gov. Sheffield refused to pay for it." ECF No. 242 at 97. However, the evidence is clear, that Governor Sheffield did approve funding for an independent review. *See, e.g.*, DX 614. Yet, the Government directs the Court's attention to the testimony of Ms. Carlson and hearsay statements made by unknown speakers during a GAC[18] meeting. ECF No. 242 at 101-03; DX 775; Trial Tr. 2192:20-2193:17. The Government also relies on letters sent to the GAC; however, the evidence showed that it was not Mr. Sheffield who wrote the letters to the GAC regarding the independent review process but Ms. Carlson.

Furthermore, the testimony elicited at trial from Ms. Carlson indicated that throughout the Project there had been an adequate independent review process. Trial Tr. 2014:3-10. In fact, Ms. Carlson's letters to the GAC, which were written on behalf of Governor Sheffield, included her stated position that the independent review process was completed. Trial Tr. 2014:20-2027:21.

[16] The Government cites to several documents to support its allegations that Governor. Sheffield is responsible for the OCSP design. However, none of these documents support this proposition. *See* ECF No. *242* at 100; DX 594 (specification for request for proposal including "OCSP design is the preferred method"), DX 608 (ICRC Request for Proposal for preliminary engineering and design services, DX 609 (letters from companies informing ICRC that no proposal would be forthcoming due to OCSP design preference), DX 614 (Task order for design services) and PX 959 (ICRC's answers to interrogatories in the Alaska case).

[17] Ms. Carlson also testified that design options were being considered by Anchorage as early as 2001. But this does not change the fact that Anchorage did not hold the contract between MARAD and ICRC and the fact that the testimony reflected that MARAD chose the OCSP design in consultation with Anchorage. Again, MARAD held the contracts and as such decided the who and what of each contract.

[18] The Geotechnical Advisory Commission ("GAC") is a nine-member commission appointed for three-year terms by the Anchorage Mayor and confirmed by the Anchorage Assembly. Stip. ¶ 22. In May 2008, the Project design team presented to the GAC regarding the Project's final design and final geotechnical analysis. This included a presentation by Terracon regarding its pre-design studies and reviews for the Project. Stip. ¶ 23.

The Government's argument that MARAD, ICRC, and PND recommended that the OCSP installation begin with a small test section, but that recommendation was denied by Governor Sheffield is not true. ECF No. 242 at 35. Rather the evidence at trial showed that MARAD chose to eliminate the one-year trial. *See* JX 42; DX 973; Trial Tr. 2081:3-20.

With regard to the Government's assertion that Governor Sheffield failed to prevent construction deficiencies, the Government relies on an April 9, 2009 ICRC email to MARAD recommending terminating QAP's subcontract. PX 413. In this email ICRC recommends terminating QAP's subcontract for convenience due to the Beluga whales and the environmental restrictions. According to the Government however, the email should have put Anchorage on notice of the difficult pile driving conditions which ended in the construction defects. The email clearly shows that the Government's contention is without merit. Even so, Anchorage was not a party to this subcontract. MARAD hired ICRC who in turn hired QAP. Anchorage had no authority to terminate the QAP subcontract or to direct ICRC to do so. Nor could Anchorage terminate the ICRC contract or direct ICRC to take action due to the contractual relationship between MARAD – ICRC – QAP. Trial Tr. 539:23-542:16. Of course, Anchorage could make recommendations to MARAD and ICRC, but again, Anchorage had no legal authority to terminate any of these contracts.

Moreover, MARAD knew that the design and construction defects were the responsibility of ICRC and its contractors. In its November 2010 award fee determination issued to ICRC pursuant to the 2008 MARAD-ICRC Contract, MARAD stated:

> ICRC's inability to properly manage their subcontractors is a major weakness. Given the substantial amount of subcontract work being performed for both design and construction of the project, substantial cost overruns have taken place, in addition to scheduled delays. This has had a major impact on the critical path of the program. ICRC and their subcontractors have been late in meeting design milestones, and designs have required numerous revisions, which have resulted in cost escalation.

PX 619. MARAD further stated:

> The contractor has implemented some project activities successfully, but has failed to implement the project as a whole. ICRC core activity for the PIEP is to build the bulkhead structure that will create new real estate and serve as the foundation for the container cranes. ICRC has failed to implement and manage the bulkhead construction, negatively impacting the program performance. ICRC has put corrective action plans in place to mitigate the impact, but the project remains behind schedule and over budget.

*Id*.

Likewise, the suitability study done by CH2M Hill also concluded that both the design and construction of the Wet Barge Berth and North Extension were defective and had to be

reconstructed using a suitable design.  PX  917.  MARAD does not dispute the findings in the CH2M Hill Suitability Study, nor has MARAD offered an expert to rebut these findings.

The Court notes again, Anchorage was not a party to the MARAD-ICRC contract. MARAD contracted with ICRC to procure a completed, defect-free Project.  As the Federal contracting entity, pursuant to its contract administration obligations, MARAD was required to ensure that it obtained the needed work on time and at a level of quality called for by the contracts. To accomplish this, MARAD was to administer federal procurement contracts; specifically, MARAD contracted with ICRC to procure a completed, defect-free Project. Because MARAD failed to do so, the Court finds that MARAD breached its contractual obligations to Anchorage

The Court, therefore, finds that MARAD was responsible for the defective construction of the Project and as such breached the 2003 MOU.[19]

## B.  MARAD Failed to Enforce its Contractual Remedies or to Administer Funds Properly

With regard to the Anchorage's contention that MARAD failed to enforce its contractual remedies or to administer its funds properly in breach of the 2003 MOU, the Court agrees with Anchorage.  Pursuant to Addendum No. 2 to the 2003 MOU, MARAD was required to accept all work on the Project before it could be approved as completed, at which time MARAD would convey to Anchorage a completed Port free of defects.  PX 188.  The addendum specified that MARAD was to accept the work via execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects."[20] *Id.*

It is undisputed that, through the 2003 and 2008 MARAD-ICRC contracts, MARAD had contractual remedies that it could assert against ICRC to complete the work.  In fact, the 2003 MARAD-ICRC Contract contained the following remedies:

> • Contractor performance shall be evaluated by the contracting officer throughout the life of the contract. Contractor product and services, which do not meet the minimum quality standards specified in attachment J-1, statement of work, and elsewhere in this contract, may be subject to correction. These corrections may include but are not limited to the following: (1) re-performance by the contractor, as directed by the contracting officer; (2) re-performance by the government, with

---

[19] The Government also alleges that the Project was not fully funded.  The Court finds that it was as a total of $306,466,919.76 in Federal and non-Federal funds for administration of the Project.  Stip. ¶ 104.  The original contract to ICRC was for $207 million.  Thus, when the Project began, it was fully funded.

[20] It is undisputed that neither MARAD not its prime contractor, ICRC, ever delivered a certificate of acceptance for Anchorage to sign, nor is there any evidence to that effect.

re-performance costs charged to the contractor; (3) termination for default.

> • The contractor shall also be responsible for all damages to persons or property that occur as a result of the contractor's fault or negligence.

JX 4.

The 2008 MARAD-ICRC contract also contained remedies including:

> • Contractor performance shall be evaluated by the Contracting Officer throughout the life of the contract. Contractor product and services, which do not meet the minimum quality standards specified in attachment J-1, statement of work, and elsewhere in this contract, may be subject to correction. These corrections may include but are not limited to the following: (1) re-performance by the contractor, as directed by the contracting officer; (2) re-performance by the government, with re-performance costs charged to the contractor; (3) termination for default.

