**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee

v.

UNITED STATES,
Defendant-Appellant

***Appeal No. 2022-1719***

On Appeal from the United States Court of Federal Claims
Case No. 14-166C, Hon. Edward J. Damich

# BRIEF OF PLAINTIFF-APPELLEE ANCHORAGE, A MUNICIPAL CORPORATION

Jason N. Smith
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5398
Email: jnsmith@seyfarth.com
*Attorneys for Plaintiff Anchorage,*
*A Municipal Corporation*

OF COUNSEL:
Bennett D. Greenberg
Donald G. Featherstun
Edward V. Arnold
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, D.C. 20004
(202) 463-2400

DATED: April 28, 2023

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES.....................................................................4

STATEMENT OF THE CASE........................................................................4

I. NATURE OF THE CASE ..........................................................................4

II. FACTUAL BACKGROUND.......................................................................5

A. Port History and Project Overview ......................................................5

B. MOA And MARAD Entered Into An Agreement Pursuant To Which MARAD Had A Duty To Provide Technical Expertise And Oversee, Design, Construct, And Deliver The Port ......................6

1. The Express Terms Of The 2003 MOU Delineated The Parties' Roles And Responsibilities............................................6

a. MARAD's Responsibilities Included Providing Technical Expertise To Oversee, Design, Construct, And Deliver The Port.....................................6

b. Addendum No. 2 To The 2003 MOU Required MARAD To Deliver A Project Free From Material Defects ......................................................................7

c. MARAD's Contracting Personnel Interpreted The 2003 MOU To Require MARAD To Award And Manage Contracts For Program Management, Design And Construction ................................................8

d. MARAD's Contracting Personnel Agreed That Addendum No. 2 Required MARAD to Deliver A Defect Free Port...........................................................10

e. MOA's Witnesses Agreed MARAD Was Responsible For Contracting With Designers and Contractors To Deliver a Defect Free Port.....................11

f. MOA's Responsibilities Included Providing Program Requirements, Consistent With Its Role As Project Owner.........12

C. MARAD Contracted With KSI/ICRC For Program Management, Design And Construction Services To Fulfill Its Obligations Under The 2003 MOU.........14

D. The 2003 MARAD-ICRC Contract Expressly Confirmed MARAD's Contractual Obligations Under The 2003 MOU.........15

E. MARAD Confirmed The 2003 ICRC Contract Provided MARAD With Numerous Contractual Remedies To Ensure The Project Was Successfully Completed.........17

F. Consistent With Its Contractual Obligations, MARAD Directed ICRC To Contract With Geotechnical Engineers, Designers, And Contractors.........19

1. The Geotechnical Investigation Concluded That The OCSP Design Was Suitable For Use At The Project.........19

2. MARAD Selected The OCSP Design Through The Environmental Assessment.........20

3. MARAD Directed ICRC To Execute Design And Construction Contracts.........22

a. MARAD Issued Task Order 312 For Design Services.........22

b. MARAD Issued Task Order 414 For Construction Services.........22

G. Construction Defects Were Discovered At The Project.........23

H. 2010 Inspections Revealed Additional Damage To The Structure.........25

I. MARAD Blamed ICRC For Project Failures.........25

J. MOA And MARAD Entered Into The 2011 Memorandum Of Agreement, Reaffirming MARAD's Duties And Establishing The POMO ..........26

K. MARAD's Retained Engineering Firm Concluded The Project Was Defective ..........27

L. MARAD Settled ICRC's Claims Without MOA's Knowledge Or Consent..........28

III. LEGAL ARGUMENT..........29

A. The 2003 MOU Unambiguously Established That MARAD Had A Contractual Duty To Deliver The Port To MOA Free From Defects ..........29

1. MARAD's Argument On Appeal Was Properly Stricken By The COFC ..........29

2. The 2003 MOU Unambiguously Obligated MARAD To Deliver A Completed Port ..........31

3. The Plain Meaning Of Addendum No. 2 To The 2003 MOU Specifically Required MARAD To Deliver A Defect-Free Port..........35

4. MARAD's Witnesses Confirmed MARAD's Duty To Deliver The Project To MOA ..........37

5. The Cases Cited By MARAD Are Inapplicable And Do Not Support MARAD's Attempt To Avoid Its Contractual Duties To MOA..........39

6. MARAD's Reliance On Anchorage Municipal Code Is Misplaced..........41

7. The COFC Did Not Rely On The "Objectives" Clause To Establish MARAD's Duties..........42

8. The COFC Struck MARAD's Termination Argument ..........43




94428757v.2

B. The COFC Correctly Held That The 2003 MOU Established MARAD's Duty To Oversee, Design, And Construct The Project........44

1. MARAD Ignored The Plain Meaning Of The 2003 MOU.......44

2. Contemporaneous Evidence Supports The COFC's Decision........45

a. The 2003 MOU Is Fully Integrated And Prior Drafts Are Irrelevant........45

b. The Assembly Workshop Transcripts Support MOA's Interpretation Of The 2003 MOU........46

c. MARAD's Argument That Alleged Congressional Duties Relieved It From Contractual Obligations Is Illogical........49

C. The 2011 Agreement Reaffirmed MARAD's Duties And Obligated MARAD To Pursue Claims On MOA's Behalf........50

D. MOA Is Entitled To Recover $367,446,809 In Expectancy Damages........51

1. MARAD Failed To Challenge The COFC's Fundamental Damage Findings........51

2. MARAD Does Not Challenge The Quantification Of $356 Million In Expectancy Damages........52

E. MOA Is Entitled To The $11.3 Million In Expectancy Damages Awarded By The COFC........55

F. Alternatively, The $11.3 Million Qualifies As Non-Overlapping Reliance Damages........58

1. The $11.3 Million Is Recoverable As Reliance Damages........58

G. Reversal Rather Than Remand Would Be Inappropriate........62

IV. CONCLUSION........62



94428757v.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Capital Corp. v. Fed. Deposit Ins. Corp.*,
472 F.3d 859 (Fed. Cir. 2007) ....................59

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) ....................52

*California Fed. Bank, FSB v. United States*,
245 F.3d 1342 (Fed. Cir. 2001) ....................52

*CBS, Inc. v. Merrick*,
716 F.2d 1292 (9th Cir. 1983) ....................61

*Chattler v. United States*,
632 F.3d 1324 (Fed. Cir. 2011) ....................39, 40

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) ....................31

*Com. Fed. Bank, F.S.B. v. United States*,
59 Fed. Cl. 338 (2004)....................52

*Cutler-Hammer, Inc. v. United States*,
441 F.2d 1179 (Ct. Cl. 1971)....................40

*Dolmatch Group, Ltd. v. United States*,
40 Fed. Cl. 431 (1998)....................59, 60

*ECC Int'l Constructors, LLC v. Secretary of the Army*,
817 F. App'x 952 (2020) ....................38

*Energy Cap. Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002) ....................52

*Fifth Third Bank v. United States*,
518 F.3d 1368 (Fed. Cir. 2008) ....................42, 56

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) ....................59

*Glendale Federal Bank FSB v. United States*,
43 Fed. Cl. 390 (1999).....60, 61

*Hi-Shear Technology Corp. v. United States*,
356 F.3d 1372 (Fed. Cir. 2004).....56, 57

*Indiana Michigan Power Company v. United States*,
422 F.3d 1369 (Fed Cir. 2005).....52, 54

*Julius Goldman's Egg City v. United States*,
697 F.2d 1051 (Fed. Cir. 1983).....38

*Macke Co. v. United States*,
467 F.2d 1323 (Ct. Cl. 1972).....38

*Meridian Eng'g Co. v. United States*,
885 F.3d 1351 (Fed. Cir. 2018).....3, 48, 62

*Nat'l By-Products, Inc. v. United States*,
405 F.2d 1256 (Ct. Cl. 1969).....40

*Pacific Gas & Electric Co. v. United States*,
536 F.3d 1282 (Fed. Cir. 2008).....46

*Shell Oil Co. v. United States*,
896 F.3d 1299 (Fed. Cir. 2018).....56

*Slattery v. Roth*,
710 F.3d 1336 (Fed. Cir. 2013).....61

*Slattery v. United States*,
583 F.3d 800, 815-18 (Fed. Cir. 2009), vacated and reh'g en banc granted, 369 Fed.Appx. 142 (Fed. Cir. 2010), reinstated as modified on reh'g en banc, 635 F.3d 1298 (Fed. Cir. 2011) (en banc).....61

*Slattery v. United States*,
69 Fed. Cl. 573 (2006).....61

*Stovall v. United States*,
94 Fed. Cl. 336 (2010).....60

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005) .......................................................................34, 35, 47

*TEG-Paradigm Env't, Inc. v. United States*,
465 F.3d 1329 (Fed. Cir. 2006) ........................................................................31

*Vizio, Inc. v. Int'l Trade Comm'n*,
605 F.3d 1330 (Fed. Cir. 2010) ..................................................................30, 43

*Westfed Holding, Inc. v. United States*,
407 F.3d 1352 (Fed. Cir. 2005) ........................................................................54

*Westlands Water District*, 109 Fed Cl. 177 (2013) ..............................................39

**Statutes**

Contract Disputes Act, 41 U.S.C. §§ 7001-7013.....................................................50

Anchorage Municipal Code 7.15.040(A) ..................................................29, 41, 42

**Other Authorities**

FAR 2.101 .........................................................................................................33

FAR 52.246-12(i)...................................................................................................36

Fed. Cir. R. 28(b) ...................................................................................................4

*The Government Contracts Reference Book* (Nash, Schooner, et al, 4th
ed. 2013) ..........................................................................................................33

K. Allen, *Government Contract Interpretation: A Comprehensive
Overview*, 15-4 Briefing Papers 1, pp.- 8 .........................................................33

Nash & Cibinic, ADMINISTRATION OF GOVERNMENT
CONTRACTS....................................................................................................34

R. Nash, *Postscript XI: The Plain Meaning Rule*, 31 Nash & Cibinic
Rep. NL P. 5 (2017)..........................................................................................33

Restatement (Second) Contracts, §349 ..............................................................59, 60

Webster's College Dictionary..................................................................................33

# STATEMENT OF COUNSEL

Pursuant to Rule 47.5, Plaintiff-Appellee's counsel states that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Plaintiff-Appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee

v.

UNITED STATES,
Defendant-Appellant

***Appeal No. 2022-1719***

On Appeal from the United States Court of Federal Claims
Case No. 14-166C, Hon. Edward J. Damich

# BRIEF OF PLAINTIFF-APPELLEE ANCHORAGE, A MUNICIPAL CORPORATION

## INTRODUCTION

This appeal arises out of the failed infrastructure project known as the Port of Anchorage Intermodal Expansion Project (the "Project" or "Port"). In 2003, Anchorage, a Municipal Corporation ("Anchorage" or "MOA") and the United States Department of Transportation, Maritime Administration ("MARAD", "Government" or "United States") entered into a valid and binding contract for the development and delivery of the Project. (Appx16044-16048). A subsequent contract for development and delivery of the Project was executed in 2011. (Appx44); (Appx18329-18337). Pursuant to those contracts, MARAD agreed to deliver a completed defect-free Port by contracting for project oversight, program

management, engineering, design and construction. MOA, the Project owner, was responsible for securing funding and informing MARAD what it wanted built, as well as to ensure that its existing facilities were kept operational during construction. MARAD, in turn, executed the necessary procurement contracts and issued Task Orders to fulfill those requirements. Unfortunately, MARAD delivered a defective Project, resulting in hundreds of millions of dollars of wasted funds and necessitating removal of the majority of the existing structure. These facts are not in dispute.

