No. 2022-1719

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee,

v.

UNITED STATES,
Defendant-Appellant.

Appeal from the United States Court of Federal Claims,
Case No. 14-166C, Hon. Edward J. Damich, Senior Judge

## REPLY BRIEF OF DEFENDANT-APPELLANT UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

STEVEN J. GILLINGHAM
Assistant Director

OF COUNSEL:                          VINCENT D. PHILLIPS, JR.
EVAN WISSER                          Senior Trial Counsel
DANIEL A. HOFFMAN                    Commercial Litigation Branch
KARA M. WESTERCAMP                   Civil Division, Department of Justice
Trial Attorneys                      P.O. Box 480
Commercial Litigation Branch         Ben Franklin Station
                                     Washington, D.C. 20044
                                     Telephone: (202) 305-4591
                                     E-mail: Vincent.Phillips2@usdoj.gov
                                     *Attorneys for Defendant-Appellee*
                                     *United States*

Dated: May 26, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

ARGUMENT ....................................................................................2

I.   Anchorage Misstates The Standard Of Review By Incorrectly Arguing That Our Legal Argument Challenges The Trial Court's Findings Of Fact .....2

II.  MARAD Did Not Promise To Deliver Anything To Anchorage In The 2003 MOU ....................................................................................3

    A.   The 2003 MOU's Plain Language Does Not State That MARAD Promised To Deliver Anything To Anchorage .........................................4

    B.   MARAD's Purported Duty To Deliver A Port Cannot Be Inserted Into The 2003 MOU Through Extrinsic Evidence ...................................9

III.  Anchorage Has Not Met Its Burden To Identify Any Remaining Genuine Issues Of Fact In The Existing Trial Record To Justify A Remand Regarding Breach Of The 2003 MOU ...........................................................14

    A.   Anchorage Has Not Identified Any Other Viable Theory Of Damages For Breach Of The 2003 MOU Beyond Its Purported Expectation Interest In Receiving A Completed, Defect-Free Port Structure ............15

    B.   The 2003 MOU Does Not Contain Any Of The Duties Necessary To Support Anchorage's Alternative Breach Theories .................................19

IV.  The 2011 MOA Contained No Duty For MARAD To Pursue Legal Claims On Anchorage's Behalf ........................................................................21

V.  Anchorage Cannot Receive Both Expectation And Reliance Damages .........22

VI.  The Legal Issues Raised By The United States Are Properly Presented To This Court ....................................................................................27

    A.   The Proper Interpretation Of The 2003 MOU Is The Issue Before This Court On Appeal ..........................................................................27

B.    The United States Preserved The Issue Of Conflicting Damages
      Awards ...............................................................................................30

CONCLUSION .......................................................................................................31

## TABLE OF AUTHORITIES

### Cases

*Am. Cap. Corp. v. F.D.I.C.*,
  472 F.3d 859 (Fed. Cir. 2006) ....................................................... 25, 26

*Anchor Sav. Bank, FSB v. United States*,
  597 F.3d 1356 (Fed. Cir. 2010) ...............................................................23

*Barseback Kraft AB v. United States*,
  121 F.3d 1475 (Fed. Cir. 1997) .................................................................9

*Black v. Cutter Labs.*,
  351 U.S. 292 (1956) ................................................................................29

*Blackstone Consulting Inc. v. United States*,
  65 Fed. Cl. 463 (2005), *aff'd*, 170 F. App'x 128 (Fed. Cir. 2006).........................8

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
  266 F.3d 1348 (Fed. Cir. 2001) ...............................................................23

*CardSoft, (assignment for the Benefit of Creditors), LLC v. VeriFone, Inc.*,
  807 F.3d 1346 (Fed. Cir. 2015) ...............................................................15

*Cmty. Health Choice, Inc. v. United States*,
  141 Fed. Cl. 744 (2019),
  *aff'd in relevant part*, 970 F.3d 1364 (Fed. Cir. 2020) .........................................8

*Coast Fed. Bank, FSB v. United States*,
  323 F.3d 1035 (Fed. Cir. 2003) (en banc) ...........................................................10

*CSI Aviation, Inc. v. Dep't of Homeland Sec.*,
  31 F.4th 1349 (Fed. Cir. 2022) ...................................................... 11, 12

*Dalton v. Cessna Aircraft Co.*,
  98 F.3d 1298 (Fed. Cir. 1996) ...............................................................3

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ...............................................................30

*Est. of Hage v. United States*,
  685 F. App'x 927 (Fed. Cir. 2017) ........................................................29

*Forshey v. Principi*,
  284 F.3d 1335 (Fed. Cir. 2002) (en banc) ............................................29

*Fox v. Off. of Pers. Mgmt.*,
  100 F.3d 141 (Fed. Cir. 1996) ..............................................................10

*Glendale Federal Bank FSB v. United States*,
  43 Fed. Cl. 390 (1999),
  *aff'd in part, vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001) .................... 25, 26

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ............................................................30

*Indiana Michigan Power Company v. United States*,
  422 F.3d 1369 (Fed. Cir. 2005) ............................................................18

*Interwest Const. v. Brown*,
  29 F.3d 611 (Fed. Cir. 1994) ................................................................11

*King v. Dep't of Navy*,
  130 F.3d 1031 (Fed. Cir. 1997) ..............................................................5

*LAI Servs., Inc. v. Gates*,
  573 F.3d 1306 (Fed. Cir. 2009) ..............................................................3

*McAbee Const. Inc. v. United States*,
  97 F.3d 1431 (Fed. Cir. 1996) ..............................................................11

*Nat'l By-Prods., Inc. v. United States*,
  405 F.2d 1256 (Ct. Cl. 1969) ..............................................................4, 5

*Nelson v. Adams USA, Inc.*,
  529 U.S. 460 (2000) ..............................................................................30

