# United States Court of Appeals for the Federal Circuit

---

**ANCHORAGE, A MUNICIPAL CORP.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2022-1719

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00166-EJD, Senior Judge Edward J. Damich.

---

Decided: December 16, 2024

---

JASON N. SMITH, Seyfarth Shaw LLP, Washington, DC, argued for plaintiff-appellee. Also represented by EDWARD VICTOR ARNOLD, BENNETT DAVID GREENBERG; DONALD FEATHERSTUN, San Francisco, CA; ANNE HELZER, ROBERT OWENS, Municipality of Anchorage, Anchorage, AK.

EVAN WISSER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BRIAN M. BOYNTON, VINCENT DE PAUL PHILLIPS, JR., STEVEN JOHN GILLINGHAM, DANIEL HOFFMAN, PATRICIA M. MCCARTHY, KARA WESTERCAMP.

Before TARANTO, HUGHES, and CUNNINGHAM, *Circuit Judges*.

HUGHES, *Circuit Judge*

The United States appeals a decision from the United States Court of Federal Claims holding that the United States breached two contracts with the municipality of Anchorage to improve the Port of Alaska. Anchorage and the United States signed a Memorandum of Understanding in 2003 and a Memorandum of Agreement in 2011 to upgrade and expand the Port of Alaska. The Court of Federal Claims held that the government breached the 2003 agreement by not delivering a defect-free port and breached the 2011 agreement by settling subcontractor claims without conferring with Anchorage.

Because the 2003 Memorandum of Understanding did not require the United States to deliver a defect-free port, we vacate the Court of Federal Claims' decision as it relates to the 2003 Memorandum of Understanding and remand for further proceedings as described below. We affirm the Court of Federal Claims' determination that the United States breached the 2011 Memorandum of Agreement by settling subcontractor claims without conferring with Anchorage, as well as the court's award of damages to Anchorage for the United States' breach of the 2011 Memorandum of Agreement.

## I

### A

The Port of Alaska (Port), formerly the Port of Anchorage, is a critical national seaport and the "kingpin in Alaska's corridor of commerce." J.A. 5698. An estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port annually. Additionally, jet fuel for military operations at Joint Base

Elmendorf-Richardson and for the Ted Stevens Anchorage International Airport arrives via the Port.

Prior to 2003, "[t]he Municipality of Anchorage determined that the facilities at the Port . . . were deteriorating and outdated." J.A. 3. Anchorage envisioned a multi-year project that would help increase the Port's ability to serve Anchorage, the State of Alaska, commercial tenants, and the United States military. "Not having the expertise to undertake the [p]roject on its own, [Anchorage] sought a party to provide the requisite technical expertise." *Id.* After considering the private sector, Anchorage contracted with the Maritime Administration (MARAD), within the U.S. Department of Transportation "to embark on a port infrastructure development program." *Id.* Anchorage selected MARAD for its "purported expertise in designing, constructing, and overseeing port development projects and its authority to administer federal and non-federal share funds." Compl. at ¶ 17, *Anchorage v. United States*, Case No. 1:14-cv-00166 (Fed. Cl. Feb. 28, 2014), ECF No. 1.

Anchorage and MARAD executed two contracts over the life of the project. The first contract was a Memorandum of Understanding executed in 2003 (2003 Memorandum), which "described project administration, funding, and the obligations of the parties." J.A. 3.

The express terms of the 2003 Memorandum required Anchorage to "[p]rovide overall program requirements and direction of Port Expansion to MARAD." J.A. 16044. The 2003 Memorandum also specified, with regard to the level of program control to be exerted by Anchorage, that Anchorage had the responsibility to "[r]eview all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD." J.A. 16045. "[Anchorage] was also responsible for certifying completion and acceptance of the work." J.A. 3. Specifically, Anchorage was required to certify that a

contractor's work was acceptable and, if so, would issue a certificate of completion to MARAD. Only with the completed certificate of completion could MARAD accept the work and pay the contractor.

