# United States Court of Appeals
# for the Federal Circuit

ANCHORAGE, a Municipal Corp.,
Plaintiff-Appellee

v.

UNITED STATES,
Defendant-Appellant

On Appeal from the United States Court of Federal Claims
Case No. 14-166C, Hon. Edward J. Damich

## CORRECTED COMBINED PETITION FOR PANEL REHEARING AND REHEARING EN BANC BY PLAINTIFF-APPELLEE ANCHORAGE

Joseph F. Busa
Deputy Municipal Attorney
Municipality of Anchorage
632 W. 6th Avenue
Anchorage, AK 99501
joseph.busa@anchorageak.gov

Jason N. Smith
Bennett D. Greenberg
Edward V. Arnold
Erica L. Bakies
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone:  (202) 463-2400
Facsimile:   (202) 828-5393
Email:  jnsmith@seyfarth.com
        bgreenberg@seyfarth.com
        earnold@seyfarth.com
        ebakies@seyfarth.com

*Attorneys for Plaintiff-Appellee*
*Anchorage, a Municipal Corporation*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** <u>2022-1719</u>

**Short Case Caption** <u>Anchorage, a Municipal Corporation v. USA</u>

**Filing Party/Entity** <u>Anchorage, a Municipal Corporation</u>

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>January 31, 2025</u>     Signature: <u>/s/ Jason N. Smith</u>

Name: <u>Jason N. Smith</u>

| 1. Represented Entities.<br><br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br><br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br><br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Anchorage, a Municipal Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**1. Legal Representatives.** List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☒ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**2. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☒ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**3. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................1

II.   BACKGROUND ...........................................................................4

III.  GIVEN ITS CONFLICT WITH CIRCUIT PRECEDENT AND
      PROFOUND IMPACT TO CONTRACT LAW, THE EN BANC
      COURT SHOULD CONSIDER WHETHER OMITTING TERMS
      "ORDINARILY" PRESENT IN A CONSTRUCTION CONTRACT
      MEANS A CONTRACT CAN NEVER IMPOSE A DUTY TO
      DELIVER A COMPLETED ITEM OF CONSTRUCTION..........................6

IV.   PANEL REHEARING IS JUSTIFIED TO CONSIDER
      ADDITIONAL FACTS AND CASELAW THAT, HAD THE PANEL
      CONSIDERED THEM, DEMONSTRATE MARAD
      CONTRACTUALLY AGREED TO DELIVER A DEFECT-FREE
      PORT.........................................................................................9

      A.   The Panel Overlooked or Misapprehended the Plain Language
           of the 2003 MOU, Which Confirms MARAD's Responsibility
           for Delivering a Defect-Free Port.............................................9

      B.   The Panel Overlooked Contemporaneous Evidence from
           MARAD, Confirming Its Intent to Deliver a Defect-Free Port.........15

V.    CONCLUSION.............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. North Carolina,*
  560 U.S. 330 (2010)........................................................................14

*Anchorage v. United States,*
  No. 14-166, Dkt. 100 .............................................................10, 13

*CNH Industrial N.V. v. Reese,*
  583 U.S. 133 (2018)........................................................................13

*Johnson Mgmt. Grp. CFC, Inc. v. Martinez,*
  308 F.3d 1245 (Fed. Cir. 2002) ........................................10, 12, 16

*KMS Fusion, Inc. v. United States,*
  36 Fed. Cl. 68 (1996) .....................................................................12

*M & G Polymers USA, LLC v. Tackett,*
  574 U.S. 427 (2015)........................................................................13

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020)........................................................................11

*Metropolitan Area Transit, Inc. v. Nicholson,*
  463 F.3d 1256 (2006)......................................................................15

*National By-Products, Inc. v. United States,*
  405 F.2d 1256 (Cl. Ct. 1969).................................................1, 2, 6, 7

*Reliable Contracting Grp., LLC v. Department of Veterans Affairs,*
  779 F.3d 1329 (2015)......................................................................15

**Other Authorities**

Design-Build Institute of America, *What Is Design-Build?,*
  https://dbia.org/what-is-design-build/ (last accessed Jan. 21, 2025)...................8

FAR 52.249-2, Termination for Convenience of the Government
  (Fixed-Price) ..................................................................................14

GAO, *A Glossary of Terms Used in the Federal Budget Process* (Sept. 2005) ................................................................................................11

Kenneth M. Roberts, Nancy C. Smith, *Design-Build Contracts Under State and Local Procurement Laws*, 25 Pub. Con. L.J. 645, 646 (1996) ...............................................................................................7, 8

Municipality of Anchorage, Budget Overview 1-1 (2003), https://www.muni.org/Departments/budget/operatingBudget/2003 %20Apv%20GGOB/2003%20Apv/01-Budget%20Overview.pdf .....................5

Section 626 of Title VI, Division B, of the <u>Consolidated Appropriations Resolution, 2003</u> (Public Law 108-7, approved February 20, 2003)..............................................................4, 9, 10, 13

11 Williston on Contracts § 30:19 (4th ed.)............................................9

## STATEMENT OF COUNSEL PURSUANT TO
## FEDERAL CIRCUIT RULE 40(c)

Based on my professional judgment, I believe the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedent(s) of this court:  *National By-Products, Inc. v. United States*, 405 F.2d 1256 (Cl. Ct. 1969).

Based on my professional judgment, I believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance:

- Notwithstanding any other language in a contract, does the omission of typical construction contract terms affirmatively demonstrate that a contract does ***not*** impose a duty to actually deliver a completed item of construction?

/s/ Jason N. Smith
Jason N. Smith
*Attorney of Record for Plaintiff-Appellee*

## I.    INTRODUCTION

The federal Maritime Administration ("MARAD") entered into a Memorandum of Understanding ("2003 MOU") with the Municipality of Anchorage ("Anchorage") that, as amended, sets forth the parties' duties for the "efficient and timely completion of" the redevelopment of the vital, but aging, Port of Anchorage. JA21676.  The 2003 MOU provides, in part, that MARAD would be responsible for "federal project oversight, program management," "design," and "construction," JA21678, and an addendum thereto provides for "acceptance by MARAD of work

1

tendered" to it by MARAD's own general contractor for Port construction and "convey[ance]" of such work to Anchorage. JA21681.