> • The contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence.

> • The contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements. If the contractor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the work and charge the cost to the contractor; or (2) terminate for default the contractor's right to proceed.

> • FAR 52.228-16 ("The contractor shall furnish a performance bond for the protection of the Government…. The contractor shall furnish all executed bonds…before starting work.").

PX 357. MARAD's witnesses confirmed that MARAD never enforced these remedies. For instance, MARAD's Captain Scott Davies testified that, when the construction defects became apparent, Anchorage expected MARAD to enforce its rights against the contractors. Trial Tr. 1521:25-1522:13. The evidence showed that Captain Davies further testified that Anchorage had no way to enforce rights and thus Anchorage relied on MARAD to enforce these remedies. Trial Tr. 1523:18-1523:24. MARAD never did.

The Government further asserts that it disclaimed its design liability to Anchorage through a 2005 contract Modification 12 to its Federal procurement contract with ICRC. ECF No. 242 at 75; DX 588. However, turning to Modification 12 the Court notes that the Modification relates to MARAD's contract with ICRC, not Anchorage. Again, Anchorage was not a party to the MARAD-ICRC contract. JX 4. But, the Court does note that the modification includes the statement that: "neither Anchorage nor MARAD are taking professional responsibility for the design." *Id.* This, claims the Government, alleviates it from liability. However, Mr. Leong explained that this clause is standard language in any agreement to procure

architect-engineering services.   Trial Tr. 255:20-256:11. In fact, his testimony revealed: "Yes. That's pretty standard government contracting – construction contracting.  If we're hiring professional engineers, you know, we rely on their -- on their professional expertise."  Trial Tr. 256.   Thus, it does not mean that MARAD, who contracted with ICRC to procure design services, would not have liability to Anchorage for the design if it ultimately turned out to be defective, as it did here.

Moreover, the evidence at trial demonstrated that MARAD understood and agreed that it undertook design liability in the event the OCSP design failed.  In a March 5, 2007 Memo authored by Diana Carlson to Mr. Leong, Ms. Carlson provides MARAD with information on additional insurance to protect the project.  JX 15; Trial Tr. 190:12-190:14. Specifically, Ms. Carlson stated:

> This insurance is required due to the design-build component of the project. Without including this policy requirement, **ICRC and the government may be ultimately responsible for design errors and omissions** in the event the contractor's designer fails to procure adequate coverage and a loss occurs.

JX 15; Trial Tr.  191:11-191(emphasis added).

MARAD also tries to argue that it is relieved from liability because the language in the "Background" section of the Statement of Work provides that deliverables would be provided to Anchorage, not to MARAD.   However, as this Court has already held, when MARAD awarded the procurement contract to ICRC, MARAD was procuring those services from ICRC pursuant to its obligations to Anchorage.  That was the entire purpose of that procurement.  Although Anchorage was to be the end user and recipient of the Project, nothing in the ICRC contract allows MARAD to avoid its responsibility to properly administer that contract or to avoid its obligations to Anchorage.

And finally, MARAD admits that it had contract administration responsibilities, and that this includes administration of funds.  ECF No. 242 at 126, 145.  At trial, the evidence showed that MARAD continued to pay ICRC after the defective work was discovered.  Trial Tr. 558:9-12.  Specifically, in May 2009, MARAD was advised by ICRC that there were issues with installation of the sheet pile, including potential damage to the sheet pile interlocks and the need for a physical inspection.  PX 431.  A physical inspection did not happen at this time; instead MARAD waited until late 2009.  Pursuant to its 2008 contract with ICRC, not only was MARAD required to inspect the Project but it was also required to enforce the provisions of the contract requiring ICRC to correct defective work.  PX 357.  Instead, MARAD continued to pay ICRC for work defectively performed in 2009 and 2010.  In doing so, the Court finds that MARAD failed to administer the Project funds properly and thus, breached the 2003 MOU.

### C.  The Government's Breach of the 2011 MOA

The 2011 MOA obligates MARAD to defend against claims as well as pursue affirmative claims on MOA's behalf.  MARAD specifically agreed that it would "[p]ursuant to Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7001-7013 [sic], administer claims submitted by MARAD contractors and coordinate and cooperate with the MOA/POA in affirmative and defense of claims consistent with federal contract law." JX 34 at 5.  The evidence showed that MARAD settled a claim with ICRC without Anchorage's input and with Anchorage's money. See ECF No. (summary judgment order and opinion).  However, in support of its actions, the Government argues that it did not need Anchorage's input, as "the 2011 MOA was not extended according to its terms."  ECF No. 242 at 122.  This is true, the 2011 MOA expired in May 2011 and the claims were paid on September 28, 2012.  ECF No. 241 at 96.

However, even though MARAD settled the claims with ICRC after the expiration of the 2011 MOA, in this case, the parties stipulated that ICRC began filing its claims in early 2011, during the existence of the 2003 MOU.  Stip. ¶¶ 92-96.  Furthermore, when the parties executed the 2011 Agreement, Col Vakalis testified that it was, in part, to agree on how the parties would address ICRC's claims.  Trial Tr. 439:9-439:20.  In light of that, the parties included in the 2011 Agreement the provision whereby MARAD would defend against claims as well as pursue affirmative claims on Anchorage's behalf.[21]  *See* JX 34 at 5.  This is also well-established by case law.  *See Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 785 (2013) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied.").  "A provision that survives the expiration of a contract's term, therefore, may obligate a party to perform under the provision even after the contract in which it is contained has expired."  *Seven Resorts, Inc.*, 112 Fed. Cl. at 785–86.  For these reasons, the Court finds that MARAD breached the 2011 MOA when it settled the claim.[22]

---

[21] The provision was intended to address ICRC's certified pass-through claim (on behalf of QAP/MKB) to MARAD filed several months prior to execution of the 2011 Agreement.  Stip. ¶¶ 94-96; Trial Tr. 439:9:20.

[22] In light of this ruling, the Court need not address whether the Government breached its duty of good faith and fair dealing.

## V.    Conclusion

For the reasons set forth above the Court hereby finds the Government breached its Agreements with Anchorage.

The Court will enter a separate opinion on damages.

**IT IS SO ORDERED.**

s/Edward J. Damich<br>
EDWARD J. DAMICH<br>
Senior Judge

# In the United States Court of Federal Claims

No. 14-166C
(Filed:  February 24, 2022)

```
**************************************
                                     *
ANCHORAGE, A MUNICIPAL               *
CORPORATION,                         *        Trial, Damages, Expectancy Damages
                                     *
              Plaintiff,             *
                                     *
       v.                            *
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
**************************************
```

## OPINION AND ORDER

**DAMICH,** Senior Judge

     Trial was held in this matter from February 16, 2021 through March 4, 2021.  Post-trial briefs were filed by Plaintiff, Anchorage, A Municipal Corporation ("Anchorage") on May 4, 2021, ECF No. 241, and the Defendant, the United States ("the Government") on June 3, 2021, ECF No. 242.  Anchorage filed its reply on August 2, 2021.  ECF No. 248.  On September 21, 2021, the Court ordered Anchorage to respond to its questions regarding new arguments by the Government.  ECF No. 249.  Anchorage complied.  ECF No. 252.