MARAD appeals portions of the U.S. Court of Federal Claim's ("COFC") entitlement and quantum decisions by asserting a series of arguments that were *struck* by the COFC for MARAD's failure to raise them during the 7-year litigation. In addition, MARAD raises the same arguments it pursued (and lost) at various junctures in this litigation. MARAD argues that it had no duties, was not required to deliver a defect free Port, and that it was MOA's duty to manage the Project. However, this position contradicts MARAD's own prior admissions that it "holds all of the cards" and was "running the show" and "in control" while the 2003 MOU merely gave MOA "a little bit of control" and a "seat at the table." (Appx10088-89) (Tr. 179:16-180:1); (Tr. 181:12-182:13) ("Anchorage had no ability to affect or make any decision or even direct or tell MARAD what to do on

the contract."). MARAD's admissions alone establish that MARAD has no basis for this appeal.

MARAD's arguments are further undermined by its other admissions – that MOA had no contractual rights against MARAD's prime contractor, Integrated Concepts and Research Corporation ("ICRC")[1], and that MOA had no ability to direct ICRC or any of its subcontractors. MARAD also inconsistently maintains that while it had no duties under the contracts it was entitled to settle claims asserted by ICRC without MOA's knowledge or consent. MARAD settled ICRC's claims despite knowing that ICRC's work was defective, and that such a settlement would severely damage MOA.

Importantly, MARAD's appeal almost entirely challenges the COFC's *factual* findings, rather than the COFC's resulting *legal* conclusions.[2] However,

---

[1] MARAD inappropriately refers to ICRC as the "project contractor." (Dkt 23 at 4, 29, 39, 40). It is undisputed that ICRC was MARAD's prime contractor, pursuant to which MARAD undertook the risk of ICRC's non-performance.

[2] MARAD is challenging the COFC's rejection of the facts it asserted to support its position that it had no duty to deliver a port. To reverse the COFC, this Court must find that the COFC clearly erred in its factual findings, which is not the case here. *See Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1359 (Fed. Cir. 2018) ("We have stated that 'weighing of conflicting evidence is a task within the special province of the trial judge who, having heard the evidence, is in a better position than we to evaluate it.' Where 'a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.'") (internal quotation marks and citations omitted).

the COFC endured 7 years of litigation, countless motions, and a mountain of witness testimony and documents to arrive at its factual and legal conclusions. There is no basis for this Court to overturn the COFC's well-reasoned decision.

## STATEMENT OF THE ISSUES

A. Whether the COFC erred by holding MARAD had breached a contractual duty to oversee, design, construct and deliver a defect free Port to Anchorage;

B. Whether the COFC erred by holding MARAD breached a contractual duty to pursue legal claims on Anchorage's behalf; and

C. Whether the COFC erred by awarding Anchorage $367,446,809 in expectation damages.[3]

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

MOA filed a lawsuit in February 2014 against the United States asserting breach of contract claims for MARAD's failure to satisfy its contractual obligation to oversee, design, construct and deliver the Project. The case was tried in February and March 2021. The COFC issued its entitlement decision on December 9, 2021, finding that the Government had a contractual duty to MOA to oversee, design, construct, and deliver the project, which it breached when it

---

[3] MOA restates the issues because MARAD improperly included argument and misstated the COFC's findings in its Statement of Issues. *See* Fed. Cir. R. 28(b).

delivered a defective Project.[4] In addition, the COFC found that the United States breached a contractual duty to assert and defend against claims on MOA's behalf. (Appx35-62). The COFC issued its quantum decision on February 24, 2022, awarding $367,446,809 in damages to MOA. (Appx63-81). The COFC entered judgment pursuant to Rule of the Court of Federal Claims ("RCFC") 58 that MOA recover from the Government damages in the amount of $367,446,809.[5]

## II. FACTUAL BACKGROUND

### A. Port History and Project Overview

The Port of Anchorage, now the Port of Alaska ("POA"), is a critical national seaport and the kingpin in Alaska's corridor of commerce.[6] (Appx5697-704). An estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the POA on an annual basis. (Appx38); (Stip.

[4] MARAD falsely asserts the COFC "largely accepted the evidence offered by the United States showing that the Port made all of the decisions that resulted in the design and construction failures of which Anchorage had complained." (Dkt 23 at 18 citing Appx51-52). The COFC could not be more clear in citing a mountain of factual evidence that proved otherwise. For example, the COFC expressly found that the fact that the Port Director was briefed on the status of the Project did "not mean he had control of the Project." (Appx52).

[5] MARAD misstates the damages breakdown. (Dkt. 23 at 4). As further set forth herein, the COFC did not differentiate $11,279,059 as a "third set of damages," nor did the COFC identify that amount as being awarded for a breach of the 2011 MOA. (Appx63-81).

[6] The POA is a department within the MOA; POA and MOA will be referred to as MOA.

¶4)[7](Appx14508). Fuel for military operations at Joint Base Elmendorf Richardson ("JBER") and for the Ted Stevens Anchorage International Airport, now the third busiest cargo hub in the world, arrive through the POA. *Id.* The Port is also located in one of the most seismically active areas in the world. In light of the significance of the Project, MOA was able to secure for MARAD a total of $306,466,919.76 in Federal and non-Federal funds for the Project. (Appx38); (Stip. ¶104)(Appx14518).

## B. MOA And MARAD Entered Into An Agreement Pursuant To Which MARAD Had A Duty To Provide Technical Expertise And Oversee, Design, Construct, And Deliver The Port

### 1. The Express Terms Of The 2003 MOU Delineated The Parties' Roles And Responsibilities

#### a. *MARAD's Responsibilities Included Providing Technical Expertise To Oversee, Design, Construct, And Deliver The Port*

In March 2003, MOA and MARAD executed a Memorandum of Understanding ("2003 MOU"). (Appx9); (Appx6044-16048); (Stip. ¶9)(Appx14509). MARAD admitted that the 2003 MOU was a contract, and the COFC agreed. (Appx547-548); (Appx2-27). The 2003 MOU states that the intent of the agreement was to "benefit the efforts of MOA, Port of Anchorage in execution of its Port Expansion." (Appx39); (Appx16044-16048).

---

[7] All cited Stipulations are found at Appendix 14508-14518.

Section V of the 2003 MOU set forth MARAD's responsibilities for the Project. (Appx40); (Appx16044-16048). Pursuant to Section V.2, MARAD was required to "[p]rovide specialized technical expertise and input as appropriate to Port Expansion activities." (Appx38); (Appx16045). In addition, under Section V.3, MARAD was required to "[d]esignate primary MARAD points of contact for day-to-day management of Port Expansion activities." (Appx38); (Appx16045). Section V.7 of the MOU provided that MARAD was to "[o]bligate and disburse funding for Port Expansion project oversight, program management…engineering, design, construction or rehabilitation pursuant to the Port Expansion requirements consistent with contract requirements."[8] (Appx38); (Appx16046). Section V.2 provided that, in return for its efforts to manage the Project, MARAD was to be paid three percent (3%) of all funding received for the Project to cover administrative costs. (Appx38); (Appx16045).

#### b. *Addendum No. 2 To The 2003 MOU Required MARAD To Deliver A Project Free From Material Defects*

Addendum No. 2 to the 2003 MOU, signed by MARAD in February 2006, set forth the requirements for acceptance of work. (Appx42); (Stip. ¶12) (Appx21681). Under this Addendum, MARAD was required to accept all work on the Project before it could be approved as completed. (Appx21681). The

[8] MARAD does not dispute that it also had a duty to administer contract funds, (Appx143-187), which duty it also breached.

Addendum specified that MARAD was to accept the work through a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed ***according to specifications and all applicable requirements***, including but not limited to customary industry standards, and is ***free from material defects***." (Appx42); (Appx21681) (emphasis added). MARAD was then to transfer title to the new Port to MOA. (Appx42) (Appx21681).

### c. *MARAD's Contracting Personnel Interpreted The 2003 MOU To Require MARAD To Award And Manage Contracts For Program Management, Design And Construction*

MARAD's Deputy Director of Acquisitions, Iris Cooper, testified that MARAD served as the lead federal agency on the Project. (Appx14758) (Tr. 47:4-47:6). MARAD carried out its obligations on the Project through the award of contracts. (Appx14758) (Tr. 47:16-47:18). Cooper understood that "MARAD was responsible for managing the contract with the contractor who did the actual port construction." (Appx14758) (Tr. 47:7-47:15) (Tr. 47:19-47:23). Cooper also understood MARAD was to deliver a newly expanded Port to the MOA. (Appx14758) (Tr. 47:24-48:3).

MARAD Contracting Officer Wayne Leong[9] – who had ultimate responsibility for the contract – agreed that MARAD's role on the Project was to assume contracting and procurement authority, project oversight, quality assurance, and management and administration of funds. (Appx14780) (Tr. 133:23-133:25). Leong also confirmed that "from day one, step one, to the end of the contract" MARAD was tasked with procuring the technical aspects of the Project, (Appx14783) (Tr. 147:19-148:1), including engineering, drawings and phasing plans. (Appx14783) (Tr. 148:3-148:5). Leong agreed that MARAD's Contracting Officer's Technical Representative ("COTR") was responsible for overseeing those aspects of the Project. (Appx14783) (Tr. 148:6-148:10).

Leong confirmed that MARAD executed a contract with a project manager – ICRC – to fulfill those contractual obligations. (Appx14780) (Tr. 134:6-134:8). Leong testified that MARAD provided civil engineering through ICRC. (Appx14778-14779) (Tr. 128:25-129:3). MARAD also hired civil engineers directly for the Project, who were tasked with reviewing design specifications and other technical components of the Project. (Appx14779) (Tr. 129:4-129:7); (Appx14779) (Tr. 129:8-129:11). MARAD's engineers were located in Washington, D.C. and onsite. (Appx14779) (Tr. 130:15-130:23). Leong agreed

[9] Leong served as MARAD's Contracting Officer for the Project from approximately 2004 to mid-2011. (Appx14777) (Tr. 121:23-122:15).

that MARAD should have hired engineers at an earlier point in the project, as that "would have been a more prudent thing to do in hindsight." (Appx14779) (Tr. 131:2-131:6).

MARAD Contracting Officer's Representative, Captain Robert Loken, also understood that MARAD's role was to act as procurement authority, provide project oversight, quality assurance and the management and administration of funds (Appx14964) (Tr. 561:5-561:9), and that the Port's role was to secure funding and to communicate the Project's phasing needs. (Appx14964) (Tr. 561:1-561:4). Loken understood that MARAD had contracted with ICRC to provide the services required to design and construct the Project. (Appx14964) (Tr. 561:11-561:14).

#### d. *MARAD's Contracting Personnel Agreed That Addendum No. 2 Required MARAD to Deliver A Defect Free Port*

MARAD's Leong confirmed Addendum No. 2 required MARAD's prime contractor (ICRC) to inspect the work and certify its acceptance by executing a Certificate of Completion that the work was complete in accordance with the specifications or requirements, that it was complete according to industry standards, and that it was free from material defect. This would then be acknowledged and signed by MOA. Once MOA signed the Certificate of

Completion, MARAD was contractually required to sign the Certificate, at which time title to the work would transfer to MOA. (Appx14782) (Tr. 143:23-144:11).[10]

**e. *MOA's Witnesses Agreed MARAD Was Responsible For Contracting With Designers and Contractors To Deliver a Defect Free Port***

With respect to Section V.2, Port Executive Administrator Cheryl Coppe testified as to the phrase "provide specialized technical expertise and input as appropriate to Port expansion tasks and activities." (Appx14985) (Tr. 643:21-644:11). Coppe testified that MARAD was to provide overall oversight, contract administration, and execute contracts. (Appx14985) (Tr. 643:21-644:11). Other specific areas of technical expertise that MARAD was to provide included program management, environmental analysis, engineering and design. (Appx14985) (Tr. 644:12-644:23).