*NVT Techs., Inc. v. United States*,
  370 F.3d 1153 (Fed. Cir. 2004) ..........................................................5, 9

*Pac. Gas & Elec. Co. v. United States*,
   536 F.3d 1282 (Fed. Cir. 2008) ........................................................................14

*Pacificorp Cap., Inc. v. United States*,
   25 Cl. Ct. 707 (1992), *aff'd*, 988 F.2d 130 (Fed. Cir. 1993) ...............................20

*Premier Off. Complex of Parma, LLC v. United States*,
   916 F.3d 1006 (Fed. Cir. 2019) ...........................................................................3

*S. California Fed. Sav. & Loan Ass'n. v. United States*,
   422 F.3d 1319 (Fed. Cir. 2005) ........................................................ 11, 16, 23, 24

*S. Nuclear Operating Co. v. United States*,
   637 F.3d 1297 (Fed. Cir. 2011) .........................................................................18

*San Carlos Irr. & Drainage Dist. v. United States*,
   111 F.3d 1557 (Fed. Cir. 1997) .........................................................................23

*Slattery v. United States*,
   583 F.3d 800 (Fed. Cir. 2009), *vacated*, 369 F. App'x 142 (Fed. Cir. 2010),
   *reinstated*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc) .........................................25

*TEG-Paradigm Env't, Inc. v. United States*,
   465 F.3d 1329 (Fed. Cir. 2006) ................................................................ 9, 10, 20

*United Techs. Corp. v. Chromalloy Gas Turbine Corp.*,
   189 F.3d 1338 (Fed. Cir. 1999) .........................................................................30

*Westfed Holdings, Inc. v. United States*,
   407 F.3d 1352 (Fed. Cir. 2005) .........................................................................18

*Yankee Atomic Elec. Co. v. United States*,
   536 F.3d 1268 (Fed. Cir. 2008) .........................................................................18

Statutes

41 U.S.C. § 7103(a) ................................................................................................21

Regulations

FAR 33.210 ............................................................................................................21

## Other Authorities

Anchorage Municipal Code, § 7.15.040(A) ............................................................4

Recital, Black's Law Dictionary (10th ed. 2014) ......................................................8

Restatement (Second) of Contracts § 344(a) (1981) ...............................................23

No. 2022-1719

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee,

v.

UNITED STATES,
Defendant-Appellant.

Appeal from the United States Court of Federal Claims,
Case No. 14-166C, Hon. Edward J. Damich, Senior Judge

## <u>REPLY BRIEF OF DEFENDANT-APPELLANT UNITED STATES</u>

### <u>INTRODUCTION</u>

The trial court erred in holding that the Maritime Administration (MARAD) promised to deliver a completed port structure, or anything at all, to the Municipality of Anchorage (Anchorage).  Nothing in the plain language of the parties' 2003 Memorandum of Understanding (2003 MOU) supports that reading.  The trial court also erred in holding that MARAD promised to pursue and defend claims on Anchorage's behalf in the parties' 2011 Memorandum of Agreement (2011 MOA).  Nothing in that agreement's plain language supports that reading.

Anchorage's response only emphasizes the distance between Anchorage's theory and the agreements' text.  Anchorage paraphrases the agreements' actual

words and relies heavily on extrinsic evidence.  But neither the plain text nor the relevant extrinsic evidence supports Anchorage's interpretation of the agreements.

If the Court agrees with our argument that the 2003 MOU contains no express duty to deliver a completed defect-free port structure, the appropriate remedy would be to reverse without remand, for two alternative reasons.  First, Anchorage implicitly concedes that at trial it did not present any alternative basis to award expectation damages, and the undisputed record evidence shows that Anchorage suffered no reliance damages.  Second, the 2003 MOU contains none of the other duties that the trial court held MARAD had breached.

Even if the Court's *de novo* review affirms the trial court's interpretation of the agreements, the trial court's damages award must be reduced by $11,279,059 because the trial court unlawfully awarded both expectation and reliance damages.

## ARGUMENT

I.     Anchorage Misstates The Standard Of Review By Incorrectly Arguing That Our Legal Argument Challenges The Trial Court's Findings Of Fact

Anchorage misunderstands the applicable *de novo* standard of review, incorrectly asserting that our appeal disputes the trial court's factual findings.[1]

---

[1]  Perhaps based on this misunderstanding, Anchorage cites to several voluminous trial exhibits, often without pin cites.  The contents of these documents have no impact on the legal arguments we have presented on appeal.

Anch. Br. 3.  Our appeal contends that the trial court misinterpreted the 2003 MOU

and 2011 MOA and that those agreements, properly interpreted *de novo*, do not

contain duties that support the trial court's damages awards.  "Contract

interpretation is a question of law over which [this Court] exercise[s] complete and

independent review." *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1310 (Fed. Cir.

2009) (internal quotation and citation omitted).  *See also Dalton v. Cessna Aircraft

Co.*, 98 F.3d 1298, 1303-04 (Fed. Cir. 1996) (explaining that an appeal focused on

the duties established by a contract did not challenge findings of fact but presented

solely issues of law).  The Court does not need to review any of the trial court's

factual findings to reverse the trial court's judgment.  The Court need only

interpret the legal agreements *de novo*.

## II.    MARAD Did Not Promise To Deliver Anything To Anchorage In The 2003 MOU

Our opening brief demonstrated that the plain language of the 2003 MOU

contains no promise to deliver anything, U.S. Br. 22-32,[2] meaning the Court's

"inquiry ends and the plain language of the Agreement controls." *Premier Off.

Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011-12 (Fed. Cir. 2019)

(internal quotation and citation omitted).  Anchorage's response rewrites the 2003

---

[2]  We refer to our opening brief as "U.S. Br. __."  We refer to Anchorage's
Br. as "Anch. Br. __."