The 2003 Memorandum also outlined MARAD's responsibilities, which included "[c]oordinat[ing] with other Federal agencies that receive annual Congressional appropriations for Port Expansion" to increase funding for the project. J.A. 16045. Additionally, MARAD was responsible for executing all financial documents, accepting transfers of non-federal funds, and to "[o]bligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." J.A. 16046. Either party could terminate the 2003 Memorandum by providing ninety days' notice to the other party.

To complete the project, MARAD contracted with Integrated Concepts and Research Corporation (ICRC) in 2003 (the MARAD-ICRC contract). ICRC, in turn, was to "[sub]contract[] with other design/engineering firms and contractors to complete various aspects of the work." Compl. at ¶ 31, *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. The contract between MARAD and ICRC "included contract clauses which provided [MARAD] the right to require ICRC to correct defective work without charge." *Id.* at ¶ 35.

Problems with the project were discovered during a third-party inspection in 2010, when "large-scale damage was found in the installed sheet piles", which protect an excavated area from earth and groundwater. J.A. 3. While ICRC and its subcontractors performed the work, Anchorage ultimately blamed the project issues on MARAD, alleging that MARAD failed to "develop[] [p]roject management or inspection protocols" over ICRC and its

subcontractors, and “abdicated its responsibilities” to oversee the project. Compl. at ¶¶ 61–65, *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. The damage resulted in “large sections of the [Port] being unsuitable for use.” J.A. 3 The damage was the “impetus for [Anchorage and MARAD] entering into a second agreement in 2011.” J.A. 3.

The 2011 Memorandum of Agreement (2011 Memorandum), which supplemented the 2003 Memorandum, “redefined the roles and responsibilities of Anchorage and [MARAD], outlined authorities, and assured accountability for the [p]roject” through joint oversight by both parties. J.A. 3–4. “It created a Port Oversight and Management Organization [] to ‘provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project.’” *Id.* (internal citations omitted). The Port Oversight and Management Organization consisted “of a committee of decision makers from both Anchorage and MARAD, who would hold frequent meetings to address issues related to the Port construction.” J.A. 16. The 2011 Memorandum also removed Anchorage’s prior “responsibility to provide program requirements and direction for the [p]roject and instead gave [the Port Oversight and Management Organization] the responsibility to ‘[m]anage the scope, schedule, and budget of the [p]roject on a day-to-day basis.’” J.A. 4 (internal citations omitted).

That same year, another issue arose when Quality Asphalt Paving, Inc. and MKB Constructors—two subcontractors hired by ICRC—sought to file a claim against MARAD for work performed that they alleged was not reimbursed. As the prime contractor, ICRC certified the validity of the claim (known as a certified pass-through claim) and presented it to MARAD. MARAD denied the certified pass-through claim from ICRC and, as a result, ICRC brought three claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals

(CBCA). Without consulting Anchorage, MARAD settled the claims with ICRC in 2012, with MARAD paying ICRC $11,279,059. On March 8, 2013, Anchorage filed its own lawsuit against ICRC, Quality Asphalt Paving, Inc., and MKB Constructors, among others, for deficient work on the project. "[Anchorage] recovered approximately $19.35 million through settlements with all parties in that suit." J.A. 14518.

B

In 2014, Anchorage filed suit against the United States in the Court of Federal Claims, alleging that MARAD had breached the 2003 Memorandum and the 2011 Memorandum. Compl., *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. On December 9, 2021, after trial, the court issued a decision, holding that MARAD had breached express duties under the plain text of the 2003 Memorandum and the 2011 Memorandum while stating that it would issue a separate damages opinion. J.A. 35–62.

In the opinion, the trial court held that the 2003 Memorandum contained an unambiguous duty for MARAD to deliver a defect-free port structure to Anchorage. It further held that MARAD had breached this duty by failing to deliver to Anchorage a completed, defect-free project. The trial court also held that MARAD had breached duties under the 2003 Memorandum by failing to exercise its contractual rights and remedies against ICRC under the MARAD-ICRC contract. Finally, the trial court held that, in the 2011 Memorandum, MARAD had promised to pursue and defend claims on Anchorage's behalf, which MARAD breached by settling ICRC's claims without Anchorage's input.