Despite the 2003 MOU's plain language, the Panel nonetheless held that "MARAD did ***not*** contractually promise to construct a port structure or assure that one would be built" because the 2003 MOU lacked certain terms that, in the Panel's view, were "essential 'terms ***normally*** needed for a construction contract,'" such as the "particular project structure to be built." Op. 9 (quoting *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1266 n.9 (Cl. Ct. 1969)) (emphasis added). The Panel's new, categorical rule conflicts with this Court's prior precedent finding the absence of such terms was merely "***persuasive***" in the particular facts of a case that a letter regarding site access contained no obligation to engage in construction. *See Nat'l By-Prods., Inc.*, 405 F.2d at 1266 n.9. The Panel's holding improperly upends black letter law that a contract should be interpreted in accordance with its plain language to instead require the inclusion of specific terms before a construction obligation can be imposed. That holding imposes disastrous, real-world consequences for design-build and development contracts. It is also an issue of extraordinary importance for the people of Alaska and the U.S. military, for whom a new working port is essential for security and prosperity. Accordingly, *en banc* rehearing is warranted to consider whether the omission of terms normally found in

a construction contract affirmatively demonstrates that the contract does not impose a duty to deliver an item of completed construction.

Furthermore, panel rehearing is warranted because the Panel overlooked or misapprehended several facts and caselaw that confirm the 2003 MOU placed a duty on MARAD to deliver a defect-free port. In particular, the 2003 MOU:

- Required the parties to construe its terms in a manner consistent with Congress's appropriation, which mandated MARAD impose "conditions and requirements" on the funds, which MARAD did when it issued a prime contract for the design and construction of the Project;

- Required MARAD to "[o]bligate" funding for the Project, thereby assigning Project contracting responsibility, and consequently, liability for its successful completion, to MARAD;

- Listed MARAD's responsibilities as, among others, "project oversight," "program management," "engineering," "design," and "construction," as well as "rehabilitation" and ensuring such activities are completed in a manner "consistent with contract requirements," demonstrating that MARAD was responsible not only for design and construction of the Port but ensuring such services were defect-free;

- Contemplated the parties' desire was "completion" of the Project; and

- Dictated, in Addendum 2, that MARAD accept delivery of completed items from its prime contractor, not Anchorage as the Panel concluded.

Had the Panel considered the 2003 MOU's plain language, as well as additional contemporaneous evidence from MARAD confirming it understood that it held contractual liability to deliver a completed Port, it would have found MARAD had a duty to deliver a defect-free port. At the very least, the Panel would have found the 2003 MOU to be ambiguous and, at that point, considered parole evidence from

MARAD's personnel, which also confirms MARAD understood it had an obligation to deliver a defect-free port. Accordingly, panel rehearing is warranted.

## II. BACKGROUND

The Port of Alaska in Anchorage is the single most essential piece of infrastructure in the entire State of Alaska. It transports 90% of the goods—including food—used by nearly all Alaskans, "jet fuel for military operations," and fuel for civilian flights that knit together the entire State and connect the State with the Lower 48. Op. 3. In short, modern life in Alaska would not be possible without the Port. Yet the Port is deteriorating and in urgent need of replacement.

To ensure the Port continued to fulfill these essential functions, in 2003 the Federal Government undertook federal project management and obligated funds to replace the deteriorating and overburdened Port facilities. *See infra* Section 626. Taking the lead on designing and constructing a new Port, MARAD issued a prime contract to an entity now called ICRC. *See* JA16972-17033. The prime contract contemplated ICRC providing "program management, port planning and conceptual engineering, . . . design management, [and] construction management" services "as directed by TOs [MARAD's Task Orders], for the duration of the" Project. JA17015.

A month later, Anchorage ratified the 2003 MOU with MARAD. *See* JA21676, JA21679. That 2003 MOU established an "innovative partnership," JA39,

in which Anchorage was responsible for "overall program requirements and direction of Port Expansion to MARAD" and "[a]uthoriz[ing] all Port Expansion funding maintained by MARAD," while MARAD was required to "[o]bligate and disburse funding for Port Expansion project program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." JA21676-78. As put in an Anchorage Assembly meeting discussing the 2003 MOU's ratification, "they're [MARAD] going to build what we want." JA16959 (Tr. 52:16-17).

The Project was an undisputed complete and total failure. JA14516-17. "[T]he entire … structure" built under MARAD's project management "must be removed and then stabilized because it is a safety hazard and will fail." JA47. As relevant here, the trial court held that MARAD breached its duties under the MOU, including its duty to deliver a defect-free port and that Anchorage was entitled to $367,466,809 in damages, *see* Dist. Ct. Op. at 19—an amount of money far greater than Anchorage's entire general operating budget the year the project began[1] and money that will help fund Anchorage's renewed effort to remove and rebuild still-dilapidated Port facilities that were the object of the failed 2003 effort. On appeal,

---

[1] Municipality of Anchorage, Budget Overview 1-1 (2003), https://www.muni.org/Departments/budget/operatingBudget/2003%20Apv%20GGOB/2003%20Apv/01-Budget%20Overview.pdf

the Panel reversed, finding that the 2003 MOU did not contain any "language that could be read to create a duty for MARAD to deliver any completed item of construction."  Op. 9, 20.

III.  **Given Its Conflict with Circuit Precedent and Profound Impact to Contract Law, the *En Banc* Court Should Consider Whether Omitting Terms "Ordinarily" Present in a Construction Contract Means a Contract Can Never Impose a Duty to Deliver a Completed Item of Construction.**

The Panel held that the absence of certain terms that would "ordinarily be present" in a contract for construction "*demonstrates* that MARAD did not contractually promise to construct a port structure or to assure that one would be built through the 2003 [MOU]."  Op. 9 (emphasis added).  The Panel then listed those terms:  "what specifically is to be built, where, [and] with what dimensions," "a deadline for delivery," and "the cost."  Op. 9.  This holding begs a precedent-setting question of exceptional importance that also conflicts with this Court's own caselaw:  whether—notwithstanding any other language in a contract—the absence of terms ordinarily present in a construction contract *affirmatively* and *conclusively* demonstrates that a contract does not impose a duty to deliver an item of completed construction.