     On December 9, 2021, this Court issued its Opinion and Order on liability, finding that the Government breached its contracts to build a defective free port structure ("Project").  ECF No. 253.  The parties, Anchorage and the Department of Transportation, Maritime Administration ("MARAD") entered two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") to build the Project.  *Id*. It is these Agreements the Court found MARAD had breached.  *Id*.

     After the Court issued its Opinion and Order on liability, the Court issued an order requesting the parties clarify and provide the supporting trial evidence for certain damages calculations.  ECF No. 254.  The parties complied.  ECF Nos. 255, 256.  This damages' opinion

and order incorporates the trial testimony and evidence, post-trial briefs, and responses to the Court order.[1]

Anchorage seeks two categories of damages as a result of the failed Project: (1) costs spent by Anchorage for the Government to design and construct the defective open cell sheet pile ("OCSP") system and related costs ("impairment damages"); and (2) costs to remove and stabilize the OCSP system ("future costs"). Specifically, Anchorage argues and has presented evidence that it suffered damages related to the lost costs/value due to the defective design and construction in the amount of $180,839,809. ECF No. 255. To remove and stabilize the OCSP System, Anchorage advances it will cost $186,607,000. ECF No. 241 at 102; ECF No. 255. Thus, the total amount of damages sought by Anchorage for breach of contract is $367,446,809. This amount, according to Anchorage, will not put it in a better position than it would have had the breach not occurred but will put Anchorage in the same position it would have been but for the breach. ECF No. 248 at 40.

The Government objects to these amounts. Relying on this Court's order, ECF No. 254, requesting clarification and direction to supporting evidence, the Government argues that these discrepancies "demonstrates the unreliability of the damages calculation." ECF No. 256 at 1. The Government further argues that Anchorage's damages calculations are inaccurate because the damages calculations: (1) do not include a deduction for Alaska state funds that the Government claims have been already reimbursed to Anchorage (2) do not account for the value Anchorage received in the project; (3) cannot include future costs because Anchorage has already rejected the removal project that it claims will occur; and (4) that the portion of Federal funds was never recorded as an asset or an advance on Anchorage's financial statements. *Id*. at 1-2; *see also* ECF No. 242 at 131-34, 137-39.

For the reasons set forth below, the Court finds that Anchorage has proven both its impairment damages and future costs in the amount of $367,446,809.

## I.    Findings of Fact[2]

The Port of Anchorage, now the Port of Alaska, is an enterprise department of the Municipality of Anchorage. Stip. ¶ 1.[3] The Port is a critical national seaport with an estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port on an annual basis. Stip. ¶ 4. The Port is subject to some of the highest tidal fluctuations in the United States and second highest in North America. Trial Tr. 1046:17-1047:2. The City of Anchorage is also known to be very seismically active. Trial Tr. 1019:5-1019:11.

Relevant to damages, Anchorage called four expert witnesses at trial. Specific to this opinion and order, Anchorage's expert witnesses included: James Schoonmaker and Patrick

---

[1] The Court notes that there a calculation discrepancies—these are discussed in detail *infra*.

[2] A full recitation of the findings of fact can be found at ECF No. 253.

[3] "Stip." refers to the stipulation of facts filed jointly by the parties. ECF No. 191.

McGeehin.  Anchorage also called Doug Playter, Project Manager of CH2M Hill, and Lucinda Mahoney, Commissioner of the Alaska Department of Revenue and former Chief Financial Officer of Anchorage.  The Government did not call any expert witnesses.

### A. Impairment Damages Testimony and Evidence

For impairment cost calculations, Mr. McGeehin, of FTI Consulting, was qualified at trial as an expert in forensic accounting and damages calculation.  Trial Tr. 1164:4-17.  He testified that $180,839,809 was the amount incurred attributed to the unusable section of the OCSP system.  Trial 1183:5-23.  Mr. McGeehin apportioned the money that was spent on the usable and unusable assets. Trial Tr. 1165:1-19.  He reviewed where the money was spent on the Project taking into consideration the Federal funds, Alaska grant funds, Anchorage funds, Task Orders, Bohnet spreadsheets,[4] deposition transcripts, the views of the Government's expert witness, Mr. Benes (who did not testify), settlements between the Government and Integrated Concepts and Research Corporation ("ICRC"), as well as Anchorage's settlement with ICRC. Trial Tr. 1165:20-1167:12.  From these Mr. McGeehin calculated that $298,790,000 was spent on the Project.  Trial Tr. 116:3-9; 1168:22-23.  He did not include the $3 million administrative fees paid to the Government.   Trial Tr. 1268:18-1170:6; *see also* ECF No. 153.

Then, Mr. McGeehin calculated certain areas that were deemed usable and excluded them from his calculations.  PDX3.  The North Backlands, South Backlands, and Tidewater Road were usable space.  *Id.*  For the unusable portion of the OCSP structures, he calculated an area of 2435 lineal feet.  The total OCSP structures amounted to 2905 lineal feet.  *Id.*  The unusable portion (2435 lineal feet) constituted 83.82% of the OCSP lineal feet of the 2905 lineal feet.  *Id.* Mr. MeGeehin applied the 83.23% against the OCSP-Construction Task Orders, OCSP Fill amount, and OCSP general sites.  *Id.*  Other Task Orders and amounts spent on the Project were listed at 100%—worked performed in 2009/2010 by West Construction Company ("West") to temporarily stabilize the structure—line items OCSP Remediation Task Order and OCSP Remediation General Site, the Corps of Engineers suitability study, and the Government-ICRC settlement.  Anchorage was also able to sell unused sheet pile and gravel, which Mr. McGeehin added as a credit.

The following summarizes the impairment damages:

---

[4] On February 18-19, 2020, the Court held a "min-trial" on the issue of consideration. The Government presented Mr. Bohnet, a MARAD employee, as its witness regarding funds. As part of his responsibilities, and in preparation of trial, he was tasked with preparing spreadsheets tallying all the funds appropriated, transferred, and expended in connection with the project.  The purpose of the spreadsheets was to show where every dollar, federal and nonfederal, was expended.  *See* ECF No. 141.

### SUMMARY OF DAMAGES

| Categories/Percentages | Total Unusable 2,435 LF |
|---|---|
| *83.82%* | |
| OCSP-Construction Task Orders | $126,264,016 |
| OCSP Fill Materials Amounts | $5,032,192 |
| OCSP General Site Amounts | $20,260,567 |
| Subtotal | **$151,556,775** |
| | |
| *Percentages 100%* | |
| Corps of Engineers (Suitability Study), Task 8 | $3,397,900 |
| ICRC Settlement Amounts with MarAd | $11,279,059 |
| OCSP Remediation Task Orders | $32,421,056 |
| OCSP Remediation General Site | $5,002,955 |
| Credit for Sales of Sheet Pile and Gravel | ($3,467,936) |
| Subtotal | **$48,633,034** |
| | |
| Subtotal | $200,189,809 |
| Less: Settlements from Prior Litigation | ($19,350,000) |
| **Total** | **$ 180,839,809**[5] |

The Government did not challenge this evidence by expert witness. Nor did the Government challenge the Task Order amounts calculated by Mr. McGeehin in its post-trial brief. *See* ECF No. 242. However, at trial, Government counsel attempted to discredit Mr. McGeehin's allocation of costs with regard to Task Orders by challenging Mr. McGeehin's knowledge of the Task Orders as related to the Project. Specifically, Government counsel asked:

BY MR. WISSER:

Q. Mr. McGeehin, you recall you had highlighted these red areas as, I guess, the scope of what you were looking at in terms of costs associated with those areas; is that accurate?