Coppe also testified about Section V.7 of the MOU regarding MARAD's role with respect to obligating and disbursing funding for Project Oversight and other tasks. (Appx14985) (Tr. 645:5-645:25). She testified that "obligate" is another way to describe "contracting," and that MARAD would be disbursing funds to a prime contractor for specific activities. (Appx14985) (Tr. 645:5-645:25).

[10] It is undisputed that a Certification of Completion was never provided for the North Extension Bulkhead because that work was – and still remains – irreparably defective. (Appx14782) (Tr. 144:12-144:19).

Coppe defined "federal project oversight" as what it meant for MARAD to be a lead federal agency (Appx14984) (Tr. 641:13-641:20), and that MARAD was responsible for managing the overall Project, managing the contractors MARAD hired, and delivering a Port to MOA. (Appx15074) (Tr. 831:3-831:22).

Col. George Vakalis, the MOA Municipal Manager,[11] testified that MARAD was to provide expertise to the Project, provide oversight and management of the design and construction, and manage all funds. (Appx14888) (Tr. 415:9-415:18). Vakalis also understood that per Addendum No. 2, the Project was to be free of defects. (Appx14888-14889) (Tr. 415:19-416:3).

#### f. *MOA's Responsibilities Included Providing Program Requirements, Consistent With Its Role As Project Owner*

Section IV of the 2003 MOU set forth MOA's responsibilities for the Project. (Appx39); (Appx16044-16048). MOA, as the Project end user and owner, was to provide to MARAD "overall program requirements and direction of Port Expansion," "[d]esignate primary MOA, Port of Anchorage points of contact for day-to-day direction and management of Port Expansion activities," as well as to review for programmatic, maintenance and operational consistency "all plans, specifications, and status reports submitted by the primary contractor and its

[11] Vakalis was hired in 2009 while the 2003 MOU was still in effect.

subcontractors before submission to MARAD for inclusion in its permanent federal project file." (Appx39); (Appx16044-45).

MARAD's Leong confirmed that it was MOA's responsibility to secure Project funding and communicate Project needs. (Appx14780) (Tr. 133:17-133:21). MARAD's Cooper testified that Anchorage was the owner of the Project and was tasked with defining the requirements for the Project. (Appx14758) (Tr. 46:17-46:25). Cooper agreed that this meant Anchorage would define "what it wanted out of the Project." (Appx14758) (Tr. 47:1-47:3).

Coppe testified that providing program requirements was MOA's main responsibility under the 2003 MOU. (Appx14983) (Tr. 636:9-636:19). The language in Section IV.2 of the MOU regarding "day to day direction" was necessary so that MOA could inform MARAD's prime contractor as to MOA's daily operations to ensure that the Port expansion did not interfere with Port operations. (Appx14983) (Tr. 637:1-637:13). This day-to-day direction did not, however, relate to design and construction work, as MOA did not have the staff to oversee the design and construction. (Appx14983) (Tr. 637:14-637:23).

Coppe testified that the purpose of Section IV.3 regarding the review of "all plans, specifications and status reports" was to ensure that MOA received what it

wanted before MARAD proceeded with the work.[12] (Appx14983) (Tr. 638:2-638:15). The purpose of this review was not to provide engineering oversight. (Appx14983) (Tr. 638:16-638:18). MOA's review of the plans was thus limited to verifying that the work was consistent with its needs before MARAD proceeded with the work and spent money. (Appx14983-14984) (Tr. 638:19-639:5).

Vakalis testified that because the Port served 80% of the State of Alaska, MOA's role was to ensure that the Port remained operational throughout the Project, and to review Task Orders to ensure that there were no conflicts between tasks and normal operations at the Port. (Appx14889) (Tr. 417:5-417:12); (Appx14889) (Tr. 417:13-417:18).

### C. MARAD Contracted With KSI/ICRC For Program Management, Design And Construction Services To Fulfill Its Obligations Under The 2003 MOU

On May 30, 2003, MARAD awarded a contract for $210 million to Koniag Services, Inc. ("KSI"). (Appx16972-17023) (Stip. ¶14)(Appx14509). MARAD's Cooper confirmed that it was MARAD's decision to award the contract to KSI. (Appx40); (Appx17064); (Appx14759) (Tr. 50:14-51:1); (Appx14759) (Tr. 50:16-51:1). Cooper confirmed that once the contract was awarded to KSI, MARAD

[12] MARAD argues that per Section IV.3, ICRC was "work[ing] directly with the Port to manage the project." (Dkt. 23 at 8). The express language in Section IV.3 does not support MARAD's position, nor did MARAD offer any witness to testify regarding this provision.

took the lead in managing the technical aspects of KSI's contract. (Appx14760) (Tr. 54:6-54:9). Cooper agreed that MARAD was obligated to manage the contract consistent with the Federal Acquisition Regulation ("FAR"). (Appx14761) (Tr. 57:15-57:18). Cooper testified the FAR contained a range of administrative penalties designed to protect the Government's interests. (Appx14761) (Tr. 57:19-57:23).

KSI's contract was subsequently novated to ICRC.[13] (Stip. ¶16)(Appx14509). Cooper confirmed MARAD independently vetted ICRC's qualifications and experience prior to approving the novation. (Appx21107); (Appx14765) (Tr. 74:25-75:18). Cooper also confirmed that "MARAD has extensive experience in managing prime-subcontractors" and that "ICRC, as the prime contractor, must comply with the Purchasing Policies for Subcontracting consistent with regulatory requirements." (Appx21107); (Appx14765) (Tr. 75:24-76:7).

### D. The 2003 MARAD-ICRC Contract Expressly Confirmed MARAD's Contractual Obligations Under The 2003 MOU

The 2003 MARAD-ICRC Contract ("2003 ICRC Contract") contemplated that MARAD would fulfill its contractual obligations to MOA to oversee, design, construct, and deliver the Project through the issuance of Task Orders to ICRC.

[13] Because KSI's contract was novated to ICRC, KSI will hereafter be referred to as ICRC.

(Appx16972-17033). Cooper testified as to the Task Order process. Anchorage would establish its programmatic requirements. (Appx14766) (Tr. 77:1-77:7). MARAD would then review, approve, and direct ICRC to develop a Statement of Work and technical specifications to fulfill Anchorage's programmatic requirements. (Appx14766) (Tr. 77:13-77:22).

Cooper confirmed that MARAD was the only entity that could direct ICRC through Task Orders (including the applicable procurement method). (Appx14766) (Tr. 78:9-78:12); (Appx14766) (Tr. 78:13-79:3). Cooper confirmed that MARAD had final authority to approve Task Order issuance. (Appx14766) (Tr. 78:13-79:3). Cooper further confirmed that MARAD was responsible for enforcing the contract provisions if ICRC failed to satisfy its contractual obligations.[14] (Appx14766) (Tr. 79:14-79:23). Cooper also confirmed that MOA had no authority to enforce those contractual remedies. (Appx14766) (Tr. 79:24-80:4).

The 2003 ICRC Contract contained a Statement of Work ("SOW") detailing the services ICRC was to provide. Per the SOW, ICRC agreed to provide Program

---

[14] MARAD misstated the terms of the 2003 ICRC Contract and Cooper's testimony. For example, the Government cites Cooper to claim that ICRC was providing services directly to MOA. (Dkt 23 at 7, citing Appx14774 (Tr. 109:1-15)). In fact, Cooper never said this. Likewise, the Government repeatedly cited ICRC's Statement of Qualifications as though it was part of the 2003 ICRC Contract, when it was not a contract document. (Dkt. 23 at 7).

Management Services, including quality control/quality assurance. (Appx17017); (Appx14762) (Tr. 62:22-62:25). The SOW also contemplated that ICRC would provide, among other things, Port Planning and Conceptual Engineering Services, Design Management Services, Construction Management Services, and Contractor Oversight Services.[15] (Appx41); (Appx17017-17023); (Appx14762) (Tr. 62:13-66:2).

The 2003 ICRC Contract also contained Purchasing Policies for Subcontracting, which stated that "**[i]n no instance shall [ICRC] allow work to begin without MARAD's approval of the specification**." (Appx21058-21091); (Appx41) (emphasis in original). Leong agreed that he had an obligation to ensure the goods procured by MARAD were properly secured, and that ICRC had to have a MARAD-approved purchasing system. (Appx14781) (Tr. 140:17-140:23).

### E. MARAD Confirmed The 2003 ICRC Contract Provided MARAD With Numerous Contractual Remedies To Ensure The Project Was Successfully Completed

The 2003 ICRC Contract detailed MARAD's technical and oversight responsibilities, as well as the remedies MARAD could assert to ensure completion of the Project. (Appx16980, Appx16985, Appx16988, Appx16991). For example: (1) MARAD could order correction of non-conforming work at ICRC's cost; (2)

---

[15] Leong agreed that the SOW included a "Background" section that had the Port's "goals" for the Project, and that <u>ICRC was procuring those services for MARAD</u>. (Appx14784) (Tr. 149:10-150:11); (Appx17016-17016).

MARAD was obligated to perform inspection and acceptance of supplies and services; and (3) MARAD was responsible for the technical aspects of the project and served as the technical liaison with ICRC. Cooper confirmed that the 2003 ICRC Contract required ICRC to meet the specifications set forth in the SOW, failing which MARAD had the right to reject non-conforming work. (Appx41); (Appx13761-14762) (Tr. 60:24-61:23). Leong acknowledged that the 2003 ICRC Contract required the Contracting Officer to inspect and accept supplies and/or services provided by ICRC. (Appx41); (Appx16980); (Appx14783) (Tr. 145:4-145:16).

Leong testified that ICRC was required to ensure quality assurance/quality control. (Appx14784) (Tr. 151:3-151:5); (Appx17017). To this end, ICRC produced a quality assurance manual for MARAD. (Appx21501-21575); (Appx14784) (Tr. 151:6-151:16). ICRC was also responsible for reviewing and reconciling design comments. (Appx14785) (Tr. 154:4-154:10).

On July 15, 2008, MARAD awarded a new contract to ICRC ("2008 ICRC Contract") on almost identical terms and conditions. (Appx43); (Stip. ¶19)(Appx14510); (Appx14789) (Tr. 169:24-170:3); (Appx21869, Appx21670, Appx21873- 21874, Appx21878, Appx21882, Appx21885).

### F. Consistent With Its Contractual Obligations, MARAD Directed ICRC To Contract With Geotechnical Engineers, Designers, And Contractors

#### 1. The Geotechnical Investigation Concluded That The OCSP Design Was Suitable For Use At The Project

When the 2003 MOU was executed, the specific design for a new wharf at the POA had not been selected. (Appx14981) (Tr. 629:6-629:25). The design selection process commenced in 2003 when MARAD directed ICRC to enter into a contract with Terracon Consultants, Inc. ("Terracon") for a site-specific geotechnical investigation. (Appx41); (Stip. ¶25) (Appx14510). On March 16, 2004, Terracon issued its Marine Geotechnical Exploration Report, concluding that "the open cell sheet pile wall ('OCSP') concept is a feasible alternative," and that "the OCSP option will prove most economical to construct and potentially have lower life cycle costs than the pile-supported deck." (Appx44); (Appx21131).

On August 3, 2004, ICRC and Terracon entered into a second subcontract. (Appx42); (Stip. ¶26)(Appx14510). On September 24, 2004, Terracon issued its Global Stability Analysis Report, which evaluated conceptual designs for an OCSP and a pile-supported structure in all areas of the Port. (Appx42); (Stip. ¶27)(Appx14510); (Appx21576-21664). Terracon concluded that "[b]ased upon the stability analysis, we have determined that the OCSP and PSD options are feasible for the construction of the port." (Appx42); (Appx21592-21593). Leong

agreed that Terracon ultimately recommended pursuing the OCSP design. (Appx42); (Appx14785) (Tr. 156:6-156:8); (Appx21576-21664).