MOU to insert different language, only confirming that nothing in the actual text of

the 2003 MOU required MARAD to deliver anything to Anchorage.  Absent that

duty, there is no basis for the Court to affirm the trial court's judgment and

damages award.

    A.    The 2003 MOU's Plain Language Does Not State That MARAD
             Promised To Deliver Anything To Anchorage

No language in the 2003 MOU supports Anchorage's theory that MARAD

promised to deliver a completed port structure.  Thus, unsurprisingly, Anchorage

fails to cite any language in the 2003 MOU identifying what specifically was to be

built, any deadline for delivery, or the cost of whatever MARAD was supposed to

be delivering.  These are some of the essential "terms normally needed for a

construction contract." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1266

(Ct. Cl. 1969).[3]  While *National By-Products* did not establish a mandatory

checklist of terms for every construction contract, "the lack of *any* terms which

would ordinarily be present in such a contract is persuasive that this was not a

---

[3] Our opening brief also cited Anchorage's Municipal code, which
mandates similar essential terms for contracts where the municipal government is
acquiring construction and design services or purchasing items of construction.
U.S. Br. 24 (citing Anchorage Municipal Code, § 7.15.040(A)).  Anchorage asserts
that this provision applies only to competitive procurements, Anch. Br. 41-42, but
the requirement to include certain essential terms applies to both "contract[s]
awarded through competitive procedures" *and* "contracts awarded through other
authorized procedures."  Anchorage Municipal Code, § 7.15.040(A).

4

contract to construct a [structure] or to assure that one would be built." *Id.* at 1266 n.9 (emphasis added).

Anchorage also fails to explain how its theory of the 2003 MOU is compatible with the language providing either party with an unlimited, unilateral right to terminate the agreement with 90 days' written notice. U.S. Br. 33-34. Anchorage suggests that because neither party exercised its termination rights, the termination clause is irrelevant to the Court's interpretation of the 2003 MOU. Anch. Br. 43-44. But "[t]he paramount focus [in interpreting a written agreement] is the intention of the parties *at the time of contracting . . .*" *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997) (emphasis added). In doing so, "the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts . . . [without] leav[ing] a portion of the contract useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citations omitted). The parties' inclusion of a *unilateral* termination right is wholly incompatible with the theory that MARAD meant to bind itself to deliver anything to Anchorage when the agreement was executed. *See id.*

Anchorage's theory to the contrary completely disregards the agreement's text. Although Anchorage directs the Court to certain provisions in the 2003

MOU, Anchorage repeatedly relies on paraphrases of those provisions, tellingly avoiding full quotes of the agreement's text.

*First*, Anchorage cites to sections IV.7. and V.7. of the 2003 MOU, Anch. Br. 31-33, which state in full:

> IV. MOA, PORT OF ANCHORAGE RESPONSIBILITIES:
>
> . . .
>
> 7.  Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary.
>
> V. MARAD RESPONSIBILITIES:
>
> . . .
>
> 7. Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

Appx16045-16046.

Our opening brief explained that this language established reciprocal responsibilities for expending funds on the project—Anchorage was required to authorize all expenditures for substantive project activities, after which MARAD would obligate and disburse funding for those activities through the ICRC contract. These clauses do not state that MARAD was responsible for delivering anything to

Anchorage.  Anchorage emphasizes that these clauses refer to the authorization,

obligation, and disbursement of funds for "federal project oversight" and "Port

Expansion project oversight."  Anch. Br. 31-32.  This language plainly does not

obligate MARAD to deliver any specific structure, and as we explain in section III,

it also does not obligate a MARAD to manage the project on Anchorage's behalf.

Nonetheless, Anchorage asserts that the language in these clauses "cannot be more

clear" that Anchorage authorized project funding so MARAD could "deliver a

defect free [p]ort to [Anchorage]."  Anch. Br. 33.  But Anchorage fails to identify

any such words, resorting to their own words instead: "deliver a defect free port to

Anchorage."  *Id.*

*Second*, Anchorage cites Addendum No. 2 to the 2003 MOU.  *Id.* at 35-37.

This addendum too, however, does not state that MARAD would deliver any

specific structure to Anchorage; rather, it describes *the process* for reviewing and

accepting work done on the project, with acceptance to be performed by

Anchorage.  U.S. Br. 28-29.  Anchorage asserts that Addendum 2 provides that

"MARAD would certify the work was completed according to specifications" and

that "MARAD [would] ensure that the work was completed consistent with

specifications and free of defects."  Anch. Br. 35-36.  But those words never

appear in Addendum 2.  Instead, the addendum establishes a process whereby:  (1)

"MARAD's prime contractor" was responsible for "certifying the work was

completed according to specifications and all applicable requirements . . . and is free from material defects," Appx21681; and then (2) "the Municipality of Anchorage," not MARAD, was responsible for "accept[ing] . . . the work provided by MARAD's prime contractor." *Id.*

*Third*, Anchorage discusses the objectives clause in the 2003 MOU, though Anchorage suggests that the trial court did not rely on the objectives clause (despite the trial court's express reliance on that language in the damages opinion, Appx71). Anch. Br. 42-43. Regardless, Anchorage does not strongly dispute that, as a recital, the objectives clause cannot impose contractual duties on either party. A recital does not require the use of specific words but is simply a "'preliminary statement in a contract . . . explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts' . . . ." *Cmty. Health Choice, Inc. v. United States*, 141 Fed. Cl. 744, 765 (2019), *aff'd in relevant part*, 970 F.3d 1364 (Fed. Cir. 2020) (quoting Recital, Black's Law Dictionary (10th ed. 2014)). *Accord Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470 (2005), *aff'd*, 170 F. App'x 128 (Fed. Cir. 2006).

The first three clauses of the 2003 MOU (purpose, authority, and objectives) are plainly recitals setting out the reasons for entering into the agreement and the relevant background. The specific language cited by Anchorage confirms this, as the objectives clause states only that the parties "anticipate substantial completion

of Port Expansion" by 2008, Appx21676, language that "express[es] only desires, not binding commitments." *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997).