During trial, the United States sought to show that Anchorage was responsible for the managerial decision to contract with ICRC. But the court deemed Anchorage's decision-making on the project irrelevant because, in its

view, "MARAD held the legal right [under the 2003 Memorandum] to refuse" Anchorage's directions, and MARAD's choice to accommodate Anchorage's instructions was "not the requirement under the 2003 [Memorandum]." J.A. 52.

The trial court issued a separate opinion addressing damages on February 24, 2022. *Anchorage v. United States*, No. 14-166C, 2022 WL 577669 (Fed. Cl. Feb. 24, 2022). In the opinion, the court found that Anchorage had adequately proven its entitlement to $367,446,809 in expectation damages. The court's damages calculation contained two parts. First, the court determined that Anchorage had proven its entitlement to $180,839,809, representing the value of the structure Anchorage expected but did not receive. Included in this amount was $11,279,059, the amount MARAD paid to ICRC out of project funds as part of the CBCA litigation settlement. The court did not explain how this sum was related to the value of the port structure Anchorage claimed. The expectation damages also encompassed a deduction for the $19,350,000 in funds Anchorage recovered through its settlements with ICRC and other contracts. Second, the court determined that Anchorage had proven its entitlement to $186,607,000 in costs Anchorage anticipates it will have to pay to remediate the defects in the existing sheet pile structure. The United States filed a timely notice of appeal to our court on April 22, 2022. We possess jurisdiction under 28 U.S.C. § 1295(a)(3) to review final decisions and judgments of the Court of Federal Claims.

## II

"We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Shell Oil Co. v. United States*, 896 F.3d 1299, 1306 (Fed. Cir. 2018). Contract interpretation is a question of law that we review de novo. *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1284–85 (Fed. Cir. 2008) (citing

*Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), *aff'd*, 518 U.S. 839 (1996)).

III

When interpreting a contract, we "begin[] with the language of the written agreement." *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quotation omitted). We may also look to contemporaneous evidence of the parties' understanding to confirm the plain meaning of the contract. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). We interpret the contract in a way that gives reasonable meaning to all parts of the contract and avoids a conflict among the provisions. *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021). Further, we cannot insert words into the contract that the parties never agreed to. *George Hyman Const. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987).

The first question before us is whether the 2003 Memorandum required the United States to provide Anchorage with a defect-free port. The second question is whether the United States breached the 2011 Memorandum by settling ICRC's claims against the United States without conferring with Anchorage. We address each in turn.

A

Our predecessor, the Court of Claims, identified some of the essential "terms normally needed for a construction contract . . . [such as] time period, . . . specifications as to form and height, . . . [and] the methods or procedures to be followed." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1266 (Ct. Cl. 1969); *see also First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999) (citing *S. Corp. v. United States*,

690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc) (explaining that the Court of Federal Claims and our court are both "bound by the decisions of the Court of Claims")). While the absence of some standard construction terms could be remedied by implying reasonable terms, "the lack of *any* terms which would ordinarily be present in such a contract is persuasive that this was not a contract to construct a [structure] or to assure that one would be built." *Nat'l By-Prods.*, 405 F.2d at 1266 n.9 (emphasis added).

Turning to the 2003 Memorandum, we find no language that could be read to create a duty for MARAD to deliver any completed item of construction. Nothing states what specifically is to be built, where, or with what dimensions. Nothing identifies a deadline for delivery, or any binding timeline for any part of the project. Nothing identifies the cost for what MARAD is ostensibly delivering to Anchorage. Consistent with the 2003 Memorandum's plain language, Cheryl Coppe, a former Anchorage official and one of the primary drafters of the 2003 Memorandum, J.A. 39, testified that the 2003 Memorandum did not define any particular project structure to be built or any price, and that the decision of what was going to be built had not yet been made when the 2003 Memorandum was executed. J.A. 15063 (Trial Tr. 788:2–19 (Coppe)). The absence of any of these terms demonstrates that MARAD did not contractually promise to construct a port structure or to assure that one would be built through the 2003 Memorandum.