The Panel's new, bright-line rule conflicts with the Court of Claims' *National By-Products* decision, which addressed whether a letter from a company to the Government permitting the Government to access its land for the purpose of building

6

a levee placed a duty on the Government to actually construct a levee.  186 Ct. Cl. at 562-63.  The Court of Claims concluded that the company's letter was not a contract and did not demonstrate that the Government had made an affirmative "expression of undertaking or commitment" to construct a levee.  *Id.* at 564.  With respect to a lack of construction contract terms, the Court of Claims stated "the lack of any terms which would ordinarily be present in such a contract is ***persuasive*** that [the company letter] was not a contract to construct a levee or to assure that one would be built."  *Id.* at 565 n.9 (emphasis added).

Instead of identifying the lack of such terms as evidence ***confirming*** that there was no affirmative expression of undertaking as the Court did in *National By-Products*, the Panel instead created for the first time a contrary, categorical rule of contract interpretation:  that without those specific terms, a contract could ***never*** impose a duty to deliver an item of completed construction.

Left standing, the Panel's new rule will have disastrous, real-world consequences.  This is particularly true for design-build and development contracts, where a project owner contracts "with a single entity, typically at the beginning of the project, for both design and construction."  Kenneth M. Roberts, Nancy C. Smith, *Design-Build Contracts Under State and Local Procurement Laws*, 25 Pub. Con. L.J. 645, 646 (1996).  By their very nature, design-build and development contracts often do not include the Panel's prescribed list of terms, yet the contractual parties

clearly intend to place a duty to construct on the developer. *See id.* (touting one benefit of the design-build method as "enabling design and **construction** to proceed concurrently") (emphasis added). The impact of the Panel's holding will be extensive: "design-build is now the fastest growing and most commonly used project delivery method in the United States" and is predicted "to represent over 47% of spending by 2028 and account for $1.1 trillion in construction spending nationwide over the next five years." Design-Build Institute of America, *What Is Design-Build?*, https://dbia.org/what-is-design-build/ (last accessed Jan. 21, 2025).

Just as problematically, the Panel's holding impacts other contracts, like the 2003 MOU, that plainly have construction as their primary object. *See* JA21678 (requiring MARAD to "[o]bligate and disburse funding for Port Expansion . . . engineering, design, **construction**, or rehabilitation pursuant to Port Expansion requirements") (emphasis added). Indeed, here, MARAD agreed to deliver a completed item of construction, took Anchorage's funding, partially engaged in defective construction, and then left Anchorage with $360 million in consequences. JA14518. As such, the *en banc* Court should resolve the conflict between the Panel's holding and prior circuit precedent and answer the question of exceptional importance raised by the Panel: whether the absence of the Panel's prescribed list of terms normally in a construction contract categorically alleviates any duty to deliver a completed item of construction.

**IV.    Panel Rehearing Is Justified to Consider Additional Facts and Caselaw that, Had the Panel Considered Them, Demonstrate MARAD Contractually Agreed to Deliver a Defect-Free Port.**

In erroneously limiting MARAD's role under the 2003 MOU to "disburs[ing] funding for [substantive project] activities through the MARAD-ICRC contract," Op. 10, the Panel overlooked or misapprehended the 2003 MOU's plain language placing responsibility on MARAD to oversee the design, construction, and delivery of a defect-free port; contemporaneous evidence confirming MARAD agreed to deliver a defect-free port; and Supreme Court guidance on contract interpretation. For these reasons, panel rehearing is warranted.

**A.    The Panel Overlooked or Misapprehended the Plain Language of the 2003 MOU, Which Confirms MARAD's Responsibility for Delivering a Defect-Free Port.**

In finding "no language that could be read to create a duty for MARAD to deliver any completed item of construction," the Panel overlooks or misapprehends several aspects of the 2003 MOU's plain language. *First*, Article X requires the parties to "construe the terms of this Agreement pursuant to Section 626 of Title VI, Division B, of the <u>Consolidated Appropriations Resolution, 2003</u> (Public Law 108-7, approved February 20, 2003) [hereinafter, "Section 626"]." JA21679. As such, the 2003 MOU must also be read in a manner consistent with Section 626. *See* 11 Williston on Contracts § 30:19 (4th ed.) (explaining that "[w]hen a contract expressly incorporates a statutory enactment by reference, that enactment becomes

part of the contract for the indicated purposes").  In Section 626, Congress stated that any appropriated funds for the Project "shall be subject only to the conditions and requirements required by the Maritime Administration."  In doing so, Congress dictated that **MARAD**—not Anchorage—set "the conditions and requirements"— *i.e.*, take on contractual responsibility, and consequently liability, for the Project.

Indeed, in its trial court briefing, Defendant-Appellant explained "[t]he appropriate interpretation of the statute is that Congress authorized MARAD to administer the ICRC contract **to complete the Project** and to disburse all Project funds to that contract."  *Anchorage v. United States*, No. 14-166, Dkt. 100 at 4 (emphasis added) ("Congress directed MARAD by statute to **administer** all Project funds and **the Federal contract with the prime contractor, and to provide project oversight**." (emphasis added)).  And in its opening appellate brief, Defendant-Appellant explained "once a procurement contract was issued, **MARAD** as the procuring agency was responsible for managing and overseeing the contract."  U.S. Br. at 47 (emphasis added); *see also Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1252-53 (Fed. Cir. 2002) ("A contractor is responsible for the unexcused performance failures of its subcontractors.").  Accordingly, had the Panel considered Article X of the 2003 MOU, it would have found MARAD was responsible for engaging and overseeing a contractor to complete the Project—*i.e.*, deliver a defect-free port.