A. Yes.

Q. Okay. And do you know how those particular areas of the project relate to the task order structure?

---

[5] In his chart, PDX 3, Mr. McGeehin has added the subtotals incorrectly. The first category he totals as $151,556,774, which is off by $1.00. It should be $151,556,775. The 100% subtotal is also recorded as $48,633,033, also off by $1.00. It should be $48,633,034. This lends to the total impairment damages as being off by a total of $2.00 on his chart, as well as Plaintiff's briefs. The summary provided above has the correct calculations as well as throughout this Opinion and Order.

A.  Well, they -- they were task orders -- as I  mentioned before, there are task orders that were  specifically identified as OCSP task orders.  And some of those were based upon times.

So, for example, I forget the year, but I  think by 2008, a lot of task orders now, because by  2006, the north backlands had been completed, and I think it was 2007 or so, the south backlands, so there  was a time element of the identification.

But it's not always that pure because as I  said, within a particular task order, you could be doing work both in the bulkhead area and in the – in  the, for example, south backlands and north backlands, but I think I gave two examples of task order 406 and  414.

So it's -- it's not, unfortunately, simply a matter of one is definitely all of this and one is definitely all of that.

Q.  Well, do you recall that the amount you  allocated from 406 to 414 was only for materials, purchases, fill and steel?

A.  I think the amount that got – that  originally was -- was -- 406 was originally allocated  all to north backlands and considered usable.  The  amount that we then allocated over into the OCSP system was more than just a fill and steel.  It included some traffic control, it included some filter rock, it included some armor rock.

So there were a series of items that were billed from AIC[6] up through ICRC that we looked at on the final change order on that project to see how those had been designated.  Were they designated as OCSP?  Or  were they designated by -- as south backlands?

Q.  So you referenced that you would review the final change order to make that determination?

A.  Sometimes, yes.  So, for example, in – in  that particular -- in that particular one, which is the  only big one that we really made a move on, there was a  Change Order 8 that summarized everything for that  project.

And the contractor, AIC, identified in that change order where the different costs related to among  the three areas that I just identified.  We -- we used  that as our framework for identifying from the work  done by AIC up through ICRC, how that should be apportioned to the task orders.

Q.  And I guess that's what I'm trying to get a clear picture of, because you say that the work should have been apportioned to the open cell sheet pile, and

---

[6] Alaska Interstate Construction Company, LLC ("AIC") was hired by ICRC and performed work on the North Backlands.  AIC placed armor rock on the slip slope for tidal protection.  Stip. §§ 43-44.  The armor rock slipped into the footprint into the future footprint of the Wet Barge Berth and was not removed prior to the installation of the sheet piles.  *Id.*

that's what I'm trying to figure out, is what – what  basis are you using to define the open cell sheet pile work, whether it's based on a specific task order or something else?

A.    Yes, so the -- the -- for example, in that    particular area, the identification for the OCSP was done by subcontractor AIC.  So they -- they identified  their -- what they called their south backlands, north backlands, and there were certain change orders where you had to try to marry that back to one of the areas  and -- and the area generally called the dry barge berth, meaning the -- the bulkhead.

Trial Tr. 1194:15-1197:9.  This small sample shows that Mr. McGeehin understood the Project and allocated costs appropriately.  For instance, Mr. McGeehin was clear that he reviewed the task orders together with the change orders.  In doing so, he evaluated what costs should be allocated to the OCSP system and, if any, what costs should be allocated to the usable areas.  To accomplish this, at times he had to "marry" back change orders to task orders for various areas, as well as determine what materials should be included in what he considered the usable portion of the Project versus the unusable portion of the Project.  The Government did not challenge the costs as related to the Bohnet spreadsheets, Trial Tr. 1201:10-16, nor did the Government challenge the ICRC settlement amount, Trial Tr. 1201:17-20, which were used in Mr. McGeehin's damages' calculation.

With regard to the linear amount used in making his calculations, again, the Government did not challenge the calculation in its brief.  However, during trial, the Government again attempted to discredit Mr. McGeehin's usable vs. unusable assumption. Trial Tr. 1200:12-1201:9.  On cross examination Mr. McGeehin stated that he was not offering any opinion about the usability of any structure from a technical, functional basis but instead was relying on the Suitability Study which stated which areas of the project are considered unusable.  Trial Tr. 1200:18-1201:9.  The Suitability Study was a detailed engineering analysis to evaluate whether the bulkhead design was suitable for use at the Project as well as investigated and documented defective construction work at the Project.  Stip. ¶ 88; Trial Tr. 860:8-22.  CH2M Hill issued its final Suitability Study finding that the design and construction were defective, JX 41; Stip. ¶ 90.  The study also concluded that the Wet Barge Berth and North Extension were defective and had to be reconstructed using a suitable design.  PX  917.  These findings were not disputed by the Government, nor did the Government offer an expert to rebut these findings.  This study, therefore, supports the Court's conclusion that Mr. McGeehin's calculations are accurate.

### B.  Future Costs Damages Testimony and Evidence

With regard to future costs, CH2M Hill, the program manager for the Port Modernization Project ("Modernization Project"), Douglas Playter, the Senior Project Manager at CH2M Hill, who oversaw the Suitability Study, testified that CH2M Hill found that the factors of safety for the OCSP bulkhead constructed in the Wet Barge Berth and North Extension are below industry standard and that the OCSP bulkhead could collapse, is a safety hazard, and must be removed

and stabilized as it will fail.  He further testified that neither the Wet Barge Berth nor the North Extension were completed.  Trial Tr. 1016:4-1019.

Anchorage is currently undergoing a Modernization Project designed to rebuild the entire Port infrastructure.  Mr. Playter testified that the Modernization Project will be built in phases because Anchorage does not have enough money to build it all at once and the Port needs to remain open during construction.  CH2M Hill hired Kiewit-Manson as the design-build contractor for the Modernization Project.  Kiewit-Manson hired AECOM to prepare a preliminary design for the North Extension areas.  CH2M Hill currently oversees the work of Kiewit-Manson and indirectly AECOM.

AECOM prepared a 35% design estimate ("AECOM 35% Design Estimate").  To accomplish the design estimate, AECOM first reviewed the North Extension area and evaluated a variety of designs for slopes and soil mixing processes.  AECOM broke the project into 2 steps. PX 973.

Step 1 was called:  35% Design for North Extension Stabilization Step 1. This was to be done as soon as possible and a second effort, known as Step 2, will be done after the construction of key facilities necessary to provide services.  Step 1 removes the highest part of the OCSP structure to allow ships to dock at Terminal 3 more safely.  It also is a result of the need to replace essential facilities in the Port prior to a major earthquake.  *Id.*  The 35% design includes a detailed design narrative, a constructability review, and a detailed schedule.  Although the AECOM 35% North Extension stabilization design was only for Step 1, the damages sought by Anchorage are an estimate for both Steps 1 and 2.  In Step 2, Anchorage plans to come back and remove the balance of the structure.  The OCSP structure will have to be removed all the way to the Dry Barge Berth.  This plan will not use any open cell sheet piles nor does it use a closed cell structure.  *Id*.