#### 2. MARAD Selected The OCSP Design Through The Environmental Assessment

In 2005, MARAD and ICRC conducted an Environmental Assessment ("EA"), which examined a number of different design alternatives. (Appx42); (Stip. ¶24)(Appx14510) (Appx17139-18260). The EA ultimately concluded that the OCSP was the preferred design. (Appx42); (Appx17139-18260). MARAD's Director of the Office of the Environment, Michael Carter, acknowledged that MARAD relied on Terracon's geotechnical analysis in selecting the design. (Appx42); (Appx14862) (Tr. 309:20-310:5).

In March 2006, MARAD submitted a report to the US Army Corps of Engineers ("USACE") touting its selection of the OCSP design: "During MARAD's studies of seismic events, an open cell sheet pile structure performed equal to or better than other design alternatives. . . . ***MARAD selected the open cell sheet pile structure as a preferred alternative for the Port of Anchorage Expansion***." (Appx21684). (emphasis added).

Carter also confirmed the accuracy of each of the following statements made in the report:

- MARAD was leading and overseeing the Project (Appx14864) (Tr. 317:14-318:7);

- MARAD performed feasibility studies out of concern for seismic events (Appx14864) (Tr. 318:12-318:21);
- MARAD retained a design team of engineering professionals and an independent advisory committee to independently oversee Terracon's modeling efforts (Appx14865) (Tr. 321:20-322:10); (Tr. 322:21-323:11); and
- MARAD selected the OCSP structure as the preferred alternative for the Project.[16] (Appx14870) (Tr. 341:10-341:18).

Significantly, Carter included in the report an organizational chart acknowledging that MARAD assumed responsibility of ICRC and the design and construction of the Project:




[16] MARAD's statement that "the Port mandated a specific type of patented design, referred to as an open-cell sheet pile structure" is factually incorrect. (Dkt. 23 at 14). MARAD's own witnesses disputed this assertion, as evidenced by Carter's testimony above. Moreover, MARAD's suggestion that the Port (1) rejected the idea of bidders proposing alternative designs and (2) refused to fund additional design reviews is entirely meritless. (Dkt. 23 at 14). MARAD cannot point to any reliable evidence to support these statements, and the only witness it points to completely contradicted and discredited herself and was entirely contradicted by MARAD's other witnesses at trial and her own sworn affidavits. (Appx20992-21005); (Appx22661-22708).

(Appx21703).[17]

### 3. MARAD Directed ICRC To Execute Design And Construction Contracts

#### a. *MARAD Issued Task Order 312 For Design Services*

In March 2006, MARAD issued Task Order 312 to ICRC for design and related services for the North Waterfront Expansion. (Appx42); (Stip. ¶28)(Appx14510); (Appx21787-21790). In June 2006, ICRC, at MARAD's direction, contracted with PND Engineers, Inc. ("PND") for design services under Task Order 312. The subcontracts were approved by MARAD. (Stip. ¶31)(Appx14511); (Appx21791-21829). During the months of June/July 2006, PND subcontracted with GeoEngineers, Inc. and VECO, for additional design services. (Stip. ¶ 32)(Appx14511).

#### b. *MARAD Issued Task Order 414 For Construction Services*

In March 2008, MARAD issued Task Order 414 for construction of the OCSP bulkhead at the North Extension, Wet Barge Berth and Dry Barge Berth. (Appx43); (Stip. ¶45)(Appx14512); (Appx22419-22431). On March 19, 2008, ICRC, at MARAD's direction, contracted with Quality Asphalt Paving, Inc. ("QAP") to construct the OCSP structure specified in Task Order 414. (Appx43);

[17] Carter confirmed the organizational chart accurately reflected that MARAD was responsible for the environmental, geotechnical, engineering, design, and construction services necessary to ultimately deliver the Port to MOA. (Appx14865-14866); (Tr. 323:22-324:18).

(Stip. ¶47)(Appx14513). QAP contracted with MKB Constructors, Inc. ("MKB") to provide sheet pile installation. (Appx43); (Stip. ¶48)(Appx14513). Thus, MARAD was contractually responsible for, and oversaw, all of the designers and contractors – ICRC, Terracon, PND, GeoEngineers, VECO, QAP, MKB, and others (collectively referred to as "MARAD's Contractors").

### G. Construction Defects Were Discovered At The Project

In 2008, QAP and MKB began sheet pile installation in the Wet Barge Berth, and almost immediately experienced difficulties. (Appx43); (Stip. ¶58)(Appx14514). MARAD's Leong confirmed that the contractors experienced hard driving conditions in certain cells and were unable to complete those cells. (Appx14800) (Tr. 213:25-214:14). Leong agreed that only MARAD could direct the contractor to stop performance. (Appx14800) (Tr. 214:24-215:5).

Prior to the 2009 construction season, PND recommended inspection dredging along the face of the sheet piles to verify that interlocks were not damaged. (Stip. ¶63)(Appx14514). On April 11, 2009, MKB began in-water pile driving. (Stip. ¶62)(Appx14514). On May 28, 2009, ICRC provided formal notice to MARAD of construction deficiencies, including misalignment of sheet piles. ICRC notified MARAD about the need to dredge and physically inspect damaged sheet pile, and requested MARAD's consent to negotiate and mitigate cost impacts with QAP. (Appx21970-21971). MARAD, however, maintained that ICRC was

responsible for its subcontractors' deficiencies and did not immediately agree to stop the work and mitigate the damage. (Appx15337) (Tr. 1518:25-1519:4); (Appx15337) (Tr. 1519:6-1519:10).

It was not until September 29, 2009, that ICRC finally issued a Notice to Proceed for inspection dredging in the Wet Barge Berth.[18] (Stip. ¶71)(Appx14515). In October 2009, dive inspections revealed widespread damage to sheet piles. (Stip. ¶73)(Appx14515).

In the end, neither the Wet Barge Berth nor the North Extension were completed in conformance with Project requirements.[19] (Stip. ¶91)(Appx14516). In breach of its contractual obligations to MOA, MARAD refused to enforce its remedies against ICRC, and instead continued to advance additional funds to ICRC for defective work. (Appx14963) (Tr. 558:9-558:12). MARAD ultimately agreed that ICRC could terminate QAP and MKB. (Stip. ¶74).

---

[18] MARAD falsely suggests that "[t]he Port repeatedly refused ICRC's request to pause and inspect the work to determine what was going wrong." (Dkt. 23 at 14). MARAD attempted to establish this narrative at trial, but testimony from ICRC's Carlson confirmed that this was not true. (Appx15554-15555) (Tr. 2010:13-2011:11). MARAD has not furnished any evidence to support its allegations.

[19] Following the construction difficulties in 2008 and 2009, MARAD hired engineers to be assigned to the Project. (Appx14798) (Tr. 209:16-209:21); (Appx14799) (Tr. 212:18-213:2).

### H. 2010 Inspections Revealed Additional Damage To The Structure

In 2010, ICRC engaged West Construction, Inc. ("West") in an attempt to complete the Wet Barge Berth and North Extension. (Appx43) (Stip. ¶76)(Appx14515). Once West began work, however, extensive damage throughout the Wet Barge Berth and North Extension was discovered preventing completion of the OCSP. (Stip. ¶79)(Appx14515).

### I. MARAD Blamed ICRC For Project Failures

MARAD blamed ICRC and its subcontractors for the failed Project. This was reflected in MARAD's refusal to pay ICRC an award fee based on ICRC's performance problems. (Appx22045). Contemporaneous with MARAD's decision to withhold ICRC's award fee, MOA's Port Director, William Sheffield, demanded that MARAD pursue claims against ICRC for the failed Project. (Appx43); (Appx22048). MARAD's Roger Bohnert wrote to MARAD's Keith Lesnick stating that "[o]n several occasions the Governor [Sheffield] talked about being "made whole," and MARAD should "go after ICRC" for restitution. (Appx43-44); (Appx22048). Thus, by the end of 2010, MARAD was well aware of the following: (1) MARAD's contractors caused the Project failures; (2) MOA demanded that MARAD make it whole; and (3) MOA wanted to be copied on future correspondence due to MARAD's deficient project oversight.

### J. MOA And MARAD Entered Into The 2011 Memorandum Of Agreement, Reaffirming MARAD's Duties And Establishing The POMO

As a result of the construction defects discovered in 2009 and 2010, MOA's Vakalis suggested, and MARAD's Bohnert agreed, to implement a Project Oversight and Management Organization ("POMO"), the purpose of which was to give MOA a management role in the Project.[20] (Appx44); (Appx14892-14893) (Tr. 430:20-432:3).

In 2011, MOA and MARAD negotiated and executed a new Memorandum of Agreement ("2011 Agreement"). (Appx14893) (Tr. 433:1-433:11); (Appx44); (Stip. ¶86)(Appx14516); (Appx18329-18337).[21] The 2011 Agreement reaffirmed the Parties' existing obligations and formally established the POMO. (Appx44); (Appx14893) (Tr. 433:1-433:11). MARAD's Leong confirmed that <u>MARAD's role on the Project never changed during the course of the Project</u>. (Appx14802) (Tr. 221:7-221:10). Vakalis testified that the 2011 Agreement did not alter or amend the Parties' oversight responsibilities for the project. (Appx14893) (Tr. 434:13-434:25). MOA's Vakalis did testify, however, that because the 2011

[20] MARAD falsely asserts that the POMO was intended to "remov[e] the Port Director's authority." (Dkt. 23 at 16). Again, MARAD has no evidence to support this position and the position was contradicted by Vakalis' trial testimony.

[21] Until the execution of the 2011 Agreement in November 2011, the Parties operated under the terms of the 2003 MOU. (Stip. ¶86)(Appx14516).

Agreement expired on May 31, 2012, the Parties agreed that MOA would take control of the Project on that date. (Appx14893) (Tr. 434:2-434:12).

Specifically, the 2011 Agreement reiterated that MARAD was contractually obligated, as it had been since 2003, to oversee, design, construct and deliver the Project. (Appx18329-18337). Section V.A.6 of the 2011 Agreement stated that MOA would assume responsibility for the design and construction of the Project from MARAD not later than May 31, 2012. (Appx45); (Appx18332). Vakalis testified that this section meant that MOA was not responsible for the design of the Project before May 31, 2012.[22] (Appx14895) (Tr. 440:6-441:9).

The 2011 Agreement also required MARAD to "***coordinate and cooperate with MOA in the affirmative and defense of claims***" submitted by MARAD contractors. *Id.* (Appx45); (Appx14894) (Tr. 439:2-439:8) (emphasis added).

### K. MARAD's Retained Engineering Firm Concluded The Project Was Defective

In 2011, MARAD and USACE entered into an inter-agency agreement to contract with CH2M Hill to perform a Suitability Study. (Appx44); (Stip. ¶88)(Appx14516); (Appx22067-22068); (Appx14965); (Tr. 563:11-563:17); (Stip.

[22] Stated another way, if MOA was responsible for design and construction prior to May 31, 2012, as the Government alleges, why would MOA assume those responsibilities on May 31, 2012? As the witness testimony reflects, both Parties understood that MARAD was, and always had been, responsible for design and construction prior to May 31, 2012.

¶88)(Appx14516). The purpose of the Suitability Study was to evaluate the adequacy of the design and construction of the Project. (Stip. ¶88)(Appx14516); (Appx15081) (Tr. 860:8-22); (Appx44). On February 14, 2013, CH2M Hill issued its final Suitability Study, concluding that the design and construction of the Wet Barge Berth and North Extension were defective and had to be reconstructed using a suitable design. (Appx45); (Stip. ¶90-91)(Appx14516); (Appx18411-18924). MARAD has never disputed CH2M Hill's conclusions.