> ### B.    MARAD's Purported Duty To Deliver A Port Cannot Be Inserted Into The 2003 MOU Through Extrinsic Evidence

Failing to identify any language in the 2003 MOU to support its theory of MARAD's contractual duties, Anchorage suggests that MARAD's duties can be imputed into the 2003 MOU through three forms of extrinsic evidence: (1) the MARAD-ICRC contract, (2) MARAD's performance, and (3) trial testimony. Anch. Br. 35-39.  Although this Court considers *de novo* "[w]hether a contract provision is ambiguous," *NVT Techs.*, 370 F.3d at 1159, neither party has challenged the trial court's holdings that the 2003 MOU was unambiguous and fully integrated.  Anch. Br. 31-33.  Where the text is unambiguous, "the [C]ourt may not look to extrinsic evidence to interpret its provisions." *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  Thus, the Court need not wade into the lengthy trial testimony and other evidence to follow Anchorage's meandering path to a different agreement than that signed by the parties.

Where the text is unambiguous, at most the Court may "look[] to contemporaneous evidence of the parties' understanding" "to confirm that the

9

parties intended for the [language] to have its plain and ordinary meaning." *Id.* at 1338 (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). If the Court considers such evidence, the transcripts of the presentations to the Anchorage Assembly and other documents surrounding the 2003 MOU's ratification provide ample contemporaneous evidence of confirming the agreement's plain meaning. The Assembly transcripts are especially helpful because they document the information that was conveyed to the Assembly during the ratification process. The Assembly was the approving authority for Anchorage, and the information it received is the primary evidence of Anchorage's own understanding about the duties contained in the 2003 MOU.

Even if the Court were to consider the extrinsic evidence cited by Anchorage, the Court cannot rely on such evidence to insert a duty to deliver a port into the 2003 MOU. Extrinsic evidence can help the Court "to interpret the meaning of a term that is found in a [contract]," but extrinsic evidence cannot be "used to justify reading a term into an agreement that is not found there." *Fox v. Off. of Pers. Mgmt.*, 100 F.3d 141, 145 (Fed. Cir. 1996). *Accord TEG-Paradigm*, 465 F.3d at 1339 (explaining that extrinsic evidence may be used "to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself" but not "to supplement or modify a written agreement"); *Interwest*

10

*Const. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994) ("[E]xtrinsic evidence . . . should not be used to introduce an ambiguity where none exists.").

To the extent the Court considers the three forms of extrinsic evidence referenced in Anchorage's brief, we provide this brief response.

*First*, Anchorage's theory that the MARAD-ICRC contract can provide the missing terms for what MARAD was supposed to deliver under the 2003 MOU, Anch. Br. 35-36, directly conflicts with Anchorage's position (which we do not dispute) that the MARAD-ICRC contract could not alter the agreement reached between MARAD and Anchorage. *Id.* at 36-37, 45-46. The 2003 MOU "contains no references to any external documents or agreements[,]" which "prohibits [reference to the MARAD-ICRC contract] to add to or to modify its terms." *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996). *Accord S. California Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1329-30 (Fed. Cir. 2005). Indeed, "the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract . . . ." *CSI Aviation, Inc. v. Dep't of Homeland Sec.*, 31 F.4th 1349, 1355 (Fed. Cir. 2022) (quotation omitted). No such language is present in the 2003 MOU, and thus the MARAD-ICRC contract is out of bounds for any interpretive exercise aimed at

11

determining what MARAD promised to deliver to Anchorage through the 2003

MOU.[4]  The plain language fully explains it.

*Second*, Anchorage makes a course of performance argument, echoing the

trial court's suggestion that MARAD executed its Federal procurement contract

with ICRC only because the 2003 MOU assigned MARAD the contractual

responsibility to deliver the project to Anchorage.  Appx52; *see* Anch. Br. 33-39,

46-47.  We addressed this issue in our opening brief, U.S. Br. 47-49, and our

arguments apply equally to Anchorage's contention that MARAD essentially

subcontracted with ICRC to fulfill MARAD's purported responsibility to deliver a

port to Anchorage.  MARAD did no such thing.  MARAD executed a Federal

procurement contract, using congressionally-appropriated funds, to execute a

Federal project that was authorized and mandated by Congress.  All of this

occurred before the 2003 MOU was finalized.  U.S. Br. 6-10 (summarizing the

---

[4]  Alternatively, if the Court were to accept Anchorage's argument that the terms of the MARAD-ICRC contract were somehow incorporated by reference into the 2003 MOU, the Court would have to incorporate all of the provisions of the MARAD-ICRC contract absent some express language stating that only some of the terms were incorporated.  *See CSI Aviation*, 31 F.4th at 1355.  Thus, the Court would have to conclude that the 2003 MOU also incorporated the language in the MARAD-ICRC contract stating that MARAD was not accepting design liability for the project, Appx16156, and the language directing ICRC to work directly with Anchorage Port staff to manage the project.  Appx17016-17017.

relevant timelines and authorities for execution of the MARAD-ICRC contract and the 2003 MOU).

Anchorage's theory that MARAD executed a Federal procurement contract to discharge its purported duties under the 2003 MOU is a post-hoc rationalization that ignores the order in which the documents were executed.  It also ignores Anchorage's contemporaneous understanding that the purpose of the 2003 MOU was to provide a mechanism to transfer Anchorage's local funds onto the already existing project and contract.  Appx17041-17042 (Tr. 27:10-29:16) (Port Executive Administrator explaining that MARAD's ability to execute its own procurement contract for the project had nothing to do with the execution of the 2003 MOU); Appx15846 (Tr. 8:3-5) (Port Director explaining that "[t]he MOU is to allow us to transfer our local dollars as matching dollars for the federal program that goes into MARAD itself."); Appx15849 (Tr. 18:2-5).  When the 2003 MOU was being finalized, Anchorage understood that it was not contractually tasking MARAD to deliver a port, which MARAD would accomplish through a procurement contract with ICRC.  At best, this argument begs the question; it is only meaningful if one assumes going in that MARAD had obligated itself to such a responsibility.