Anchorage's assertion that MARAD was required to deliver a defect-free port disregards the 2003 Memorandum's text. Although Anchorage directs us to certain provisions in the 2003 Memorandum, Anchorage repeatedly relies on paraphrases of those provisions, avoiding full quotes of the 2003 Memorandum's text. First, Anchorage cites to sections IV.7. and V.7. of the 2003 Memorandum, Appellee's Br. 31–33, which state in full:

> IV. MOA, PORT OF ANCHORAGE RESPONSIBILITIES: . . . 7. Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary.
>
> V. MARAD RESPONSIBILITIES: . . . 7. Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

J.A. 16045–46.

The United States argues that this language established reciprocal responsibilities for expending funds on the project—Anchorage was required to authorize all expenditures for substantive project activities, after which MARAD would disburse funding for those activities through the MARAD-ICRC contract. We agree. The 2003 Memorandum does not state that MARAD was responsible for delivering anything to Anchorage. Anchorage emphasizes that these clauses refer to the authorization, obligation, and disbursement of funds for "federal project oversight" and "Port Expansion project oversight." Appellee's Br. 31–32 (emphasis omitted). This language does not obligate MARAD to deliver any specific structure, and it also does not obligate MARAD to manage the project on Anchorage's behalf. Yet, Anchorage asserts that the language in these clauses "cannot be more clear" and that Anchorage authorized project funding so MARAD could "deliver a defect free [p]ort to [Anchorage]." Appellee's Br. 32–33. But Anchorage fails to identify any such language. *See Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed. Cl. 161, 169 (2001) ("The court may not insert a term into the contract that simply is not there."), *aff'd*, 64

F. App’x 780 (Fed. Cir. 2003); *see also Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 n.8, 717 n.9 (1992).

Anchorage further asserts that Addendum 2 of the 2003 Memorandum required MARAD to deliver a defect-free port to Anchorage. Addendum 2 states:

> Acceptance by MARAD of work shall be effective upon execution by a MARAD Contracting Officer’s Technical Representative (COTR) of a properly executed Certificate of Completion tendered by MARAD’s prime contractor. Upon acceptance by MARAD of work tendered, all right, title and interest to such work, and all warranties, and guarantees applicable thereto, shall be conveyed to the Municipality of Anchorage and its Department, the Port of Anchorage (MOA), unless otherwise provided. The term “Work” includes, but is not limited to: Materials, workmanship, warranties, guarantees, and manufacture and fabrication of components.
>
> The Certificate of Completion shall be a document executed by MARAD’s prime contractor attesting to the prime contractor’s inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects. Prior to submission to a MARAD COTR, the Certificate of Completion shall also be signed by an authorized representative of the Municipality of Anchorage. Such signature indicates acceptance by MOA of the work provided by MARAD’s prime contractor as specifically described in the Certificate of Completion.

J.A. 21681.

We find that Addendum 2 simply describes the process for reviewing and accepting work done on the project, with acceptance to be performed by Anchorage. *See* Appellant's Br. 28–29. Anchorage asserts that Addendum 2 provides that "MARAD would certify 'the work was completed according to specifications'" and that "MARAD [would] ensure that the work was completed consistent with specifications and free of defects." Appellee's Br. 34–35. But those words never appear in Addendum 2. Instead, the addendum only established a process whereby: (1) "MARAD's prime contractor" was responsible for "certifying the work was completed according to specifications and all applicable requirements . . . and is free from material defects," and then (2) "the Municipality of Anchorage[,]" not MARAD, was responsible for "accept[ing] . . . the work provided by MARAD's prime contractor." J.A. 21681.