***Second***, the Panel misapprehended the responsibilities that Articles IV.7 and V.7 of the 2003 MOU places on MARAD. Section IV.7 expressly refers to "***federal*** project oversight, program management, … engineering, design, construction or rehabilitation as necessary"—demonstrating MARAD was responsible for those activities. JA16045 (emphasis added). Section V.7 similarly obligates MARAD to, among other activities, "design" the Project and engage in "construction," as well as ensure such activities are defect-free by tasking MARAD with "rehabilitation" and confirming the activities were "consistent with contract requirements," *i.e.*, the ICRC prime contract. JA16046. Section V.7 does so by requiring MARAD to "[o]bligate and disburse funding" for those purposes:

> **V. MARAD RESPONSIBILITIES:** …
>
> 7. ***Obligate and disburse funding for Port Expansion*** project oversight, program management, study, environmental analysis, engineering, ***design***, ***construction***, ***or rehabilitation*** pursuant to Port Expansion requirements ***consistent with contract requirements***.

JA16046. "Obligate" means "[a] definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 307-08 (2020) (quoting GAO, *A Glossary of Terms Used in the Federal Budget Process*, 70 (Sept. 2005)). In requiring MARAD to obligate funds for the Project, Article V.7 requires MARAD to take on contractual responsibility, and as a result liability, for the Project, the

object of which was delivering a defect-free port. *See* JA21677; *Johnson Mgmt. Grp.*, 308 F.3d at 1252-53.

*Third*, the Panel overlooked Article III of the 2003 MOU, which, even if construed as a recital, "may be read in conjunction with the operative portions of a contact in order to ascertain the intention of the parties." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996). Article III provides the parties "shall facilitate efficient and timely ***completion of Port Expansion***," that the goal is "***successful*** administration of federal and non-federal amounts made available for Port Expansion," and that the parties "anticipate substantial ***completion*** of Port Expansion will occur during calendar 2008." JA21676 (emphasis added). The parties thus clearly intended for the Project to result in the delivery of a defect-free port.

*Fourth*, the Panel overlooked that Addendum 2 to the 2003 MOU expressly requires MARAD to deliver a defect-free Port. The Addendum requires "[a]cceptance by MARAD of work . . . tendered by MARAD's prime contractor," requires "execution by . . . MARAD" of a certificate stating that the work is "free from material defects," and obligates MARAD to "convey[] to the Municipality of Anchorage" all "right, title and interest to such work." JA21681. Addendum 2 thus expressly provides that MARAD itself is responsible for conveying to Anchorage a defect-free Port. Furthermore, the Panel erred in concluding that Addendum 2

instead makes ***Anchorage*** responsible for accepting constructed items from ICRC. Op. 12. Addendum 2's requirement that Anchorage sign a certificate before it is presented to MARAD, JA21681, merely establishes an additional precondition to MARAD's acceptance and delivery of a defect-free Port. It does not negate MARAD's express duties, put Anchorage in MARAD's shoes, or give Anchorage any rights with respect to MARAD's prime contractor. Addendum 2 thus leaves to MARAD itself the responsibility to deliver to Anchorage a defect-free Port.

***Fifth***, the Panel overlooked Supreme Court caselaw in concluding the 2003 MOU's ultimate right to terminate the MOU confirms MARAD could never have made "a contractual promise to deliver a completed item of construction." Op. 12-13. In both *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) and *CNH Industrial N.V. v. Reese*, 583 U.S. 133 (2018), the Supreme Court noted the Sixth Circuit had overlooked the plain language of collective bargaining agreements as well as a contrasting congressional determination in favor of relying on its own "assessment of ***likely*** behavior in collective bargaining." *Tackett*, 574 U.S. at 439 (emphasis added); *see CNH*, 583 U.S. at 139. The Supreme Court rejected "these inferences . . . because they are not a valid way to read a contract." *CNH*, 583 U.S. at 139; *see Tackett*, 574 U.S. at 438-39.

Here too, the Panel disregarded the plain text of the 2003 MOU, as well as a contrasting congressional determination (Section 626), in favor of imposing its own

preconception of termination clauses. *See* Op. 12-13. In particular, the Panel cited FAR 52.249-2, Termination for Convenience of the Government (Fixed-Price), which requires the Government to pay a contractor its close-out costs, to explain why the 2003 MOU could not have tasked MARAD with completing any construction. *See id.* at 12-13. But the 2003 MOU is not a FAR-based contract; instead, it reflects an "innovative partnership" that "establish[es] working relations and assign[s] responsibilities" with respect to a federal infrastructure project that involved design and construction of a port. JA21676. Accordingly, the Panel improperly imposed its own assessment of the parties' likely behavior, instead of the 2003 MOU's plain language.

The Panel also overlooked *Alabama v. North Carolina*, which dealt with a similar termination clause in a regional interstate compact. 560 U.S. 330, 351-53 (2010). There, North Carolina exercised its termination right after accepting $80 million from the compact's commission to defray costs incurred in obtaining licensing for the construction of a radioactive waste disposal facility that North Carolina intended to construct in accordance with its duties under the compact. *Id.* at 335, 337. The Supreme Court found the plain language of the compact "impose[d] no limitation on North Carolina's exercise of its statutory right to withdraw," even in light of the circumstances. *Id.* at 352-53. Thus, contrary to the Panel's conclusion, the Supreme Court has, in other circumstances, enforced the plain language of an

"unlimited and unilateral right to terminate the agreement," regardless of the specific duties at issue.

Had the Panel considered these facts and caselaw, it would have concluded the 2003 MOU obligated MARAD to deliver a defect-free port.

**B.    The Panel Overlooked Contemporaneous Evidence from MARAD, Confirming Its Intent to Deliver a Defect-Free Port.**

Aside from the 2003 MOU's plain language, the Panel overlooked or misapprehended additional contemporaneous evidence of MARAD's agreement to deliver a defect-free port.   Such evidence is, as this Court has recognized, "particularly probative of the meaning of a contract," *Reliable Contracting Grp., LLC v. Department of Veterans Affairs*, 779 F.3d 1329, 1332 (2015), and, at a minimum, is "highly relevant" if a contract is ambiguous, *Metropolitan Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (2006) .  Yet the Panel erroneously declined to consider it here because of the new categorical rule the Panel incorrectly applied.

*First*, on June 12, 2003, MARAD emailed Anchorage, explaining while the Port "has program/technical decision making rights and [the Port] will review prospective specs/Task Orders," MARAD was "not willing to abdicate contractual authority to [the Port]." JA14775.  Accordingly, MARAD understood that it had contractual authority, and therefore liability, for the Project.