Mr. Schoonmaker testified as an expert in estimating the cost of the demolition of the existing North Extension, removal costs of the defective structure, and the cost of stabilizing the area.  His experience included bidding on projects in Cook Inlet, Alaska.  With this experience and in preparing this estimate, Mr. Schoonmaker visited the job site, and reviewed all the construction design documents.  Opining from his experience, and reviewing PX 973 (AECOM's drawings), PX 972 (the design narrative), PX 974 (milestone constructability review), PX 975(Kiewit-Manson's Schedule for Step 1), PX 976 (AECOM's advanced design narrative justified the one to six sea floor slope, the use of an armored revetment, and the need for soil improvements), Trial Tr. 13637-24, Mr. Schoonmaker arrived at $186,700,00, for costs related to demolition, removal, and stabilization of the area.  He testified that his probability of accuracy goal for his estimate was a range of minus 20 to plus 30.  In particular, Mr. Schoonmaker detailed the following estimate of costs:

> **(1) Site Preparation and Management - $**477,000.00, for site preparation and management, including clearing of the site prior to construction and the environmental controls required for siltation and the maintenance throughout the Project.  Trial Tr. 1371:1-10.

**(2) Demolition and Excavation -** $42,776,000.00, for the complete demolition of the existing sheet piles structures and the excavation of the backfill materials. Trial Tr. 1371:11-14.

**(3) Place Slope Protection -** $15,727,000.00, for riprap slope protection that is to be placed on the dredge-prepared slopes after it is completed. Trial Tr. 1371:15-1372:1.

**(4) Material Disposal -** $13,376,000.00, for removing from the job site the excavated dredge materials, dredge disposal and the removal to the scrap yard of steel materials from the bulkhead.  Trial Tr. 1372:2-10.

**(5) Asphalt Paving -** $135,000.00, to remove a 20 foot-wide strip of paving a couple of hundred feet long. Trial Tr. 1372:11-1.

**(6) Soil Mixing -** $36,536,000.00, for enhancing and strengthening soil properties by injecting a cement blend in with the existing soil. Trial Tr. 1373:18-1373.

**(7) Mobilization-** $11,626,000.00, for bringing the material, equipment, personnel, and any construction fixtures that may be necessary for the Project.  Trial Tr. 1373:4-19.

**(8) Engineering Design and Geotech - $**7,516,000.00, for completing the design including borings and lab analysis of soils. Trial Tr. 1373:20-1374:2.

**(9) General and Administrative -** $19,032,000.00, is the contractor's overhead costs, including supervision, maintenance, and costs not assigned to direct efforts listed above. It also includes an office complex, bonds, and insurance. Trial Tr. 1374:8-18.

**(10) Corporate Overhead and Profit -** $29,440,000.00, is calculated at a 20% rate due to the challenging restrictions related to marine mammals and unknown conditions with respect to wind, weather and seismic activity and risk. Trial Tr. 1374:19-1375:11.

 **(11) Environmental and Permitting Consultant -** $775,000.00, third-party environmental and permitting consultant.  Trial Tr.     1375:21-1376:1.

**(12) PM/CM Consultant -** $9,191,000.00, for a third-party consultant during the design phase to manage that process and to handle the procurement of the construction contractor and the construction of the Project.  Trial Tr. 1376:2-15.

The Government did not challenge this evidence by expert witness.  The Government's cross-examination did not successfully counter these numbers either.  Instead, the cross-examination merely focused on whether the two-step process is cost effective, the effect on the whale population, and where the equipment might come from to complete the Project.  Trial Tr. 1388-1392.  The cross-examination did nothing to dissuade the Court from finding Mr. Schoonmaker's calculations accurate.

## II.    Discussion

After proving a breach of contract, as Anchorage has done, Anchorage is now entitled to recover damages which were proximately caused by the defendant's breaches, were reasonably foreseeable, and were proven with sufficient certainty to permit the finder of fact to reasonably calculate, with reasonable certainty, the amount.  *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002); *Cal. Fed. Bank FSB v. United States*, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001); *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

Here, Anchorage argues that it suffered damages related to the lost costs/value due to the defective design and construction of the Wet Barge Berth and North Extension as well as future costs that will be needed to remove and stabilize the defective structure. ECF No. 241 at 102; ECF No. 255. In order to recoup these costs, Anchorage proposes two separate theories for recovery: expectancy or reliance. For the reasons set forth below, the Court awards damages to Anchorage under the expectancy theory of damages.[7]

### A. Expectancy Damages

Expectancy damages are intended to "place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (citing *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). The "general principle is that all losses, however described, are recoverable." *Indiana Michigan*, 422 F.3d at 1373 (quoting Restatement (Second) of Contracts, § 350, cmt. b). Expectation damages cover both costs to mitigate damages and incidental costs. *Citizens Federal Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) (bank entitled to recover costs related to mitigating damages); *Boston Edison Company v. United States*, 64 Fed. Cl. 167 (2005) (incidental damages include "costs incurred in a reasonable effort, whether successful or not, to avoid loss").

In addition, a plaintiff must also prove that both the "magnitude and type of damages were foreseeable" at the time of contract formation. *Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Id.* (quoting Restatement (Second) of Contracts § 351(2)). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351, cmt. a.

The Government argues that Anchorage cannot claim expectancy damages because the 2003 MOU did not define any expectancy interest.[8] ECF No. 242 at 136. As this Court has held, the 2003 MOU contained the essential terms for contract formation. Furthermore, the 2003 MOU stated clearly that "MOA, Port of Anchorage and MARAD anticipate substantial completion of Port Expansion will occur during calendar year 2008." That was the shared expectancy of the parties. Clearly, the Port was expected to be delivered by the end of 2008.

---

[7] The Court need not address Anchorage's alternative theory—reliance damages—in light of this opinion. (Reliance damages include all costs incurred in reliance on the broken promises. *See* Restatement (Second) Contracts, §349. Reliance damages allow a party to recover all damages caused by the breach, regardless whether the damages occurred before the breach. *See Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)).

[8] The Government also argues that because MARAD could terminate the Agreement at any time, this disproves that MARAD owed any Anchorage any specific item of construction. The Court disagrees. The termination clause is just standard government contracting language.

Nevertheless, the Government further argues that Anchorage cannot show that the magnitude and type of damages were foreseeable because the 2003 MOU never contemplated a clearly defined deliverable, that no specific dollar amounts were listed, and that the Project was entirely subject to the availability of non-Federal contributions and Federal appropriations. ECF No. 242 at 135. In support, the Government argues that Anchorage had only $55 million available when the 2003 MOU was executed, JX 3 at 31:2-11; Trial Tr. 792:4-20, and that that the initial estimate for the entire project was between $210 and $227 million. ECF No. 242 at 135. By now requesting approximately $100 million over the initial estimate as damages, based upon the information known in 2003, when the 2003 MOU was executed, damages in the amount of $367 million were not foreseeable. *Id.* The Court disagrees.

In 2003, the MOU was entered into between Anchorage and MARAD for MARAD to design and develop a port for Anchorage. PX 43. At that time, MARAD also entered into a contract with KSI in the amount of $210 million to begin the Project. JX 4; Stip. ¶ 14. In addition, prior to the 2003 MOU, in 1999, the Port issued a Master Plan which looked at 12 different scenarios, one of which, was estimated to cost $306 million. Stip. ¶ 6; JX 1. Thus, even in 1999 there was an estimate of over $300 million. It was, therefore, foreseeable that if the Project failed it could result in the loss of hundreds of millions of dollars. Furthermore, it was also foreseeable that an unstable structure in the Port of Anchorage would have to be removed and if it was not removed it could result in shutting down the Port entirely—as the area has extreme tides and seismic activity and a Port which provides for 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port on an annual basis.