### L. MARAD Settled ICRC's Claims Without MOA's Knowledge Or Consent

On December 11, 2011, ICRC filed a Complaint against MARAD in the CBCA on behalf of QAP/MKB. (Stip. ¶99) (Appx14517). In July 2012, MARAD and MOA entered into a Joint Defense Agreement to defend the claims and pursue affirmative claims against ICRC. (Appx45); (Stip. ¶98) (Appx14517). Vakalis testified that he asked MARAD to assert claims against the contractors, and MARAD agreed to do so. (Appx14897) (Tr. 448:1-448:18).

MARAD settled these claims despite (1) agreeing to assert counterclaims in the CBCA on MOA's behalf, (2) knowing MOA expected to be made whole for the damages sustained at the Project, (3) having a draft of the CH2M Hill Suitability Study that concluded that the Project design and construction were defective and that MARAD's contractors were to blame (Appx14965) (Tr. 564:25-565:5) (Appx14896-24897) (Tr. 447:24-448:18), and (4) MARAD failing to

investigate the legitimacy of the contractor's claims. (Appx14960) (Tr. 546:3-546:5).

MARAD's surreptitious settlement with ICRC was executed September 28, 2012, and resulted in ICRC receiving an additional $11.3 million dollars, as well a full release of all claims against ICRC and its contractors. (Appx14897) (Tr. 449:16-449:21); (Appx45); (Stip. ¶99) (Appx14517). MARAD's Leong agreed that MOA should have participated in that settlement process. (Appx14803) (Tr. 225:9-225:18).

## III. LEGAL ARGUMENT

### A. The 2003 MOU Unambiguously Established That MARAD Had A Contractual Duty To Deliver The Port To MOA Free From Defects

#### 1. MARAD's Argument On Appeal Was Properly Stricken By The COFC

The COFC properly *struck* MARAD's arguments that (1) the 2003 MOU lacked necessary essential terms to establish a duty on the part of MARAD to deliver a Port and (2) Anchorage Municipal Code 7.15.040(A) was applicable, because both arguments were untimely and contrary to the COFC's Pre-Trial Order prohibiting the Government from raising any new arguments. (Appx36). To this end, the COFC noted that (1) neither argument was raised at any point during the 7 years of litigation, and (2) MARAD raised these arguments for the first time in its *post-trial* memorandum. (Appx36-37). MARAD does not appeal the Trial Court's

ruling striking the argument – instead, MARAD improperly reargues the stricken arguments.

This Court has confirmed that it will not review untimely issues where appellants challenge the merits of those issues but not the timeliness of them. *See Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1345 (Fed. Cir. 2010) (finding that appellants noninfringement argument, raised for the first time during trial, was raised "late in the game" and that "[t]his alone is reason enough for the panel to affirm, as appellants do not appeal the ALJ's determination that the noninfringement argument on the 'suitable for use' limitation was untimely raised"). Here, MARAD's arguments are not only untimely, but raised for the first time, not during trial, but in its Post-Trial Memorandum. (Appx36-37). As a result, the COFC properly struck these arguments (and others), and this Court should ignore these arguments.[23] (Appx37).

[23] MARAD claims this Court should still consider this late-raised argument because the COFC allegedly addressed "at least a portion" of the Government's argument in Footnote 8 of its *Damages* Opinion. (Dkt. 23 at 22 n.5). This is untrue. The COFC's Damages Opinion addressed and rejected MARAD's argument that "MOA could not claim expectancy damages because the 2003 MOU did not define an expectancy interest." (Appx71). In Footnote 8, the COFC responded to a nonsensical argument that the inclusion of a termination clause proved that MARAD had no obligation to deliver anything to MOA. This was clearly not an argument the COFC substantively addressed, nor does it provide a basis for MARAD to revive stricken claims never previously raised below. The COFC properly struck these untimely arguments, which MARAD did not challenge. (Appx36-37).

### 2. The 2003 MOU Unambiguously Obligated MARAD To Deliver A Completed Port

The COFC properly struck, and did not consider, MARAD's argument that the 2003 MOU lacked "essential terms." (Appx37). Indeed, the COFC found the 2003 MOU unambiguously required MARAD to deliver to MOA a defect free Port. The COFC properly followed *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006):

> When interpreting a contract, language of the contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances… When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions…**Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning.**

*Id.* at 1338. (internal citations and quotations omitted)(emphasis added). *See also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (looking to contemporaneous evidence of the parties' understanding and "not[ing] that much of it is consistent with the [contract's] plain meaning"). Consistent with *TEG-Paradigm*, the COFC found the terms of the 2003 MOU unambiguously required MARAD to deliver a defect free Port, and the contemporaneous evidence supported the same conclusion. (Appx48).

MARAD asserts that the 2003 MOU contained no duty for MARAD to deliver any "specific item of construction"[24] and that the 2003 MOU lacked necessary terms required for "construction contracts" such as time period, specifications, methods and procedures. (Dkt. 23 at 23).

As found by the COFC, MARAD's argument lacks merit. The 2003 MOU states repeatedly that MARAD was to provide federal oversight for "**Port Expansion**" and "**Port Expansion tasks and activities**." (Appx16044-16048) (emphasis added). MARAD also ignores: (i) Section IV.7 of the 2003 MOU, which states that the MOA was to "**[a]uthorize** all Port Expansion funding maintained by MARAD for ***federal*** *project oversight*, *program management*, study, environmental analysis, *engineering*, *design*, *construction* or rehabilitation as necessary," (Appx16044-16048) (emphasis added); and (ii) Section V.7 which provided that MARAD was to "[o]bligate and disburse funding for Port Expansion project oversight, program management…engineering, design, construction or rehabilitation pursuant to the Port Expansion requirements consistent with contract requirements."

[24] MARAD also argues that this "was the only basis for the Trial Court's Award of Contract Damages to Anchorage." (Dkt. 23 at 22). This is untrue, as the COFC previously concluded in its Summary Judgment ruling, and restated in its Entitlement Opinion, that under the 2003 MOU "MARAD had a duty to oversee, design and construct the Project." (Appx47). The COFC "incorporated by reference as if fully set forth herein" its Summary Judgment ruling into its decision. (Appx35).

The word “authorize” as used in Section IV.7 is defined by Webster’s College Dictionary “to give authority or formal permission” to spend.[25] The word “federal” as used in Section IV.7 that precedes “project oversight . . . engineering, design, construction” obviously refers to the United States.

As for the phrase in Section V.7 where MARAD was to “[o]bligate and disburse funding for Port Expansion project oversight, program management…engineering, design, construction”, “obligate”, in a government contract context, relates to the concept of “obligations.” This term is defined as “[a] definite commitment by the government to spend appropriated funds” and “[a] binding contract is an obligation.” *The Government Contracts Reference Book* (Nash, Schooner, et al, 4th ed. 2013) (emphasis added).

The unambiguous language of IV.7 and V.7, which MARAD simply ignores, cannot be more clear: MOA authorized funding so that MARAD could obligate those funds by executing contracts to oversee, design, construct and deliver a defect free Port to MOA.

[25] This Court has long looked to dictionary definitions to confirm unambiguous terms. *See* R. Nash, *Postscript XI: The Plain Meaning Rule*, 31 Nash & Cibinic Rep. NL ¶ 5 (2017) at 6-7; K. Allen, *Government Contract Interpretation: A Comprehensive Overview*, 15-4 Briefing Papers 1, at 8 (citing *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 695, 708-9 (2007) and FAR 2.101, which states that if a term is not defined in an official source, then a “common dictionary meaning” applies).

MARAD attempts to dismiss its obligations under the 2003 MOU by suggesting that its role was "entirely financial and administrative in nature" and not "substantive." (Dkt. 23 at 42).[26] In rejecting this position, the COFC found that "administrative" could only be defined in the government procurement context since MARAD was the contracting agency. (Appx54). *See* Nash & Cibinic, ADMINISTRATION OF GOVERNMENT CONTRACTS at 1 ("The broad goals of contract administration are to ensure that the government obtains the needed work on time and at the level of quality called for by the contract and that the contractor receives proper compensation. This will often involve ensuring that both parties fulfill their contractual obligations.")

As noted above, MARAD contracted to provide design and construction services to deliver a completed Port; unfortunately, MARAD admittedly failed to meet its contractual obligations. It is important to note, as the COFC did, that it is a basic premise of contract law that, absent excusable grounds, a party to a contract is obligated to fulfill the duties it undertook. *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 776 (2005). Furthermore, a contractor is responsible for the performance failures of its subcontractors absent a showing of impossibility or other excusable

[26] Even assuming *arguendo* MARAD's role was "entirely financial," it still breached the duty owed to MOA by disbursing $300 million to its contractors in exchange for an admittedly defective Port.

grounds." *Id*. MARAD offers no excusable grounds for its contractors' failure and is responsible for damages caused by the failure of the Project.

### 3. The Plain Meaning Of Addendum No. 2 To The 2003 MOU Specifically Required MARAD To Deliver A Defect-Free Port

The COFC's interpretation of the 2003 MOU is also supported by Addendum No. 2 to the 2003 MOU. The Addendum specified that MARAD was to accept the work through a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards and is free from material defects." (Appx42) (Stip. ¶ 12); (Appx14509). Addendum No. 2 further states: "[u]pon acceptance by MARAD of work tendered, all right, title and interest to such work…shall be conveyed to [MOA]…." (Appx21681).

MARAD asserts that Addendum No. 2 to the 2003 MOU also lacks certain "essential terms," and that it did not specify "what that completed work must be." Dkt. 23 at 28; (Appx21676-21683). MARAD executed Addendum No. 2 in February 2006 *after* it selected the OCSP design through the EA and one month before MARAD issued Task Order 312 for the design of the Port. Addendum No. 2 stated that MARAD would certify "the work was completed according to specifications." "Work" is defined in Addendum No. 2 to include "[m]aterials,



94428757v.2

workmanship, warranties, guarantees and manufacturer and fabrication of components," which is an obvious reference to the work MARAD secured through the design and construction contracts it executed with ICRC. It is completely disingenuous for MARAD to now suggest that MARAD did not know what work was to be completed at the time it executed Addendum No. 2.

MARAD also argues that Addendum No. 2 is "purely procedural" and "places the substantive responsibility for reviewing and accepting work onto parties other than MARAD." (Dkt. 23 at 29). While Addendum No. 2 lays out the process for MARAD to convey completed work to MOA, it also includes a substantive obligation for MARAD ensure that the work was completed consistent with specifications and free of defects. (Appx21681).

MARAD further argues that it modified ICRC's prime contract to include FAR 52.246-12(i) "to state that MARAD was relying on the inspection and acceptance of ICRC and the Port." (Dkt. 23 at 29). However, the COFC correctly noted that the modification to MARAD's contract with ICRC did not waive any design liability between *MARAD and MOA*, for the obvious reason that MOA was not a party to the MARAD-ICRC Contract. (Appx59). Rather, the modification states that neither MOA nor MARAD are taking professional responsibility for the design. (Appx59). The COFC noted that this does *not* alleviate MARAD from design liability, as MARAD's Leong – *who actually signed the modification* –

testified that this was standard language for architect-engineering services. (Appx59-60); (Appx14810) (Tr. 255:20-256:11). Thus, it does not mean that MARAD, who contracted with ICRC to procure design services, would not have liability *to MOA* for the defective design it procured. In fact, ICRC's Diana Carlson wrote to MARAD during the Project to notify MARAD that it would have liability for design defects. (Appx14794) (Appx18266-18273).