*Third*, Anchorage relies extensively on trial testimony regarding what various project participants understood to be the parties' legal obligations under the 2003 MOU.  Anch. Br. 8-18, 37-39.  Even if the Court finds an ambiguity in the

2003 MOU that requires extrinsic evidence to resolve, trial testimony is the least relevant record evidence available to the Court.  Trial testimony is by definition post-breach evidence, which is necessarily tainted by the parties' disputes.  *See Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290-92 (Fed. Cir. 2008).

In sum, both the plain text of the 2003 MOU and the most relevant extrinsic evidence confirm that MARAD had no contractual duty to deliver anything to Anchorage.

III.    Anchorage Has Not Met Its Burden To Identify Any Remaining Genuine Issues Of Fact In The Existing Trial Record To Justify A Remand Regarding Breach Of The 2003 MOU

Our opening brief explained that if the Court agrees with our interpretation of the 2003 MOU and reverses the trial court's holding that MARAD promised to deliver a defect-free port structure, then Anchorage has the burden to explain what genuine issues of fact would require further proceedings on remand, based on the existing trial record.  U.S. Br. 35-36.  Anchorage has neither acknowledged nor satisfied its burden in its response brief, instead briefly asserting that the facts "clearly support upholding all of the [trial court's] orders."  Anch. Br. 62. Anchorage has not identified specific genuine issues of fact present in the existing trial record that the trial court did not resolve, but which now would have to be addressed in light of this Court's decision.  Thus, reversal without remand is appropriate.

14

A.    Anchorage Has Not Identified Any Other Viable Theory Of Damages For Breach Of The 2003 MOU Beyond Its Purported Expectation Interest In Receiving A Completed, Defect-Free Port Structure

The trial court was clear that it was awarding Anchorage expectation damages to compensate Anchorage for MARAD's failure to deliver a completed and defect-free open cell sheet pile structure under the 2003 MOU.  Appx71-72. Anchorage's response brief is equally clear that its presentation of expectation damages was based on MARAD's purported "obligation to deliver a defect-free Port to [Anchorage]."  Anch. Br. 52.  For all of the other purported duties and breaches referenced in the trial court's opinions and Anchorage's response—the duties to design, construct, and manage the project, and the duties to oversee and administer the contract—Anchorage introduced no evidence of its damages separate from its purported expectation interest in receiving a defect-free port structure.  U.S. Br. 36-38.  Anchorage did not dispute this point in its response, and "[b]y failing to respond to [our] argument in the briefing, [Anchorage] has effectively conceded . . . [and] waived this argument*." CardSoft, (assignment for the Benefit of Creditors), LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1353 (Fed. Cir. 2015).

Instead, Anchorage responded only to our argument that the trial record could not support any reliance damages award, regardless of Anchorage's breach theory.  U.S. Br. 38-40; Anch. Br. 53-54, 59.  Anchorage notes that the trial court

15

expressly stated that it was not addressing reliance damages in its decision, which we do not dispute. Anch. Br. 53; Appx71. But that does not prevent this Court from evaluating whether the evidence could support any damages award under alternative theories. *See*, *e.g.*, *S. California Fed.*, 422 F.3d at 1334-35 ("[E]ven if we assume . . . a breach . . . the Individual Plaintiffs are not entitled to recover the damages they seek under any applicable theory of contract damages.").

There is no genuine dispute over the relevant facts necessary to assess Anchorage's potential reliance damages. The parties stipulated to the total amount of funds Anchorage contributed to the project, $163.4 million. Appx14518 (stipulation ¶ 107). The parties stipulated that portions of the project were successfully completed and transferred to Anchorage, Appx14512 (stipulation ¶ 42), Appx14514 (stipulation ¶ 57), assets which Anchorage's Chief Financial Officer confirmed were valued at $117,598,306[5] in Anchorage's audited financial statements. Appx15238 (Trial Tr. 1304:19-1305:14 (Mahoney)); Appx21010-21011. The parties also stipulated that Anchorage received $19.35 million in settlement proceeds from its direct suit against the project contractors in district court. Appx14518 (stipulation ¶ 108). And Anchorage has not disputed that the State of Alaska reimbursed Anchorage through grant funds for $91,290,263 of the

---

[5] Our opening brief mistakenly stated this figure as $117,780,814. U.S. Br. 13, 39.

$163.4 million that Anchorage contributed to the project. Appx15236 (Trial Tr. 1295:12-1297:18 (Mahoney)); Appx21009.  As a direct result of the project, Anchorage received funds and value totaling $228,238,569, *exceeding* its total contribution of $163.4 million.  Thus, Anchorage has no viable claim for reliance damages.

Anchorage's arguments in response are meritless.  First, Anchorage claims that it contributed "$306 million in reliance on MARAD's promise that it would deliver a Port to [Anchorage] that met [Anchorage's] requirements."  Anch. Br. 59. This $306 million amount includes the $143,066,919.76 that both parties stipulated was contributed to the project by the Federal Government, not by Anchorage. Appx14518 (stipulation ¶¶ 104-106).  Anchorage makes no factual or legal argument explaining why the amount that the Federal Government contributed to the project should be included as part of Anchorage's contribution in any reliance damages analysis.