Finally, a duty to deliver a defect-free port would conflict with another express provision in the 2003 Memorandum. Any interpretation of a contract must give a reasonable meaning to all terms and avoid a conflict among the provisions. *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021). Here, the termination clause of the 2003 Memorandum granted both parties an unlimited and unilateral right to terminate the agreement at any time with ninety days' written notice. J.A. 21678–79. The trial court acknowledged this clause in its damages opinion but disagreed with the United States "that[,] because MARAD could terminate the Agreement at any time, this disproves that MARAD owed Anchorage any specific item of construction . . . . The termination clause is just standard government contracting language." J.A. 71. Not so. The clause here allowed MARAD to walk away from the project, unlike a "standard" termination clause that permits the government as procurer to relieve the contractor of its obligation, at the expense of paying close out costs. *See, e.g.*,

FAR 52.249-2. The trial court did not explain how the parties' actual termination provision could be harmonized with an obligation to deliver a defect-free port. In short, MARAD could not have made a contractual promise to deliver any completed item of construction if it also had the undisputed freedom to end the agreement at any time for any reason.

For all of these reasons, we conclude that the plain language of the 2003 agreement did <u>not</u> require MARAD to deliver a defect free port.[1] Accordingly, we vacate the trial court's decision and remand for the court to consider any adequately preserved arguments for breach of duties found

---

[1] Anchorage urges us to consider testimony from contracting personnel as further evidence that both parties understood MARAD was to deliver a defect-free port. *See, e.g.*, Appellee's Br. 8–11, 36–38. Testimony from contracting personnel regarding their understanding and expectations cannot be used to add terms to the 2003 Memorandum. The parol evidence rule is a rule of substantive law that precludes the admission of prior or contemporaneous evidence seeking to add to or vary the terms of a written agreement when the parties have adopted a written agreement as an expression of their final intent. *David Nassif Assocs. v. United States,* 557 F.2d 249, 256 (Ct. Cl. 1977). "The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir.1996)).

in the 2003 Memorandum and, if such a breach is found, a determination of reliance damages.

B

The United States also argues that it did not breach the 2011 Memorandum by settling ICRC's claims against it without conferring with Anchorage. The trial court correctly rejected this argument. The United States' argument contradicts the plain language of clause V.B.7 of the 2011 Memorandum, which states that MARAD's role was to "administer claims submitted by [MARAD] contractors *and coordinate and cooperate with the [Muncipality of Anchorage/Port of Alaska] in affirmative and defense of claims* consistent with federal contract law." J.A. 18333 (emphasis added).

The United States claims that federal contract law instructs the federal government to try to resolve all contractual issues in controversy at the contracting officer's level, which gave "MARAD full discretion regarding the management of claims." Appellant's Br. 51; *see also* FAR 33.210. But this interpretation would render the 2011 Memorandum's requirement for MARAD to coordinate contract disputes with Anchorage meaningless. *See Jemal's Lazriv Water, LLC v. United States*, 114 Fed. Cl. 512, 516 (2013), *aff'd*, 578 F. App'x 982 (Fed. Cir. 2014) ("It is a fundamental tenet of contract construction that a contract should be interpreted so as not to render portions of it meaningless."). Considering the full language of the clause, the correct interpretation is that MARAD was to coordinate a response to contract disputes with Anchorage, with the requirement that any such response be consistent with federal contract law. Thus, we affirm the trial court's holding that the United States breached the 2011 Memorandum by settling ICRC's claims without conferring

with Anchorage, as well as the trial court's award of $11,279,059 in damages to Anchorage.[2]

## IV

We have considered the remainder of the parties' arguments and find them unpersuasive. Because the 2003 Memorandum of Understanding did not require the United States to deliver a defect-free port, we vacate the Court of Federal Claims' decision as it relates to the 2003 Memorandum of Understanding, as well as its award of damages, and remand for consideration consistent with this opinion. We affirm the Court of Federal Claims' determination that the United States breached the 2011 Memorandum of Agreement by settling subcontractor claims without coordinating with Anchorage, as well as the court's award of damages to Anchorage for the United States' breach of the 2011 Memorandum of Agreement.

**VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED**

COSTS

No costs.

---

[2] While the trial court awarded the damages from the United States' breach of the 2011 Memorandum under an expectation theory, J.A. 71, 74, the damages are more correctly categorized as reliance damages, which "put [the plaintiff] in as good a position as he was in before the promise was made." *Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 744 (2006), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008). Nevertheless, the award itself is correct.