*Second*, the Panel overlooked that MARAD prepared an organizational chart for the Project, which demonstrates MARAD's central role:



Port of Anchorage Organization Chart

JA21703. In short, even though Anchorage had responsibilities under the 2003 MOU, MARAD did **not** view those roles as having any actual control over the Project. Accordingly, contemporaneous evidence *from MARAD* confirms that MARAD believed it had contractual authority, and therefore liability, for delivering a defect-free port through the ICRC contract. *See Johnson Mgmt. Grp.*, 308 F.3d at 1252-53 ("A contractor is responsible for the unexcused performance failures of its subcontractors.").

**Third**, additional extrinsic evidence only further confirms the 2003 MOU required MARAD to deliver a defect-free port. A 2011 Memorandum of Understanding between Anchorage and MARAD stated the Project "is a major transportation infrastructure project for the Federal Government and [Anchorage] that must be delivered in a manner that capture's the public's trust and confidence in

*the government's ability to effectively and efficiently deliver a quality project*."

JA44 (emphasis added). Additionally, before the trial court:

- MARAD's Iris Cooper confirmed that MARAD's contractual obligation was to manage and ultimately deliver to MOA a newly expanded Port, JA14758 (Tr. 47:24-48:3);

- MARAD's Wayne Leong agreed that MARAD's role on the Project was to assume contracting and procurement authority, project oversight, quality assurance, and management and administration of funds, JA14780 (Tr. 133:23-133:25); Leong also confirmed that MARAD was obligated to complete the work consistent with the specifications and free of defects, JA14782 (Leong, Tr. 143:23-144:11); and

- Consistent with those sentiments, MARAD engaged geotechnical engineers to vet design alternatives (JA14865 (Tr. 321:20-322:10; Tr. 322:21-323:11)); MARAD selected the OCSP design for the Project (JA21684-771); MARAD contracted with ICRC for the OCSP design including detailed specifications for the new Port (JA16972-17033); MARAD contracted with ICRC for the construction of the Port consistent with the plans and specifications that MARAD's designers and contractors developed for a specific price and schedule (JA16972-17033); and MARAD reviewed and approved the design plans and specifications prior to commencement of construction, JA14779 (Leong, Tr. 129:8-129:11).

In short, the plain language of the 2003 MOU, congressional direction, contemporaneous evidence, and extrinsic evidence all confirm that the parties' intent under the 2003 MOU was for MARAD to deliver a defect-free port to Anchorage. In reality, MARAD completely failed. It left the people of Anchorage to foot the $350 million bill to not only remove what MARAD attempted to construct, but undertake what MARAD was contractually obligated to deliver: reconstruction of

the Port of Anchorage, the most important piece of infrastructure in the entire State of Alaska, to maintain civilian and military security.

## V.    CONCLUSION

For these reasons, Anchorage respectfully requests the Court grant this petition for rehearing en banc or panel rehearing.

Dated:        January 31, 2025                Respectfully submitted,

By: /s/ Jason N. Smith
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone:  (202) 463-2400
Facsimile:  (202) 828-5393
Email:        jnsmith@seyfarth.com

*Attorney for Petitioner*
*Anchorage, a Municipal Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion: (1) complies with the type volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(a); (2) contains 3,761 words, excluding the portions of this motion exempted from the type volume limitation by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 27(d); (3) complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5); (4) complies with the type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(6); and (5) has been prepared on a computer in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the response.

_____/s/ Jason N. Smith_____
Jason N.  Smith

# Addendum 1 to
# Corrected Petition for Panel Rehearing and Rehearing En Banc by Plaintiff-Appellee Anchorage

# 12/16/2024 Decision

# United States Court of Appeals for the Federal Circuit

_____

**ANCHORAGE, A MUNICIPAL CORP.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

_____

2022-1719

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00166-EJD, Senior Judge Edward J. Damich.

_____

Decided: December 16, 2024

_____

JASON N. SMITH, Seyfarth Shaw LLP, Washington, DC, argued for plaintiff-appellee. Also represented by EDWARD VICTOR ARNOLD, BENNETT DAVID GREENBERG; DONALD FEATHERSTUN, San Francisco, CA; ANNE HELZER, ROBERT OWENS, Municipality of Anchorage, Anchorage, AK.

EVAN WISSER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BRIAN M. BOYNTON, VINCENT DE PAUL PHILLIPS, JR., STEVEN JOHN GILLINGHAM, DANIEL HOFFMAN, PATRICIA M. MCCARTHY, KARA WESTERCAMP.

—————————————

Before TARANTO, HUGHES, and CUNNINGHAM, *Circuit Judges*.

HUGHES, *Circuit Judge*

The United States appeals a decision from the United States Court of Federal Claims holding that the United States breached two contracts with the municipality of Anchorage to improve the Port of Alaska. Anchorage and the United States signed a Memorandum of Understanding in 2003 and a Memorandum of Agreement in 2011 to upgrade and expand the Port of Alaska. The Court of Federal Claims held that the government breached the 2003 agreement by not delivering a defect-free port and breached the 2011 agreement by settling subcontractor claims without conferring with Anchorage.

Because the 2003 Memorandum of Understanding did not require the United States to deliver a defect-free port, we vacate the Court of Federal Claims' decision as it relates to the 2003 Memorandum of Understanding and remand for further proceedings as described below. We affirm the Court of Federal Claims' determination that the United States breached the 2011 Memorandum of Agreement by settling subcontractor claims without conferring with Anchorage, as well as the court's award of damages to Anchorage for the United States' breach of the 2011 Memorandum of Agreement.

I

A

The Port of Alaska (Port), formerly the Port of Anchorage, is a critical national seaport and the "kingpin in Alaska's corridor of commerce." J.A. 5698. An estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port annually. Additionally, jet fuel for military operations at Joint Base

Elmendorf-Richardson and for the Ted Stevens Anchorage International Airport arrives via the Port.