For these reasons, the Court finds that Anchorage had an expectancy interest in damages that were foreseeable.

### 1. Impairment Damages

In the alternative, the Government argues that "[i]f the Court were to find Anchorage had an expectancy interest in the OCSP structure, Anchorage miscalculated its expectancy damages." ECF No. 242 at 136. With regard to the "impairment damages" the Government argues that the only funds that Anchorage is entitled to recover are the funds it put into the Project—$163 million. *Id.* at 139. Accordingly, certain funds must be excluded from the impairment damages calculation. In particular, the Government argues that the Federal funds should not be counted in Anchorage's damages calculations because the funds were never in Anchorage's possession. *Id.* at 137. The Government further argues that the Alaska State funds have been reimbursed to Anchorage and, therefore, are not recoverable. *Id.* at 137-38. And finally, the Government argues that the settlement paid to ICRC should not be included in Anchorage's damages. *Id.* at 138. The Court finds otherwise.

### a. Anchorage Has Suffered a Net Capital Loss and The Federal Funds Are Recoverable

The Government asserts that Anchorage has admitted that it never received the Federal Funds and never recorded those funds as an asset or an advance, and therefore, it is not recoverable. ECF No. 242 at 136. Additionally, because both parties–the Federal Government

and Anchorage–lost a substantial amount of money as a result of the Project, and because both the Federal Government and Anchorage contributed capital in pursuit of a shared public policy goal—the improvement of the Port, following the *Winstar* line of cases, the Government argues "it would be only appropriate to replace Anchorage's capital that the alleged breach eliminated because additional damages would be 'duplicative.'" *Id.* at 136-37 (citing O*ld Stone Corp. v. United States*, 450 F.3d 1360, 1378 (Fed. Cir. 2006)).

In applying *Old Stone* here, the Government argues that Anchorage has not suffered any net capital loss. To arrive at this conclusion, the Government calculates that Anchorage invested only $75,139,398 of its own capital and received $117,780,814 in assets as a result of the Project. Stip. ¶¶ 42, 57 (Anchorage accepted and received all of the work done between 2003 and 2008 and the dry barge berth portion of the OCSP work); JX 44 at 441 (showing breakdown of Anchorage vs. State of Alaska contributions to the project); JX 45 (impairment calculation showing total value of assets received). According to the Government, this calculation shows that Anchorage has suffered no net capital loss. Instead, the damages calculation shows that Anchorage has gained a net capital benefit gaining over $37 million from its initial investment. ECF No. 242 at 138.

The Court disagrees. As Anchorage correctly points out, the Government's argument concerning the source of funds was rejected in the *Westfed Holding, Inc. v. United States,* 407 F.3d 1352 (Fed. Cir. 2005)[9] case. In that case, the court held:

> It is inconsequential that Westfed chose to borrow the funds from investors to acquire Old Western's shares rather than use its own money. The government cites no legal authority to support distinguishing the "losses actually sustained" based on whether Westfed used its own funds or the funds of investors to whom it is indebted. Westfed is entitled to that amount it actually expended to acquire Old Western in reliance on the forbearance promise, which the government repudiated.

*Id.* at 1368. As in *Westfed*, the Court finds that Anchorage is entitled to recover the funds expended on the project no matter the source of the funds. The amount spent is undisputed, therefore, Anchorage is entitled to recover the funds, regardless of the source. In addition, the Government's argument that Anchorage received any capital gain on their initial investment of $163 million, much less a $37 million net capital gain when the Project failed, is untenable, as the evidence clearly shows that Anchorage is left with a dangerous structure that could fail at any moment which needs to be removed and the ground stabilized. These funds are, therefore, recoverable.

### b. Alaska State Funds Are Recoverable

The Government further argues that "if the court disagrees that Anchorage has received a net capital benefit based on its investment, the Court still must reduce Anchorage's claimed

---

[9] The Court notes that the *Westfed* case is relied upon by the Government for its source of funds argument.

expectancy damages amount" by $91,290,163—the Alaska State funds—which the Government argues have been reimbursed to Anchorage. ECF No. 242 at 134. In reaching this conclusion, the Government cites to the testimony of Ms. Mahoney. Her testimony, according to the Government "conceded" that the State replaced Alaska grant funds. *Id.* (citing Trial Tr. 1296:20-1297:18). Therefore, if the State funds are not deducted that would amount to double recovery. *Id.*

The Government has misconstrued Ms. Mahoney's testimony. Ms. Mahoney never "conceded" that the State had been fully reimbursed for the loss off the Alaska State grant funds. In fact, Ms. Mahoney never said that the State replaced the State funds due to the failure of the Project. Instead, Ms. Mahoney testified how Anchorage received the grant in the first instance. *See* Trial Tr. 1296:20-1297:18. These funds are, therefore, recoverable.

### c.  20212 MARAD-ICRC Settlement Is Recoverable

And finally, the Government argues that Anchorage should not be able to claim the value of the 2012 MARAD-ICRC settlement as part of its expectation damages ($11,279,059). ECF No. 242 at 138. Relying on the testimony of Mr. McGeehin, when asked by Government counsel, Mr. McGeehin admitted that he included the ICRC settlement amount at the direction of counsel and had no opinion as to whether it was appropriate to include as part of the OCSP structure. Therefore, the Government argues that relying on counsel's advice for damages is not proper and should be deducted. *Id.* However, this Court has already found that this money was spent out of Anchorage's coffers. *See* ECF No. 141. In addition, the Government concedes that the money "may have come from Anchorage funds." ECF No. 242 at 138. In light of this, and the Court's finding that the MARAD breached the 2011 MOA when it entered into the settlement agreement, Anchorage is entitled to recover this amount.

### 2.  Future Damages are Recoverable

The Government asserts that Anchorage is not entitled to future damages—that is— Anchorage cannot recover its costs for removal of the structure because Anchorage "has not paid anything out of its pocket," and, therefore, "the amount claimed is not an actual loss." ECF No. 242 at 131 (citing *Westfed Holdings*, 407 F.3d at 1352). Because "potential future obligations . . . do not count yet as an actually sustained loss," *Westfed Holdings*, at 1368-69, the Government contends it would be error to award future costs to Anchorage. Moreover, the Government argues that "Anchorage has not demonstrated any legal basis to recover its theoretical future costs." ECF No. 242 at 132.

According to the Government, Anchorage's claims that its costs to remove the OCSP structure are recoverable as mitigation or incidental costs or that its theoretical removal costs are recoverable as costs necessary to remedy the defects in the structure are not supported by the cases supplied by Anchorage. *Id.* at 242 at 132 (citing ECF No. 241 at 135-36). Instead, the cases cited in support, argues the Government, disprove Anchorage's arguments for future costs. *See, e.g. Com. Contractors, Inc. v. United States*, 154 F.3d 1357, 1372 (Fed. Cir. 1998) (costs to remedy defects are available only as an alternative basis of damages when the loss in value is impossible to calculate); *Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1317 (Fed. Cir.