#### 4. MARAD's Witnesses Confirmed MARAD's Duty To Deliver The Project To MOA

MARAD's position – essentially that it had no obligation to deliver anything – is contradicted by the testimony of MARAD's witnesses regarding MARAD's contemporaneous actions: (1) MARAD engaged geotechnical engineers to vet design alternatives (Appx14865) (Tr. 321:20-322:10) (Tr. 322:21-323:11); (2) MARAD selected the OCSP design for the Project (Appx21684-21771); (3) MARAD contracted with ICRC for the OCSP design including detailed specifications for the new Port (Appx16972-17033); (4) MARAD contracted with ICRC for the construction of the Port consistent with the plans and specifications that MARAD's designers and contractors developed for a specific price and schedule (Appx16972-17033)*Id;* (5) MARAD reviewed and approved the design plans and specifications prior to commencement of construction (Leong, Tr. 129:8-129:11); and (6) MARAD managed and oversaw the construction of the Project to ensure that, per Addendum No. 2, the completed Port was delivered to MOA free

from defects. (Appx14509). The COFC properly considered all of this pre-controversy evidence. *See Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983) ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy."); *see Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972); *see also ECC Int'l Constructors, LLC v. Secretary of the Army*, 817 F. App'x 952, 955 (2020).

MARAD's Cooper confirmed that MARAD's contractual obligation was to manage and ultimately deliver to MOA a newly expanded Port. (Appx14758) (Tr. 47:24-48:3). In addition, Cooper agreed that MARAD was "responsible for contract management." (Appx14758) (Tr. 47:19-47:23). MARAD's Leong agreed that MARAD's role on the Project was to assume contracting and procurement authority, project oversight, quality assurance, and management and administration of funds. (Appx14780) (Tr. 133:23-133:25). Leong also confirmed that MARAD was obligated to complete the work consistent with the specifications and free of defects. (Appx14782) (Leong, Tr. 143:23-144:11). MARAD's Loken understood that MARAD had contracted with ICRC to provide the services required to design and construct the Port. (Appx14964) (Tr. 561:11-561:14). MARAD cannot

credibly cite to one witness who testified that MARAD was not obligated to deliver a defect free Port.[27]

#### 5. The Cases Cited By MARAD Are Inapplicable And Do Not Support MARAD's Attempt To Avoid Its Contractual Duties To MOA

MARAD cites a line of inapplicable and non-binding cases in support of its new (and stricken) position that the 2003 MOU lacks "essential terms." (Dkt. 23 at 26). This argument is made for the first time in its appeal brief, 7 years after MARAD was sued and almost 20 plus years after it signed the MOU.

MARAD relies primarily on *Westlands Water District v. United States*, 109 Fed Cl. 177 (2013), which is easily distinguished on the facts and the law. *Westlands* involved a series of water contracts for operation and maintenance of a water distributor system, and at issue was whether these contracts included an obligation to build a separate drainage system. The case focused on implications of the statute of limitations, as well as a dispute over whether contingencies in contract clauses had occurred, thus requiring the construction of a drainage system. The COFC found that none of the contingencies obligated the construction of the system.

MARAD also relies on one Federal Circuit and two Court of Claims cases, none of which are relevant: (1) *Chattler v. United States*, 632 F.3d 1324 (Fed. Cir.

[27] Any MARAD citation to suggest otherwise is simply not supported by the record.

2011); (2) *Cutler-Hammer, Inc. v. United States*, 441 F.2d 1179 (Ct. Cl. 1971); and (3) *Nat'l By-Products, Inc. v. United States*, 405 F.2d 1256 (Ct. Cl. 1969). *Chattler* and *Cutler-Hammer* were not construction cases. *Chattler* involved a refund for a passport application and *Cutler-Hammer* involved the sale of silver. These cases focused on the existence of an offer and acceptance, issues not in dispute here.

In *Nat'l By-Products*, the Court of Claims in 1969 held that (1) plaintiff's offer to sell realty to the Government for construction of a levee, and (2) plaintiff's "To Whom it May Concern" letter granting permission to enter on plaintiff's land for construction of the levee did not, by themselves, constitute a contractual undertaking by the Government to build the levee on the left side of the river. Significantly, the Government did not sign the letter entitled "To Whom It May Concern," which granted permission to the Government to enter on plaintiff's land in return for the building a levee, and specifically disputed that they agreed to do anything.

The Court mentioned that the "To Whom It May Concern" letter did not contain "terms normally needed for a construction contract – no time period, no specifications as to form and height, no indications of the methods or procedures to be followed." *Id.* at 565. However, the Court did not mandate that these terms be included in every construction contract, as argued by MARAD. It simply found that the lack of these terms in a letter entitled "To Whom It May Concern" was

part of its overall analysis of whether the letter constituted a contract to build a levee.

There is no dispute about the existence of a contract, as MARAD admitted as much in its Answer (Appx547-548) and as the COFC found (Appx2-27). MARAD clearly executed contracts for oversight, design and construction, and spent $306 million trying to design and construct the Port for MOA. Moreover, the 2003 MOU contained essential terms: (i) substantial completion date set forth in the Objectives clause; (ii) specific obligations on the part of MARAD, including a duty to deliver a defect free Port set forth in Sections V.1, 3, 4, 5, 6, 7 and IV.7; and (iii) payment terms for services MARAD provided set forth in V.2. (Appx16044-16048).

#### 6. MARAD's Reliance On Anchorage Municipal Code Is Misplaced

Similarly, MARAD's stricken argument that Anchorage Municipal Code § 7.15.040(A) "mandates" essential terms for construction contracts is flawed. *First*, § 7.15.040(A) only applies to *competitive procurements* solicited by MOA, which the 2003 MOU was not. Rather, the 2003 MOU was an arm's length negotiated contract executed between MOA and MARAD for the design, construction and delivery of a completed Port. *Second*, the COFC properly concluded that the 2003 MOU contained sufficient terms to establish MARAD's duties under the contract. (Appx47). MARAD cannot graft the requirements of

§ 7.15.040(A) onto the 2003 MOU in an effort to avoid its contractual undertakings.

### 7. The COFC Did Not Rely On The "Objectives" Clause To Establish MARAD's Duties

MARAD seeks to undercut as irrelevant the COFC's citation in its Damages Opinion to the 2003 MOU's "Objectives" clause in establishing MARAD's duty to deliver a completed Project, likening it to a "Recital" clause. (Dkt. 23 at 30-31). This argument lacks merit.

*First*, this argument was stricken by the COFC. (Appx36-37). *Second*, contrary to MARAD's statement, nothing indicates that the "Objectives" clause is a "Recital." Instead, the "Objectives" clause is simply clause III of an XI clause contract. *Third*, the "Objectives" clause is not a "prediction," an "opinion," or an "intention"; it consists of agreed-upon statements by both parties – statements that lend further support to the COFC's contract interpretation.[28]

Furthermore, the COFC did not rely on or cite to the "Objectives" clause in determining MARAD's *contractual duty* to deliver the Project. Rather, as

---

[28] MARAD inappropriately likens the 2003 MOU to a grant or cooperative agreement in arguing that "[c]ourts cannot simply assume that the Federal Government has guaranteed the successful delivery of every project with Federal involvement absent express language in a contract or statute." (Dkt. 23 at 32). To be clear, the 2003 MOU is a *contract*, as admitted by MARAD and determined by the COFC, pursuant to which MARAD agreed to undertake certain obligations in the form of duties to oversee, design, construct, and deliver the Project, which it failed to do.

MARAD conceded, the COFC correctly found that the 2003 MOU defined an *expectancy interest* pursuant to which MOA could recover expectation damages. (Appx71). Thus, after relying on (1) the plain meaning of the 2003 MOU and Addendum No. 2 and (2) the contemporaneous actions of the parties, the COFC merely cited the "Objectives" clause as evidence of a "shared expectancy of the parties," that "[c]learly, the Port was expected to be delivered by the end of 2008." (Appx71). Accordingly, MARAD's argument has no merit.

### 8. The COFC Struck MARAD's Termination Argument

MARAD argues that the existence of a termination provision in the 2003 MOU, which permitted either party to terminate, somehow proves that MARAD had no contractual duty to deliver a defect-free Port. (Dkt. 23 at 33-34). The COFC properly struck this argument because the Government failed to raise this defense during 7 years of litigation. (Appx36-37). This Court should not consider this stricken argument. *See Vizio*, *supra*.

Moreover, MARAD elicited no trial testimony, nor submitted any evidence, to support its argument. MARAD also has not articulated a legal basis for why a bilateral termination clause alleviates MARAD of its contractual duties.

MARAD objects to the COFC's statement that the termination clause was standard government contract language (in a footnote in its damages decision). (Appx71, n.8). While the COFC's dicta is accurate, MARAD's argument is

irrelevant because neither party exercised or attempted to exercise this clause. As such, MARAD's reliance on the clause is purely theoretical.

### B. The COFC Correctly Held That The 2003 MOU Established MARAD's Duty To Oversee, Design, And Construct The Project

#### 1. MARAD Ignored The Plain Meaning Of The 2003 MOU

In addition to the COFC's holding that MARAD had duty to *deliver* a defect-free Project, the COFC also held that the 2003 MOU expressly established MARAD's duty to *oversee*, *design*, and *construct* the Project.[29] (Appx47). MARAD argues that Section V of the 2003 MOU did not obligate MARAD to oversee, design, and construct the Project. (Dkt. 23 at 40-41). MARAD, however, ignores the balance of the 2003 MOU, including Sections IV.7 (requiring MARAD to provide federal oversight, design and construction) and V.7 (requiring MARAD to "obligate (i.e., contract) and disburse funding for project oversight, program management, engineering, design and construction") (Appx16046). As noted above, MARAD makes the unsupported argument that it did not provide "*substantive*

[29] During a mini-trial on MARAD's Summary Judgment motion, MARAD argued that MOA had no role in overseeing the Project. The COFC agreed holding that "[i]t is clear from the 2003 MOU that MARAD had a duty to oversee, design and construct the Project. (Appx47); (Appx26). This ruling is entirely consistent with the admissions made by MARAD's counsel during the mini-trial that MARAD was "running the show" and "in control." *See* (Appx10088) (Tr. 179:16-180:1). During trial, the COFC noted, "MARAD now argues a different position – that the "innovative partnership" required Anchorage to direct and manage the Project on a day-to-day basis, while MARAD's duties were only administrative and "almost entirely financial." (Appx47).

services of any kind to Anchorage," and that its "responsibilities were entirely *financial* and *administrative* in nature." (Dkt. 23 at 40) (emphasis added). MARAD introduced no evidence to support these statements.[30]

### 2. Contemporaneous Evidence Supports The COFC's Decision

The COFC found that "the contemporaneous evidence shows that MARAD was obligated to provide Federal project oversight, design, and construction, and for MARAD to deliver a completed defect free project." (Appx48). MARAD erroneously relies on: (a) a prior draft of the 2003 MOU; (b) the Anchorage Assembly Workshop transcripts; and (c) a fictional "preexisting legal duty from Congress to administer the Project." (Dkt. 23 at 42-49).

#### a. *The 2003 MOU Is Fully Integrated And Prior Drafts Are Irrelevant*

MARAD argues that a *prior draft* of the 2003 MOU contained modified language regarding MARAD's obligations. (Dkt. 23 at 43). MARAD chides the COFC for not examining this draft. However, the COFC found the 2003 MOU was a *fully integrated agreement*. (Appx52). MARAD presented no evidence that the 2003 MOU was not a fully integrated agreement, and thus, this Court has no

[30] As such, even if MARAD's duties to MOA were "entirely administrative," it failed to fulfill those obligations when it procured a defective Project and knowingly paid for defective work instead of enforcing its contractual remedies.

reason to consider this argument.[31] Furthermore, the prior draft confirmed MARAD's role to provide, among other things, "federal oversight," and did not include MARAD's ultimate responsibility to "obligate" (i.e., contract) the funds by contracting for design and construction. (Appx15826).