Second, Anchorage contends that its future costs to remove defective work are recoverable under a reliance theory, Anch. Br. 54, but Anchorage misunderstands the trial court's decision and the relevant precedents.  The trial court held that future damages were recoverable as part of its expectation damages analysis, Appx75-76, a conclusion that we do not challenge on appeal.  We agree that under *Indiana Michigan Power Company v. United States*, 422 F.3d 1369,

17

1376-77 (Fed. Cir. 2005), future damages may be recoverable in a total breach case, but that case, like spent nuclear fuel cases generally, evaluated expectation damages. *See id.* at 1373, 1377 ("The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. . . . When a party sues for partial breach, it retains its right to sue for damages for its remaining rights to performance."); *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011) ("'[P]laintiffs . . . are seeking expectancy damages . . . .'" (quoting *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008))).

The rule is different when calculating reliance damages. This Court has explained that "potential future obligations" are not "an actually sustained loss" that can be included in calculating reliance damages. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1368-69 (Fed. Cir. 2005). Thus, Anchorage's potential future costs are not relevant to an analysis of Anchorage's potential reliance damages.

In sum, Anchorage has not met its burden to identify any evidence in the record that could support a different damages award under the 2003 MOU if the Court concludes that MARAD was not contractually obligated to deliver a defect-free port structure to Anchorage. For this reason alone, the Court may fully

reverse without remand the trial court's decision regarding breach of the 2003 MOU.

B.   The 2003 MOU Does Not Contain Any Of The Duties Necessary To Support Anchorage's Alternative Breach Theories

Alternatively, the Court can reverse without remanding Anchorage's claim for breach of the 2003 MOU because the plain language of the agreement does not support any of the other duties identified by the trial court—providing design, construction, and project management services.  Appx54.  Anchorage again contends that sections IV.7. and V.7. of the 2003 MOU unambiguously required MARAD to provide design, construction, and project management services for the project.  Anch. Br. 44-45.  But again, the actual text of those clauses states only that Anchorage would authorize funding for those tasks, and MARAD was responsible for obligating and disbursing the necessary funding for those tasks.  Appx16045-16046.  The text plainly states that the project contractor, not MARAD, would be responsible for actually executing those activities, and the Court would have to rewrite the language to make it say what Anchorage wishes it said—that MARAD was responsible for actually performing the program management, design, and construction services on the project.

Indeed, our opening brief explained that earlier draft language for the 2003 MOU expressly stated that MARAD itself would be responsible for providing

project management services for the project.  U.S. Br. 42-44.  Anchorage removed

that language before the 2003 MOU was finalized.  Anchorage now contends that

this is impermissible parol evidence, Anch. Br. 45-46, but Anchorage

misunderstands our argument.

"Under the parol evidence rule, extrinsic evidence pre-dating a written

agreement may not be used to add to or otherwise modify the terms of a written

agreement . . . ."  *TEG-Paradigm*, 465 F.3d at 1338 (internal quotation and citation

omitted).  We are not referencing the prior draft to add to or modify the terms of

the final agreement.  Rather, the omission of language that was previously included

in the prior version is contemporaneous evidence of the parties' intent that

confirms the agreement's plain meaning—the 2003 MOU contains no language

stating that MARAD would manage the project on Anchorage's behalf because the

parties purposefully intended that the agreement would not contain such language.

*See Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 717 n.9 (1992), *aff'd*,

988 F.2d 130 (Fed. Cir. 1993) (explaining that the court could not interpret a

contract to contain a term that the parties had removed during negotiations).

In sum, we have explained that reversal without remand is appropriate here,

either because Anchorage has not identified any facts that could support an

alternative damages award or because the plain text of the 2003 MOU does not

contain the other duties supporting Anchorage's breach claim.

IV.    The 2011 MOA Contained No Duty For MARAD To Pursue Legal Claims
       On Anchorage's Behalf

The trial court's holding that MARAD contractually promised to "defend
against claims as well as pursue affirmative claims on [Anchorage's] behalf" is not
based on the text of the 2011 MOA.  U.S. Br. 49-52 (citing Appx61).  Anchorage's
response nibbles around the edges of our arguments, but never addresses our
primary point—the plain text of the 2011 MOA gave MARAD the express
authority to "administer claims submitted by [MARAD] Contractors."
Appx18333.  MARAD was required to "coordinate and cooperate with the
[Anchorage]/[Port of Anchorage] in affirmative and defense of claims consistent
with federal contract law," *id.*, but not to defend and pursue claims on Anchorage's
behalf.  Nor has Anchorage identified any evidence from trial suggesting that
MARAD failed to coordinate and cooperate while the 2011 MOA was in effect.

Anchorage's response also fails to acknowledge that MARAD's obligations
to administer claims expressly reference the Contract Disputes Act (CDA) and
"federal contract law," both of which grant the contracting officer authority to
"decide or resolve all claims arising under or relating to a contract subject to the
[CDA]."  FAR 33.210; 41 U.S.C. § 7103(a).  Simply put, the plain language of the
2011 MOA granted MARAD express authority to administer all contractor claims
consistent with Federal contract law.  Anchorage's theory, that MARAD bound

21

itself to pursue and defend claims as Anchorage directed, is the opposite of what the plain language says.

V.    Anchorage Cannot Receive Both Expectation And Reliance Damages

Even if the Court affirms the trial court's interpretation of the 2003 MOU and the 2011 MOA on a *de novo* review, the trial court erred as a matter of law by awarding Anchorage both expectation and reliance damages because the $11,279,059 million in damages awarded for breach of the 2011 MOA can only be understood as reliance damages.  U.S. Br. 52-57.  Despite Anchorage's contention that the trial court made sufficient factual findings to support this award as expectation damages, Anch. Br. 57-58, the trial court's sole basis for awarding this $11.3 million in expectation damages was that MARAD breached its duty to pursue and defend claims on Anchorage's behalf, and that MARAD used funds originally contributed by Anchorage to pay for $8,925,864 of the $11.3 million settlement.  Appx19 (citing Appx8526, Appx10070 (Tr. 105:8-25)); Appx74.  The trial court simply made no findings connecting this amount to any benefit Anchorage expected to receive.