Prior to 2003, "[t]he Municipality of Anchorage determined that the facilities at the Port . . . were deteriorating and outdated." J.A. 3. Anchorage envisioned a multi-year project that would help increase the Port's ability to serve Anchorage, the State of Alaska, commercial tenants, and the United States military. "Not having the expertise to undertake the [p]roject on its own, [Anchorage] sought a party to provide the requisite technical expertise." *Id.* After considering the private sector, Anchorage contracted with the Maritime Administration (MARAD), within the U.S. Department of Transportation "to embark on a port infrastructure development program." *Id.* Anchorage selected MARAD for its "purported expertise in designing, constructing, and overseeing port development projects and its authority to administer federal and non-federal share funds." Compl. at ¶ 17, *Anchorage v. United States*, Case No. 1:14-cv-00166 (Fed. Cl. Feb. 28, 2014), ECF No. 1.

Anchorage and MARAD executed two contracts over the life of the project. The first contract was a Memorandum of Understanding executed in 2003 (2003 Memorandum), which "described project administration, funding, and the obligations of the parties." J.A. 3.

The express terms of the 2003 Memorandum required Anchorage to "[p]rovide overall program requirements and direction of Port Expansion to MARAD." J.A. 16044. The 2003 Memorandum also specified, with regard to the level of program control to be exerted by Anchorage, that Anchorage had the responsibility to "[r]eview all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD." J.A. 16045. "[Anchorage] was also responsible for certifying completion and acceptance of the work." J.A. 3. Specifically, Anchorage was required to certify that a

contractor's work was acceptable and, if so, would issue a certificate of completion to MARAD. Only with the completed certificate of completion could MARAD accept the work and pay the contractor.

The 2003 Memorandum also outlined MARAD's responsibilities, which included "[c]oordinat[ing] with other Federal agencies that receive annual Congressional appropriations for Port Expansion" to increase funding for the project. J.A. 16045. Additionally, MARAD was responsible for executing all financial documents, accepting transfers of non-federal funds, and to "[o]bligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." J.A. 16046. Either party could terminate the 2003 Memorandum by providing ninety days' notice to the other party.

To complete the project, MARAD contracted with Integrated Concepts and Research Corporation (ICRC) in 2003 (the MARAD-ICRC contract). ICRC, in turn, was to "[sub]contract[] with other design/engineering firms and contractors to complete various aspects of the work." Compl. at ¶ 31, *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. The contract between MARAD and ICRC "included contract clauses which provided [MARAD] the right to require ICRC to correct defective work without charge." *Id.* at ¶ 35.

Problems with the project were discovered during a third-party inspection in 2010, when "large-scale damage was found in the installed sheet piles", which protect an excavated area from earth and groundwater. J.A. 3. While ICRC and its subcontractors performed the work, Anchorage ultimately blamed the project issues on MARAD, alleging that MARAD failed to "develop[] [p]roject management or inspection protocols" over ICRC and its

subcontractors, and "abdicated its responsibilities" to oversee the project. Compl. at ¶¶ 61–65, *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. The damage resulted in "large sections of the [Port] being unsuitable for use." J.A. 3 The damage was the "impetus for [Anchorage and MARAD] entering into a second agreement in 2011." J.A. 3.

The 2011 Memorandum of Agreement (2011 Memorandum), which supplemented the 2003 Memorandum, "redefined the roles and responsibilities of Anchorage and [MARAD], outlined authorities, and assured accountability for the [p]roject" through joint oversight by both parties. J.A. 3–4. "It created a Port Oversight and Management Organization [] to 'provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project.'" *Id.* (internal citations omitted). The Port Oversight and Management Organization consisted "of a committee of decision makers from both Anchorage and MARAD, who would hold frequent meetings to address issues related to the Port construction." J.A. 16. The 2011 Memorandum also removed Anchorage's prior "responsibility to provide program requirements and direction for the [p]roject and instead gave [the Port Oversight and Management Organization] the responsibility to '[m]anage the scope, schedule, and budget of the [p]roject on a day-to-day basis.'" J.A. 4 (internal citations omitted).

That same year, another issue arose when Quality Asphalt Paving, Inc. and MKB Constructors—two subcontractors hired by ICRC—sought to file a claim against MARAD for work performed that they alleged was not reimbursed. As the prime contractor, ICRC certified the validity of the claim (known as a certified pass-through claim) and presented it to MARAD. MARAD denied the certified pass-through claim from ICRC and, as a result, ICRC brought three claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals

(CBCA). Without consulting Anchorage, MARAD settled the claims with ICRC in 2012, with MARAD paying ICRC $11,279,059. On March 8, 2013, Anchorage filed its own lawsuit against ICRC, Quality Asphalt Paving, Inc., and MKB Constructors, among others, for deficient work on the project. "[Anchorage] recovered approximately $19.35 million through settlements with all parties in that suit." J.A. 14518.

B

In 2014, Anchorage filed suit against the United States in the Court of Federal Claims, alleging that MARAD had breached the 2003 Memorandum and the 2011 Memorandum. Compl., *Anchorage*, Case No. 1:14-cv-00166 (Feb. 28, 2014), ECF No. 1. On December 9, 2021, after trial, the court issued a decision, holding that MARAD had breached express duties under the plain text of the 2003 Memorandum and the 2011 Memorandum while stating that it would issue a separate damages opinion. J.A. 35–62.

In the opinion, the trial court held that the 2003 Memorandum contained an unambiguous duty for MARAD to deliver a defect-free port structure to Anchorage. It further held that MARAD had breached this duty by failing to deliver to Anchorage a completed, defect-free project. The trial court also held that MARAD had breached duties under the 2003 Memorandum by failing to exercise its contractual rights and remedies against ICRC under the MARAD-ICRC contract. Finally, the trial court held that, in the 2011 Memorandum, MARAD had promised to pursue and defend claims on Anchorage's behalf, which MARAD breached by settling ICRC's claims without Anchorage's input.

During trial, the United States sought to show that Anchorage was responsible for the managerial decision to contract with ICRC. But the court deemed Anchorage's decision-making on the project irrelevant because, in its

view, "MARAD held the legal right [under the 2003 Memorandum] to refuse" Anchorage's directions, and MARAD's choice to accommodate Anchorage's instructions was "not the requirement under the 2003 [Memorandum]." J.A. 52.