2007) (the awarded "mitigation damages" were all costs incurred in the past). Consequently, Anchorage cannot recover damages for costs not yet incurred nor can Anchorage claim remedial costs as Anchorage costs to remedy defects are available only as an alternative basis of damages when the loss in value is impossible to calculate. As Anchorage has calculated its loss in value, the Government argues, Anchorage cannot claim further costs. ECF No. 242 at 132.

However, the test is not so simple. Instead, in determining whether a party may recover future damages, the Court must determine whether the breach was a total breach or partial breach.

A total breach is defined by the Restatement (Second) of Contracts § 236 as "one for damages based on all of the injured party's remaining rights to performance. A partial breach is one for damages based on only part of the injured party's remaining rights to performance. The case of *Indiana Michigan Power* is instructive. In that case, the Court distinguished the difference between a partial breach case and a total breach case. In particular, the Court held that as some of the alleged breaches involved "remaining obligations" to be performed after the lawsuit was over, the breach was partial and, therefore, the request for future damages was denied. In comparison, MARAD missed the projected completion date of 2008 and terminated construction in 2011 due to faulty design and defective construction. When the work stopped, the OCSP foundation was not complete, causing the entire Project to stop. When the Project stopped without a completed Port and then the Project abandoned in 2011 by the Government, the Government no longer performed its obligations. Thus, any remaining obligations were breached. Therefore, the Court finds that the Government's breach constitutes a total breach for which future damages are recoverable.

The Government further argues that Anchorage is not entitled to future costs because Anchorage introduced no evidence to show that it has made any decision about the removal of the OCSP structure. ECF No. 242 at 133. In essence, argues the Government, Anchorage is asking the Court to make a finding about Anchorage's future plans based only on testimony from Mr. Playter, a CH2M Hill employee. As the Government points out, Mr. Playter admitted that neither he nor CH2M Hill has any authority to decide what the Port is going to do. *Id.* (citing Trial Tr. 1019:23-1020:14). Indeed, Anchorage could have and should have, according to the Government, chosen to present testimony from any witness currently employed by the Port or Anchorage, who could have testified as to Anchorage's intentions, but it did not. *Id.*

The testimony from Mr. Playter regarding future plans clearly shows that he and CH2M Hill are involved with Anchorage and its future regarding the Port. In fact, his responses from Plaintiff's counsel show that he considers himself, as an employee of CH2M Hill, to be part of the fix:

BY MR. SMITH:

Q. The concept D alternative that was ultimately considered, is that an economical approach to fixing what's in the North Extension?

A. Yeah, it is. It's the best -- it's -- it's -- it's the best we can do. Really. It

maximizes -- it maintains as much of the North Extension backlands as we can maintain, you know, and it preserves as much as we can, while still stabilizing. So it's a balance. It's -- it's a very fine balance. We're working -- you know, provide as much upland as possible, but stabilize it. And that's -- that's what we've done.

**Q. To the best of your knowledge, has anybody from the Municipality expressed an intent not to stabilize that -- the North Extension?**

**A. No. They're all very supportive and they realize how important it is**. I mean, they listen to the ship -- the shippers complain about it all the time. It's just -- it's a real -- it's a real navigation hazard as it is.

Q. And it's also a safety hazard?

A. And a safety -- yeah, it's a safety hazard. I mean, you know, you've seen the sinkholes. There's sinkholes that are documented in the file. One of those could open up at any moment. If somebody was out there and a sinkhole opened up, they'd be dead.  I mean, they'd be dead quick. I wouldn't walk out there. I wouldn't build a house out there. I wouldn't park a trailer out there. I mean, it's -- it's dangerous.

Q. And why hasn't that area been stabilized to date?

A. The -- the port has -- okay. So -- so the whole port infrastructure is in a state of disrepair. And that's what the whole purpose of the original project was, to replace everything. But given the limited funding that they have right now, the first thing they need, because if there's a big earthquake right now, you could lose the whole port. You could lose the North Extension and you could lose all the existing terminals. But we built -- we've gone ahead with Phase 1 to build the PCT, so that in the event of a big earthquake and we lose everything, all existing terminals and the North Extension, we at least have the PCT to work from. Okay? So we can get fuel, we can get cement, we might even be able to get some containers offloaded.

                .  .  .

Q. So the Port is left making decisions between several bad alternatives?

A. That's a good way to put it.

**Q. Now, have you received any direction from the assembly, the municipal assembly, that changes the future plans for the modernization project?**

*A.*  **No**.

Trial Tr. 1016:4-1019 (emphasis added).  The testimony clearly shows that Mr. Playter is currently involved in the Port Project, as well as his plans to be involved with the future plans to remove the dangerous structure and to stabilize the areas.  His testimony clearly shows that he is aware that Anchorage is moving forward as well.

And finally, the Government argues that the evidence proved that Anchorage has rejected the removal project that Anchorage claims will occur; therefore, it is speculative.  ECF No. 242 at 131-134; ECF No. 255.  The Government points to the evidence that Anchorage's cost estimate is based on 35% design drawings for one portion of the port, and then extrapolated to another section of the port.  Trial Tr. 1389:21-1390:8.  In other words, the Government argues "Anchorage's estimate is based on an assumption that is based on another assumption. The conceptual estimate also provides a wide range of accuracy from -20% to +30% or a 50% swing of probable costs."  ECF No. 242 at 134 (citing PX 5 at 3).  Therefore, according to Government, the Court cannot fairly ascertain the future damages that Anchorage is claiming based on the evidence it has provided.  The Court is not convinced.

Mr. Playter's testimony was clear that for safety reasons the entire structure must be removed.  Trial Tr. 902:2-921:2; 1016:4-1019:11.  The Court has already found that MARAD breached its Agreements with Anchorage and in doing so has misspent the initial $300 million. ECF No. 253.  Now Anchorage has to fix what was created by MARAD.  Anchorage's construction estimate expert, Mr. Schoonmaker, described in great detail the hundreds of hours put into his estimate.  He explained that he had "as built" drawings that described in detail what had to be taken out, and both a 35% and a 95% of the design to be installed.  PX 973; Trial Tr. 1352:15-20.  His testimony was unchallenged by any expert from MARAD or any other witness. Thus, the testimony cited clearly meets the requirement than an estimate be sufficient for this Court to make "a fair and reasonable estimate of the damage."  *Bluebonnet Savings Bank, FSB v. United States*, 266 F. 3d 1348, 1355 (Fed. Cir. 2007).  The Court, therefore, finds that Anchorage proved the legal element of "reasonable certainty" to support its future damages claim.

### B. The Damage Award Is Reliable

#### 1. Impairment Damages Calculations

In its post-trial brief, Anchorage provided a summary of the lost costs/value due to the defective design and construction.  However, several calculations did not add up to the numbers presented.  In addition, the Court was unclear as to the supporting evidence for some of the impairment damages claim—specifically the Court requested support for the $188,980,786 on page 102 of ECF 241 of Anchorage's post-trial brief.  *See* ECF No. 254.  The Court ordered the parties to respond to the inaccuracies.  The Government responded that the inaccurate calculations support its position that the damages amounts are unreliable and, therefore, not recoverable.  ECF No. 256 at 1.  Anchorage, provided the following:

This number is a combination of a part of the calculation performed by Mr. McGeehin to reach $180,839,807, as summarized on PDX 3 page 3 (Attached

as Ex. 1). (Tr 1168:3-1173:5). The $188,980,786 represents the costs of design and construction of the OCSP up until the work was halted in 2010.