#### b. *The Assembly Workshop Transcripts Support MOA's Interpretation Of The 2003 MOU*

MARAD argues that statements made to the Anchorage Assembly support its position. (Dkt. 23. at 44-46). The COFC considered these statements and cited Coppe's explanation of MARAD's roles on the project: "MARAD has three roles as the lead agency for this project. . . . [T]hey act as the funding agency, they act as the project oversight agency, and they act as a contract administration agency." (Appx50); (Appx16958); (Appx15065) (Tr. 795:15-25). MARAD agrees that it assumed these roles. (Appx51).

MARAD, however, parses these roles in an attempt to explain them away – for instance, MARAD acknowledges that it was the "project oversight agency," but

[31] MARAD cites *Pacific Gas & Electric Co. v. United States*, 536 F.3d 1282 (Fed. Cir. 2008) to support its use of inadmissible prior drafts of the MOU. (Dkt. 23. at 43). MARAD's reliance is misplaced, as *Pacific Gas & Elecric* holds that "the most accurate picture of the parties' intent for this contract is their conduct at a time when both parties still anticipated timely and full performance of the contract." 536 F.3d at 1290-91 (emphasis added). Here, the COFC properly considered MARAD's conduct in attempting to fulfill its contractual duties, but correctly refused to consider prior MOU drafts that were irrelevant to determining duties under the terms actually agreed upon.

suggests that it "did not provide general management of the project." (Dkt. 23 at 45). In addition, MARAD agrees that it was the "contract administration agency," but disclaims its obligation to provide "the design, construction, or project management services needed for *substantive* execution of the project."[32] (Dkt. 23 at 45) (emphasis added). MARAD's position is contradicted by the fact that it alone contracted for design and construction services, and was responsible when ICRC failed to perform. *See Tecom, Inc., supra*. MARAD's own witnesses agreed. (Appx14758) (Tr. 47:7-47:15); (Appx14783) (Tr. 148:6-148:10); (Appx14785) (Tr. 153:12-153:20); (Appx14865-14866) (Tr. 323:22-324:18).

MARAD relies on certain statements made by MOA's Port Director, Sheffield, addressing concerns about who would identify what was to be built. The COFC carefully considered these statements, correctly noting that they were a "sales pitch" to the Assembly to obtain approval for the 2003 MOU, and to "assure the Assembly that Anchorage would retain control of the Port, not change the meaning of the roles and responsibilities of the MOU." (Appx51).

[32] MARAD relies, not on the contract, but on a letter from its Administrator to argue what duties it undertook. (Dkt. 23 at 10). The evidence at trial, however, established the actual intent of the letter (to assuage concerns that the Government would dictate what was to be built). That letter was not signed by MOA, did not vary the terms of the 2003 MOU and did not specify contractual duties. (Appx14992) (Tr. 673:16-674:23). MARAD offered no evidence to contradict that testimony.

MARAD suggests that labeling Sheffield's statement as a "sales pitch" is somehow dishonest or misleading. (Appx46). The COFC never made any finding to this effect and looked at the totality of the statements to conclude the statements were consistent with the parties' obligations under the 2003 MOU. Dkt. 23 at 46. In particular, Sheffield told the Assembly that MARAD is "going to build what we want" and likened MARAD's engagement to "hiring a project management contractor (PMC) where PMC does the design and the procurement and the fabrication and construction on . . behalf of the owner." (Appx16959). Sheffield further told the Assembly that as the lead federal agency, MARAD "would provide one-stop shopping for federal and local funding, federal project oversight, and contracting administration." (Appx16960). Sheffield explained that "MARAD provides specialized, technical expertise and input," and as the contract administration agency, "MARAD developed, negotiates, and executes all contractual and procurement documents and activities . . . required for the administration of [the] Port Expansion Project." *Id.* Thus, contrary to what MARAD would have this Court believe, the Assembly transcripts, taken as a whole, demonstrate that Sheffield's representations were accurate. The COFC properly considered this evidence and reached the proper factual finding. There is no basis for this Court to disturb the COFC's factual findings on appeal. *See Meridian Eng'g Co., supra.*

### c. *MARAD's Argument That Alleged Congressional Duties Relieved It From Contractual Obligations Is Illogical*

In its "Reply" brief on Summary Judgment, MARAD unsuccessfully argued that "MARAD had a preexisting legal duty from Congress to administer the project" and therefore, "MARAD did not, and could not have, contractually promised to Anchorage to discharge its ordinary legal responsibilities." (Dkt. 23 at 46-48). The COFC flatly rejected MARAD's argument, noting that if it "were to accept the Government's argument, government contracting would not exist because all obligations would be owed to Congress, not the agency." (Appx24).

The import of MARAD's position at the mini-trial on summary judgment cannot be overstated, and alone justifies affirming the COFC's decision. During that trial, MARAD argued that it was "in control" of the Project. (Appx10088) (Tr. 179:16-180:1); (181:12-182:13) ("Anchorage had no ability to affect or make any decision or even direct or tell MARAD what to do on the contract."). MARAD's position that its duty to oversee, design, construct and deliver the Project under the 2003 MOU ran to Congress, and not MOA, is legally deficient. As the COFC noted, such position followed to its logical conclusion would nullify government contracts. (Appx24). More importantly for this case, MARAD's admissions in support of its argument directly contradict the position MARAD now takes on its duties under the 2003 MOU.

### C. The 2011 Agreement Reaffirmed MARAD's Duties And Obligated MARAD To Pursue Claims On MOA's Behalf

The COFC found that MARAD's duties did not change from the 2003 MOU to the 2011 Agreement, and that the 2011 Agreement required MARAD to assert and defend claims on MOA's behalf. The express language in the 2011 Agreement supports the COFC's holding: "[p]ursuant to Contract Disputes Act ('CDA'), 41 U.S.C. §§ 7001-7013 [sic], administer claims submitted by MARAD contractors and *coordinate and cooperate* with the MOA/POA in *affirmative and defense* of claims consistent with federal contract law." (Appx61); (Appx18333) (emphasis added). The COFC correctly held that MARAD breached the 2011 Agreement by settling ICRC's claims without MOA's consent. (Appx61).

MARAD asserts that the 2011 Agreement did not require it to defend against claims or pursue affirmative claims on behalf of MOA, nor did it preclude MARAD from settling claims with ICRC. (Dkt. 23 at 50). MARAD's contradictions are astounding, as MARAD cannot credibly or legally argue both that (1) MOA was the entity managing ICRC and took on the risk of non-performance, and yet (2) MARAD had full authority to settle ICRC's claims without MOA having any rights in that decision.

Moreover, the only testimony regarding this issue was from MOA's Vakalis. Vakalis testified that the parties executed the 2011 Agreement (Stip. ¶86) (Appx14516), in part, to agree on how the parties would address the contractor's

claims. (Appx14894) (Vakalis, Tr. 439:9-439:20). The parties included in the 2011 Agreement the provision whereby MARAD would defend against claims, as well as pursue affirmative claims on MOA's behalf. (Appx18333). MARAD elicited no testimony to the contrary.

Finally, the fact that MOA sued ICRC as a third-party beneficiary is irrelevant to a determination about MARAD's duties to MOA in the 2011 Agreement.[33] Nor does MARAD explain what one has to do with the other, only that the COFC did not "reconcile its interpretation of the 2011 MOA" with this fact – but the COFC did not have to. (Dkt. 23 at 50). Rather, the COFC properly interpreted the plain language of the 2011 Agreement.

### D. MOA Is Entitled To Recover $367,446,809 In Expectancy Damages

#### 1. MARAD Failed To Challenge The COFC's Fundamental Damage Findings

The COFC awarded MOA $367,446,809 ("$367") million in expectancy damages. (Appx81). This award included $180,839,809 for damages related to the "lost costs/value" due to defective design and construction of the Wet Barge Berth and the North Extension (also called "impairment damages") and $186,607,000 for costs to remove the defective structure that remains a threat to

[33] MARAD neglects to mention that it provided ICRC with a full release as part of its settlement, allowing ICRC to let its insurance lapse, and that MOA deducted the full amount of its recovery in that lawsuit from the damages asserted against MARAD.

public safety. (Appx81) The COFC found that expectancy damages are intended to place the injured party in as good a position as it would have been had the breaching party performed," citing *Indiana Michigan Power Company v. United States*, 422 F.3d 1369 (Fed Cir. 2005) (citing *San Carlos Irrigation & Drainage Dirt v. United States*, 111 F. 3d 1557, 1562 (Fed. Cir. 1997))," and that the impairment and removal costs met these criteria. (Appx71).

The COFC found that the damage asserted for both types of damages (impairment and cost to remove) were reliable, proximately caused by MARAD's breaches, reasonably foreseeable and proven with sufficient certainty to permit the finder of fact to reasonably calculate the amount.[34] (Appx70). MARAD provided no expert testimony, nor did it challenge the damages with any fact witnesses.

**2. MARAD Does Not Challenge The Quantification Of $356 Million In Expectancy Damages**

MARAD admits that if it breached its obligation to deliver a defect-free Port to MOA under the 2003 MOU and the 2011 MOA, MARAD is liable for expectancy damages of at least $356 million.[35] (Dkt. 23 at 66-67). MARAD

---

[34] *See Com. Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004); *Energy Cap. Corp. v. United States*, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002); *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

[35] MARAD argues that it did not have a duty to deliver anything, and therefore it has no liability for expectancy damages. As the COFC extensively discussed in its opinion (and as discussed above), MARAD breached not only its duty to deliver a defect-free Port, but its duty to oversee, manage, design and construct the Project.

appears, however, to suggest that somehow MOA cannot recover reliance damages in the event this Court agrees that MARAD breached its contractual obligations. MARAD's apparent argument, which utterly lacks clarity, is also meritless.[36] Nevertheless, MOA will briefly address these unfounded arguments.

MARAD claims that the trial record is clear that MOA did not establish any reliance damages. The COFC was clear, however, that there was no need to address reliance damages. (Appx69). Moreover, the arguments MARAD raised to support its position that reliance damages are improper are completely inconsistent with the evidence established below and applicable case law.

MARAD appears to argue that reliance damages cannot be awarded, and MOA should be grateful for having obtained $117 million in assets.. (Dkt 23 at 39). MARAD acts as though MOA received the completed Project for which it bargained – however, it is undisputed that MOA not only does not have the structure it needs, but it also has a dangerous, defective structure that must be removed. (Appx73). MARAD ignores the lost funds of over $180 million, as well as the $187 million needed to remove the dangerous structure.

[36] MARAD never challenges the $356 million award of expectancy damages, other than to argue it breached no duty. Thus, if the Court finds that the COFC properly found a breach, there is no need to address MARAD's reliance arguments.

Perhaps the best response to MARAD's outlandish argument that MOA somehow benefited from what MARAD admits is a defective Project was provided by the COFC:

> In addition, the Government's argument that Anchorage received any capital gain on their initial investment of $163 million, much less a $37 million net capital gain when the Project failed, is untenable, as the evidence clearly shows that Anchorage is left with a dangerous structure that could fail at any moment which needs to be removed and the ground stabilized. . .

(Appx73).