Anchorage also fails to explain how the trial court could award the $11.3 million as expectation damages without identifying Anchorage's expectation interest, instead arguing that that we have "tried to create a new and different requirement to prove anticipated benefits, which no court has ever required."

22

Anch. Br. 55-56. That assertion is inconsistent with the relevant precedents in this Court, which routinely explain and evaluate the underlying basis for expectation damages. *E.g.*, *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010) ("One way to [make the non-breaching party whole] is to award 'expectancy damages,' *i.e.*, the benefits the non-breaching party would have expected to receive had the breach not occurred."); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("A party's expectation interest is the 'interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" (quoting Restatement (Second) of Contracts § 344(a) (1981))); *San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997) ("The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed.").

This Court may review the damages arguments presented before the trial court to determine whether they are appropriately categorized as expectation, reliance, or restitution damages. *S. California Fed.*, 422 F.3d at 1334-35. In *Southern California Federal Savings & Loan*, the Court held that certain damages claimed by the plaintiffs could not "be awarded as a form of expectation damages" in part because there were no terms in the relevant agreement creating the

plaintiffs' asserted expectation interest.  *Id.* at 1334.  Here, neither the trial court

nor Anchorage explained how Anchorage expected to receive $11.3 million if

MARAD had fulfilled its purported duty to pursue and defend claims on

Anchorage's behalf.  This Court can take note of that omission and conclude that

expectation damages are not available to compensate Anchorage for this purported

loss.  *See id.*

Alternatively, Anchorage contends that the trial court could have properly

awarded Anchorage $11.3 million in non-overlapping reliance damages, together

with the $356 million in expectation damages.  Anch. Br. 58-62.  This is incorrect,

as we previously explained in section III.A. why Anchorage has no recoverable

reliance damages.  But even if Anchorage had a net reliance loss, Anchorage could

not recover the $11.3 million as non-overlapping reliance damages.

Anchorage states that, under a reliance theory, its claim for the $11.3 million

seeks to "recover the funds it lost due to MARAD's breaches" and would "put

[Anchorage] in the position it would have been in had the contract not been made."

Anch. Br. 59.  But Anchorage never explains how this $11.3 million is non-

overlapping with the $356 million it claims as expectancy damages; Anchorage

merely asserts that the damages do not overlap, without more.  *See id.* at 60-62.

Anchorage asks the Court to unwind the transaction and return to it a portion of the

funds that it contributed, while at the same time Anchorage would be receiving the

benefit of the transaction and the value it expected to receive from those same contributed funds through the $356 million expectation damages award.

The Court has previously rejected precisely this kind of inconsistent damages award, where a plaintiff seeks "both to 'unwind' the contract by returning [plaintiff] to its pre-contract status while also affording [plaintiff] the expected benefits of the contract by awarding lost value damages." *Slattery v. United States*, 583 F.3d 800, 816-19 (Fed. Cir. 2009), *vacated*, 369 F. App'x 142 (Fed. Cir. 2010), *reinstated*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc). "[T]he result is duplicative payment of damages and a 'windfall to the non-breaching party[.]'" *Id.* (quoting *Am. Cap. Corp. v. F.D.I.C.*, 472 F.3d 859, 870 (Fed. Cir. 2006)).

In *Slattery*, the Court held that "the trial court erred in awarding both the net cost of entering the contract, and the value lost due to the breach. While the two sums are measured by different transactions that do not technically 'overlap,' they are incompatible as measures of damages for breach." *Slattery*, 583 F.3d at 820. This is true whether the plaintiff seeks a combination of expectation and reliance damages, or expectation and restitution damages—these combinations of "awards are economically incompatible." *Id.*.

Anchorage misplaces its reliance on the trial court opinion in *Glendale Federal Bank FSB v. United States*, 43 Fed. Cl. 390 (1999), *aff'd in part, vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001). There, the court evaluated whether it

could award both reliance and restitution damages, not a combination of expectation and reliance/restitution. Indeed, the court agreed that "a party may not recover both expectancy and restitution damages, because the party should not be able to get the value of what it conferred to the other party as well as the full value had the party fully performed." *Id.* at 408. This is the same basis for our current argument, consistent with *Slattery*, that a party cannot receive both expectation and reliance damages. The only reason the trial court in *Glendale* entertained the possibility of non-overlapping restitution and reliance damages was that both theories "are designed to put the non-breaching party back in the position it was prior to the contract." *Id.* In any event, this Court later clarified that restitution and reliance damages cannot be combined either. *Am. Cap.*, 472 F.3d at 870 ("[R]estitution is not recoverable in addition to reliance damages for the same injury.").

This Court's precedents foreclose Anchorage's argument that it may recover both the expectation and reliance damages it claims here. Thus, even if the Court's *de novo* review affirms the trial court's interpretation of the 2003 MOU and the 2011 MOA, the damages award must be reduced by $11,279,059 because the trial court committed legal error by awarding both expectation damages and reliance damages.

VI.    **The Legal Issues Raised By The United States Are Properly Presented To This Court**

In addition to its merits arguments, Anchorage notes that the trial court struck some of the arguments we raise here regarding the proper interpretation of the 2003 MOU and contends that we are precluded from presenting these arguments on appeal without appealing the trial court's procedural ruling.  Anch. Br. 29-30.  Anchorage is mistaken.  Despite the trial court's statement in its liability opinion that it was striking some of our arguments, the trial court proceeded to address them in its damages opinion.  Plus, there is no dispute that the trial court interpreted the 2003 MOU as part of its decision and made legal rulings about what contractual duties the 2003 MOU imposed.  That issue is properly before the Court, and the Court has an independent obligation to apply the law correctly in reviewing that legal issue.