The trial court issued a separate opinion addressing damages on February 24, 2022. *Anchorage v. United States*, No. 14-166C, 2022 WL 577669 (Fed. Cl. Feb. 24, 2022). In the opinion, the court found that Anchorage had adequately proven its entitlement to $367,446,809 in expectation damages. The court's damages calculation contained two parts. First, the court determined that Anchorage had proven its entitlement to $180,839,809, representing the value of the structure Anchorage expected but did not receive. Included in this amount was $11,279,059, the amount MARAD paid to ICRC out of project funds as part of the CBCA litigation settlement. The court did not explain how this sum was related to the value of the port structure Anchorage claimed. The expectation damages also encompassed a deduction for the $19,350,000 in funds Anchorage recovered through its settlements with ICRC and other contracts. Second, the court determined that Anchorage had proven its entitlement to $186,607,000 in costs Anchorage anticipates it will have to pay to remediate the defects in the existing sheet pile structure. The United States filed a timely notice of appeal to our court on April 22, 2022. We possess jurisdiction under 28 U.S.C. § 1295(a)(3) to review final decisions and judgments of the Court of Federal Claims.

II

"We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Shell Oil Co. v. United States*, 896 F.3d 1299, 1306 (Fed. Cir. 2018). Contract interpretation is a question of law that we review de novo. *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1284–85 (Fed. Cir. 2008) (citing

*Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), *aff'd*, 518 U.S. 839 (1996)).

### III

When interpreting a contract, we "begin[] with the language of the written agreement." *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quotation omitted). We may also look to contemporaneous evidence of the parties' understanding to confirm the plain meaning of the contract. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). We interpret the contract in a way that gives reasonable meaning to all parts of the contract and avoids a conflict among the provisions. *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021). Further, we cannot insert words into the contract that the parties never agreed to. *George Hyman Const. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987).

The first question before us is whether the 2003 Memorandum required the United States to provide Anchorage with a defect-free port. The second question is whether the United States breached the 2011 Memorandum by settling ICRC's claims against the United States without conferring with Anchorage. We address each in turn.

### A

Our predecessor, the Court of Claims, identified some of the essential "terms normally needed for a construction contract . . . [such as] time period, . . . specifications as to form and height, . . . [and] the methods or procedures to be followed." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1266 (Ct. Cl. 1969); *see also First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999) (citing *S. Corp. v. United States*,

690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc) (explaining that the Court of Federal Claims and our court are both "bound by the decisions of the Court of Claims")). While the absence of some standard construction terms could be remedied by implying reasonable terms, "the lack of *any* terms which would ordinarily be present in such a contract is persuasive that this was not a contract to construct a [structure] or to assure that one would be built." *Nat'l By-Prods.*, 405 F.2d at 1266 n.9 (emphasis added).

Turning to the 2003 Memorandum, we find no language that could be read to create a duty for MARAD to deliver any completed item of construction. Nothing states what specifically is to be built, where, or with what dimensions. Nothing identifies a deadline for delivery, or any binding timeline for any part of the project. Nothing identifies the cost for what MARAD is ostensibly delivering to Anchorage. Consistent with the 2003 Memorandum's plain language, Cheryl Coppe, a former Anchorage official and one of the primary drafters of the 2003 Memorandum, J.A. 39, testified that the 2003 Memorandum did not define any particular project structure to be built or any price, and that the decision of what was going to be built had not yet been made when the 2003 Memorandum was executed. J.A. 15063 (Trial Tr. 788:2–19 (Coppe)). The absence of any of these terms demonstrates that MARAD did not contractually promise to construct a port structure or to assure that one would be built through the 2003 Memorandum.

Anchorage's assertion that MARAD was required to deliver a defect-free port disregards the 2003 Memorandum's text. Although Anchorage directs us to certain provisions in the 2003 Memorandum, Anchorage repeatedly relies on paraphrases of those provisions, avoiding full quotes of the 2003 Memorandum's text. First, Anchorage cites to sections IV.7. and V.7. of the 2003 Memorandum, Appellee's Br. 31–33, which state in full:

IV. MOA, PORT OF ANCHORAGE RESPONSIBILITIES: . . . 7. Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary.

V. MARAD RESPONSIBILITIES: . . . 7. Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

J.A. 16045–46.

The United States argues that this language established reciprocal responsibilities for expending funds on the project—Anchorage was required to authorize all expenditures for substantive project activities, after which MARAD would disburse funding for those activities through the MARAD-ICRC contract. We agree. The 2003 Memorandum does not state that MARAD was responsible for delivering anything to Anchorage. Anchorage emphasizes that these clauses refer to the authorization, obligation, and disbursement of funds for "federal project oversight" and "Port Expansion project oversight." Appellee's Br. 31–32 (emphasis omitted). This language does not obligate MARAD to deliver any specific structure, and it also does not obligate MARAD to manage the project on Anchorage's behalf. Yet, Anchorage asserts that the language in these clauses "cannot be more clear" and that Anchorage authorized project funding so MARAD could "deliver a defect free [p]ort to [Anchorage]." Appellee's Br. 32–33. But Anchorage fails to identify any such language. *See Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed. Cl. 161, 169 (2001) ("The court may not insert a term into the contract that simply is not there."), *aff'd*, 64

F. App'x 780 (Fed. Cir. 2003); *see also Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 n.8, 717 n.9 (1992).

Anchorage further asserts that Addendum 2 of the 2003 Memorandum required MARAD to deliver a defect-free port to Anchorage. Addendum 2 states:

> Acceptance by MARAD of work shall be effective upon execution by a MARAD Contracting Officer's Technical Representative (COTR) of a properly executed Certificate of Completion tendered by MARAD's prime contractor. Upon acceptance by MARAD of work tendered, all right, title and interest to such work, and all warranties, and guarantees applicable thereto, shall be conveyed to the Municipality of Anchorage and its Department, the Port of Anchorage (MOA), unless otherwise provided. The term "Work" includes, but is not limited to: Materials, workmanship, warranties, guarantees, and manufacture and fabrication of components.
>
> The Certificate of Completion shall be a document executed by MARAD's prime contractor attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects. Prior to submission to a MARAD COTR, the Certificate of Completion shall also be signed by an authorized representative of the Municipality of Anchorage. Such signature indicates acceptance by MOA of the work provided by MARAD's prime contractor as specifically described in the Certificate of Completion.