*Id.* First, the Court notes that Anchorage still provides the wrong number. Mr. McGeehin's calculations add up to $180,839,809. However, the chart below explains how to get to the first calculation in question, **$188,980,786:**

| Categories/Percentages | Total Unusable 2,435 LF |
|---|---|
| *83.82%* | |
| OCSP-Construction Task Orders | $126,264,016 |
| OCSP Fill Materials Amounts | $5,032,192 |
| OCSP General Site Amounts | $20,260,567 |
| Subtotal | **$151,556,775**[10] |
| | |
| *Percentages 100%* | |
| OCSP Remediation Task Orders | $32,421,056 |
| OCSP Remediation General Site | $5,002,955 |
| | |
| Total amount spent on unusable OCSP: | **$188,980,786** |

Thus, to arrive at $188,980,786, you add $151,556,775 plus $32,421,056 plus $5,002,955 The references to "OCSP Remediation Task Orders" and "OCSP Remediation General Site" are for work performed by West to attempt to fix errors in prior installation and to stabilize the area before the work was shut down. Trial Tr. 1172:1-11.

In its brief, ECF No. 241, Anchorage also claimed total impairment damages in the amount of $181,092,257. According to Anchorage, the improper $181,092,257 number was the result of using a lower incorrect number for the credit for sales of sheet pile and gravel. ECF No. 255 at 2. However, as the Court has provided previously, the appropriate total impairment number should be $180,839,809.

To arrive then at $180,839,809, starting with the amount spent on the unusable OCSP, namely, $188,980,786, Mr. McGeehin subtracted amounts received for the sale of sheet pile and gravel and for the moneys received by Anchorage's settlement from the prior litigation in the Federal District Court Alaska. Mr. McGeehin also included as recoverable funds spent by the Government for the suitability study—Corps of Engineers, Task 8— and the ICRC-Government Settlement Amounts. Although Mr. McGeehin's final tally is incorrect, in order to reach $180,839,809, you add the $3,397,900 for Corps of Engineers (COE), Task 8, along with the ICRC settlement of $11,279,059 to the $188, 980,786 and then deduct the $3,467,936 for sales of sheet pile and gravel and the $19,350,000 for the Settlements from Prior Litigation.

---

[10] Again, in its original brief, Anchorage's chart and PDX 3 was $1.00 off — $151,556,774. However, if you total the numbers from PDX 3 they add up to $151,556,775

Therefore, $180,839,809 is the final summary of all impairment damages caused by the defective OCSP.[11]

| | |
|---|---|
| Amount Spent for Unusable Portions of OCSP | $188,980,786 |
| ICRC Settlement with MARAD | $11,279,059 |
| Cost of Corps of Engineers Analysis | $3,397,900 |
| Credit for sale of Sheet Pile and Gravel | ($3,467,936 |
| Subtotal | $200,189,809 |
| Less Settlement Proceeds Received by Anchorage | ($19,350,000) |
| **Total Impairment Damages** | **180,839,809** |

Other than the objections which the Court has addressed above, the Government did not challenge any other calculations with regard to the impairment damages, either by expert witness or in its initial brief. And although Anchorage's briefs and Mr. McGeehin's final tabulations did contain minor incorrect calculations, the calculations were otherwise supported by Mr. McGeehin's testimony.

Therefore, the Court finds that Anchorage has suffered damages relating to the loss in value/funds associated with the construction/impairment of the Wet Barge Berth, the North Extension and the Bulkhead in the amount of $180,839,809.  The Court further finds that had the design and construction had been done properly, Anchorage would have possessed an asset valued at approximately $180,839,809 more than it is currently valued.  The Court, therefore, awards the total impairment damages in the amount of $180,839,809.

## 2. Future Damages Calculations

The second category of Anchorage damages relates to the removal of the defective structure and to stabilize the area.  Using AECOM's 35% design estimate summary the amounts are as follows:

| Item | Description | Total -to nearest thousand |
|---|---|---|
| | North Extension Stabilization | |
| 1 | Site Preparation & Management | $477,000 |
| 2 | Demolition & Excavation | $42,776,000 |
| 3 | Place Slope Protection | $15,727,000 |
| 4 | Material Disposal | $13,376,000 |

[11] In response to the Court's December 9, 2021 Order, Anchorage states that "the number of $180,607,000 on page 49 of ECF 248 is simply a mistake. It should have been $180,839,807." ECF No. 255 at 2. Yet again, the Court notes $180,839,807 is also an addition mistake.

| 5 | Asphalt Paving | $135,000 |
|---|---|---|
| 6 | Soil Mixing | $36,536,000 |
| 7 | Mobilization | $11,626,000 |
| 8 | Engineering Design & Geotech | $7,516,000 |
| 9 | General & Administrative | $19,032,000 |
| 10 | Corporate Overhead & Profit | $29,440,000 |
| | Total Construction and Engineering Costs | 176,641,000 |
| 11 | Environmental & Permitting Consultant | $775,000 |
| 12 | PM/CM Consultant | $9,191,000 |

ECF No. 241 at 102.

Once again, the Government did not present any expert witnesses to challenge any of the calculations to the estimate for removing the structure and stabilizing the area in question nor did the Government challenge the actual amount—$186,607,000 (176,641,00 + 775,000 + 9,191,000) —in its brief.  *See* ECF No. 242 at 130-138.  The only criticisms raised by MARAD relate to the use of a 35% design and the extrapolation of the Step 1 design into the Step 2 area.  These criticisms have no merit.  The law only requires that the estimate be sufficient for the Court to "make a fair and reasonable estimate of the damages."  *Bluebonnet Savings Bank FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  Anchorage's evidence meets this criterion and is accepted by the Court.

The evidence was clear that the structure left by the Government on Anchorage's property by MARAD is dangerous, prevents Anchorage from using its property and creates navigational hazards.  The evidence was also clear that Anchorage has no choice but to remove the defective structure, and the cost to remove the dangerous structure is clearly recoverable.  That amount, as provided by Anchorage's expert witnesses provide that it will cost Anchorage $186,607,000 to remove the defective structure and for the cost of restoring the impacted area.  All of these damages are directly related to the failed design and construction.  Thus, but for the breach, Anchorage would not need to stabilize the area of the defective structure for safety.   The Court, therefore, awards Anchorage $186,607,000 in damages to remove the defective structure and stabilize the area.

Therefore, the Court finds that Anchorage is entitled to recover damages which were proximately caused by the defendant's breaches as they were reasonably foreseeable and were proven with sufficient certainty to permit the finder of fact to reasonably calculate damages with reasonable certainty.

### III.    Conclusion

The Court finds that it can recover the loss in value of its property under an expectation damages theory. *See* Restatement (Second) of Contracts §§ 347-348. But for the failure of the Government to deliver a port in accordance with the terms of the parties' contract, Anchorage would have had an asset valued at $180,839,809 on its balance sheets. Therefore, Anchorage is entitled to its impairment damages for the loss in property value due to the Government's defective work. The impairment analysis does not, however, account for the full "diminution" in the value of the property, as the cost to remove the dangerous structure and stabilize the area must be added. That Court finds that cost to be $186,607,000.

Therefore, the Court previously having found that the Government breached its Agreements with Anchorage, as a result, Anchorage is awarded $367,446,809 in damages. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/Edward J. Damich</u>
EDWARD J. DAMICH
Senior Judge