MARAD also suggests that unspent costs for future work cannot be pursued under a reliance theory because "it is not an actual loss [if Anchorage] has not paid anything out of its pockets." (Dkt. 23 at 38). The COFC soundly rejected this same argument in its decision by declaring this case as a total breach case, citing *Westfed Holding, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005) and *Indiana Michigan Power Company*, 422 F.3d 1369, 1373-76 (Fed. Cir. 2005). (Appx74-75). MARAD completely misconstrues the applicable law and ignores the COFC's finding and the *Indiana Michigan Power Company* logic. The COFC's finding that this case involves a total breach has not been challenged by MARAD. Under a total breach case, future damages, either expectancy or reliance, are recoverable. *See Westfed Holding, Inc.* and *Indiana Michigan Power Company, supra*.

### E. MOA Is Entitled To The $11.3 Million In Expectancy Damages Awarded By The COFC

MARAD does, however, challenge the $11,279,059 ("$11.3") million of damages awarded (roughly 3.1% of the $367 million award) for MARAD's payment in 2012 to ICRC to settle claims of ICRC, MKB and QAP at the CBCA. (Dkt. 23 at 31).

MARAD argues that even if the COFC did not err on liability, the damages should be "reduced by $11,279,059 because the trial court unlawfully awarded Anchorage reliance damages as part of its expectation damages analysis." (Dkt. 23 at 52). MARAD asserts that including the $11.3 million as part of an expectation damage award "was based on an erroneous construction of law because the court's expectation damages impermissibly included" the questioned amount "that could only have been awarded as reliance damages." (Dkt. 23 at 52). It should be noted that MARAD did not argue this position in its Post-Trial Memorandum, nor did MARAD challenge through witnesses at trial any aspect of MOA's claim for $11.3 million. As such, this Court should refuse to hear MARAD's new argument. (Appx22962-23124).

If this Court decides to hear the argument, MARAD makes two arguments to support its claim: (1) the COFC made no findings of how the $11.3 million "represented a benefit Anchorage expected to receive . . . had the breach not occurred," and (2) MOA provided no other evidence or arguments that could

support any expectation damages award related to the ICRC settlement. (Dkt. 23 at 52-57). MARAD relies on *Fifth Third Bank v. United States*, 518 F.3d 1368 (Fed. Cir. 2008), and in doing so, selectively quotes from and otherwise ignores the three specific requirements the Federal Circuit found a plaintiff must establish to recover expectancy damages. MARAD latches onto the word "benefits," used in a general description of expectancy damages, but ignores the three requirements specifically laid out by the Federal Circuit to recover expectancy damages: (1) the claimed damages were foreseeable; (2) the damages would not have occurred but for the breach and (3) the measure of damages are reasonably certain. *Id*. As noted above, the COFC has made the findings on these three categories and MARAD has not challenged the findings. Instead, MARAD has tried to create a new and different requirement to prove anticipated benefits, which no court has ever required.

MARAD also cites *Shell Oil Co. v. United States*, 896 F.3d 1299 (Fed. Cir. 2018) and *Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372 (Fed. Cir. 2004) to argue that the COFC abused its discretion in awarding $11.3 million. However, the facts of both *Shell Oil* and *Hi-Shear* are dramatically different than the current case.[37] Moreover, MARAD never explains what the "erroneous

[37] In *Shell Oil*, the Court was asked to apply "long standing canons of contractual interpretation" to allocate costs between certain contracts, which the Federal Circuit found to have been done correctly. Nothing like that has been raised by MARAD.

conclusion of law" was, and ignores the specific factual findings made by the COFC to establish the $11.3 million was recoverable as expectancy damages.

MOA clearly established, and the COFC made numerous findings that support, the award of $11.3 million as expectancy damages, including finding that the $11.3 million was payment for defective work (Appx79) and that MARAD failed to pursue affirmative claims on MOA's behalf. (Appx61). First, the evidence demonstrates the $11.3 million claimed by ICRC and paid by MARAD included costs of construction for defective work performed prior to 2010. In fact, MARAD admits that the costs paid in the settlement to ICRC were "direct costs" associated with the attempted construction of the Project. (Dkt. 23 at 16) (Stip. ¶99) (Appx14517). Furthermore, QAP's contract was terminated at the end of the 2009 construction season. (Appx43). The $11.3 million is identical in nature to the $356 million of costs MARAD says is "the most appropriate solution" for expectancy damages. (Appx57).

Second, there is substantial evidence in the record establishing that MOA expected MARAD to pursue affirmative claims against ICRC so that MOA would

Second, the abuse of discretion analysis was applied to the question of whether damages had been proven with reasonable certainty, which the Court found that they did. In the current case, MARAD has not challenged the finding of reasonable certainty made by the COFC. In *Hi-Shear*, the Court analyzed whether a contractor was entitled to lost profits on unexercised options and whether a contractor was entitled to extra costs of performing a contract that was fixed priced. Nothing remotely similar to that exists in this case.

be made whole. (Appx14894); (Appx14897). The facts are clear that MOA's Sheffield demanded that MARAD pursue claims against ICRC for the failed project, (Appx22048) and that MARAD knew that MOA wanted to be "made whole." (Appx22048). Furthermore, the November 2011 MOA agreement expressly required MARAD "to coordinate and cooperate with MOA in the *affirmative and defense of claims*" – submitted by MARAD contractors. (Appx18329-18337) (emphasis added).

There is no dispute that MARAD did not defend or assert claims on MOA's behalf, and the damages that resulted from MARAD's failure were clearly foreseeable and the direct result of MARAD's breach. Thus, the forgoing evidence clearly supports the COFC's finding that the $11.3 million was recoverable as expectancy damages.

### F. Alternatively, The $11.3 Million Qualifies As Non-Overlapping Reliance Damages

#### 1. The $11.3 Million Is Recoverable As Reliance Damages

As noted above, the COFC's Damages Opinion stated that there was no need to address MOA's claim for reliance damages in light of the fact MOA clearly proved expectancy damages. (Appx71 n.7). Thus, contrary MARAD's assertions, the COFC did not address any of MARAD's erroneous arguments as they relate to reliance damages.

Nevertheless, if this Court believes that the COFC erroneously characterized the $11.3 million as expectancy damages, MOA requests this Court award the $11.3 million as non-overlapping reliance damages. As MOA argued in post-trial briefing, MOA made available to MARAD $306 million in reliance on MARAD's promise that it would deliver a Port to MOA that met MOA's requirements. Reliance damages include all costs incurred in reliance on the broken promises and allow a party to recover all damages caused by the breach, regardless of whether the damages occurred before the breach. *See* Restatement (Second) Contracts, §349; *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001); *see also Am. Capital Corp. v. Fed. Deposit Ins. Corp.*, 472 F.3d 859, 867 (Fed. Cir. 2007) ("Reliance damages are used "to put the non-breaching party in as 'good a position as [it]would have been in had the contract not been made.")

MOA secured the $306 million prior to and during contract performance. MARAD wasted $180,839,809 on defective work. (Appx38). The $11.3 million was included in these funds. (Appx66). MOA is entitled to be put in the position it would have been in had the contract not been made, which means that MOA can recover the funds it lost due to MARAD's breaches.

MARAD hopes to save $11.3 million by arguing that a court cannot award both reliance damages and expectancy damages in the same case. MARAD's argument ignores applicable case law. MARAD relies primarily on *Dolmatch*

*Group, Ltd. v. United States*, 40 Fed. Cl. 431, 440 (1998) and *Stovall v. United States*, 94 Fed. Cl. 336, 353-354 (2010) for the proposition that a plaintiff cannot recover both expectancy and reliance damages on the same transaction. Both are COFC and not controlling on this Court. *Dolmatch* relies solely on comment "a" to § 349 of the Restatement (Second) for that proposition. However, Comment "a" never says that. *Stovall* explains that if a plaintiff is permitted to recover under two different theories, he might be put "in a better position that he would have occupied had the contract been fully performed." *Stovall*, 94 Fed. Cl. at 354. Further, the Court in *Stovall* acknowledged that the law could allow recovery under both theories if the plaintiff could demonstrate there is no "double recovery." *Id*., n.20. As demonstrated below, if the Court denies the $11.3 million as expectancy damages, there will be no double recovery under the reliance damages since the costs would be awarded only once.

Recovery under two different damages theories when damages are not overlapping was permitted by the COFC in *Glendale Federal Bank FSB v. United States*, 43 Fed. Cl. 390 (1999). In that case, the Court noted the ability to recover "non-overlapping reliance" damages:

> Moreover, the rules governing the three interests are not strict and separate. As the Restatement (Second) notes: "The interests described in this Section are not inflexible limits on relief and in situations in which a court grants such relief as justice requires, the relief may not correspond precisely to any of these interests."

> **Restatement (Second)** of Contracts § 344 cmt. a. **The court therefore sees the categories of restitution, reliance, and expectancy as not inflexible and completely separate, but designed to enable the court to fashion a remedy that adequately compensates a party for damages it has suffered.**

*Id*. at 408. (emphasis added).

The plaintiff in *Glendale Federal* cited *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1296 (9th Cir. 1983) for the proposition "that an aggrieved party is entitled to recover its restitution interest, as well as any non-overlapping post-breach costs suffered had there been no contract, and no breach of contract." *Id.* While the *Glendale Federal* case was affirmed in part and vacated in part on appeal, the Federal Circuit did not reject the concept of recovery of non-overlapping damages under alternative theories such as reliance. *Glendale Fed. Bank, FSB v. United States*, 43 Fed. Cl. 390 (1999), *aff'd in part, vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001); *see also Slattery v. United States,* 69 Fed. Cl. 573 (2006); *Slattery v. United States,* 583 F.3d 800, 815–18 (Fed. Cir. 2009), *vacated and reh'g en banc granted*, 369 F. App'x 142 (Fed. Cir. 2010), *reinstated as modified on reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc)*; Slattery v. Roth*, 710 F.3d 1336, 1337–38 (Fed. Cir. 2013).

In essence, if the Court agrees with MARAD that the $11.3 million were reliance damages, the Court should find that the amount of the remaining expectancy costs as set forth by MARAD ($356 million) clearly do not include the

$11.3 million, and therefore do not "overlap" in any way with the $356 million expectancy damages that MARAD conceded that MOA should, at a minimum, be awarded. As such, there is no risk of putting MOA in a better position than it would have been if the contract had been performed.

### G. Reversal Rather Than Remand Would Be Inappropriate

MARAD asks this Court to reverse, rather than remand, the COFC's ruling. (Dkt. 23 at 35-40). However, reversal without remand is only an appropriate outcome when the appellant is entitled to judgment as a matter a law, with no room in the record to interpret the facts other than as supporting appellant's arguments. *See Meridian Eng'g Co., supra*. That outcome would be unfathomable given the facts before this Court – facts that clearly support upholding all of the COFC's orders. Thus, reversal without remand is inappropriate.

## IV. CONCLUSION

For all the foregoing reasons, MOA respectfully requests this Court AFFIRM the COFC's judgment in the amount of $367,446,809 in its favor.

Respectfully submitted,

ANCHORAGE, A MUNICIPAL
CORPORATION

By Counsel,

/s/ *Jason N. Smith*
Jason N. Smith
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5398
Email: jnsmith@seyfarth.com
*Attorneys for Plaintiff Anchorage,*
*A Municipal Corporation*

OF COUNSEL:
Bennett D. Greenberg
Donald G. Featherstun
Edward V. Arnold
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, D.C. 20004
(202) 463-2400

DATED: April 28, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion: (1) complies with the type volume limitation of Federal Circuit Rule 32(b)(1); (2) contains 13,687 words, excluding the portions of this motion exempted from the type volume limitation by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2); (3) complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5); (4) complies with the type style requirements of Federal Rules of Appellate Procedure 32(a)(6); and (5) has been prepared on a computer in a proportionally spaced typeface using Microsoft Word in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the response.

*/s/ Jason N. Smith*
Jason N. Smith