A.    **The Proper Interpretation Of The 2003 MOU Is The Issue Before This Court On Appeal**

As we explained in our opening brief and reiterated above, the trial court erred in holding that MARAD promised to deliver to Anchorage a completed port structure, or anything at all, in the plain language of the 2003 MOU.  Although the court purported to conduct a detailed analysis of the text to determine that the 2003 MOU contained this express promise, Appx47-53, the court stated that it would not consider the Government's specific arguments as to why "the Contracts did not

define any deliverable nor did MARAD agree to deliver any specific item of construction . . . ."  Appx36 (quotation and citation omitted).

The court stated, incorrectly, that the United States had not previously made this specific contention as part of its trial presentation or during the prior seven years of litigation leading up to trial.  Appx36-37.  But from the beginning of this case, the United States consistently disclosed its position that the 2003 MOU contained none of the duties alleged by Anchorage, including the purported duty to deliver a specific item of construction.  Appx171-176 (Def. Mot. to Dismiss) ("The 2003 agreement created no duty in [MARAD] to design, construct, or manage the project."); Appx5118-5121 (Def. Mot. for Summ. J.) ("MARAD had no responsibilities for providing design, construction, or management services, to guarantee the quality of such activities, or to deliver any specific item of construction."); Appx13143 (Def. Pretrial Br.) ("MARAD had no responsibilities for providing design, construction, or management services, to guarantee the quality of such activities, or to deliver any specific item of construction.").

Regardless, the trial court's damages opinion proceeded to acknowledge and address our argument that the 2003 MOU did not contemplate the delivery of any specific item of construction.  Appx71-72.  Anchorage asserts that this discussion in the damages opinion is irrelevant because it was not included in the liability opinion.  Anch. Br. 30 n.23.  But this Court "'review[s] judgments, not statements

28

in opinions.'" *Est. of Hage v. United States*, 685 F. App'x 927, 930 (Fed. Cir. 2017) (quoting *Black v. Cutter Labs.*, 351 U.S. 292, 297 (1956)).  The court's judgment rested upon its consideration and rejection of our argument that MARAD did not owe Anchorage any deliverable—that this discussion occurred in the damages opinion rather than the liability opinion is immaterial.

Even considering the liability opinion alone, the trial court's refusal to address some of the specific arguments the United States presented to support our interpretation of the 2003 MOU does not preclude this Court from considering those arguments in its *de novo* review of the 2003 MOU.  Once an issue is properly before this Court, the Court "may apply the correct law even if . . . the court below did not decide it . . . ." *Forshey v. Principi*, 284 F.3d 1335, 1356-57 (Fed. Cir. 2002) (en banc).

The trial court specifically addressed the issue of what duties were created under the 2003 MOU, and this Court reviews that issue on appeal.  The trial court understood that it had to identify the duties contained in the 2003 MOU in order to determine whether the United States breached the agreement, and the court's interpretation of the agreement was essential to its judgment.  Indeed, the court allocated several pages in its liability opinion discussing the text of the 2003 MOU and the evidence offered by both parties in support of their respective interpretations.  Appx47-53.

Because the issue of what duties were created under the 2003 MOU is properly before this Court, the Court must apply the law correctly in its *de novo* review of the 2003 MOU. This includes properly applying the relevant precedents identified in our briefing. "[T]o preserve a point of error for appeal," we are not required to show that before the trial court we "specifically name[d] the cases relied upon on appeal." *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) (citing *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469-70 (2000)). We met our burden to put the trial court "on notice as to the substance of the issue," *Nelson*, 529 U.S. at 469-70, that the 2003 MOU contained no duty for MARAD to deliver a completed defect-free port structure to Anchorage. *See also ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012) ("It is generally true that '[a] party may preserve an issue for appeal by renewing the issue at trial or by including it in memoranda of law or proposed conclusions of law.'" (quoting *United Techs. Corp. v. Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1344 (Fed. Cir. 1999))).

### B.    The United States Preserved The Issue Of Conflicting Damages Awards

Anchorage also incorrectly asserts that our argument that the trial court impermissibly awarded both expectation and reliance damages is a new argument presented for the first time on appeal. Anch. Br. 55. In our pretrial brief, we

explained that "Anchorage must choose to pursue either reliance or expectancy damages; it cannot pursue both simultaneously." Appx13156 (citing cases). We then contended that "Anchorage impermissibly claims the value of the 2012 MARAD-ICRC settlement as part of its expectation damages ($11,279,059)." Appx13165. In our post-trial brief, we reiterated these points. Appx23104 ("Anchorage must choose to pursue either reliance or expectancy damages; it cannot pursue both simultaneously." (citing cases)); Appx23112 ("Anchorage impermissibly claims the value of the 2012 MARAD-ICRC settlement as part of its expectation damages ($11,279,059)."). This is not an argument that we are making for the first time on appeal.

## CONCLUSION

For these reasons, and the reasons stated in our opening brief, we respectfully request that the Court reverse the judgment of the Court of Federal Claims.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

/s/Vincent D. Phillips, Jr.
VINCENT D. PHILLIPS, JR.
OF COUNSEL:                          Senior Trial Counsel
EVAN WISSER                          Commercial Litigation Branch
DANIEL A. HOFFMAN                    Civil Division, Department of Justice
KARA M. WESTERCAMP                   P.O. Box 480
Trial Attorneys                      Ben Franklin Station
Commercial Litigation Branch         Washington, D.C. 20044
                                     Telephone: (202) 305-4591
                                     E-mail: Vincent.Phillips2@usdoj.gov
                                     *Attorneys for Defendant-Appellant*
                                     *United States*

Dated: May 26, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this response:  (1) complies with the type volume limitation of Federal Circuit Rule 32(b)(1); (2) contains 6,948 words, excluding the portions of this response exempted from the type volume limitation by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2); (3) complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5); (4) complies with the type style requirements of Federal Rules of Appellate 32(a)(6); and (5) has been prepared on a computer in a proportionally spaced typeface using Microsoft Word in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the response.

s/Vincent D. Phillips, Jr.