J.A. 21681.

We find that Addendum 2 simply describes the process for reviewing and accepting work done on the project, with acceptance to be performed by Anchorage. *See* Appellant's Br. 28–29. Anchorage asserts that Addendum 2 provides that "MARAD would certify 'the work was completed according to specifications'" and that "MARAD [would] ensure that the work was completed consistent with specifications and free of defects." Appellee's Br. 34–35. But those words never appear in Addendum 2. Instead, the addendum only established a process whereby: (1) "MARAD's prime contractor" was responsible for "certifying the work was completed according to specifications and all applicable requirements . . . and is free from material defects," and then (2) "the Municipality of Anchorage[,]" not MARAD, was responsible for "accept[ing] . . . the work provided by MARAD's prime contractor." J.A. 21681.

Finally, a duty to deliver a defect-free port would conflict with another express provision in the 2003 Memorandum. Any interpretation of a contract must give a reasonable meaning to all terms and avoid a conflict among the provisions. *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1166 (Fed. Cir. 2021). Here, the termination clause of the 2003 Memorandum granted both parties an unlimited and unilateral right to terminate the agreement at any time with ninety days' written notice. J.A. 21678–79. The trial court acknowledged this clause in its damages opinion but disagreed with the United States "that[,] because MARAD could terminate the Agreement at any time, this disproves that MARAD owed Anchorage any specific item of construction . . . . The termination clause is just standard government contracting language." J.A. 71. Not so. The clause here allowed MARAD to walk away from the project, unlike a "standard" termination clause that permits the government as procurer to relieve the contractor of its obligation, at the expense of paying close out costs. *See, e.g.*,

FAR 52.249-2. The trial court did not explain how the parties' actual termination provision could be harmonized with an obligation to deliver a defect-free port. In short, MARAD could not have made a contractual promise to deliver any completed item of construction if it also had the undisputed freedom to end the agreement at any time for any reason.

For all of these reasons, we conclude that the plain language of the 2003 agreement did <u>not</u> require MARAD to deliver a defect free port.[1] Accordingly, we vacate the trial court's decision and remand for the court to consider any adequately preserved arguments for breach of duties found

---

[1]    Anchorage urges us to consider testimony from contracting personnel as further evidence that both parties understood MARAD was to deliver a defect-free port. *See, e.g.*, Appellee's Br. 8–11, 36–38. Testimony from contracting personnel regarding their understanding and expectations cannot be used to add terms to the 2003 Memorandum. The parol evidence rule is a rule of substantive law that precludes the admission of prior or contemporaneous evidence seeking to add to or vary the terms of a written agreement when the parties have adopted a written agreement as an expression of their final intent. *David Nassif Assocs. v. United States,* 557 F.2d 249, 256 (Ct. Cl. 1977). "The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir.1996)).

in the 2003 Memorandum and, if such a breach is found, a
determination of reliance damages.

B

The United States also argues that it did not breach
the 2011 Memorandum by settling ICRC's claims against it
without conferring with Anchorage. The trial court
correctly rejected this argument. The United States'
argument contradicts the plain language of clause V.B.7 of
the 2011 Memorandum, which states that MARAD's role
was to "administer claims submitted by [MARAD]
contractors *and coordinate and cooperate with the
[Muncipality of Anchorage/Port of Alaska] in affirmative
and defense of claims* consistent with federal contract law."
J.A. 18333 (emphasis added).

The United States claims that federal contract law
instructs the federal government to try to resolve all
contractual issues in controversy at the contracting
officer's level, which gave "MARAD full discretion
regarding the management of claims." Appellant's Br. 51;
*see also* FAR 33.210. But this interpretation would render
the 2011 Memorandum's requirement for MARAD to
coordinate contract disputes with Anchorage meaningless.
*See Jemal's Lazriv Water, LLC v. United States*, 114 Fed.
Cl. 512, 516 (2013), *aff'd*, 578 F. App'x 982 (Fed. Cir. 2014)
("It is a fundamental tenet of contract construction that a
contract should be interpreted so as not to render portions
of it meaningless."). Considering the full language of the
clause, the correct interpretation is that MARAD was to
coordinate a response to contract disputes with Anchorage,
with the requirement that any such response be consistent
with federal contract law. Thus, we affirm the trial court's
holding that the United States breached the 2011
Memorandum by settling ICRC's claims without conferring

with Anchorage, as well as the trial court's award of $11,279,059 in damages to Anchorage.[2]

## IV

We have considered the remainder of the parties' arguments and find them unpersuasive. Because the 2003 Memorandum of Understanding did not require the United States to deliver a defect-free port, we vacate the Court of Federal Claims' decision as it relates to the 2003 Memorandum of Understanding, as well as its award of damages, and remand for consideration consistent with this opinion. We affirm the Court of Federal Claims' determination that the United States breached the 2011 Memorandum of Agreement by settling subcontractor claims without coordinating with Anchorage, as well as the court's award of damages to Anchorage for the United States' breach of the 2011 Memorandum of Agreement.

**VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED**

COSTS

No costs.

───────────────────

[2] While the trial court awarded the damages from the United States' breach of the 2011 Memorandum under an expectation theory, J.A. 71, 74, the damages are more correctly categorized as reliance damages, which "put [the plaintiff] in as good a position as he was in before the promise was made." *Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 744 (2006), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008). Nevertheless, the award itself is correct.

# Addendum 2 to Corrected Petition for Panel Rehearing and Rehearing En Banc by Plaintiff-Appellee Anchorage

## 12/16/2024 Judgment

# United States Court of Appeals
# for the Federal Circuit

————————————

**ANCHORAGE, A MUNICIPAL CORP.,**

*Plaintiff-Appellee*

v.

**UNITED STATES,**

*Defendant-Appellant*

————————————

2022-1719

————————————

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00166-EJD, Senior Judge Edward J. Damich.

————————————

**JUDGMENT**

————————————

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED**

FOR THE COURT

December 16, 2024
Date

Jarrett B. Perlow
Clerk of Court